Mara B. Levin, Esq.
Marni E. Weiss, Esq.
HERRICK, FEINSTEIN LLP
Attorneys for Signature Bank
Two Park Avenue
New York, New York 10016
Tel. 212.592.1400
Fax. 212.592.1500
mlevin@herrick.com

**ELECTRONICALLY FILED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — — — —x

M&I EQUIPMENT FINANCE COMPANY,           :

                                         :     08 CV 02164 (GEL)(GWG)

                    Plaintiff,           :

        v.                               :     **DECLARATION OF ROBERT**
                                         :     **BLOCH IN SUPPORT OF**
                                         :     **SIGNATURE BANK'S MOTION**
SIGNATURE BANK,                          :     **FOR SUMMARY JUDGMENT**
                    Defendant.           :

— — — — — — — — — — — — — — — — — — — — — — — — — —x

ROBERT BLOCH, hereby declares under penalty of perjury as follows:

1.      I am a Senior Vice President of defendant Signature Bank ("Signature" or "the Bank") and, in that capacity, I have personal knowledge of the facts set forth herein unless stated upon information and belief in which case I believe them to be true based on my discussions and review of relevant documents.

2.      I submit this affidavit in support of Signature's motion for summary judgment in this action dismissing the complaint on the grounds that at all times since plaintiff's service of its restraining notices: (a) the Bank has had a perfected security interest in all accounts at the Bank of the judgment debtors, superior to the judgment obtained by plaintiff; (b) the funds on deposit in the Judgment Debtors' accounts never exceeded the amount of the indebtedness owed to the Bank; and (c) plaintiff never executed or levied upon its restraining notices.

## Factual Background

*The Relationship Between*
*Signature and the Judgment Debtors*

3.        Beginning August 22, 2005, and extending over the course of the following more than two years, Signature entered into a series of loan agreements and extensions of credit with, among others, Ahava Foods Corp. ("Ahava"), Lewis County Dairy Corp. ("LCD") and Moise Banayan ("MB" who, along with Ahava and LCD, shall hereinafter be collectively referred to as the "Judgment Debtors") whereby Signature agreed to loan the Judgment Debtors approximately $9 million to finance their kosher food business and to extend to them an additional $2 million in overdraft coverage.  These loans were secured by, among other things, personal guarantees given by MB, as well as security agreements in which Ahava and LCD gave Signature a first priority lien over substantially all of the assets of the Judgment Debtors and other personal assets of MB.

4.        In August, 2005, the Judgment Debtors entered into a Credit Facility Agreement (the "Credit Agreement") pursuant to which Signature agreed, *inter alia*, to extend up to $7,500,000 to the Judgment Creditors. (A copy of the Credit Agreement is annexed hereto as Exhibit A.)  Pursuant to Section 7.01(i) of the Credit Agreement, a default shall occur if:

> a final judgment or judgments for the payment of money in excess of an aggregate amount of $50,000 (or the equivalent in a foreign currency) for any or all of the [Judgment Debtors] or shall be rendered against any of them (as applicable), and the same shall remain undischarged, unbonded and unstayed for a period of 30 days, unless the Bank is provided with documentary evidence and information satisfactory to the Bank that the judgment is fully covered by insurance.

5.        Pursuant to Section 8.20 of the Credit Agreement, if an event of default occurs, Signature was:

authorized *at any time and from time to time*, to the fullest extent
permitted by law, to set off and apply and all deposits (general or
special, time or demand, provisional or final) at any time held and
other obligations at any time owing by the Bank to or for the credit
or the account of the [Judgment Debtors], against any or all of the
obligations of any or all of the [Judgment Debtors] now or
hereafter existing under this Agreement. . . .

(Emphasis supplied).

6.      In connection with the Credit Agreement, Ahava provided the Bank with

several Promissory Notes and, along with LCD, a Security Agreement.  Indeed, on August 22,

2005 Ahava executed two promissory notes made payable to Signature, one in the principal

amount of $2 million and the other in the principal amount of $5.5 million. (Copies of these

promissory notes are annexed hereto as Exhibits B and C.)

7.      On this same date, Ahava, LCD and Signature executed a Security

Agreement as security for payment of all obligations owed by Ahava.  Specifically, the Security

Agreement provided Signature with a first lien on and security interest in all of the assets of

Ahava and LCD, which included, inter alia, all personal assets, deposit accounts, securities and

investment property.  (A copy of this Security Agreement is annexed hereto as Exhibit D.)

8.      In connection with the Security Agreement, Signature filed financing

statements pursuant to the Uniform Commercial Code to perfect Signature's security interests

with the State of New York.  (A copy of the U.C.C.'s Signature filed in New York to perfect its

security interests are annexed hereto as Exhibit E.)

9.      On that same date, LCD and MB signed a Joint and Several Guarantee of

Payment Agreement whereby they became jointly and severally liable for all indebtedness

(future and past) between Ahava and Signature Bank. (A copy of this Joint and Several

Guarantee of Payment is annexed hereto as Exhibit F.)

10.    LCD executed a promissory note to Signature dated January 24, 2007 in the principal amount of $750,000. Ahava became liable for that note pursuant to a Continuing Guaranty earlier executed by Ahava dated April 5, 2006 (which was initially executed in connection with a $750,000 promissory note from Ahava to Signature which was substituted by LCD in the same amount). (A copy of this Note and Continuing Guaranty are annexed hereto as Exhibits G and H, respectively.)

11.    M&I Equipment Finance Company ("M&I") obtained a judgment against the Judgment Debtors in the amount of $658,994.02 on January 12, 2007 (the "M&I Judgment").

12.    The Judgment Debtors, however, failed to notify Signature of the M&I Judgment until March 1, 2007 -- thus constituting an event of default under the indebtedness to the Bank in the amount of $8.25 million plus interest as defined in paragraph 7.01 of the Credit Agreement. As a result, pursuant to Section 8.20 of the Credit Agreement, Signature was entitled to set off against and apply all deposits held by Signature towards the obligations owed to Signature.

13.    Although Signature was then entitled to enforce all of its rights and remedies under the Credit Agreement, the notes and the guarantees, the Judgment Debtors sought additional credit and forbearance with respect to the defaults from Signature in exchange for pledging additional collateral. Signature ultimately provided the Judgment Debtors with such relief by entering into series of agreements including a Forbearance Agreement with the Judgment Debtors, dated June 11, 2007 (the "Forbearance Agreement"), and subsequent Joinder Agreement, Waiver and First Amendment to the Forbearance Agreement ("Joinder Amendment"), dated August 27, 2007, pursuant to which, *inter alia*, Signature extended the time

for repayment of all obligations under the Credit Agreement to September 11, 2007. (Copies of these two agreements are annexed hereto as Exhibits I and J.)

14.    In connection with the Forbearance and Joinder Agreements, the Judgment Debtors entered into a series of agreements whereby they secured Signature's rights to the stock and other collateral of the Judgment Debtors and even the personal assets of MB. Specifically, MB entered into a Pledge Agreement with Signature whereby he granted Signature a lien on and security interest in the pledged stock and additional collateral belonging to the Judgment Debtors. (A copy of the Pledge Agreement is annexed hereto as Exhibit K.)

15.    The Forbearance Agreement acknowledged the M&I Judgment to be an "Existing Default" (among other defaults), and expressly provided as follows:

> (a)  The [Judgment Debtors] acknowledge that the Existing Defaults have occurred. The [Judgment Debtors] acknowledge that the [Bank] has the absolute and unconditional right (i) to declare all loans (collectively, the "Loans") made to the applicable Borrowers pursuant to the applicable Loan Documents and all obligations, indebtedness and liabilities of the [Judgment Debtors] under the Loan Documents (collectively, the "Obligations") in each case immediately due and payable in full and (ii) to demand payment in full of the Obligations. *The [Judgment Debtors] further acknowledge that as a result of the Existing Defaults, the [Bank] is entitled to exercise any of its rights and remedies immediately as provided in the Loan Documents, without further notice or opportunity to cure.*
>
> ****
>
> (c)   The parties hereto agree that the execution and delivery of this Forbearance Agreement and any other Forbearance Documents shall not prejudice any right or rights which the Lender  now has or may have in the future under any of the Loan Documents in the event of any other breach or violation of any term, condition, agreement or covenant set forth in this Forbearance Agreement or any of the other Transaction Documents.

(Emphasis added.)

16.    On August 27, 2007 Ahava executed a fourth note made payable to Signature in the principal amount of $1,750,000. In connection with the $1,750,000 note, LCD

and MB (among others) entered into a Joint and Several Guarantee of Payment wherein they would be jointly and severally liable for the $1,750,000 note.[1]  (A copy of the promissory note and the Joint and Several Guarantee of Payment are annexed hereto as Exhibits L and M, respectively.)

17.    On this same date, Ahava and LCD entered into a second Security Agreement whereby Ahava and LCD assigned, mortgaged, pledged and granted to Signature a first lien on and security interest in, among other things, all personal properties, personal assets and rights of Ahava and LCD, all deposit accounts, all letter-of-credit rights and all securities and investment property.  (A copy of this Security Agreement is annexed hereto as Exhibit N.)

18.    In connection with the Security Agreement, Signature filed financing statements pursuant to the Uniform Commercial Code to perfect Signature's security interests with the State of New York.  (See Exhibit E.)

19.    Unable to repay their obligations as they came due, on September 11, 2007, the Judgment Debtors requested and Signature Bank agreed to a Second Amendment to the Forbearance Agreement, pursuant to which Signature extended the time for repayment of all obligations under the Credit Agreement to October 5, 2007.  (A copy of this amendment is annexed hereto as Exhibit O.)  On October 5, 2007, the Judgment Debtors failed to make the required payments under the loan documents.

20.    From close of business March 5, 2007 through November 15, 2007--the date that Signature Bank set off all funds on deposit at the Bank belonging to the Judgment Debtors and the last date on which any of the Judgment Debtors' accounts had any activity, the Judgment Debtors' bank accounts maintained at Signature collectively received deposits in the

---

[1]    This note evidenced the aggregate indebtedness arising from a series of extensions of overdraft credit.

amount of approximately $5,432,284.84 (which includes the $117,076.70 that was on deposit in such accounts as of close of business March 5, 2007)-- an amount which is far less than the $8.25 million in promissory notes and guarantees they had given to the Bank prior to the Bank's receipt of the Restraining Notices. (Copies of bank records for all of the Judgment Debtors' accounts at Signature from March, 2007 through November, 2007, the date of the final set off and last activity in any of the accounts are annexed hereto as Exhibit P). A copy of a chart evidencing all monies deposited in the Judgment Debtors' accounts at Signature from March 5, 2007 (the date of the Bank's alleged receipt of the First Restraining Notice) through November, 2007 (the date of the final set off), is annexed hereto as Exhibit Q.)

21.    In November 2007, the Judgment Debtors stopped making payments on the loans and extensions of credit from Signature. As a result, in December, 2007 Signature filed a lawsuit aimed at securing a prompt judgment against the Judgment Debtors, along with Yoni Realty, LLC, St. Lawrence Food Corp., Schwartz and Sons Inc. and MB's wife, Ana Banayan, who were also either signatories to the loan documents or personal guarantors, upon which Signature could commence foreclosure and other enforcement proceedings upon its collateral.

22.    On March 14, 2008, the Judgment Debtors, along with Yoni Realty, LLC, St. Lawrence Food Corp. and Schwartz and Sons Inc. were found jointly and severally liable and a judgment was awarded to Signature in the amount of $9,338,962.16, of which the Judgment Debtors, along with Yoni Realty, LLC, St. Lawrence Food Corp., Schwartz and Sons Inc. were found jointly and severally liable to Signature in the amount of $7,556,482.37, and those same individuals/entities as well as Ana Banayan were found jointly and severally liable to Signature in the amount of $1,782,050.67 (the "Signature Judgment"). (A copy of the Judgment is annexed hereto as Exhibit R.)

*M&I Judgments*

23.    Accepting the facts contained in plaintiff's complaint as true, it is alleged that M&I obtained two judgments against the Judgment Debtors, the first of which, in the amount of $658,994.02, was on January 12, 2007 (the "First M&I Judgment").  In accordance with the First M&I Judgment, M&I alleges that it served a restraining notice and information subpoena which was received by Signature on March 5, 2007 (the "First Restraining Notice"). (A copy of this Restraining Notice and the information subpoena are annexed hereto as Exhibit S.) While the Bank acknowledged receipt of the First Restraining Notice and Information Subpoena on March 5, 2007 it did not restrain any of the accounts of the Judgment Debtors at that time.[2]

24.    On April 3, 2007, M&I's counsel, Philip Frankel, Esq. of Bond, Schoeneck & King, PLLC faxed a copy of the First Restraining Notice to Signature.  As a result, on April 7, 2007, Bruce Chang, a Legal Servings Associate at the Bank, responded to the Information Subpoena stating that there was no monies on deposit in any of the accounts maintained by the Judgment Debtors and that one account was in fact overdrawn.  Because there was no monies in any of the accounts, none of the accounts were restrained.  (Copies of Signature's response to M&I's information subpoena is annexed hereto as Exhibit T.)   He also mistakenly responded that the Judgment Debtors were not indebted to the Bank and that the Bank did not have a lien on the Judgment Debtors' property.

25.    According to the Complaint, on April 23, 2007, M&I obtained a second judgment against the Judgment Debtors in the amount of $60,553.66 (the "Second M&I

---

[2]    While not relevant for purposes of this motion, the Bank did not receive the First Restraining Notice until April 3, 2007 despite the fact that an employee of a company that was responsible for retrieving and sorting mail on behalf of Signature apparently signed the card acknowledging receipt of an envelope from M&I's counsel.

Judgment"). (The Second M&I Judgment, along with the First M&I Judgment, are collectively referred to as the "M&I Judgments.") The complaint further alleges that M&I served a second restraining notice and information subpoena on Signature in connection with the Second M&I Judgment on May 8, 2007 (the "Second Restraining Notice"). (A copy of the Second Restraining Notice and the information subpoena are annexed hereto as Exhibit U.)

26.     Accordingly, on May 23, 2007, the Bank restrained the accounts of the Judgment Debtors by freezing those accounts, removing whatever funds were contained therein, and depositing them into a Suspense Account where all restrained funds at the Bank are deposited. (The Bank did not respond a second time to the Information Subpoena served with the Second Restraining Notice.) Initially, the Bank restrained $26,864.30 from two Ahava accounts and $6,000 from two LCD accounts. (There was never any activity in MB's personal account.) At no point thereafter were any withdrawals made from any of the Judgment Debtors' accounts, except *by the Bank* (1) in accordance with its restraint procedures (by withdrawing funds deposited in the account and transferring them to the Suspense Account); or (2) to set off and apply funds on deposit to the outstanding indebtedness owed by the Judgment Debtors to the Bank.

27.     Over the course of six months beginning in June, 2007, the Bank set off from the Judgment Debtors' accounts, on six separate occasions. On June 1, 2007, the Bank set off $364.61 from the Ahava account and transferred $8,989.30 of deposits that had been made by Ahava into the Suspense Account. On or about June 5, 2007, the Bank set off $32,499.69 from the Suspense Account containing the restrained funds of the Judgment Debtors to pay principal and interest due under the loan documents. On or about July 6, 2007, the Bank set off $42,376.27 from an Ahava account for payment of principal and interest in connection with

defaults by the Judgment Debtors and $70.68 from that same account for fees in connection with the revolving credit.  On July 27, 2007, the Bank transferred $3,208.45 from an Ahava account into the Suspense Account.  On September 18, 2007, the Bank set off $38,452.32 for interest owed under the loan documents and $1,729.41 to pay down principal under the $5.5 million promissory note for a total of $40,181.73.  (A copy of all emails and computer generated documentation evidencing Signature's setoff along with supporting bank account information is annexed hereto as Exhibit V.)

28.    And finally, on November 15, 2007, as a result of the Judgment Debtors' November 1, 2007 default in all payments under the loan documents, the Bank set off $33,808.10, all that remained on deposit in the Judgment Debtors' Signature accounts.  At no time thereafter was there any activity in any of the Judgment Debtors' accounts.  (A copy of an email and the computer generated documentation evidencing this setoff along with supporting bank account information is annexed hereto as Exhibit W.)

29.    M&I never sought to enforce, execute or levy upon either Restraining Notice.

30.    As set forth more fully in the accompanying Memorandum of Law, Signature had a perfected security interest and right of setoff superior to the M&I Judgments which M&I never sought to enforce.  Because the amount of the Judgment Debtors' indebtedness to Signature from the time the First Restraining Notice was served to the time the Bank set off all funds on deposit far exceeded the amount on deposit at the time and what was subsequently deposited, and the Bank had the right at all times to offset the entire amount present in the accounts (which would have still been far less than the indebtedness), no funds were ever available to satisfy any part of the M&I Judgments.

- 10 -

31.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746.

WHEREFORE, it is respectfully requested that this Court enter an Order:

A.    granting summary judgment in favor of Signature and against M&I and dismissing all claims against Signature with prejudice;

B.    awarding to plaintiff the costs and disbursements of this action together with such other and further relief as the Court deems just and proper.

_____
Robert A. Bloch

- 11 -

# EXHIBIT A
# (Part 1 of 5)

AHAVA FOOD CORP., ST. LAWRENCE FOOD CORP.,

LEWIS COUNTY DAIRY CORP., YONI REALTY, LLC, MOISE BANAYAN

AND

SIGNATURE BANK

**MASTER CREDIT FACILITY AGREEMENT**

Dated:  As of August 22, 2005

HF 3082102v.7 #06406/0023

MASTER CREDIT FACILITY AGREEMENT, dated as of August 22, 2005, by and among AHAVA FOOD CORP., a New York corporation (the "**Borrower**"), ST. LAWRENCE FOOD CORP., a New York corporation ("**SLF Corp**"), LEWIS COUNTY DAIRY CORP., a New York corporation ("**LCD Corp**"), YONI REALTY, LLC, a New York limited liability company ("**YR LLC**") and MOISE BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("**Banayan**" and, collectively with SLF Corp, LCD Corp, YR LLC and the Borrower, the "**Obligors**" and each an "**Obligor**") and Signature Bank, a New York banking corporation (the "**Bank**").

## W I T N E S S E T H:

WHEREAS, the Borrower has requested the Bank create a facility ("**Facility A**") for the Borrower to enable it to borrow a single term loan (the "**Facility A Loan**") on the Closing Date (defined below) in the principal amount of $2,000,000; and

WHEREAS, the Borrower has requested the Bank create a facility ("**Facility B**") for the Borrower to enable it to borrow loans on a revolving credit basis at any time and from time to time prior to the Facility B Termination Date (as hereinafter defined) up to $5,500,000 in aggregate principal amount outstanding at any time; and

WHEREAS, to provide assurance for the repayment of the Loans (as hereinafter defined) and all other obligations of the Borrower with respect thereto, each of the Guarantors (as hereinafter defined) will, among other things, provide the Bank with a guaranty of payment of the Borrower's payment obligations under this Agreement, the Notes (as hereinafter defined) and the other Loan Documents (as hereinafter defined); and

WHEREAS, in addition to the foregoing, in order to induce the Bank to make the Loans, each of the Obligors have agreed to make certain representations, warranties and covenants hereinafter set forth, and to accept the other terms, conditions and provisions hereinafter set forth;

NOW, THEREFORE, intending to be legally bound, all of the parties hereto agree as follows:

I.    DEFINITIONS

SECTION 1.01. <u>Definitions</u>.  As used herein, the following words and terms shall have the following meanings:

"**Accounts**" shall mean those accounts arising out of the sale or lease of goods or the rendition of services by the Borrower.

"**Account Debtor**" shall mean the Person who is obligated on or under an Account.

"**Actions**" shall have the meaning set forth in Section 3.06.

"**Adjusted LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of

1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"**Affiliate**" shall mean any corporation, partnership, limited liability company, joint venture, trust, unincorporated organization, or other Person which, directly or indirectly, Controls or is Controlled by or is under common Control with any of the Obligors (other than Banayan) or the Bank (as applicable).

"**Annex**" shall have the meaning set forth in Section 3.22.

"**Applicable Margin**" shall mean 2.25%.

"**Approved Subordinated Debt**" shall mean Indebtedness of the Borrower to Persons other than the Bank, which is subordinated to the Indebtedness of the Borrower to the Bank under the terms of one or more Subordination Agreements or the other Loan Documents on terms approved in writing by the Bank.

"**Assessment Rate**" means, for any day, the annual assessment rate in effect on such day that is payable by a member of the Bank Insurance Fund classified as "well capitalized" and within supervisory subgroup "B" (or a comparable successor risk classification) within the meaning of 12 C.F.R. Part 327 (or any successor provision) to the Federal Deposit Insurance Corporation for insurance by such Corporation of time deposits made in dollars at the offices of such member in the United States; provided that if, as a result of any change in any law, rule or regulation, it is no longer possible to determine the Assessment Rate as aforesaid, then the Assessment Rate shall be such annual rate as shall be determined by the Bank to be representative of the cost of such insurance to the Bank.

"**Auditor**" shall have the meaning set forth in Section 5.03(a).

"**Bank**" - see heading.

"**Base CD Rate**" means the sum of (a) the Three Month Secondary CD Rate multiplied by the Statutory Reserve Rate plus (b) the Assessment Rate.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Bonds**" shall mean New York City Industrial Development Agency $6,950,000 Industrial Development Revenue Bonds (Ahava Food Corp. Project), Series 2004, dated as of January 28, 2004.

"**Bond Documents**" shall mean any and all documents entered into in connection with the Bonds.

"**Borrower**" - see heading.

HF 3082102 v.7 #06406/0023

"**Borrowing**" shall refer to (i) Facility B Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect, and (ii) the Facility A Loan, as converted or continued pursuant to Article II.A, as applicable.

"**Borrowing Base**" shall mean, at the relevant time of reference thereto, an amount determined by the Bank by reference to the most recent Borrowing Base Certificate delivered to the Bank pursuant to Section 5.03(c) and accepted by the Bank, which is equal to (i) 80% of the Eligible Accounts Receivable, plus (ii) the lesser of (A) 40% of Eligible Inventory and (B) $1,000,000.

"**Borrowing Base Certificate**" shall mean a certificate executed and delivered by an Executive Officer of the Borrower, certifying, as accurate and complete, the amount of the Borrowing Base as of the date set forth therein, in substantially the form Exhibit C.

"**Borrowing Date**" shall mean each date on which a Loan is disbursed (or continued or converted).

"**Business Day**" shall mean any day not a Saturday, Sunday or legal holiday, on which the Bank is open for business in New York City.

"**Capitalized Lease Obligations**" shall mean, with respect to any Person, the obligation of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with Generally Accepted Accounting Principles is required to be, classified and accounted for as a capital lease on a balance sheet of such Person; and for purposes of this Agreement the amount of such obligation shall be the capitalized amount thereof determined in accordance with such principles.

"**Change in Control**" shall mean (a) a change in the ownership of any Obligor (other than Banayan) without the prior written consent of the Bank so that Banayan (or a trust established for the benefit of one or more lineal descendants of Banayan for which Banayan is the sole trustee) shall cease to beneficially own a 100% interest in the profits and losses of such Obligor, or (b) Banayan shall cease to Control any Obligor, or (c) Banayan shall cease to be control of the day-to-day management and operations of any Obligor; provided, however, in the case of clause (a) above, such consent will not be required provided that, following any such change in ownership, such Obligor has provided to the Bank a certificate dated as of the date of such change in ownership and signed by an Executive Office of such Obligor confirming that: (i) Bayanan will retain a majority interest in the profits and losses of the Obligor in question and continue to be control of the day-to-day management and operations of such Obligor; (ii) no additional liabilities, direct or indirect, are incurred by any Obligor; (iii) there is no reduction in the Tangible Net Worth of any Obligor; (iv) no material reserves under GAAP are required to be established by any Obligor; (iv) each Obligor remains in pro-forma compliance with this Agreement and the other Loan Documents as demonstrated by the Obligors to the Bank's reasonable satisfaction; (v) no negative restatement of such Obligor's operating or financial condition is required under GAAP.

3

**"Closing Date"** shall mean the date of the execution and delivery of this Agreement.

**"Collateral"** shall mean, collectively (i) "Collateral" (as defined) in each of the Security Agreement, and (ii) any other collateral pledged under any other Loan Document.

**"Control"** shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto. (Except for purposes of determining whether a Change in Control has occurred, a Person shall be presumed to "Control" another Person if the former owns, directly or indirectly, 50% or more of the equity interests of any kind in the latter; however, the foregoing is not intended to limit in any way the scope of what factors or combinations thereof can cause or constitute "Control".)

**"Documentary Letter of Credit"** means a documentary letter of credit in form and substance customarily issued by the Bank from time to time.

**"Dollars"** or **"$"** refers to lawful money of the United States of America.

**"EBITDA"** shall mean, net income (or net deficit) exclusive of extraordinary gains, if any, plus (i) interest expense, (ii) depreciation expense, (iii) amortization expense, and (iv) income tax expense (all to the extent that (i), (ii), (iii) and (iv) have been deducted in calculating net income (or net deficit)), all for the period over which EBITDA is being calculated.

**"Eligible Accounts Receivable"** shall mean those Accounts which (i) are due and payable within 90 days from the original date of invoice and which do not remain unpaid for more than 90 days from the original date of invoice, and (ii) have been validly collaterally assigned to the Bank and comply with all of the terms, conditions, warranties and representations made to the Bank under this Agreement and the other Loan Documents; but the same shall not include the following: (a) Accounts with respect to which the Account Debtor is an officer, director, employee, or agent of the Borrower or an Affiliate thereof; (b) Accounts with respect to which goods are placed on consignment, guaranteed sale, bill-and-hold, repurchase or return, or other terms by reason of which the payment of the Account Debtor may be conditional; (c) Accounts arising from progress billings, invoices for deposits, and rebills of amounts previously credited to the extent of credits issued more than 15 days prior to such rebill; (d) Accounts with respect to which the Account Debtor is not domiciled in the United States of America unless such Account is fully secured by an irrevocable letter of credit acceptable to the Bank and assigned to the Bank; (e) Accounts with respect to which the sale is on an installment sale, lease or other extended payment basis; (f) Accounts with respect to which the Account Debtor is a federal, state, local or foreign governmental authority unless such governmental authority is the United States of America or any department, agency or instrumentality of the United States, and the applicable Borrower complies with the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 203 et seq.); (g) all Accounts owing by any Account Debtor if seventy-five percent (75%) or more of the Accounts due from such Account Debtor are deemed not to be Eligible Accounts Receivable hereunder; (h) Accounts with respect to which the Account Debtor is a Subsidiary of, Affiliate of, or has common officers or directors with, the Borrower; (i)

4

Accounts with respect to which the Bank does not for any reason have a perfected first priority Lien; (j) Accounts with respect to which the Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to the Borrower, to the extent of the Borrower's existing or potential liability to such Account Debtor; (k) Accounts with respect to which the Account Debtor has disputed any liability, or the Account Debtor has made any claim with respect to any other Account due to the Borrower, or the Account is otherwise subject to any right of setoff, deduction, breach of warranty or other defense, dispute or counterclaim by the Account Debtor; (l) that portion of any Account representing late fees, service charges or interest, but only to the extent of such portion; (m) Accounts owed by any Account Debtor which is insolvent or is the subject of an insolvency proceeding; (n) that portion of any Account represented by contract rights, documents, instruments, chattel paper or general intangibles; (o) Accounts owing by Cooperative Dairy Marketing, LLC, North Central Companies and City Glatt; (p) $25,000 of reserves established in connection with the Accounts and (q) any and all Accounts of an Account Debtor whose creditworthiness is not satisfactory to the Bank, in its sole credit judgment, based on information available to the Bank; provided, however, if any Account shall be deemed ineligible in accordance with clause (q) hereof, the Bank shall provide notice to the Borrower. References to percentages of Accounts are based on dollar amount of such Accounts and not the number of such Accounts; provided, however, that in the case of clauses (g) and (p) hereof, the Bank reserves the right to modify the amounts applicable thereto in its reasonable discretion.

"**Eligible Inventory**" means all Inventory, as such term is defined in the Security Agreement, that constitutes finished goods held for sale by the Borrower and LCD Corp., normally and currently saleable in the ordinary course of the Borrower's or LCD Corp.'s business, as the case may be, and (a) which at all times pertinent hereto is of good and merchantable (or saleable, as applicable) quality, (b) free from defects, (c) as to which the Bank has a perfected first priority lien not subject to any Trust Claim, (d) which is located at the locations set forth in the Security Agreement, and (e) as to which Borrower or LCD Corp., as the case may be, has satisfied all terms, conditions, warranties and representations of this Agreement and the other Loan Documents; but Eligible Inventory does not include any of the following: (i) raw materials, (ii) work in process; (iii) any spoiled, damaged, defective or recalled items; (iv) any items of inventory which have been consigned to Borrower or LCD Corp., as the case may be, or as to which a Person claims a lien; (v) any items of inventory which have been consigned by the Borrower or LCD Corp., as the case may be, to a consignee; (vi) inventory located on premises not owned by the Borrower or LCD Corp., as the case may be, and for which the Bank does not have a Mortgagee Waiver, Landlord Waiver and Consent or Warehouse Notification; and (vii) inventory which in the reasonable judgment of the Bank is considered to be slow moving or otherwise not merchantable. Eligible Inventory shall be valued at the lower of cost, market value, or the valuation consistent with that employed in the preparation of the financial statements of the Borrower or LCD Corp., as the case may be.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

HF 3082102 v.7 #06406/0023

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Obligor (other than Banayan) or any Subsidiary of any Obligor (other than Banayan) directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same has been and may hereafter be amended.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with any Obligor (other than Banayan) is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Obligor or any of their ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Obligor or any such ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Obligor or any such ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Obligor or any such ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Obligor or any such ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**Eurodollar**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"**Event of Default**" shall mean any Event of Default set forth in Article VII.

"**Executive Officer**" shall mean Banayan.

"**Facility A**" - see recitals.

"**Facility A Loan**" - see recitals.

6

"**Facility A Maturity Date**" shall mean August 22, 2008.

"**Facility A Note**" shall mean the promissory note of the Borrower delivered pursuant to Section 2A.01.

"**Facility B**" - see recitals.

"**Facility B Availability Period**" means the period from and including the Closing Date to but excluding the earlier of the Facility B Termination Date and the date of termination of the Facility B Commitment.

"**Facility B Commitment**" shall have the meaning set forth in Section 2B.01(a).

"**Facility B Loans**" shall mean each revolving credit loan made pursuant to Section 2B.01(a).

"**Facility B Note**" shall mean the promissory note of the Borrower delivered, pursuant to Section 2B.02(a).

"**Facility B Termination Date**" shall mean August 22, 2008.

"**FDA**" shall mean the Food and Drug Administration, or any successor thereto.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, consistently applied.

"**Governmental Authority**" means the government of the United States of America, any other nation or any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantee**" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

7

"**Guarantors**" shall mean SLF Corp, LCD Corp, YR LLC, Banayan and any Person who hereafter becomes a Guarantor pursuant to Section 5.10.

"**Guaranty**" shall mean the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Bank, guarantying all obligations of the Borrower to the Bank with respect to the Loans, Letters of Credit and under the Loan Documents.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Hedging Obligations**" shall mean, with respect to any Person, all liabilities of such Person under interest rate, currency and commodity swap agreements, cap agreements and collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits received or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capitalized Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) Hedging Obligations, as calculated on a basis satisfactory to the Bank and in accordance with accepted practice, and (l) all other liabilities which are reflected as such on the balance sheet of the Person in question in accordance with GAAP. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"**Interest Payment Date**" shall mean, with respect to Eurodollar Loans, the last day of each Interest Period; and (a) with respect to the Facility A Loan, the Facility A Maturity Date; and (b) with respect to any Facility B Loan, the Facility B Termination Date.

"**Interest Period**" means with respect to any Eurodollar Borrowing, (a) in the case of the Facility A Borrowing, the period commencing on the date of such Borrowing and ending on the

8

numerically corresponding day in the calendar month that is one (1) month thereafter, and, (b) in the case of any Facility B Borrowing the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three months thereafter, as the Borrower may elect; provided, in each case, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Eurodollar Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (ii) any Interest Period pertaining to a Eurodollar Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Facility B Borrowing, thereafter shall be the Closing Date of the most recent conversion or continuation of such Borrowing.

"**Internal Revenue Code**" shall mean the Internal Revenue Code of 1986, as heretofore amended and as the same may be hereafter amended.

"**LC Disbursement**" means a payment made by the Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.

"**LCD Corp**" - see heading.

"**Landlord Waiver and Consent**" shall mean, with respect to any premises leased to any Obligor (other than Banayan) where assets of such Obligor are situated, a letter, certificate or other instrument in writing from the lessor under the related lease, in substantially the form attached hereto as Exhibit E or in such other form as may be approved by the Bank in its sole discretion.

"**Letter of Credit**" means any Documentary Letter of Credit or Standby Letter of Credit issued pursuant to this Agreement.

"**LIBO Rate**" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Bank from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate (rounded upwards, if necessary, to the next 1/16 of 1%) at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are

9

offered by the principal London office of the Bank in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"**LIBOR Rate Prepayment Premium**" shall mean, in the event of (a) the payment of any principal of the Facility A Loan (if such Loan is subject to the Adjusted LIBO Rate) other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default) and (b) the conversion Interest Period applicable to the Facility A Loan other than on the last day of the then applicable Interest Period, the Borrower shall compensate the Bank for the loss, cost and expense attributable to such event. Such loss, cost or expense to the Bank shall be deemed to include an amount determined by the Bank to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of the Facility A Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to the Facility A Loan, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Bank would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market. A certificate of the Bank setting forth any amount or amounts that the Bank is entitled to receive pursuant to this "LIBOR Rate Prepayment Premium" shall be delivered to the Borrower and shall be conclusive absent manifest error.

"**Licenses**" shall have the meaning set forth in Section 3.10.

"**Lien**" shall mean with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loans**" shall mean the Facility A Loan and the Facility B Loans.

"**Loan Documents**" shall mean this Agreement, the Notes, the Security Agreement, the Guaranty, the Subordination Agreements, the Mortgagee Waiver, those other agreements pertaining to any of the Loans as to which the Bank is a party or a beneficiary on the Closing Date, any letter of credit application or any other agreement submitted by the Borrower in connection with a Letter of Credit, and all other agreements, instruments, documents and certificates, including, without limitation, pledges, powers of attorney, consents, assignments, contracts, notices, financing statements and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Obligor, or by an Affiliate of any of them or by another Person, and delivered to the Bank in connection with this Agreement or the transactions contemplated hereby, excluding, however, any letter of interest or commitment letter with respect hereto.

"**Mortgagee Waiver**" shall mean the Mortgager's Waiver and Release dated as of the date hereof by Merrill Lynch Business Financial Services, Inc.

10

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Notes**" shall mean the Facility A Note and the Facility B Note.

"**Notice of Borrowing**" shall mean the notice required to be delivered pursuant to Section 2A.05 or Section 2B.01(c).

"**Obligors**" - see heading.

"**OFAC**" shall have the meaning set forth in Section 3.22.

"**OSHA**" shall mean the Occupational Safety and Health Administration, or any successor thereto.

"**PACA**" shall mean the Perishable Agricultural Commodities Act (7 U.S.C. §§ 499a-499t).

"**PASA**" shall mean the Federal Packers and Stockyards Act (7 U.S.C. §§ 181-229).

"**Patriot Act**" has the meaning set forth in Section 3.22.

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Permitted Encumbrances**" shall mean:

(a)    Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.02;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than Trust Claims), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.02;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)    easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business;

11

(f)     Liens in existence on the Closing Date and set forth on Schedule 6.01, which Liens shall not be renewed, extended or spread in any way; and

(g)     Liens securing Indebtedness permitted under Section 6.03(e), provided such Liens encumber only the assets which are the subject of the purchase money Indebtedness in question.

"**Permitted Investments**" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     investments of the Borrower in wholly-owned Subsidiaries thereof who have become Guarantors pursuant to Section 5.10.

"**Person**" shall mean any natural person, limited liability company, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Prime Rate**" shall mean the rate per annum announced by the Bank from time to time as its prime rate in effect at its principal office. Each change in the Prime Rate shall be effective on the date such change is announced to become effective.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

12

"**Revolving Credit Exposure**" means the sum of the outstanding principal amount of the Facility B Loans and LC Exposure at the time in question.

"**Security Agreement**" shall mean the Security Agreement, dated as of the date hereof, made by each Obligor (other than Banayan) in favor of the Bank securing its obligations as the Borrower or as a Guarantor, as the case may be, and any other Security Agreement made by a (new) Guarantor pursuant to Section 5.10.

"**SLF Corp**" - see heading.

"**Standby Letter of Credit**" means a standby letter of credit in form and substance customarily issued by the Bank from time to time, and issued for such purposes as are reasonably acceptable to the Bank.

"**Statutory Reserve Rate**" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Bank is subject (a) with respect to the Base CD Rate, for new negotiable nonpersonal time deposits in dollars of over $100,000 with maturities approximately equal to three months and (b) with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the Closing Date of any change in any reserve percentage.

"**Subordination Agreement**" means each subordination agreement of even date herewith by and among the applicable Subordinated Lender, the applicable Obligor and the Bank, subordinating such Subordinated Lender's right to repayment of the indebtedness owing to such Subordinated Lender from such Obligor to the obligations owing to the Lender and its Affiliates with respect to this Agreement or otherwise.

"**Subordinated Lender**" means the applicable lender set forth on Schedule 3.12.

"**Subsidiary**" shall mean with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity, the accounts of which could be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests, are as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled, by (in any case under foregoing clause (a) or

13

(b)) the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"**Tangible Net Worth**" shall mean (i) the aggregate amount at which the value of the assets (other than patents, patent rights, trademarks, trade names, franchises, copyrights, licenses, permits, goodwill and other intangible assets classified as such in accordance with GAAP) would appear on a balance sheet, after deducting loans and advances to Affiliates who are not Obligors, capitalized research and development costs, capitalized interest and debt discount and expense and after all appropriate adjustments in accordance with GAAP (including, without limitation, reserves for doubtful receivables, obsolescence, depreciation and amortization), but excluding the value of any account receivable from an Affiliate other than accounts receivable generated in the ordinary course of business, which are payable within 90 days of the date when they arise and are not more than 90 days old at the time in question, less (ii) the aggregate amount of all Indebtedness, other liabilities (including tax and other proper accruals) and reserves of the Borrower but excluding Approved Subordinated Debt, in each case computed in accordance with GAAP.

"**Three Month Secondary CD Rate**" means, for any day, the secondary market rate for three month certificates of deposit reported as being in effect on such day (or, if such day is not a Business Day, the next preceding Business Day) by the Board through the public information telephone line of the Federal Reserve Bank of New York (which rate will, under the current practices of the Board, be published in Federal Reserve Statistical Release H.15(519) during the week following such day) or, if such rate is not so reported on such day or such next preceding Business Day, the average of the secondary market quotations for three month certificates of deposit of major money center banks in New York City received at approximately 10:00 a.m., New York City time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) by the Bank from three negotiable certificate of deposit dealers of recognized standing selected by it.

"**Total Liabilities**" means all liabilities, including (i) Capitalized Lease Obligation, (ii) Approved Subordinated Debt, and (iii) all reserves for deferred taxes and other deferred sums appearing on the liabilities side of the balance sheet of the Borrower.

"**Trust Claim**" shall mean any Lien or claim imposed upon any asset of an Obligor in connection with PACA or PASA.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate, the Prime Rate or, in the case of a Term Loan or Borrowing, the LIBO Rate.

"**UCC**" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Bank's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform

14

Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

"**Unfunded Capital Expenditures**" means capital expenditures that the Borrower has made that have not been financed with the proceeds of borrowed money or leased pursuant to a lease agreement giving rise to a Capitalized Lease Obligation.

"**Unused Fee**" shall mean have the meaning set forth in Section 2B.04.

"**Warehouse Notification**" shall mean with respect to any warehouse in which any Obligor (other than Banayan) stores assets, a letter from such Obligor (and acknowledge by the warehouse), in substantially the form attached hereto as Exhibit F or in such other form as may be approved by the Bank in its sole discretion.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**YR LLC**" - see heading.

SECTION 1.02. Accounting Terms; Consolidation. Except as otherwise specifically provided in this Agreement, each accounting term used in this Agreement shall have the meaning given to it under GAAP.

SECTION 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Group (e.g., a "Facility B Loan") or by Type (e.g., a "Prime Loan") or by Group and Type (e.g., a "Facility B Eurodollar Loan").

15

Borrowings also may be classified and referred to by Group (e.g., a "Facility B Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Group and Type (e.g., a "Facility B Prime Borrowing").

## II.A.    FACILITY A - THE TERM LOAN FACILITY

SECTION 2A.01    Facility A Loan.  Subject to the terms and conditions hereof, and in particular this Article II.A, the Bank is making the Facility A Loan to the Borrower on the Closing Date, in the principal amount of $2,000,000.  The Faiclity A Loan shall remain as a single Borrowing, bearing a single interest rate at all times.

SECTION 2A.02    Facility A Note; Payments.  (a)  The Facility A Loan shall be evidenced by a single promissory note (the "**Facility A Note**"), substantially in the form attached hereto as Exhibit A, appropriately completed, duly executed and delivered on behalf of the Borrower and payable to the Bank.

(b)    The Facility A Note shall be payable, as to principal, in thirty-five (35) equal installments of $33,333.33 on the first day of each month, followed by a final payment of the then unpaid principal balance of the Facility A Loan on the Facility A Maturity Date.  Subject to the provisions of this Article II.A, which may require that the Prime Rate apply, the Facility A Loan shall bear interest from the Closing Date at the Adjusted LIBO Rate plus the Applicable Margin and interest shall be payable on each Interest Payment Date including the Facility A Maturity Date.

(c)    Amounts repaid or prepaid on account of the Facility A Loan may not be reborrowed.

SECTION 2A.03    Prepayment of Facility A Loan.  (a)  Intentionally omitted.

(b)    In the event of the payment of any principal other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default) the Bank shall deliver to the Borrower a certificate of the Bank setting forth any amount or amounts of the LIBOR Rate Prepayment Premium shall be delivered to the Borrower, which certificate shall be conclusive absent manifest error, and the Borrower shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.  For the avoidance of doubt, should any such payment be made on the last day of the Interest Period applicable thereto, no LIBOR Rate Prepayment Premium shall apply.

(c)    Intentionally Omitted.

(d)    Each partial prepayment in respect of the Facility A Loan shall be in the minimum principal amount of $50,000, and in an integral multiple of $10,000, and upon not less than three (3) Business Days nor more than fifteen (15) Business Days' prior written notice to the Bank. All partial prepayments of the Facility A Loan shall be applied to installments of principal thereof in the inverse order of maturity.  Each notice of prepayment shall specify the prepayment date and the principal amount to be prepaid, shall be irrevocable and shall commit the Borrower

16

to prepay the Facility A Loan by the amount stated therein on the date stated therein. Any such prepayment shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment and the LIBOR Rate Prepayment Premium.

(e)    Any payment of the outstanding principal balance of the Facility A Loan after the occurrence and continuance of an Event of Default shall be deemed a voluntary prepayment for the purposes of this paragraph, and the LIBOR Rate Prepayment Premium (calculated pursuant to the provisions of this Section based upon the interest rate specified herein) applicable to the outstanding principal balance of the Facility A Loan immediately prior to the occurrence of such Event of Default, shall be payable with respect thereto.

(f)    The Borrower acknowledges that the Bank might not fund or hedge its fixed rate loan portfolio or any prepayment thereof, and that the Bank makes such determination on a loan-by-loan basis. The Borrower further agrees that the calculation of the LIBOR Rate Prepayment Premium is a reasonable and appropriate method of calculating liquidated damages for any such prepayment irrespective of whether or not any of the foregoing hedging transactions have in fact occurred or occurred precisely as contemplated herein with respect to the Facility A Loan. All calculations and determinations by the Bank of the amount of the LIBOR Rate Prepayment Premium or of any element thereof, if made in accordance with its then standard procedures for so calculating or determining such amounts, shall be conclusive absent manifest arithmetic error.

SECTION 2A.04    Funds; Manner of Payment.    Unless otherwise specified herein, each payment and prepayment of principal of and interest on the Facility A Note shall be made not later than 1:00 p.m., New York City time, on the date on which it is payable and shall be made in U.S. Dollars in Federal or other immediately available funds. The Borrower hereby authorizes the Bank to automatically debit its account, account no. 1500583386, maintained at the Bank to make any such payments and agrees that it will maintain an amount in such account equal to or exceeding the amount of regularly scheduled interest and principal due and owing under the Facility A Note.

SECTION 2A.05    Interest.    (a)    The Interest Period applicable to the Facility A Borrowing should always be of a one (1) month duration.

(b)    If an Event of Default has occurred and is continuing and the Bank so notifies the Borrower, then, so long as an Event of Default is continuing, unless repaid, the Facility A Loan shall be converted to a Prime Borrowing at the end of the Interest Period applicable thereto.

(c)    All interest under this Article II.A shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Adjusted LIBO Rate or LIBO Rate shall be determined by the Bank, and such determination shall be conclusive absent manifest error.

(d)    Notwithstanding the foregoing, upon the Closing Date, the Facility A Loan shall bear interest at the Prime Rate and such interest rate shall be converted to a Eurodollar Loan on the third Business Day following the Closing Date. The Interest Period applicable there to shall be of a one (1) month day duration.

17

SECTION 2A.06    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for the Facility A Loan: (i) the Bank determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; (ii) the Bank determines that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Bank of making or maintaining the Facility A Loan for such Interest Period; or (iii) the Bank determines (which determination shall be conclusive absent manifest error) that it would be illegal to create a Eurodollar Borrowing at the time in question, then the Bank shall give notice thereof to the Borrower by telephone or telecopy as promptly as practicable thereafter and, until the Bank notifies the Borrower that the circumstances giving rise to such notice no longer exist, the interest rate applicable to the Facility A Loan shall be automatically converted to the Prime Rate.

SECTION 2A.07    Break Funding Payments.  At any time when the Faiclity A Loan is a Eurodollar Loan, in the event of (a) the payment of any principal of the Facility A Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), or (b) the failure to continue or prepay the Interest Period applicable to the Facility A Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance herewith) then, in any such event, the Bank shall deliver to the Borrower a certificate of the Bank setting forth the amount of the LIBOR Rate Prepayment Premium shall be delivered to the Borrower, which certificate shall be conclusive absent manifest error, and the Borrower shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

II.B.    FACILITY B - THE FACILITY B REVOLVING CREDIT FACILITY

SECTION 2B.01    Facility B Revolving Credit.  (a)    Subject to the terms and conditions hereof, and in particular this Article II.B, and relying upon the representations and warranties set forth herein, the Bank agrees to make revolving credit loans to the Borrower at any time or from time to time on or after the Closing Date and until the sooner of the Facility B Termination Date, or the termination of the Facility B Commitment in accordance with the terms hereof (the "**Facility B Loans**"), in an aggregate principal amount at any time outstanding not in excess of the lesser of (i) $5,500,000, less the Revolving Credit Exposure at the time in question, and (ii) the Borrowing Base less the Revolving Credit Exposure at the time in question (the "**Facility B Commitment**").  Within the foregoing limits, the Borrower may borrow, repay and reborrow the Facility B Loans.

(b)    The Facility B Loans made by the Bank on any one day shall be in a minimum aggregate principal amount of the lesser of $100,000 or the then unused portion of the Facility B Commitment shall be in an integral multiple of $10,000.  Facility B Borrowings of more than one type may be outstanding at the same time; provided that there shall be no more than a total of two (2) Facility B Borrowings outstanding at any time.  The Facility B Loans shall be made for working capital purposes of the Borrower (as required under Section 5.12).

(c)    The Borrower shall give the Bank a prior Notice of Borrowing, which may be by facsimile if followed immediately by telephonic confirmation), no later than, in the case of a

18

Prime Rate Loan, noon (New York time) on the Business Day of each proposed borrowing, and in the case of a Eurodollar Loan, no later than noon (New York time) two (2) Business Days prior to the date of the proposed Borrowing, each under this Section 2B.01. Each Notice of Borrowing shall be irrevocable and shall also specify the following information:

(i)     the aggregate amount of the requested Borrowing (which, in the case of a Eurodollar Borrowing, must be in a minimum amount of $250,000);

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)   whether such Borrowing is to be a Prime Borrowing or a Eurodollar Borrowing;

(iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)     the location and number of the account to which funds are to be disbursed, which shall be an account contemplated by Section 2B.05;

(d)     Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Facility B Loan if the Interest Period requested with respect thereto would end after the Facility B Termination Date.

(e)     Each Facility B Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Notice of Borrowing. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in Section 2B.01(c). The Borrower may also elect different options with respect to different portions of the affected Borrowing, in which case the Facility B Loans comprising each such portion shall be considered a separate Borrowing, all of which shall be set forth in the applicable Notice of Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Bank so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Facility B Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Facility B Eurodollar Borrowing shall be converted to a Prime Borrowing at the end of the Interest Period applicable thereto.

(f)     Notwithstanding the foregoing, any Facility B Borrowing advanced to the Borrower on the Closing Date shall bear interest at the Prime Rate and such interest rate shall be converted to a Eurodollar Loan on the third Business Day following the Closing Date. The Interest Period applicable there to shall be of a three (3) month duration.

SECTION 2B.02    Facility B Note. (a) The Facility B Loans shall be evidenced by a single promissory note (the "**Facility B Note**"), substantially in the form attached hereto as Exhibit B, appropriately completed, duly executed and delivered on behalf of the Borrower and

payable to the order of the Bank in a principal amount equal to the Facility B Commitment. The date and amount of any Facility B Loan and of each payment, prepayment and readvance of principal thereunder shall be recorded on the grid schedule annexed to the Facility B Note or any similar electronic or other record maintained by the Bank, and the Borrower authorizes the Bank to make such record; provided, however, that the failure of the Bank to set forth any such Facility B Loan, payment, readvance and/or other information on such grid or (other similar record) shall not in any manner affect the obligation of the Borrower to repay the Facility B Loans in accordance with the terms of the Facility B Note and this Agreement, and in particular this Article II.B. Absent manifest error, the Facility B Note, the grid schedule (part thereof) and the books and records of the Bank with respect thereto shall be presumptive evidence of the Facility B Loans. The aggregate unpaid amount of the Facility B Loans at any time outstanding shall be the principal amount owing on the Facility B Note at such time.

(b)    All Facility B Loans shall be due and payable on the Facility B Termination Date and all accrued and unpaid interest thereon shall, subject to the provisions hereof, be payable on each Interest Payment Date including the Facility B Termination Date; provided, however, that if any such day is not a Business Day, such principal and such interest, if any, shall be payable on the next succeeding Business Day with additional accrued interest until paid.

SECTION 2B.03    Interest on Facility B Loans. (a) The Facility B Loans comprising each Facility B Prime Borrowing shall bear interest at the Prime Rate.

(b)    The Loans comprising each Facility B Eurodollar Borrowing shall bear interest at a rate equal to the Adjusted LIBO Rate plus the Applicable Margin for the Interest Period in effect for such Borrowing.

(c)    Foregoing clauses (a) and (b) of this Section 2B.03 are subject to Section 8.16.

(d)    Accrued interest on each Facility B Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Facility B Commitment; provided that (i) interest accrued pursuant to Section 8.16 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Facility B Loan (other than a prepayment of a Facility B Prime Loan prior to the Facility B Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Facility B Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Facility B Loan shall be payable upon such conversion.

(e)    All interest under this Article II.B shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Adjusted LIBO Rate or LIBO Rate shall be determined by the Bank, and such determination shall be conclusive absent manifest error.

20

SECTION 2B.04    Prepayment of Facility B Loans.  (a)  The Borrower shall have the right at any time and from time to time to prepay the Facility B Loans, in whole or in part, without premium or penalty except as set forth in Section 2B.07; provided, however, that each such partial prepayment shall be in the minimum principal amount of $25,000, and in an integral multiple of $10,000 in excess thereof.  The Borrower shall notify to Bank by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Facility B Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of a Facility B Prime Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Each partial prepayment of any Borrowing shall be in the minimum principal amount of $50,000, and in an integral multiple of $10,000 in excess thereof.

(b)    [Intentionally Omitted.]

(c)    All prepayments shall be accompanied by accrued interest on the principal amount being prepaid to the date of prepayment.

(d)    The Borrower shall immediately repay any Revolving Credit Exposure in excess of the amount of the Facility B Commitment at the time in question; provided, if such payment shall not reduce the amount of Revolving Credit Exposure to an amount that is less than or equal to the amount of the Commitment, the Borrower shall provide cash collateral to the Bank for such excess amount in accordance with Section 2.08, mutatis, mutandis.

SECTION 2B.05    Funds; Manner of Payment.  Unless otherwise specified herein, each payment and prepayment of principal of and interest on the Facility B Note shall be made not later than noon (New York City time) on the date on which it is payable and shall be made in U.S. Dollars in Federal or other immediately available funds.  The Borrower hereby authorizes the Bank to automatically debit its account, account no. 1500583386, maintained at the Bank to make any such payments and agrees that it will maintain an amount in such account equal to or exceeding the amount of regularly scheduled interest and principal due and owing under the Facility B Note.

SECTION 2B.06    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Facility B Eurodollar Borrowing: (i) the Bank determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; (ii) the Bank determines that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to the Bank of making or maintaining the Loans (or Loan) included in such Borrowing(s) for such Interest Period; or (iii) the Bank determines (which determination shall be conclusive absent manifest error) that it would be illegal to create a Eurodollar Borrowing at the time in question, then the Bank shall give notice thereof to the Borrower by telephone or telecopy as promptly as practicable thereafter and, until the Bank notifies the Borrower that the circumstances giving rise to such notice no longer exist, (i) any Notice of Borrowing that contains a request for the

21

conversion of any Facility B Borrowing to, or continuation of any Facility B Borrowing as, a Facility B Eurodollar Borrowing shall be ineffective, and (ii) if any Notice of Borrowing requests a Eurodollar Borrowing, such Borrowing shall be made as a Prime Borrowing.

SECTION 2B.07    Break Funding Payments. In the event of (a) the payment of any principal of any Facility B Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Facility B Eurodollar Loan other than on the last day of the Interest Period applicable thereto or (c) the failure to borrow, convert, continue or prepay any Facility B Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked and is revoked in accordance herewith) then, in any such event, the Bank shall deliver to the Borrower a certificate of the Bank setting forth the amount of the LIBOR Rate Prepayment Premium shall be delivered to the Borrower, which certificate shall be conclusive absent manifest error, and the Borrower shall pay the Bank the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2B.08    Letters of Credit. (a) General. Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Letters of Credit for its own account, in a form acceptable to the Bank, at any time and from time to time during the Facility B Availability Period, provided that such issuance will not cause the Revolving Credit Exposure to exceed the Facility B Commitment; provided, however, that the aggregate amount of LC Exposure shall at no time exceed $500,000. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. Standby Letters of Credit may only be issued for purposes approved by the Bank, in its reasonable discretion

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Bank) to the Bank (reasonably in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit and the purpose thereof (which must be permitted under Section 5.12), the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. If requested by the Bank, the Borrower also shall submit a letter of credit application on the Bank's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension, the Revolving Credit Exposure shall not exceed the Facility B Commitment.

22

(c)    <u>Expiration Date</u>.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Facility B Termination Date.

(d)    <u>Reimbursement</u>.  If the Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Bank an amount equal to such LC Disbursement not later than 3:00 noon, New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2B.01 that such payment be financed with a Facility B Loan in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting Facility B Loan.  If the Borrower fails to make such payment when due, the Borrower shall be deemed to have made a request for a Facility B Loan, which shall (initially) be a Prime Loan.

(e)    <u>Obligations Absolute</u>.  The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (d) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Bank nor any Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Bank; provided that the foregoing shall not be construed to excuse the Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Bank (as finally determined by a court of competent jurisdiction), the Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of

23

a Letter of Credit, the Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(f)    <u>Disbursement Procedures</u>.  The Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Bank shall promptly notify the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Bank with respect to any such LC Disbursement.

(g)    <u>Interim Interest</u>.  If the Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to Facility B Prime Loans; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (d) of this Section, and such failure caused the Borrower to exceed the Facility B Commitment, then Section 8.16 shall apply.

(h)    <u>Cash Collateralization</u>.  Subject to the provision of the following sentence, the Borrower shall, on or before the Facility B Termination Date, deposit in an account with the Bank in the name of the Bank, an amount in cash equal to 105% of the sum of (i) the aggregate undrawn stated amount of any Standby Letter of Credit having an expiration date later than the Facility B Termination Date plus (ii) all amounts theretofore drawn under any such Standby Letter of Credit and not then reimbursed plus (iii) any accrued and unpaid interest on such unreimbursed amounts, if any.  If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Bank demanding the deposit of cash collateral pursuant to this paragraph, the Borrower shall deposit such cash collateral in an account with the Bank, in the name of the Bank, an amount in cash equal to 105% of the LC Exposure as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (g) or (h) of Section 7.  Such deposit shall be held by the Bank as collateral for the payment and performance of the obligations of the Borrower under this Agreement.  The Bank shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Bank and at the Borrower's risk and expense, such deposits shall bear interest at the rate applicable to standard demand savings accounts maintained at the Bank.  Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Bank to reimburse the itself for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Facility B Loans has been accelerated, be applied to satisfy

24

HF 3082102 v.7 #06406/0023

other obligations of the Borrower under this Agreement. If the Borrower is required to provide cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived. It is expressly agreed that amounts deposited into such account in respect of a Standby Letter of Credit shall remain on deposit after the termination of this Agreement so long as such Letter of Credit remains outstanding, and to the extent that such funds have not been applied as permitted hereunder, shall be returned to the Borrower following the expiration of such Letter of Credit or the return thereof, in each case without the same having been drawn.

(i)    Fees.  The Borrower agrees to pay to the Bank a fee with respect to Letters of Credits, which shall be calculated at the rate of 0.25% of the full amount of each draw under each Documentary Letter of Credit, and shall accrue at a per annum rate of 2.25% of the face amount of each Standby Letter of Credit, during the period from and including the Closing Date to but excluding the later of the date on which the Facility B Commitment terminates and the date on which the Bank ceases to have any LC Exposure. In addition to the fees in the nature of those referred to in the preceding sentence (without duplication), the Borrower agrees to pay the Bank's standard fees with respect to the issuance, amendment renewal or extension of any Letter of Credit or processing of drawings thereunder. Fees accrued through and including the last day of [May, August, November and February] of each year shall be payable on the third Business Day following such last day, commencing on the first such date to occur after the Closing Date; provided that all such fees shall be payable on the date on which the Facility B Commitment terminate and any such fees accruing after the date on which the Facility B Commitment terminate shall be payable on demand. Any other fees payable to the Bank pursuant to this paragraph shall be payable within 10 days after demand. All fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

SECTION 2B.09    Unused Fee.  The Borrower agrees to pay, in immediately available funds to the Bank, in consideration of the Facility B Commitment, an unused fee (the "Unused Fee") of one-quarter (1/4) of one percent (0.25%) per annum (based on a 360-day year) of the average monthly unused amount of the Facility B Commitment determined as of the end of each calendar month. The Unused Fee shall accrue from the date hereof to and including the earlier to occur of the Facility B Termination Date or the termination of the Facility B Commitment in accordance with the terms hereof, and shall be payable monthly in arrears commencing on the first day of the first whole calendar month after the date hereof and on the first day of each calendar month thereafter until and on the earlier to occur of the latest if the Facility B Termination Date or the termination of the Facility B Commitment in accordance with the terms hereof. As used in this Section 2B.09, the term "unused amount of the Facility B Commitment" shall mean $5,500,000 less the Revolving Credit Exposure at the time in question.

HF 3082102 v.7 #06406/0023

III.    REPRESENTATIONS AND WARRANTIES

The Obligors each represent and warrant to the Bank that:

SECTION 3.01. Organization, Powers, etc.  (a)  Each of the Obligors (other than Banayan) (i) is an entity duly organized or incorporated (as applicable), validly existing and in good standing under the laws of the state of its organization or incorporation (as applicable), (ii) has the power and authority to own its properties and to carry on its business as now being conducted and (iii) is duly qualified to do business in every jurisdiction wherein the conduct of its business or the ownership of its properties are such as to require such qualification and the failure to so qualify would be likely to have a material adverse effect on such Obligors and (b) each of the Obligors, (i) has the power to execute and perform this Agreement and the other Loan Documents to which it is a party, and (ii) has the power to borrow or guarantee and to pledge assets to the extent contemplated hereunder, and to execute and deliver all applicable Loan Documents.

SECTION 3.02. Authorization of Borrowing, etc.   The execution, delivery and performance by the Obligors (other than Banayan) of this Agreement and the other Loan Documents, the grants of Collateral, and the borrowings and guaranties contemplated hereunder have been duly authorized by all requisite corporate action (or equivalent).  The execution and delivery of this Agreement and the other Loan Documents by each of the Obligors will not violate (i) any provision of law or any governmental rule or regulation applicable to such party, or, in the case of the Obligors (other than Banayan), the certificate of incorporation or formation or by-laws or operating agreement and/or other organizational documents of such party, or (ii) any order of any court or Governmental Authority binding on such party, or any indenture, agreement or other instrument (including the Bond Documents) to which such party is a party, or by which such party or any of their respective property is bound, and will not be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any Lien, of any nature whatsoever upon any of the property or assets of any Obligor other than as contemplated by this Agreement.  Each of this Agreement and the other Loan Documents, and all other documents, certificates or instruments related thereto, are legal, valid and binding and enforceable against each of the Obligors in accordance with their terms subject to any limitations imposed by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, rehabilitation, moratorium or other laws affecting the enforcement generally of creditors rights and remedies.

SECTION 3.03. Financial Condition.  (a)  The Borrower has heretofore furnished to the Bank (i) (A) the financial statements of the Borrower dated December 31, 2004 for the year then ended, (B) (a) management prepared income statement highlights for the Borrower for the six months ending June 30, 2005, (ii) (A) financial statements of LCD Corp dated July 31, 2004 for the year then ended and (B) management prepared financial statements for LCD Corp. dated September 30, 2004 for the two months then ended, (iii) financial statements of YR LLC dated December 31, 2004 for the year then ended, and (iv) a personal financial statement of Banayan dated February, 2005 for the 12 months then ended.  All such financial statements were prepared in conformity with GAAP, and present fairly and accurately the financial condition of such

26

Obligor as of the dates of such financial statements, and between the date of said statements and the date hereof, no material adverse change in the financial condition, the business or the operations of any of the Obligors has occurred.

(b)    There is no obligation or liability, contingent or otherwise of any of the Obligors which is material in amount and which is not reflected in the financial statements referred to in the foregoing subsection (a) for the periods covered thereby.

(c)    The Borrower heretofore furnished to the Bank income statement projections for the fiscal year 2005, and such financial projections were prepared by the Borrower in good faith and constitute best efforts to fairly represent the expected financial condition of each such Person for each such fiscal year.

SECTION 3.04. Taxes.  Any assessed deficiencies resulting from Internal Revenue Service examinations of the Federal income tax returns of each Obligor have been discharged or reserved against.  Each Obligor has filed or caused to be filed all Federal, state, local and other tax returns which are required to be filed, and has paid or has caused to be paid all taxes as shown on said returns or on any assessment received by them, to the extent that such taxes have become due, except for any such taxes that are immaterial in amount and reserved against, or any such taxes, levies, assessments, deficiencies or claims which are being contested in good faith by appropriate proceedings on terms satisfactory to the Bank, and as to which each of the Obligors (other than Banayan), as applicable, has set aside on its books adequate reserves with respect to any such tax, levy assessment, deficiency or claim so contested.

SECTION 3.05. Title to Properties.  Each of the Obligors have good and valid title to the properties and assets reflected on the financial statements referred to in Section 3.03(a).  All such properties and assets are free and clear of mortgages, pledges, liens, charges and other encumbrances, except for Permitted Encumbrances.

SECTION 3.06. Litigation.  Other than as provided herein, there are no actions, suits or proceedings (whether or not purportedly on behalf of the Obligors pending or, to the knowledge of the Obligors, threatened against or affecting one or more of the Obligors, at law or in equity or before or by any Governmental Authority ("Actions"), which involve any of the transactions contemplated herein or which, if adversely determined against one or more of the Obligors, would result in any materially adverse change in the business, operations, prospects, properties or assets or in the condition, financial or otherwise, of one or more of the Obligors; and none of the Obligors is in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or Governmental Authority, which would have a materially adverse effect on the condition (financial or otherwise) of such Obligors. Schedule 3.06 hereto sets forth a true and accurate description of each pending or threatened Action.  Unless otherwise indicated on Schedule 3.06 hereto, with respect to any such Action affecting any of the Obligors, each of the Obligors (other than Banayan), as applicable, has established appropriate reserves in respect of each such Action, which reserves, are reflected on the applicable financial statements referred to in Section 3.03(a).

27

SECTION 3.07. <u>Agreements.</u>  None of the Obligors is a party to any agreement or instrument or subject to any judgment, order, writ, injunction, decree or regulation, or, in the case of the Obligors (other than Banayan), subject to any charter or other corporate restriction, materially and adversely affecting its business, properties or assets, operations or condition (financial or otherwise).  None of the Obligors is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument (including the Bond Documents) to which it is a party in any manner which would materially and adversely affect its business, properties or assets, operations or condition (financial or otherwise).

SECTION 3.08. <u>ERISA.</u>  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a material adverse effect on any of the Obligors.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Account Standards No. 87) did not, as of the date of the financial statement referred to in Section 3.03(a), exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all under funded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the financial statement referred to in Section 3.03(a), exceed the fair market value of the assets of all such under funded Plans.

SECTION 3.09. <u>Federal Reserve Regulations.</u>  (a)  None of the Obligors is engaged principally in, or has as one of its important activities the business of, extending credit for the purpose of purchasing or carrying any "margin stock" (within the meaning of Regulation U of the Board as amended to the date hereof).  If requested by the Bank at any time, each of the Obligors will furnish to the Bank such a statement on Federal Reserve Form U-1.

(b)  No part of the proceeds of any of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately (i) in violation of the said Regulation U, to purchase or to carry margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock, or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose which violates or is inconsistent with the provisions of the Regulations T or X of the Board.

SECTION 3.10. <u>Governmental Approval; Licenses.</u>  No registration with or consent or approval of, or other action by, any Governmental Authority is required in connection with the execution, delivery and performance of any of the Loan Documents by any of the Obligors. Each of the Obligors possesses all licenses, permits, certificates, approvals and the like ("Licenses") necessary for the lawful operation of its respective business in a manner so as to not cause a material adverse effect on any of them.  All such Licenses are in full force and effect and there exists no threat of a revocation or suspension of any of the Licenses.

SECTION 3.11. <u>Subsidiaries/Affiliates.</u>  There is no Subsidiary or Affiliate of any Obligor other than as set forth on <u>Schedule 3.11.</u>  Attached hereto as <u>Schedule 3.11</u> is a correct and complete list of all Subsidiaries and Affiliates of each of the Obligors showing as to each

Subsidiary and Affiliate, its name, the jurisdiction of its incorporation or formation and the ownership of equity interests therein.

SECTION 3.12.  Subordinated Debt.  On the Closing Date, there are no outstanding obligations of any Obligor to any other Obligor or to any officer of any Obligor other than the $876,000 of Approved Subordinated Debt owing to Banayan, and that which is set forth on Schedule 3.12.

SECTION 3.13.  Compliance with Applicable Laws.  Each of the Obligors is in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority applicable to it (including, without limitation, all Environmental Laws, rules and regulations), the breach of which could materially and adversely affect its respective business, operations, prospects, properties or assets or the condition, financial or otherwise.

SECTION 3.14.  Loans to Affiliates.  Schedule 3.14 of this Agreement sets forth all loans and/or advances made by any Obligor to any Subsidiary or Affiliate of any Obligor, or by any such Subsidiary or Affiliate to any Obligor or to any other such Subsidiary or Affiliate.

SECTION 3.15.  Schedules.  All of the information which is required to be scheduled in this Agreement is correct and accurate in all material respects.

SECTION 3.16.  Investment and Holding Company Status.  None of the Obligors is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

SECTION 3.17.  Solvency, etc.  On the Closing Date and immediately prior to and after giving effect to each borrowing hereunder and the use of the proceeds thereof: (i) the assets of each of the Obligors, respectively, will exceed such Person's own (i.e. uncombined) liabilities, and (ii) each of the Obligors will be solvent, will be able to pay its debts as they mature, will own property with fair saleable value greater than the amount required to pay its debts and will have capital sufficient to carry on its business as then constituted.

SECTION 3.18.  Environmental Matters.  Except as set forth in Schedule 3.18, none of the Obligors (i) has failed to comply with any material provision of any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.19.  Labor Disputes.  No Obligors is involved in any material labor dispute.

SECTION 3.20.  Leases; Warehouses.  Schedule 3.20 provides a list of all real property in which any Obligors (other than Banayan) holds a leasehold interest, as well as a list of all warehouse (or similar) locations where any of their respective property is held as of Closing

HF 3082102 v.7 #06406/0023

Date.  Other than such leasehold interests, none of such Persons owns an interest in any real property.

SECTION 3.21.  Bonds.  All material matters with respect to the obligations of the Borrower in connection with the Bonds are fairly and accurately summarized on Schedule 3.21. True copies of all existing Bond Documents have been provided to the Bank and there have been no amendments to any of the Bond Document since such delivery.

SECTION 3.22.  Patriot Act.  All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices, related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "**Patriot Act**") are incorporated into this Section.  Each of the Obligors is:  (i) not a "blocked" person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "**Annex**"); (ii) in full material compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury (as used in this Section only, "**OFAC**"); (iii) operated under policies, procedures and practices, if any, that are in full material compliance with the Patriot Act and available to the Bank for its review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" person on any lists maintained by OFAC pursuant to the Patriot Act or any other list of terrorist or terrorist organizations maintained pursuant to any of the rules and regulation of  OFAC issued pursuant to the Patriot Act, or on any other list of terrorist or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be subject to any of the prohibitions contained in the Patriot Act; and (vii) not owned or Controlled by or now acting and/or will in the foreseeable future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or for or on behalf of any other Person who has been determined to be subject to the prohibitions contained in the Patriot Act.

SECTION 3.23.  PACA/PASA.  (a) Any and all products sold by any Obligor which are potentially subject to regulation under PASA are imported by such Obligor and manufactured prior to their import.  Therefore, PASA is not applicable to any such products.

(b)      None of the Obligors imports any perishable produce (i.e., fruits or vegetables) as defined in 7 U.S.C. § 499(b)(4) and as further described in 7 C.F.R. §§ 46.2(u) and (v) and therefore PACA is not applicable to any of the Obligors.

(c)      There currently exists no Trade Claim against any assets of any of the Obligors.

# EXHIBIT A
# (Part 2 of 5)

## IV. CONDITIONS OF LENDING

The making of the Facility A Loan and the Commitment, and the obligations of the Bank to make any Loan or to effect any Borrowing hereunder, are subject to the following conditions precedent:

SECTION 4.01. <u>Representations and Warranties</u>. On the Closing Date and on each Borrowing Date, the representations and warranties set forth in Article III of this Agreement shall be true and correct in all material respects, on and as of such time with the same effect as though such representations and warranties had been made on and as of such time, except for such subsequent matters as shall have been disclosed to the Bank in writing and approved (also in writing) by the Bank as being unlikely to have a material adverse effect on the ability of any Obligor to perform as required under the Loan Documents.

SECTION 4.02. <u>No Default</u>. On the Closing Date and on each Borrowing Date, no Event of Default nor any event which upon notice or lapse of time or both would constitute such an Event of Default, shall have occurred and be continuing or would be caused by any such borrowing.

SECTION 4.03. <u>Executed Documents</u>. The following shall have been delivered to the Bank on or before the Closing Date (unless another time is indicated), all in form and substance satisfactory to the Bank, and (unless otherwise indicated) each dated as of the Closing Date:

(a) The Facility A Note executed by the Borrower;

(b) The Facility B Note executed by the Borrower;

(c) The Guaranty duly executed by the Guarantors;

(d) The Security Agreement duly executed by the Obligors (other than Banayan);

(e) A Subordination Agreement executed by Banayan, as Subordinated Lender, and the applicable Obligor;

(f) The Mortgagee Waiver duly executed by Merrill Lynch Business Financial Services, Inc. in favor of the Bank;

(g) UCC-1 financing statements as to any Collateral pledged by the Obligor under the Security Agreement, which shall be filed by the Bank at the expense of the Obligors;

(h) Certified copies of the Bond Documents,

(i) An accounts receivable aging report and finished inventory schedule for the Borrower, together with a Borrowing Base Certificate;

(j) A completed collateral examination, inclusive of an accounts receivable, inventory and books and records review, satisfactory to the Bank in its sole discretion;

31

(k)    An appraisal of the Borrower's machinery and equipment which is not subject to any Permitted Encumbrance and whose (i) value as calculated by dividing (a) the sum of (1) the market value of such machinery and equipment and (2) the net orderly liquidation value divided by (b) two, is not less than $2,000,000 and (ii) whose net orderly liquidation value is greater than or equal to $1,000,000;

(l)    Opinion letter of counsel for the Obligors addressed to the Bank;

(m)    The following supporting documents:

(i)    Certificates of good standing (or equivalent) for LCD Corp. from the Secretary of the State of its respective incorporation or formation;

(ii)    Proof of filing of the necessary biennial statements of each of the Borrower, YR LLC and SLF Corp. so as to cause such Obligors to be in good standing and eliminate any existing deficiencies;

(iii)    Certificates of Resolution, Incumbency and Organizational Documents for each Obligors (other than Banayan); and

(iv)    such other documents as the Bank may reasonably request;

(n)    For each Borrowing Date after the Closing Date, a certificate, dated such date and signed by an Executive Officer of the Borrower requesting such borrowing, confirming compliance with the conditions precedent set forth in Sections 4.01 and 4.02, and such other documents, opinions, searches, further assurances and the like as the Bank may, in good faith, request in order to confirm compliance with the Loan Documents;

(o)    Proof satisfactory to the Bank that the Collateral is free and clear of all liens, claims, security interests and other encumbrances, except Permitted Encumbrances;

(p)    If requested for any Borrowing Date, evidence satisfactory to counsel to the Bank that all applicable laws and regulations applicable to the Obligors have been complied with;

(q)    Certificates of insurance or other documentary evidence that casualty and risk insurance on the property of the Obligors (other than Banayan), and liability insurance covering, among other things, inability or failure to perform under contractual obligations, are in full force and effect, which certificates of insurance shall name the Bank an additional insured and a loss payee with respect to all tangible personal property;

(r)    If requested on the Closing Date or for any Borrowing Date, documentary evidence that there exists no other agreement, indenture, or contract, to which any Obligor is party, which would be violated by any of the Loan Documents or the extensions of credit contemplated hereunder; and

(s)    On the Closing Date, a letter requesting the initial disbursement of proceeds of any of the Loans, and prior to each Borrowing Date after the Closing Date (as required under Section 2B.01(c)), a Notice of Borrowing in connection with any Facility B Borrowing.

(t)    Proof satisfactory to the Bank that any Indebtedness owing to, or Liens in favor of, Merrill Lynch Business Financial Services, Inc. and NBT Bank have been satisfied and terminated.

SECTION 4.04.    Fees and Expenses.    As of the Closing Date and each Borrowing Date, the Bank shall have received payment of all fees and expenses of the Bank in connection with the Loan Documents and the transactions contemplated thereby, including fees and expenses of the Bank's counsel and, as of the Closing Date, a fully earned and non-refundable facility fee payable to the Bank in an amount equal to (a) $10,000 for Facility A and (b) $27,500 for Facility B.

SECTION 4.05.    Landlord Consents/Warehouse Notifications.    On or before the Closing Date, the Obligors (a) shall have delivered to the Bank (a) Landlord Waiver and Consent with respect to each applicable leased location, if any, and (b) a Warehouse Notification with respect to each warehouse in which any Obligor stores any Collateral, if any.

## V.    AFFIRMATIVE COVENANTS

Each of the Obligors covenants and agrees with the Bank that, so long as the Facility B Commitment shall remain in effect or any of the principal of or interest on either Note or any fees incurred hereunder, or any other expense or amounts payable under this Agreement or under any of the other Loan Documents, shall be unpaid, each of the Obligors (as applicable) shall:

SECTION 5.01.    Existence, Properties, etc.    (a)    Do or cause to be done, all things necessary to preserve and keep in full force and effect the existence of each of the Obligors (other than Banayan) as a corporation or limited liability company (as applicable); (b) comply with the Bond Documents and all other material contractual obligations applicable to it (in addition to those obligations contemplated by other portions of this Article V); (c) preserve all of its property used or useful in the conduct of its business and keep the same as required under the Security Agreement and otherwise in good repair, working order and condition, and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and (d) at all times maintain (i) property and business interruption insurance as required under the Security Agreement and otherwise to such extent and against such risks, including fire, as is customary with companies in the same or similar businesses, (ii) worker's compensation insurance in the amount required by applicable law, (iii) public liability insurance in the amount customary with companies in the same or similar business against claims for personal injury or death or property damage, and (iv) such other insurance as may be required by law or as may otherwise be required in writing by the Bank.    All such insurance shall be in amounts required by law and be reasonably satisfactory to the Bank, and shall, as to tangible assets which are Collateral name the Bank as an additional insured and loss payee.

HF 3082102 v.7 #06406/0023

SECTION 5.02. <u>Payment of Taxes, etc.</u>  Pay and discharge or cause to be paid and discharged promptly all taxes, assessments and governmental charges or levies imposed upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become delinquent, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a lien or charge upon such properties or any part thereof; <u>provided, however,</u> that except for a tax, charge, assessment, levy or claim with respect to any part of the Collateral, the Obligors shall not be required to pay and discharge or cause to be paid and discharged any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings on terms satisfactory to the Bank, and in the case of any of the Obligors (other than Banayan), the applicable Obligor shall have set aside on its books appropriate reserves with respect to any such tax, assessment, charge, levy or claim so contested.

SECTION 5.03. <u>Financial Statements, Reports, etc.</u>  Furnish to the Bank the following, which must be in form satisfactory to the Bank:

(a)    Within 90 days after the end of each fiscal year, a balance sheet, statement of income and expense and a statement of cash flow of the Borrower together with supporting schedules (including supporting schedules showing consolidated results for the Borrower and its Subsidiaries with respect to the balance sheet, statement of income and expense and statement of cash flow), reviewed by to by independent certified public accountants (the "**Auditor**") of recognized standing acceptable to the Bank, and prepared in each case in accordance with GAAP;

(b)    Within 90 days after the end of each fiscal year, a balance sheet, statement of income and expense and a statement of cash flow of each Guarantor (other than Banayan), together with supporting schedules (including supporting schedules of the type specified in the foregoing clause (a)), compiled by the Auditor, and prepared in accordance with GAAP;

(c)    Within 45 days after the end of each fiscal quarter, a balance sheet, statement of income and expense and a statement of cash flow of the Borrower (other than Banayan), together with supporting schedules (including a supporting schedule of the type specified in foregoing clause (a)), prepared by management in accordance with GAAP and certified by an Executive Officer of such Obligor (as applicable), showing the financial condition and the results of operations at the close of such period;

(d)    Within 30 days from the filing thereof, copies of the Federal and state income tax returns of each of the Obligors;

(e)    Together with the delivery of the copies of his tax returns pursuant to foregoing subsection (d), a personal financial statement (on the Bank's form) for Banayan;

(f)    [Intentionally omitted];

34

(g)     Within 15 days after the end of each calendar month, an accounts receivable aging report, a current inventory run and accounts payable aging report, each signed and certified by Banayan together with a Borrowing Base Certificate for the Borrower for the month then ended;

(h)     A copy of any management letter prepared by the Auditor in connection with the financial statements furnished to the Bank pursuant to subsection (a) and (b) hereof, in the event any such management letter is prepared;

(i)     Together with the financial statements descried in clause (a), (b) and (c) above, a certificate signed by an Executive Officer of each applicable Obligor (in the form of Exhibit G) stating whether or not an Event of Default exists and showing the details of compliance with all financial covenants hereunder;

(j)     From time to time, such other information regarding the operations, business affairs and financial condition of each of the Obligors as the Bank may in good faith request; and

(k)     All reports and forms filed with respect to any Plan, except as are filed in the normal course of business and that would not be likely to result in an adverse action to be taken under ERISA, together with a statement explaining the details related to any ERISA Event.

SECTION 5.04.  Access to Premises and Records.   Maintain financial records in accordance with GAAP and permit, upon prior reasonable notice to the respective Obligor, internal consultants of the Bank or similar representatives of the Bank to have reasonable access to the financial records, and other records of the Obligors and their properties during business hours, and permit such consultants or representatives to make such excerpts from such records and to conduct, once in any 12 month period (and as often as requested after an Event of Default), at the Borrower's cost and expense, such audits of the Collateral and their books and records as such representatives reasonably deem necessary.

SECTION 5.05.  Notice of Adverse Change.   Promptly notify the Bank in writing of (a) any change in the business, operations or financial condition of any Obligor, or any other development (including any material labor dispute) relating to any such Person which may make it more likely that a Trust Claim could arise or may be materially adverse to any of the Obligors, disclosing the nature thereof, and (b) any information which indicates that any financial statement delivered pursuant to this Agreement, fails, to any material extent, to present fairly the financial condition and results of operations or other information purported to be presented therein, disclosing the nature thereof.

SECTION 5.06.  Notice of Default.   Promptly furnish to the Bank a written statement upon the occurrence of (i) any Event of Default or the occurrence of any event which, upon notice or lapse of time or both, would constitute an Event of Default, and (ii) any default under any other material agreement to which any Obligor is a party, such notice to specify the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto.

SECTION 5.07.  Litigation Notice.   Give the Bank prompt written notice of any Action, investigation or audit which, if adversely determined against any Obligor on the basis of the

35

allegations and information set forth in the complaint or other notice of such action, suit or proceeding, or in the amendments thereof, if any, would materially impair the right or ability of any Obligor to carry on its or his business substantially as now conducted such Obligor.

SECTION 5.08. ERISA Reports. (a) Comply in all material respects with the applicable provisions of ERISA, and (b) furnish to the Bank (i) as soon as possible, and in any event within five days after any Executive Officer knows or has reason to know that any ERISA Event has occurred with respect to any Obligor or any of their ERISA Affiliates, a statement of the chief financial officer of the applicable Obligor setting forth details as to such ERISA Event, if any, given to PBGC, and (ii) promptly after receipt thereof, a copy of any notice it may receive from the PBGC relating to the intention of the PBGC to terminate any Plan or to appoint a trustee to administer any Plan.

SECTION 5.09. Compliance with Applicable Laws. Comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, including, without limitation, Environmental Laws, and regulations promulgated by the FDA and OSHA the breach of which would be likely to materially and adversely affect the business, operations, prospects, properties or assets or the condition, financial or otherwise, of any Obligor.

SECTION 5.10. Subsidiaries/Affiliates. Upon its formation or acquisition, cause any Subsidiary or Affiliate of any Obligor to become a Guarantor of all of the Loans, and of the other obligations of the Borrower under the Loan Documents, pursuant to documentation acceptable to the Bank. Such documentation shall, among other things, require such Subsidiary or Affiliate (i) to become a grantor of Collateral under a (new) Security Agreement, in form and substance substantially the same as the Security Agreement and (ii) to comply with all of the terms and conditions of this Agreement which the Bank in good faith determines should be applicable to such Subsidiary or Affiliate. Such documentation shall, among other things, also include a new Guaranty substantially in the form of Exhibit D and a joinder and/or amendment to this Agreement and the other Loan Documents; certified resolutions and a good standing certificate.

SECTION 5.11. Licenses. Maintain all Licenses necessary for the lawful operation of its businesses, and promptly notify the Bank upon becoming aware of any revocation or suspension or the existence of any threat of a revocation or suspension of any such License.

SECTION 5.12. Use of Proceeds. Use the proceeds of (a) the Facility A Loan, only to finance the permanent working capital requirements of the Borrower and (b) any Facility B Loan, only to finance working capital requirements and for the corporate purposes of the Borrower.

SECTION 5.13. UCC Filings. Promptly after a request therefor, deliver to the Bank UCC search reports evidencing the completion of all UCC filings made in connection with the closing under this Agreement.

SECTION 5.14. Banking Relationship. In the case of each Obligor (other than Banayan), maintain all of its banking depository and disbursement relationship with the Bank and establish such accounts and maintain balances therein with the Bank sufficient to cover the

36

cost of all the Bank's services provided; provided, however, that nothing herein shall require any such Obligor to keep and maintain a specific minimum balance in any such account.

SECTION 5.15. <u>Bond Documents</u>. Promptly, upon receipt thereof, provide to the Bank copies of all proposed and actual amendments to any existing Bond Documents and any additional Bond Documents.

SECTION 5.16. <u>Affiliate and Officer Loans</u>. Subordinate all obligations of any Obligor to any other Obligor or to any officer thereof, to the obligation of the Borrower to the Bank under the Loan Documents, which subordination shall be pursuant to documentation in form and substance substantially the same as the Subordination Agreement entered into as of the Closing Date.

SECTION 5.17. <u>Post Closing</u>. (a)  No later than 120 days following the Closing Date, the Borrower shall (a) implement, and cause to be operational, an accounting system which tracks inventory by its age and value and such system must be satisfactory to the Bank and (b) provide confirmation to the Bank that its general ledger is being tracked and updated on a basis no less frequent than monthly.

(b)  No later than 120 days following the Closing Date, the Obligors shall use best efforts to cause amendments to the financing statements listed on Schedule 5.17(b) to be filed and such amendments shall alter the description of collateral thereon such that it covers solely specific pieces equipment being financed by the applicable secured party; provided, however, should the Obligors not be able to effect any such amendments despite their commercially reasonable efforts, the Obligors agree to commence suit against the applicable secured party(s) to cause such secured party(s) to make such amendments and/or take other such reasonable action as is requested by the Bank in connection therewith, including, without limitation, taking any necessary action to affect the reduction of the principal amount of the Facility A Loan in an amount as determined by the Bank in its reasonable discretion; and provided further that, should any such amendment be obtained subsequent to any such reduction, the amount reduced shall be reinstated without penalty or premium;

(c)  No later than 90 days following the receipt by the Obligors of a list of certain specific equipment from the Bank, the Obligors will take any necessary action requested by the Bank as a further assurance with respect to any Liens on such specific equipment of the Obligors identified by the Bank; and

(d)  No later than 30 days following the Closing Date, the Obligors shall provide good standing certificates for each of the Borrower, SLF Corp and YR LLC without qualification or notification of deficiency thereon.

VI.    NEGATIVE COVENANTS

Each Obligor covenants and agrees with the Bank that, so long as the Facility B Commitment shall remain in effect or any of the principal of or interest on either Note, or any

fees incurred hereunder, or any other expense or other amounts payable under this Agreement or under any of the other Loan Documents, shall be unpaid, it shall not:

SECTION 6.01. Liens.    Incur, create, assume or suffer to exist any Lien or other encumbrance of any nature whatsoever (including any Trust Claim or any conditional sales or other title retention agreements) on any assets now or hereafter owned by it, other than Permitted Encumbrances.

SECTION 6.02. Sale of Assets, Consolidation, Merger, etc.  (i) Sell, lease, transfer or otherwise dispose of any of its properties or assets, whether or not pursuant to an order of a Governmental Authority, except in the normal course of business (including replacement of obsolete or worn out equipment), (ii) consolidate with, acquire or merge into any Person or permit a Person to merge into it or to acquire it, (iii) acquire all or substantially all of the property or assets of any other Person, or (iv) create or acquire any Subsidiary or Affiliate without compliance with Section 5.10.

SECTION 6.03. Indebtedness.    Incur, create, assume or suffer to exist or otherwise become liable in respect of any Indebtedness other than:

(a)    Indebtedness heretofore incurred and described in Schedule 6.03, which Indebtedness shall not be renewed, extended, refinanced or optionally prepaid;

(b)    Indebtedness to the Bank incurred in connection with this Agreement or otherwise;

(c)    Trade payables and other ordinary liabilities incurred in the normal course of business;

(d)    Any Approved Subordinated Debt;

(e)    Capital Lease Obligations of the Obligors taken as a whole not to exceed $250,000 in the aggregate during any fiscal year; and

(f)    Any consumer debt of Banayan.

SECTION 6.04. Guarantees.    Be or become liable under any Guarantee except:

(a)    Existing Guarantees as set forth in Schedule 6.04 , which Guarantees may not be renewed, extended or increased; and

(b)    The Guaranties or any other Guarantee in favor of the Bank.

SECTION 6.05. Sales of Notes, etc.    Sell, transfer, discount or otherwise dispose of notes, accounts receivable or other obligations owing to it, with or without recourse, except for collection in the ordinary course of business.

HF 3082102 v.7 #06406/0023

SECTION 6.06. <u>Loans and Investments</u>.  Lend or advance money, credit or property to any Person, or invest in (by capital contribution or otherwise) or purchase or repurchase the stock, other securities, or partnership interests, other equity or Indebtedness of any Person, except for Permitted Investments.

SECTION 6.07. <u>Nature of Business</u>.  Change or alter the nature of its business.

SECTION 6.08. <u>Violations of Board Regulations</u>.  Permit any of the proceeds of any of the Loans to be used for purposes which might constitute a violation of any Board regulation.

SECTION 6.09. <u>Leverage Ratio</u>. In the case of the Borrower only, fail to maintain, at all times, a ratio of (a) Total Liabilities, to (b) Tangible Net Worth plus Approved, Subordinated Debt, of not greater than 3.00 to 1.00.

SECTION 6.10. <u>Debt Service Coverage</u>.  In the case of the Borrower only, fail to maintain at all times, measured on a rolling four quarters basis for the term most recently completed fiscal quarters in which results are available, a ratio of (a) EBITDA (less Unfunded Capital Expenditures), to (b) the sum of the current scheduled maturities of all Indebtedness for borrowed money (including, but not limited to, Capitalized Lease Obligations) having an original term of one year or more, plus interest expense of not less than 1.25 to 1.00.

SECTION 6.11. <u>Net Loss</u>.  Incur or suffer any net loss at the end of any fiscal quarter.

SECTION 6.12. <u>Sale and Leaseback</u>.  Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, whether real or personal, used or useful in its business, whether now owned or hereafter acquired, if at the time of such sale or disposition it intends to lease or otherwise acquire the right to use or possess (except by purchase) such property or like property for a substantially similar purpose.

SECTION 6.13. <u>Fiscal Year</u>.  Change its fiscal year.

SECTION 6.14. <u>Negative Pledge</u>.  Sell, lease or otherwise dispose of, or create or suffer to exist any Lien other than any Liens on the assets of YR LLC and on the subleasehold intent of the Borrower arising under the Bond Documents, on any of the real property of any of the Obligors.  For the avoidance doubt, any conflict between this Section 6.14 and any of Sections 6.01, 6.04, 6.03 or 6.12 shall be construed in favor of this Section 6.14.

SECTION 6.15. <u>PACA/PASA</u>.  Alter, change, expand or modify any of its lines of business or any of its business practices such that any purchase or importing of any products by any Obligor shall subject such Obligor to a Trust Claim under either PACA or PASA.

VII.    EVENTS OF DEFAULT

SECTION 7.01. <u>Events of Default</u>.  In the case of the happening of any of the following events (each an "**Event of Default**"):

39

(a)    any representation or warranty of any Obligor made in this Agreement or in any other Loan Document shall prove to be false or misleading in any material respect when made or given or deemed made or given;

(b)    any report, certificate, financial statement or other document, agreement or instrument furnished to the Bank in connection with this Agreement or any of the other Loan Documents or any borrowing hereunder, shall prove to be false or misleading in any material respect when made or given or deemed made or given;

(c)    default shall occur in the payment of any principal when due hereunder (or under either Note), or any of interest or fees due hereunder (or under either Note), or if any Obligor shall fail to pay when due, any other amounts payable to the Bank or its representatives under this Agreement or any of the other Loan Documents as and when the same shall become due and payable and such default shall remain unremedied for a period of five (5) days following the occurrence of such default;

(d)    default shall occur in respect of any agreement or obligation relating to any Indebtedness (to the Bank or to any other Person) of any Obligor (other than the agreements and obligations referred to in the foregoing item (c)) (A) in any amount to the Bank or (B) in an aggregate amount owing to any other Person(s) exceeding $50,000 for the Obligors combined, if the effect of such default is (or would be with the giving of notice, passage of time or both) to accelerate the maturity of such obligation or to permit the holder or obligee thereof (or a trustee on behalf of such holder or obligee) to cause such obligation to become due prior to the stated maturity thereof, or if any such obligation shall not be paid when due (or within any applicable grace period);

(e)    default shall occur in the due observance or performance of any covenant set forth in Article VI hereof or of any covenant set forth in Section 5.01, 5.05, 5.06, 5.07, 5.10, 5.12, 5.14 or 5.15;

(f)    default shall occur in the due observance or performance of any covenant, condition or agreement (other than the agreements, obligations and covenants referred to in the foregoing items (c) and (e)) of any of the Obligors to be performed pursuant to this Agreement or any of the other Loan Documents and, if in the Bank's good faith opinion, such default is capable of being remedied, such default shall remain unremedied for a period of 30 days following the occurrence of such default;

(g)    any Obligor shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code or any other federal or state bankruptcy, insolvency or similar law, (ii) consent to the institution of, or fail to controvert in a timely and appropriate manner, any such proceeding or the filing of any such petition, (iii) apply for or consent to the employment of a receiver, trustee, custodian, sequestrator or similar official for itself or for a substantial part of its property, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable or admit in writing the inability or the failure generally to pay its

40

debts as they become due, or (vii) take any corporate (or equivalent) action for the purpose of effecting any of the foregoing;

(h)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of any Obligor, or of a substantial part of the property of any such Person under Title 11 of the United States Code or any other federal or state bankruptcy, insolvency or similar law (U.S. or foreign), (ii) the appointment of a receiver, trustee, custodian, sequestrator or similar official for any Obligor, or for a substantial part of the property of any such Person, or (iii) the winding-up or liquidation of any such Person, which, in any such case, is not dismissed or vacated within 60 days after the commencement or the filing thereof;

(i)      a final judgment or judgments for the payment of money in excess of an aggregate amount of $50,000 (or the equivalent in a foreign currency) for any or all of the Obligors or shall be rendered against any of them (as applicable), and the same shall remain undischarged, unbonded and unstayed for a period of 30 days, unless the Bank is provided with documentary evidence and information satisfactory to the Bank that the judgment is fully covered by insurance;

(j)      an ERISA Event shall have occurred that in the opinion of the Bank, when taken together with all other ERISA Events that have occurred could reasonably be expected to have material adverse effect on any obligor (other than the Borrower);

(k)      the Guaranty, the Security Agreement or any Subordination Agreement shall not be in full force and effect at any time;

(l)      a material adverse change has occurred with respect to any Obligor, in the good faith opinion of the Bank;

(m)      any Change in Control shall have occurred;

(n)      any Obligor shall (A) become named on any list of persons who are or may be engaged in or who have been or may have been engaged in possible criminal activity or other wrongdoing, which list is promulgated under the Patriot Act, or (B) be indicted, arraigned or custodially detained on charges involving money laundering or any predicate crime to money laundering;

(o)      any Lien purported to be created under any of the Loan Documents (including any documentation pertaining to a Documentary Letter of Credit) shall be asserted by any Obligor not to be a valid Lien, except as a result of (i) the sale or other disposition of the applicable assets in a transaction permitted under the Loan Documents or (ii) the termination of the Lien in accordance with Section 2.05(a);

(p)      any Obligor, any asset of any Obligor or any payment made to the Bank by or for any Obligor shall become subject to any Trust Claim;

then, (i) automatically upon an Event of Default under subsection (g) or (h) above, or (ii) as to any other Event of Default, at the Bank's option at any time thereafter, the Bank may, without notice (or, in the case of a default set forth in subsection (f) above as to which notice is given, without further notice), or demand upon any Obligor, take any of or all of the following actions, at the same or different times:  (i) terminate the Facility B Commitment, (ii) declare the Notes and all fees accrued hereunder and all obligations of the Obligors under the Loan Documents, contingent or matured, to be forthwith due and payable, both as to principal and interest, without presentment, demand, protest or other notice of any kind, all of which are expressly waived, anything contained in this Agreement or in any of the other Loan Documents to the contrary notwithstanding, and (iii) exercise any or all of the rights and remedies afforded to the Bank in the Guaranty, in the Security Agreement, in the other Loan Documents, by the UCC or other law, or otherwise possessed by the Bank.

## VIII.   MISCELLANEOUS

SECTION 8.01. <u>Notices</u>.    Except as expressly provided to the contrary in this Agreement, any notice, request, demand, statement, authorization, approval or consent made hereunder shall be in writing and shall be hand delivered or sent by Federal Express, or other reputable courier service, or by postage pre-paid registered or certified mail, return receipt requested, or by telecopier, and shall be deemed given (i) when received at the following addresses if hand delivered, sent by Federal Express or other reputable courier service, or telecopied, and (ii) five Business Days after being postmarked and addressed as follows if sent by registered or certified mail, return receipt requested:

If to the Obligors at:

c/o Ahava Food Corp.
110 Beard Street
Brooklyn, New York 11231
Telecopier No.:  (718) 243-0700
Attention:  Moise Banayan

With a copy to:

Stein Riso Mantel, LLP
The Chrysler Building
405 Lexington Avenue
New York, New York  10174
Telecopier No.: (212) 559-6155
Attention:  Dennis L. Stein, Esq.

If to the Bank:

Signature Bank
565 Fifth Avenue
New York, New York  10017

42

Telecopier No.: (646) 822-1833
Attention: Robert Bloch

With a copy to:

Herrick, Feinstein LLP
Two Park Avenue
New York, New York 10016
Telecopier No.: (212) 592-1500
Attention: Stephen D. Brodie, Esq.

Each party may designate a change of address by notice to the other party, given at least 15 days before such change of address is to become effective.

SECTION 8.02. Survival of Agreement. All covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to this Agreement shall survive the making by the Bank of any Loan or issuing by the Bank of, any Letter of Credit, and the execution and delivery to the Bank of the Notes, and shall continue in full force and effect so long as the Facility B Commitment is unterminated or either Note is outstanding or any amount due thereunder or hereunder or under any of the other Loan Document remains unpaid or any Letter of Credit is outstanding. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party (and in the case of a natural person, such person's heirs, executors and administrators); and all covenants, promises and agreements by or on behalf of Obligors which are contained in this Agreement shall inure to the benefit of the respective successors and assigns of the Bank. None of the Obligors may assign or transfer any of its interest under this Agreement or either Note, or under any of the other Loan Documents, without the prior written consent of the Bank.

SECTION 8.03. Expenses of the Bank. Upon receipt of written demand from the Bank, the Borrower shall pay all out-of-pocket expenses incurred in good faith by the Bank in connection with the preparation and negotiation of this Agreement and the other Loan Documents (whether or not all of the transactions hereby or thereby contemplated shall be consummated), the making of any Loan, the enforcement of any rights of the Bank in connection with this Agreement and/or the other Loan Documents, or with respect to any matter arising in connection with the administration of the Loans (other than ordinary loan administration) or any proposed amendment or waiver (whether or not agreed by the Bank) or otherwise concerning any Loan, or with respect to any action or proceeding which may be instituted by any Person against the Bank in respect of any of the foregoing, or as a result of any transaction, action or non-action arising from any of the foregoing, including, but not limited to, the fees and disbursements of counsel to the Bank.

SECTION 8.04. Applicable Law. This Agreement and each Note shall be construed in accordance with and governed by the laws of the State of New York, without regard to principles of conflict of laws except as set forth in Section 5-1401 of the New York General Obligation Law.

43

SECTION 8.05.  <u>Waiver of Rights by the Bank</u>.  Neither any failure nor any delay on the part of the Bank in exercising any right, power or privilege hereunder or under any of the other Loan Documents shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege.  The rights and remedies of the Bank hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom, shall in any event be effective. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Bank may have had notice or knowledge of such Default at the time.

SECTION 8.06.  <u>Adjustment of Maturity</u>.    Except as otherwise expressly provided herein, whenever a payment to be made hereunder shall fall due and payable on any day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such adjustment of time shall be included in computing interest.

SECTION 8.07.  <u>Modification of Agreement</u>.  No modification, amendment or waiver of any provision of this Agreement or any of the other Loan Documents, nor consent to any departure by any Obligor therefrom shall in any event be effective unless the same shall be in writing and signed by the Bank and the party against whom enforcement of any such modification, amendment or waiver is sought, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Obligor or one or more Obligor in any case shall entitle any Obligor to any other or further notice or demand in the same, similar or other circumstance unless this Agreement expressly so requires.

SECTION 8.08.  <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement or any of the other Loan Documents should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

SECTION 8.09.  <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

SECTION 8.10.  <u>Headings</u>.    Section headings used herein are for convenience of reference only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

SECTION 8.11.  <u>Other Events</u>.  (a)  In the event that any introduction of or change in applicable law, regulation, condition, directive or interpretation thereof (including any request, guideline or policy whether or not having the force of law and including, without limitation, Regulations D or U promulgated by the Board as now and from time to time hereafter in effect) by any authority charged with the administration or interpretation thereof:

HF 3082102 v.7 #06406/0023

(i)     subjects the Bank to any tax with respect to any Loan or Letter of Credit (other than any tax on the overall net income of the Bank); or

(ii)    changes the basis of taxation of payments to the Bank of principal of or interest on any Loan or the Letter of Credit (other than any tax measured by or based upon the overall net income of the Bank); or

(iii)   imposes, modifies or deems applicable any reserve or deposit requirements against any assets held by, deposits with or for the account of, or loans or commitments by, an office of the Bank in connection with the obligations of the Bank hereunder; or

(iv)    imposes upon the Bank any other condition with respect to any amount paid or payable to or by the Bank pursuant to this Agreement;

and the result of any of the foregoing is to increase the cost to the Bank of maintaining the Facility B Commitment or any Loan or Letter of Credit, or to reduce the amount of any payment receivable by the Bank hereunder, or to require the Bank to make any payment on or calculated by reference to the gross amount of any sum received by it pursuant hereto, in each case by an amount which the Bank in its reasonable judgment deems material, then:

(A)     the Bank shall promptly notify the Borrower in writing of the happening of such event;

(B)     the Bank shall promptly deliver to the Borrower a certificate stating the change which has occurred or the reserve requirements or other conditions which have been imposed on the Bank or the request, direction or requirement with which it has complied, together with the date thereof, the amount of such increased cost, reduction or payment and the way in which such amount has been calculated; and

(C)     the Borrower shall pay to the Bank, within 30 days after delivery of the certificate referred to in clause (B) above, such amount or amounts as will compensate the Bank for such additional cost, reduction or payment.

Without limitation of the foregoing, if the Bank makes a demand for compensation pursuant to this Section 8.11(a), the Borrower may at any time, upon at least five Business Days' prior notice, subject to the payment of any applicable amounts set forth in the certificate of the Bank referred to in clause (B) of this Section 8.11(a) which have accrued prior to the date of such certificate, repay in full any outstanding Loans, together with accrued interest thereon to the date of prepayment (and the LIBOR Rate Prepayment Premium, if applicable).

(b)     The failure on the part of the Bank to demand compensation under paragraph (a) above on any occasion shall not constitute a waiver of its right to demand such compensation on any other occasion, and the failure on the part of the Bank to deliver any certificate in a timely manner shall not in any way reduce any obligation of the Borrower to the Bank under this

45

Section. The protection of this Section shall be available to the Bank regardless of any possible contention of the invalidity or inapplicability of any law, regulation or other condition which shall give rise to any demand by the Bank for compensation hereunder.

(c)    The Bank will not exercise its rights under this Section 8.11 unless it is doing so at the same general time to other similarly situated customers, in connection with similar financings.

SECTION 8.12. Indemnification. (a) The Obligors jointly and severally agree to indemnify the Bank and each Related Party of the Bank (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any other agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, or the consummation of any transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use of the proceeds thereof, (iii) all reasonable out-of-pocket expenses incurred by the Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by one or more of the Obligors, or any Environmental Liability related in any way to any of the Obligors, (v) any prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(b)    To the extent permitted by applicable law, none of the Obligors nor the Bank shall assert, and each of them hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby, or any Loan or Letter of Credit or the use of the proceeds thereof.

(c)    All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.13. Capital Adequacy. (a) If the Bank shall have determined that the applicability of any law, rule, regulation or guideline or any change therein or in the interpretation or administration of any of the foregoing by any Governmental Authority, central lender or comparable agency charged with the interpretation or administration thereof, or compliance by the Bank (or any lending office of the Bank) or the Bank's holding company with any request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central lender or comparable agency, has or would have the

effect of reducing the rate of return on the Bank's capital or on the capital of the Bank's holding company, as a consequence of this Agreement, the Facility B Commitment or any Loan to a level below that which the Bank or the Bank's holding company could have achieved but for such adoption, change or compliance (taking into consideration the Bank's policies and the policies of the Bank's holding company with respect to capital adequacy) by an amount deemed by the Bank to be material, then from time to time the Borrower agrees to pay to the Bank such additional amount or amounts as will compensate the Bank or the Bank's holding company for any such reduction suffered.

(b)     A certificate of the Bank setting forth such amount or amounts as shall be necessary to compensate the Bank or its holding company as specified in the foregoing Section 8.13(a) shall be delivered to the Borrower and shall be conclusive and binding on the Borrower absent manifest error. The Borrower jointly and severally agrees to pay to the Bank the amount shown as due on any such certificate delivered by it within 10 Business Days after receipt of the same. Without limitation of the foregoing, if the Bank makes a demand for compensation pursuant to this Section 8.13(b), the Borrower may at any time, upon at least five Business Days' prior notice, subject to the payment of any amounts set forth in the certificate of the Bank referred to in this Section 8.13(b) which have accrued prior to the date of such certificate, repay in full any outstanding sum hereunder, together with accrued interest thereon to the date of payment (and the LIBOR Rate Prepayment Premium, if applicable).

(c)     Failure on the part of the Bank to demand compensation for any reduction in return on capital with respect to any period shall not constitute a waiver of the Bank's right to demand such compensation with respect to such period or any other period. The protection of this Section shall be available to the Bank regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed.

(d)     The Bank agrees that it will not make a demand for payment under this Section unless it is, at the same time, generally making similar demands with respect to the other loans of this type to other similarly situated customers of the Bank.

SECTION 8.14. Participation, etc.  The Bank shall have the right at any time, with or without notice to any Obligor: (i) to sell, assign, transfer or negotiate all or any part of its rights and/or obligations under or in respect of the Facility B Commitment, the Loans, the Letters of Credit, this Agreement and the other Loan Documents, and/or (ii) to grant participations therein, to (in any case under either (i) or (ii)) one or more banks (foreign or domestic, including an Affiliate of the Bank and any bank managed by the Board or a Federal Reserve Bank), insurance companies or other financial institutions, pension funds, mutual funds or other Persons. In the event of an assignment pursuant to clause (i), if practicable, such assignee shall assume such rights and/or obligations in writing and shall acknowledge such assumption to the Obligors; provided, however, that the failure to so assume in writing or to so acknowledge to the Obligors shall have no effect on the assignment or the validity or enforceability thereof.

SECTION 8.15. Late Charges.  At the option of the Bank, the Borrower shall pay a fee on any principal and/or interest payment not received by the Bank within 10 days of the date any

47

such payment is due, whether by acceleration or otherwise, in an amount equal to 3% of the amount overdue.

SECTION 8.16.  Default Interest.  At the option of the Bank, upon the occurrence and for the duration of an Event of Default, whether or not the same results in a late charge pursuant to Section 8.15, the Borrower shall, regardless of whether the Bank has exercised any of the other remedies provided for in this Agreement or any of the other Loan Documents, pay interest, to the extent permitted by law (i) on the outstanding principal of any Loan and on any unreimbursed LC Disbursement, (ii) on any amounts advanced by the Bank pursuant to this Agreement or any of the other Loan Documents to protect its security interest in any of the Collateral, or for any other reason contemplated by any of the Loan Documents (after as well as before judgment), and/or (iii) on past due interest on any Loan, at a per annum rate (based on a 360-day year) of three percentage points (3%) in excess of the Prime Rate.

SECTION 8.17.  Usury Saving Clause.  All payment obligations arising under this Agreement, the Notes and the other Loan Documents are subject to the express condition that at no time shall any Obligor be obligated or required to pay interest at a rate which could subject the Bank to either civil or criminal liability as a result of being in excess of the maximum rate which any of them is permitted by law to contract or agree to pay.  If by the terms of this Agreement, the Notes or any other Loan Document, an Obligor is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the applicable rate of interest shall be deemed to be immediately reduced to such maximum rate, and interest thus payable shall be computed at such maximum rate, and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of principal.

SECTION 8.18.  Waiver of Jury Trial.  THE BANK AND THE OBLIGORS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, EITHER OF THE NOTES OR ANY OF THE OTHER LOAN DOCUMENTS.

SECTION 8.19.  Conflicts.  Any conflict between any term, covenant, condition or provision of this Agreement, on the one hand, and any term, covenant, condition or provision of any other Loan Document, on the other, shall be resolved in favor of the term, covenant, condition or provision which is more likely to enlarge the scope of the Collateral or to enhance better the financial security provided to the Bank by the Collateral and/or the Guaranty.

SECTION 8.20.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Bank to or for the credit or the account of the Obligors, against any or all of the obligations of any or all of the Obligors now or hereafter existing under this Agreement held by the Bank, irrespective of whether or not the Bank shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of the Bank under this Section are in addition to any

48

other rights and remedies (including other rights of setoff) which the Bank may have under any other Loan Document, under the law or otherwise.

SECTION 8.21.  Jurisdiction; Consent to Service of Process.

(a)      Each of the Obligors and the Bank hereby irrevocably and unconditionally submit themselves and their property to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court for any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Bank may otherwise have to bring any action or proceeding relating to this Agreement against any or all of the Obligors or any of their properties in the courts of any other jurisdiction.

(b)      The Obligors hereby irrevocably and unconditionally waive to the fullest extent they may legally effectively do so, any objection which they now or may hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01.  Noting in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.22.  Entire Agreement.  This Agreement and the other Loan Documents contain the entire agreement of the Bank and the Obligors with respect to the Loans and the subject matter of the Loan Documents, superseding entirely any prior commitment letter, letter of interest or other agreement or understanding of any kind with respect to any aspect thereof.

**[Remainder of Page Intentionally Blank.]**

49

IN WITNESS WHEREOF, the Obligors and the Bank have executed this Agreement by their duly authorized officers, all as of the day and year first above written.

THE OBLIGORS:

AHAVA FOOD CORP.

By: _Moise Banayan_
Name: _Moise Banayan_
Title: _President_

ST. LAWRENCE FOOD CORP

By: _Moise Banayan_
Name: _Moise Banayan_
Title: _President_

LEWIS COUNTY DAIRY CORP

By: _Moise Banayan_
Name: _Moise Banayan_
Title: _President_

_Moise Banayan_
MOISE BANAYAN

THE BANK:

SIGNATURE BANK

By: _Robert_
Name: _Robert A. Brett_
Title: _SVP_

Credit Agreement

IN WITNESS WHEREOF, the Obligors and the Bank have executed this Agreement by their duly authorized officers, all as of the day and year first above written.

THE OBLIGORS:

AHAVA FOOD CORP.

By: _____
Name: Moise Banayan
Title: President

LEWIS COUNTY DAIRY CORP

By: _____
Name: Moise Banayan
Title: President

_____
MOISE BANAYAN

ST. LAWRENCE FOOD CORP

By: _____
Name: Moise Banayan
Title: President

YONI REALTY, LLC

By: _____
Name: Moise Banayan
Title: Manager

THE BANK:

SIGNATURE BANK

By: _____
Name: Robert *- Brett
Title: SVP

## SCHEDULE 5.17(b)

## FINANCING STATEMENT AMENDMENTS

| Debtor | Secured Party | Jurisdiction | Filing No. |
|---|---|---|---|
| Borrower | NMHG Financial Services Inc. | NY Secretary of State ("NYSOS") | 034362 |
| Borrower | Central Capital Corporation | NYSOS | 200212272862788 |
| Borrower | General Electric Capital Corporation | NYSOS | 200303240638788 |
| Borrower | Valley Commercial Capital, LLC | NYSOS | 200304070767573 |
| Borrower | NMHG Financial Services Inc. | NYSOS | 200409305822337 |
| SLF Corp. | General Electric Capital Corporation | NYSOS | 200407300785453 |
| SLF Corp. | City of Ogdensburg | NYSOS | 200502160255135 |
| LCD Corp. | Lewis IDA Community Development Corporation | NYSOS | 178870 |
| LCD Corp. | California First Leasing Corporation | NYSOS | 200302240407737 |
| LCD Corp. | Development Authority of the North Country | NYSOS | 200412201297079 |
| LCD Corp. | North Country Alliance Local Development Corporation | NYSOS | 200412271327460 |
| LCD Corp. | Lewis IDA Community Development Corporation | NYSOS | 941313 |
| LCD Corp. | Lakeland Bank Equipment Leasing Division | NYSOS | 00-1506 |
| LCD Corp. | California First Leasing Corporation | NYSOS | U2003-00054 |
| LCD Corp. | North Country Alliance Local Development Corporation | NYSOS | U2004-000143 |
| LCD Corp. | Lewis IDA Community Development Corporation | NYSOS | 941313 |
| LCD Corp. | Lakeland Bank Equipment Leasing Division | NYSOS | 00-1506 |
| LCD Corp. | California First Leasing Corporation | NYSOS | U2003-00054 |
| LCD Corp. | North Country Alliance Local Development Corporation | NYSOS | U2004-000143 |

SIGNATURE BANK

**Schedule 6.04 – Guarantees of
Ahava Food Corp.
and the Obligors**

Any guarantees issued in connection with the Bonds transaction or to secure indebtedness owing to Merrill Lynch Business Financial Services, Inc., GE Capital or any equipment lessor, if any, that are not currently being discharged.

## ATTACHMENTS TO CREDIT AGREEMENT

**SIGNATURE BANK**

**Schedule 6.03 – Existing Indebtedness of
Ahava Food Corp.
and the Obligors**

1. Any indebtedness owed to Merrill Lynch Business Financial Services, Inc., GE Capital and pursuant to the Bonds transaction, to the extent not currently being discharged or refinanced.

2. Indebtedness of $1,376,000 owed by the Borrower to Moise Banayan.

3. The following indebtedness:

| Name of Debtor | Description of Indebtedness | |
|---|---|---|
| (a)   Ahava Food Corp. | Account Name | Amount as of 3/31/05 |
| | 1st Greenwich Capital | $103,898.00 |
| | All Point Capital | 23,111.00 |
| | Alto Financial | 1,967.00 |
| | American Equipment Leasing | 23,559.00 |
| | Center Capital | 3,968.00 |
| | Dell Financial Services | 2,470.00 |
| | GE Capital | 97,204.00 |
| | Interchange Capital | 99,793.00 |
| | KeySpan | 75,714.00 |
| | Marlin Leasing | 18,900.00 |
| | NMHG Financial Services | 29,959.00 |
| | SCG Capital | 6,011.00 |
| | Security Leasing | 21,823.00 |
| | Total | $508,377.00 |

| (b) | Lewis County Dairy Corp. | Account Name as of 3/31/05 | |
|---|---|---|---|
| | | Account Name | Amount as of 3/31/05 |
| | | All Points Capital | $      782.28 |
| | | Cal First | 129,511.50 |
| | | Development Authority | 26,868.41 |
| | | Frontier Leasing | 2,902.19 |
| | | Newcourt Financial | 9,006.27 |
| | | NMHG Financial | 983.58 |
| | | North Central Alliance | 32,914.22 |
| | | Valley Commercial | 262,198.32 |
| | | Wells Fargo | 461,869.02 |
| | | Total | $927,035.79 |
| | | Prepaid | 4,327.12 |
| | | Net | $922,708.67 |
| (c) | St. Lawrence Food Corp. | None | |
| (d) | Yoni Realty, LLC | $6,950,000 principal amount owing in connection with the Bonds transaction | |
| (e) | Moise Banayan | Mortgage debt on a personal residence, as previously disclosed to the Bank. | |

SIGNATURE BANK

### Schedule 6.01 – Existing Liens against
### Ahava Food Corp.
### and the Obligors

1.  Ahava Food Corp.:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Hobart Corporation | NY SOS | 125796 | 6/28/01 | 1 Food Processor  FP400-1<br>1 Manual/Tubular Cylinder PFD-CYL<br>1 Manual Push Feed Assy. MNLPFD-    Handle<br>1 Product Cart<br>2 Clear Polycarbonate Pans<br>1 Shredder Plate 3Shred-1/16<br>1 Shredder Plate 3Shred-3/32<br>1 Shredder Plate 3 shred-1/8<br>1 Shredder Plate 3shred-3/16<br>1 Fine Grater Plate 3Grate-fine<br>1 Product Cart |
| Hobart Corporation | Kings Cty | 01PK09357 | 6/29/01 | Same as above |
| GE Capital Corp. (assigned from First Greenwich Capital, LLC & amended) | NY SOS | 172065<br>200306261238452<br>200306261238503 | 9/10/01<br>6/26/03<br>6/26/03 | 1 Spray Dryer System Model 2520A and its auxiliaries, serial number HE-1 AL-FF335, which system includes a drum carrying a serial #VB-1AL-FF-335 sold by Alaqua, Inc. |
| GE Capital Corp. (assigned from First Greenwich Capital, LLC & amended) | NY SOS | 172067<br>200306261238539<br>200306261238553 | 9/10/01<br>6/26/03<br>6/26/03 | 1 Spray Dryer System Model 2520A & its auxiliaries, serial #HE1 AL-FF335, which system includes a drum carrying a serial #VB-1AL-FF-335 sold by Alaqua, Inc. |
| Ervin Leasing Co. | NY SOS | 210874 | 10/30/01 | 1 Koch Double Chamber Packaging Machine SN:1126 |
| Diligenz, Inc. | NY SOS | 211904 | 10/31/01 | 1 Dished Top Vertical Side 1201A Cone Bottom Dimple Jacketed/Insulated SS Tank;<br>1 Homogenizer Eccentric |

# EXHIBIT A
# (Part 3 of 5)

| | | | | Subassembly |
|---|---|---|---|---|
| Alto Financial Services | NY SOS | 229439 | 11/23/01 | 1 Alto Encore Walk Behind Floor Scrubber Model S-28 and accessories |
| GE Capital (assigned from First Greenwich Capital LLC | NY SOS | 237196 20030610144222 | 12/03/01 6/10/03 | Chattel Mortgage Security Agreement on: 1 20F Refrigerated Environmental Chamber (499,800 Cu Ft) 1 35 F Refrigerated Environmental Chamber (375,060 Cu Ft) 1 Rudox 800KW Diesel generator set model RM800 set for 277/480 volt 60HZ standby 1 Lot of 1200 Amp switchgear lineup consisting of 201200 amp parallel breakers and controls; 1-1200 amp automatic transfer switch; 1-1200 amp distribution lineup w/225 amp AF breakers |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 256716 | 12/31/01 | 1 Air Compressor System consisting of 1 1R Compressor Model EP40SF; 1 1R Dryer Model DKR140; 1 1R Compressor Model T303012H; 1 1R Dryer Model DXR 100 1 Vacuum Packaging System consisting of 1 intact RM 572 Vacuum Packaging Machine; 1 MC 57 Cutter 3 Norand 4810 Printers 2 Norand 6212 Hand Held Computer 1 Norand TDK Modem |
| NMHG Financial Services, Inc. | NY SOS | 034362 | 2/12/02 | 4130498 NMHGFS Cost Center 08A24 |
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 161929 200408195701551 | 7/12/02 8/19/04 | 1 80 ton Trane Mnfg Air-Cooled Chiller Package |

| | | | | |
|---|---|---|---|---|
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 188289 200408195701587 | 8/14/02 8/19/04 | 3 Heat Rec Heat Exchange |
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 242137 200408195701854 | 10/25/02 8/19/04 | 1 300 Gal PZ-ST Processor 1 10,000 Gallon Silo Tank |
| Interchange Capital Company, LLC (amended to change name of debtor) | NY SOS | 200212112755865 200408195701804 | 12/11/02 8/19/04 | 1 Case and Stack Conveyor 1 Bottle Conveyor from Filler to New Haabtec Caser 1 Haabtec Caser Model #HT24DCV and installation 1 D.C.C. Stainless Steel Single Case Stacker and Installation |
| Center Capital Corporation | NY SOS | 200212272862788 | 12/27/02 | 1 Octamag Self-Contained Compactor/Container S/N 114453 |
| GE Capital Corp. | NY SOS | 200303240638788 | 3/24/03 | 1 Avanti Plumbing & Heating S/N #AL-FF295, 2003-2nd effect Stainless Steel Evaporator Subsystem complete with heater, condenser, instrumentation and feed/re-circulation pumps complete with CIP interface. |
| Valley Commercial Capital, LLC (assigned from Interchange Bank & amended to change name of debtor and to add equipment) | NY SOS | 200304070767573 200304280900622 200408195701777 200412306088399 | 4/7/03 4/28/03 4/19/04 12/30/04 | 1 Hard Cheese Finishing System, consisting of a cheese curd pump, jacketed stainless steel draining table with accessories, cheese curd elevator, weigh checker, cheese mold filler, pre-press appliance and 2 vertical mold presses; 1 soft cheese packaging system: modified atmosphere semi automatic tray packer, with exact weight ability, USDA standard for soft cheeses and butter in attractive packages with extended shelf life; 1 |

| | | | | |
|---|---|---|---|---|
| | | | | compressors & blowers: 60 HP, dual discuss, low temp, 460 volt 3 phase. 2 commercial electric defrost: extended compressor warranty, liquid line solenoid suction filter, suction accumulator, oil separator, electric defrost kit 1 S.S. Debagger |
| Wells Fargo Bank, MN NA | NY SOS | 200305221042457 | 5/22/03 | 9-GPS/CDPD Antenna 9-NET 955 Mobile Data terminal VLU+ 1-EClient Software Package 9-VLU Plus SN: 0060D618E760, 006-D618E70A, 0060D618E9FB, 0060D618F061, 0060D618E7BF, 0060D618EF4C, 0060D618EFAF, 0060D618C94 |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200306261235812 | 6/26/03 | 1 Mozzarella Cheese Configuration System 1 Soft Cheese Packaging System 1 10,000 Gallon Silo Tank 2 8,000 Gallon Silo Tank 7 Rite Hite HD1700 Series Dock Levelers 1 LB-Automatic Cap Seal/Label Applicating Machine 1 R1200-420 Automatic Vacuum Packaging Machine |
| GE Capital Corp. | NY SOS | 200307241373850 | 7/24/03 | 2 Rudox RM500 Generator Sets Serial Numbers 22254 & 21693 |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200310281783563 | 10/28/03 | 1 Multivac R230 fully automatic rollstock vacuum packaging machine with MC 96-control base machine; Tooling Section: MULTIVAC new construction die Printing Section: MULTIPRINT SM 1, Multiprint "Hot Stamp" Code dating Unit with 2 print beams Cross Cutting section: Film Punch for semi-rigid film Longitudinal Cutting section: Roller Shear Cutting |

| | | | | |
|---|---|---|---|---|
| | | | | Accessories section: Vacuum Trim Canister for edge trims and center strips<br>Vacuum Pumps section: Busch RA0160 Vacuum Pump with single stage, direct driven, air cooled, gas ballasted, Multi-Vane pump without motor starter |
| Wells Fargo Equipment Finance Inc. (amended to add equipment) | NY SOS | 2003130285462822<br>200312035561862 | 10/28/02<br>12/03/03 | 7 Rite Hite HD1700 Series Dock Levelers<br>1 10000 Gallon Silo Tank<br>1 600 Gal Proc |
| Marlin Leasing Corp. | NY SOS | 200405135387860 | 5/13/04 | 1 Netgear Managed 48 Port Switch 2GB Ports with novel XML; 1 Sony AIT-2 50/130GB Tape Drive, 20 Symantec Anti-Virus, 1 Tape Kit, 1 Veritas Backup Exec 9.1 Server Edition, Backup Exec Netware Agent, Backup Exec SQL Agent, 1 Linksys 4 Port Proconnect KVM Switch and 3 Linksys 6Ft KVM Cables, 1 Intel S5200 Server with 2.8FHZ Processor, 1GB DDR RAM, Keyboard and Mouse, 1 CITRIX Metaframe XP, 1 Windows 2003 Server, 1 APC 700VA UPS Backup Battery, 1 APC 1500VA UPS Backup Battery, 1 Windows 2003 Terminal Server, 1 Intel S5200 Server with 2 2.8GHZ Processors, 2GB DDR RAM, Raid Level 5, Keyboard and Mouse, 1 SQL Client Access and Microsoft SQL Server 2000 |
| GE Credit Corp. | NY SOS | 200407300785453 | 7/30/04 | **See attachment A hereto** |
| M&I First National Leasing Corp. | NY SOS | 200408020789531 | 8/2/04 | Biological Wasterwater Treatment Equipment |
| Valley Commercial | NY SOS | 200408115675293<br>200409166776057 | 8/11/04<br>9/15/04 | 6 Engine Intercoolers<br>1 Roof Top Closed Loop |

| Capital LLC (assigned from Interchange Bank) | | | | Intercooler |
|---|---|---|---|---|
| Wells Fargo Equipment Finance Inc. | NY SOS | 200408300891424 | 8/30/04 | 1 Multivac Model R140 packaging Machine<br>1 Concentration Plant Pasteurizer and Pre-healer Sub-system, featuring 16 Second holding Tube, V22 Divert Valve assembly Electronic control, Hot Water Sparge unit, Balance Vat and Connecting piping<br>1 110 Ton Chiller<br>1 Sam 15006 West Falia Milk Separator |
| Security Leasing Services | NY SOS | 200503170424265 | 3/17/05 | 1 EP 100 Air Compressor with 460 Volt Modulation Control, S/N: CK6450 |
| SCG Capital Corp. | NY SOS | 200409018283753 | 9/1/04 | 1 Comat Moulding Machine M50/B4 with 4 Modullar Drums BTR4 and 2 Mozzarella collecting trays<br>1 Curd drainage CSDR30<br>1 Multivac MR615EF |
| NMHG Financial Services, Inc. | NY SOS | 200409305822337 | 9/30/04 | All equipment now or hereafter leased by lessor to lessee |
| First Community Bank | NY SOS | 20053170424304 | 3/17/05 | 1 New Westfalia Butter Churn Model BUC-4000, Stainless Steel HP Drive for 2 Screw, 2 HP Top Drive, Controls, S/N: 078378-23888 |
| Security Leasing Services, Inc. | NY SOS | 200506065496555 | 6/6/05 | 1 Damrow Stainless Steel Cheese Block Former w/ Vacuum Chamber S/n: 91-005/P/N 161600 – CBF-E-394 |
| S I Bank & Trust | Kings Cty | 01PK09366 | 6/29/01 | No description |

2. Lewis County Dairy Corp.:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Lewis County IDA Community Development Corp. | NY SOS | 178870 continuation 073576 continuation 200403160272991 | 8/30/94 4/14/99 3/16/04 | All of Machinery, equipment, fixtures & furnishings at Route 812, New Bremen, NY |
| Lewis County IDA Community Development Corp. | Lewis Cty. | 941313 99525 continuation U2004-00019 continuation | 8/17/94 2/4/04 | All of Machinery, equipment, fixtures & furnishings at Route 812, New Bremen, NY |
| GE Capital Corp. | Lewis Cty. | 95-1467 00-1004 continuation | 10/16/95 6/26/00 | Ghester Jerisen Reconditioned MIX HTST system w/press, holding tube, balance tank & flow direction controls; Pfaulder 3,000 gal. S/S tank, refrigerated w/Sprayball C.I.P.; DamRow pasteurized cream tank, all stainless steel 2,000 gal, Rectangular refrigerated tank w/vertical agitators & C.I.P. sprayballs; S/S tank 1,000 gal., Cherry Burrell refrigerated (reconditioned) w/agitators; American 6,000 gal. Sugar tank w/roper pump; Laboratory sterilizer barnstead auto clave; Chester Jensen ice builder 60,000 lb. Insulated ice tank w/accumulation blower & 2 pumps; Firck Dyna Metric 60 H.P. cooling compressor model MR 190-4A; (2) 25 H.P. 4 cyl. Quincy Air compressors, Model 5120 w/ air teck drain, master water separator, filter & air receiver |
| European American Bank | Lewis Cty | 96-168 amended 96-1178 continued 00-1439 | 1/29/96 7/30/96 9/25/00 | 2 6200 Hanheld, 4MB, 56 Key, S/N 2901336; 2091346; Norand 6200 Handheld Computer S/N 2717680, software Label Aire 2111M, S/N 6-21859405; modification kit for Norwood Printer |

| | | | | 2 Anderson Sle Sanitary Liquid Level Transmitters; 2 Tricover 2" 3-way Tri-Clamp Stainless Steel Valves; Tri-Clover 2" Air Valve Assembly with Quick Coupler Adapter; Tri-Clover 2" 2-way Tri-Clamp Stainless Steel Valve; Eurodrive Tefc Motor Single Winding Constant Solid Haft; Eurodrive TEFC Single Winding Constant Torque Crepaco M-10 Whipper/Chiller/Freezer, S/N 1-2174 Champion Atlantic 328 Home, S/N 9314 All stainless steel 6 head federal bottle filler, including filling heads, custom conveyor, FMC cap vibrator w/stand, misc. change Champion Atlantic 328 Home s/n 9314 Gateway equipment |
|---|---|---|---|---|
| Lakeland Bank Equipment Leasing Division | Lewis Cty | 00-1505 | 10/4/00 | 1 single effect falling film evaporator S/N AL-FF335 |
| Lakeland Bank Equipment Leasing Division | Lewis Cty | 00-1506 | 10/4/00 | 1 Franz Model STSF fluid filler system inclusive of Filler bowl with 30 spouts welded and polished 30 Franz fast-fill no-drip valves Three sets of bottle handling equipment with neck supporting transfer star wheel and in-feed screw Power adjustment of filler bowl height and digital readout Electronically variable speed drive Ladish level control system including controller and valve Stainless Steel column on filler to mount throttling valve and CIP circulating pump CIP System Franz cap applying head |

| | | | | |
|---|---|---|---|---|
| | | | | and mounting to be used with cap chute and pickoff supplied by Consumer Cap Stainless mounting bracket for ink roll date coder Bottle-feed (right hand) |
| California First Leasing Corp. | Lewis Cty | U2003-00054 | 5/20/03 | Fixture filing for 01 MLC 602 Computer Controller Slicer Serial Number 360 01 MLC 602 Computer Controller Slicer Serial Number 360 |
| M&I First National Leasing Corp. | Lewis Cty | U2004-00089 | 8/6/04 | Biological Wastewater Treatment Equipment |
| Development Authority of North County | Lewis Cty | U2004-00140 | 12/22/04 | **Fixture filing per attachment B** |
| North County Alliance Local Development Corp. | Lewis Cty | U2004-000143 | 12/30/04 | **Fixture filing per attachment C** |
| GE Capital Corp. | NY SOS | 209799 125673 continuation | 610/18/95 6/26/00 | Ghester Jerisen Reconditioned MIX HTST system w/press, holding tube, balance tank & flow direction controls; Pfaulder 3,000 gal. S/S tank, refrigerated w/Sprayball C.I.P.; DamRow pasteurized cream tank, all stainless steel 2,000 gal, Rectangular refrigerated tank w/vertical agitators & C.I.P. sprayballs; S/S tank 1,000 gal., Cherry Burrell refrigerated (reconditioned) w/agitators; American 6,000 gal. Sugar tank w/roper pump; Laboratory sterilizer barnstead auto clave; Chester Jensen ice builder 60,000 lb. Insulated ice tank w/accumulation blower & 2 pumps; Firck Dyna Metric 60 |

| | | | | |
|---|---|---|---|---|
| | | | | H.P. cooling compressor model MR 190-4A; (2) 25 H.P. 4 cyl. Quincy Air compressors, Model 5120 w/ air teck drain, master water separator, filter & air receiver |
| European American Bank | NY SOS | 020636 185598 continuation | 1/31/96 9/25/00 | 2 6200 Hanheld, 4MB, 56 Key, S/N 2901336; 2091346; Norand 6200 Handheld Computer S/N 2717680, software Label Aire 2111M, S/N 6-21859405; modification kit for Norwood Printer 2 Anderson Sle Sanitary Liquid Level Transmitters; 2 Tricover 2" 3-way Tri-Clamp Stainless Steel Valves; Tri-Clover 2" Air Valve Assembly with Quick Coupler Adapter; Tri-Clover 2" 2-way Tri-Clamp Stainless Steel Valve; Eurodrive Tefc Motor Single Winding Constant Solid Haft; Eurodrive TEFC Single Winding Constant Torque Crepaco M-10 Whipper/Chiller/Freezer, S/N 1-2174 Champion Atlantic 328 Home, S/N 9314 All stainless steel 6 head federal bottle filler, including filling heads, custom conveyor, FMC cap vibrator w/stand, misc. change Champion Atlantic 328 Home s/n 9314 Gateway equipment |
| All Points Capital Corp. | NY SOS | 192305 | 10/04/00 | 1 Franz Model STSF fluid filler system inclusive of Filler bowl with 30 spouts welded and polished 30 Franz fast-fill no-drip valves Three sets of bottle handling equipment with neck supporting transfer star wheel and in-feed screw Power adjustment of filler bowl height |

| | | | | and digital readout Electronically variable speed drive Ladish level control system including controller and valve Stainless Steel column on filler to mount throttling valve and CIP circulating pump CIP System Franz cap applying head and mounting to be used with cap chute and pickoff supplied by Consumer Cap Stainless mounting bracket for ink roll date coder Bottle-feed (right hand) |
|---|---|---|---|---|
| Sterling National Bank | NY SOS | 192314 | 10/04/00 | 1 Single Effect Falling Film Evaporator S/N AL-FF335 |
| First Greenwich Capital LLC | NY SOS | 159594 | 8/22/01 | 1 Spray Dryer System Model 2520A and its auxiliaries s/n Al-DR-207 |
| GE Capital Colonial Pacific Leasing | NY SOS | 211907 | 10/31/01 | 1 Dished Top Vertical Side 120IA Cone Bottom Dimple Jacketed/Insulated SS Tank; 1 Homogenizer Eccentric Subassembly |
| All Points Capital Corp. | NY SOS | 098067 | 4/29/02 | 1 Used Cherry Burrel Double Cylinder Thermutater, Serial #s 1419 and 1293 |
| California First Leasing Corp. (Assigned, collateral added and address changed) | NY SOS | 200302240407737 200306111152598 200408050805177 200408050805191 | 2/24/03 6/11/03 8/5/04 8/5/04 | Fixture filing for 01 MLC 602 Computer Controller Slicer Serial Number 360 01 MLC 602 Computer Controller Slicer Serial Number 360 |
| GE Capital Corp. | NY SOS | 200303240638788 | 3/24/03 | Fixture filing for 01 MLC 602 Computer Controller Slicer Serial Number 360 01 MLC 602 Computer Controller Slicer Serial Number 360 |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 200306261235812 | 6/26/03 | 1 Mozzarella Cheese Configuration System 1 Soft Cheese Packaging System 1 10,000 Gallon Silo Tank |

| | | | | 2 8,000 Gallon Silo Tank<br>7 Rite Hite HD1700 Series Dock Levelers<br>1 LB-Automatic Cap Seal/Label Applicating Machine<br>1 R1200-420 Automatic Vacuum Packaging Machine |
|---|---|---|---|---|
| Wells Fargo Equipment Finance, Inc. | NY SOS | 200310281783575 | 10/28/03 | 1 Multivac R230 fully automatic rollstock vacuum packaging machine with MC 96-control base machine; Tooling Section: MULTIVAC new construction die<br>Printing Section: MULTIPRINT SM 1, Multiprint "Hot Stamp" Code dating Unit with 2 print beams<br>Cross Cutting section: Film Punch for semi-rigid film<br>Longitudinal Cutting section: Roller Shear Cutting<br>Accessories section: Vacuum Trim Canister for edge trims and center strips<br>Vacuum Pumps section: Busch RA0160 Vacuum Pump with single stage, direct driven, air cooled, gas ballasted, Multi-Vane pump without motor starter |
| Wells Fargo Equipment Finance, Inc. (amended to add collateral) | NY SOS | 200310285462822<br>200312035561862 | 10/28/03<br>12/03/03 | 1 10000 Gallon Silo Tank; 2 8000 Gallon Silo Tank; 1 15000 Gallon Silo Tank; 7 Rite Hite HD1700 Series Dock Levelers; 1 10000 Gallon Silo Tank; 1 600 Gal Proc |
| BBH Financial Services Company | NY SOS | 200406035454484 | 6/3/04 | 2 Omino Amjet A300 SE Printers |
| GE Capital Corp. | NY SOS | 200407300785453 | 6/30/04 | See Attachment A |
| M&I First National Leasing Corp. | NY SOS | 20048020789531 | 8/2/04 | Biological Wasterwater Treatment Equipment |

| Valley Commercial Capital, LLC (assigned from Interchange Bank) | NY SOS | 200408115674809 200409165778065 | 8/11/04 9/16/04 | Model 2l-40 2 Lane Inline Remanufactured Cup Filling Machine with Heat Seal for Three Diameter Containers |
|---|---|---|---|---|
| Valley Commercial Capital, LLC (assigned from Interchange Bank) | NY SOS | 200408115675837 200409165779788 | 8/11/04 9/16/04 | Pump 3- 30 GPM @60TD TEFC 460/3/60 |
| Interchange Bank (amended to change debtor's address) | NY SOS | 200408185698930 200411025918932 | 8/18/04 11/02/04 | 1 MPS Pressure Booster Mounted on 14 Gallon Tank; 1 Parker Hannifin Model #DB5 Nitrogen Generator, Oxygen Analyzer #72-730 with Alarm Capacity |
| Wells Fargo Equipment Finance Inc. | NY SOS | 200408300891424 | 8/30/04 | 1 Multivac Model R140 packaging Machine 1 Concentration Plant Pasteurizer and Pre-healer Sub-system, featuring 16 Second holding Tube, V22 Divert Valve assembly Electronic control, Hot Water Sparge unit, Balance Vat and Connecting piping 1 110 Ton Chiller 1 Sam 15006 West Falia Milk Separator |
| Development Authority of the North Country | NY SOS | 200412201297079 | 12/20/04 | **See attachment B** |
| North County Alliance Local Development Corporation | NY SOS | 200412271327460 | 12/27/04 | **See attachment C** |

3. St. Lawrence Food Corp.:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Ogdensburg Growth Fund Development Corporation | NY SOS | 200402128042156 | 2/12/04 | Ammonia Refrigeration System with the following major components: Chesler Jensen Chiller System (#16A1186 & 16315), Vilter Ammonia Compressor (Serial #31105), Jenera Ammonia Compressor (Serial #0109048); 40 HP Ingersol Rand Air Comp. (Serial #30T6222226); 20 HP Busch Vacuum Pump (serial #588633); 20 HP Busch Vacuum Pump (serial # H114887-12); Multivac 1829; Multivac 1820; Multivac 1831; SS Fabricating-Chill Tank System 0G077; SS Fabricating-mixer molder 867; APV Pasteurizer 75,000 lbs/hr (serial # HMBMMC1551) |
| Greater Massena Economic Development Loan Fund | NY SOS | 200402128042168 | 2/12/04 | Separator Inc. Separator SAMM15006; Separator Inc. Clarifer 352851; Kusel A Frame Cheese Press 3269, 3259 $ 3249; Kusel Finishing Table System 286614-0403920 |
| GE Capital Corp. | NY SOS | 200407300785453 | 7/30/04 | **See attachment A** |
| Interchange Bank (amended to change debtor's address) | NY SOS | 200408185698930 200411025918932 | 8/18/04 11/02/04 | 1 MPS Pressure Booster Mounted on 14 Gallon Tank; 1 Parker Hannifin Model #DB5 Nitrogen Generator, Oxygen Analyzer #72-730 with Alarm Capacity |
| Wells Fargo Equipment Finance, Inc. | NY SOS | 200411025919972 | 11/02/04 | 1 Concentration Plant Pasteurizer and Pre-healer Sub-system, featuring 16 Second holding Tube, V22 Divert Valve assembly Electronic control, Hot Water Sparge unit, Balance Vat and Connecting piping |

| Interchange Bank (amended to add equipment) | NY SOS | 200412066015624<br>200412106033354 | 12/06/04<br>12/10/04 | **See attachment D** |
|---|---|---|---|---|
| Interchange Bank | NY SOS | 200412206056707 | 12/20/04 | 2 curd drainage case model CSDR30.251 disperser table model TSP301 pneumatic mix cutter and drum molds MC241 cheese cooker stretcher unica model BTR4 |
| ICB Leasing Corp. | NY SOS | 200502070196774 | 2/7/05 | 2 22,500 lb. SS Jacketed Curb Vats with Automatic Agitators and Motors<br>1 Rudox Model RM800 Diesel Generator Set, S/N 22298<br>2 32" Conveyor Belt, Item#BV30.00X8X534.00<br>1 V-Belt Applicator Tool, Item # NRE Tooling<br>SS Pulley w/ V-Groove, Item # 24"Odx1'Wide |
| City of Ogdensburg | NY SOS | 200502160255135 | 2/16/05 | **See attachment E** |
| City of Ogdensburg | NY SOS | 200502160255399 | 2/16/05 | Multivac Tooling – Model #R230 – Serial #2275; Pac N Wrap – Model #LDU/2 – Serial #340682LDU – Little David Box Topper |
| Thompson & Johnson Equipment Co., Inc. | NY SOS | 200504085305398 | 4/8/05 | 1 used Clarkmodel #CGC25 Serial #5629394 |

4. Yoni Realty, LLC:

No Liens other than Liens created in connection with the Bonds transaction.

5. Moise Banayan:

| Secured Party | Jurisdiction | File # | File Date | Security |
|---|---|---|---|---|
| Mendel Group Inc, | NY SOS | 200504040476005 | 4/4/05 | All fixtures at his residence |

# ATTACHMENT A

COMPANY NAME: ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 1 | 1 | [1987] VERTICAL JACKETED DAIRY SILO - 60,000 GAL. CAP., SIDE ENTERING AGITATOR - APPROX. 2 HP, PNEUMATIC VALVES, SPRAY BALL AND ACCESSORIES | WALKER | VSHT4323 | 10053 | $27,500 |
| 2 | 1 | [1982] VERTICAL JACKETED DAIRY SILO - 30,000 GAL. CAP., SIDE ENTERING AGITATOR - APPROX. 2 HP, PNEUMATIC VALVES, SPRAY BALL AND ACCESSORIES | WALKER | VSHT3631 | 9362 | $20,000 |
| 3 | 1 | STAINLESS STEEL SKID MOUNTED THREE-TANK CIP SYSTEM W/ (3) STAINLESS STEEL TANKS - 400 GAL. CAP., W/ CENTRIFUGAL PUMP - 7.5/3.75 HP W/ CENTRIFUGAL FEED PUMP W/ CONTROLS | | | | $7,000 |
| 4 | 1 | STAINLESS STEEL TRUCK UNLOADING ASSEMBLY - CABLE SUSPENDED FROM CEILING TRACK, CONSISTING OF: - STAINLESS STEEL CENTRIFUGAL UNLOADING PUMP - 5 HP (NOTE: MOTOR DAMAGED) - STAINLESS STEEL CENTRIFUGAL UNLOADING PUMP - 25 HP - FILTERS, SUPPORTS AND CONTROLS | | | | $1,000 |
| 5 | 2 | STAINLESS STEEL HORIZONTAL, REFRIGERATED HOLDING TANKS - 7,000 GAL. CAP., STAINLESS STEEL INTERNALS, HAND VALVES, SPRAY BALLS AND ACCESSORIES (NOTE: DIFFICULT REMOVAL) | | | | NO VALUE |
| 8 | LOT | FLOW METERS CONSISTING OF: - FLOW METER - PROGRAMABLE FLOW METER W/ BATCH CONTROLLER - PROGRAMABLE FLOW METER W/ BATCH CONTROLLER | AFCO ACCURATE METERING CONTREC- ACCURATE METERING | BC-52 414 TP-709 | 39636 35685 | $1,550 |

DALEY-HODKIN, LLC

MARCH 2004

PAGE 1

COMPANY NAME:
ST. LAWRENCE FOOD CORP.
DBA PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 5 | | HORIZONTAL REFRIGERATED TANKS - 7,000 GAL. CAP., STAINLESS STEEL FACE AND INTERNALS, TOP MOUNTED AGITATORS, SPRAY BALLS, PNEUMATIC VALVE (NOTE DIFFICULT REMOVAL) | N/A | | | NO VALUE |
| 7 | | | | | | |
| 8 | 1 | [1983] STAINLESS STEEL COOLING PRESS - 7,500 LBS/HR., MANUAL CLOSING, APPROX. (165) STAINLESS STEEL PLATES - 10"W X 49"H W/ 30 GAL BALANCE TANK AND CONTROLS | CHESTER/JENSEN | 55 H4/C | 1631/175 | $10,000 |
| 9 | 1 | STAINLESS STEEL COOLING PRESS - MANUAL CLOSING, APPROX. (180) STAINLESS STEEL PLATES - 16"W X 54"H, (2) DIVIDERS W/ CONTROLS | AHLBORN | 161 | 105 | $10,000 |
| 10 | LOT | COMPRESSORS AND ACCESSORIES CONSISTING OF: | | | | $5,000 |
| | | · AMMONIA COMPRESSOR - 60 HP | VILTER | VMC-440 SIZE#4A33K44-6R | R43943 | |
| | | · AMMONIA COMPRESSOR - 60 HP | VILTER | VMC-440 | 31105 | |
| | | · AMMONIA COMPRESSOR - 60 HP | VILTER | SIZE#A33N4446B | N/A | |
| | | · AMMONIA COMPRESSOR - 60 HP (NOTE WITHOUT MOTOR) | VILTER | N/A | N/A | |
| | | · HORIZONTAL INSULATED AMMONIA STORAGE TANK - 1,500 GAL. CAP., STAND, SURGE TANK AND CONTROLS | | | | |
| | | · ROOF MOUNTED COOLING TOWER | | | | |
| 11 | 2 | MEZZANINE MOUNTED ICE BUILDERS - APPROX. 1,000 LB. CAP. | | | | NO VALUE |
| 12 | 1 | PLANT STEAM SYSTEM CONSISTING OF: | | | | $22,000 |
| | | · [1989] COMBINATION GAS AND OIL FIRED BOILERS - 800 HP, 150 PSI | CLEAVER-BROOKS | CB-400-800 | L-85561 | |
| | | · [1975] COMBINATION GAS AND OIL FIRED BOILERS - 800 HP, 150 PSI | CLEAVER-BROOKS | CB-800HP SERIES 400 | L59963 | |
| | | · DEAERATOR TANK - APPROX. 3,000 GAL. CAP., PUMP - 25 HP (NOTE NOT INSTALLED) | N/A AURORA | | | |

DALEY-HODKIN, LLC                                    MARCH 2004                                    PAGE 2

**COMPANY NAME:** ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | - WATER SOFTENING SYSTEM, OTHER PUMPS AND CONTROLS | | | | |
| 13 | 1 | WATER SOFTENING SYSTEM - (2) TANKS, PROGRAMMABLE CONTROLS AND VALVES | | | | $ 500 |
| 14 | 1 | STAINLESS STEEL CIP SYSTEM - SINGLE TANK, 750 GAL. CAP. W/ BALANCE TANK, PUMPS, PNEUMATIC VALVES AND CONTROLS | CUSTOM | | | $ 3,500 |
| 15 | 2 | PVC VERTICAL STORAGE TANKS - 2,000 GAL. CAP. W/ TANK LINERS | | | | $ 650 |
| 16 | 1 | STAINLESS STEEL COP TANK - 1,500 GAL. CAP. | | | | $ 750 |
| 17 | 1 | STAINLESS STEEL CHEESE COOKER - STEAM INJECTION, DUAL INCLINED SCREW, 6" DIA. X 6'L W/ PUMPS AND CONTROLS | SUPREME | | | $ 5,000 |
| 18 | 1 | [1996] STAINLESS STEEL CHEESE SHREDDER - TOP SHREDDER HEAD, DUAL SCREW, 6" DIA. X 20"L W/ PUMPS AND CONTROLS | STAINLESS STEEL FABRICATORS | 720-E | 857 | $ 7,000 |
| 19 | 5 | STAINLESS STEEL CHEESE FINISHING TABLES - 22,000 LB. CAP., TILTED BOTTOM, TRAVELING MIXERS - 60" W X 36'L W/ ACCESSORIES AND CONTROLS | N/A | | | $ 32,500 |
| 20 | 1 | STAINLESS STEEL RINSE TANK - 7' X 4' X 26"H, STAINLESS STEEL LEGS | | | | $ 700 |
| 21 | LOT | BRINE TREATING EQUIPMENT CONSISTING OF: - STAINLESS STEEL OPEN TOP TANK - 25'L X 45"W X 31"H W/ (2) ELECTRIC CHAIN HOISTS - 1 TON CAP. CEILING MOUNTED, PENDANT CONTROLS W/ (12) STAINLESS STEEL HOLDING RACKS | | | | $ 15,000 |

DALEY-HODKIN, LLC                    MARCH 2004                    PAGE 3

COMPANY NAME: ST. LAWRENCE FOOD CORP.
DBA PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | - THREE-TIER FIBERGLASS AND WOOD BRINE TREATING TANKS - 8'W X 20"D X 10", 110' AND 112L - VERTICAL INSULATED STAGE TANK - 12" DIA. X 16H - WOOD AND FIBERGLASS BRINE TANK - 12' X 4' X 20"H - 2-UNIT SHELL AND TUBE HEAT EXCHANGERS - STAINLESS STEEL INTERNALS, 15" DIA. X 15' AND 20L - PUMPS, PORTABLE STAINLESS STEEL, DRYING CONVEYOR, STAINLESS STEEL CHEESE HOLDER RACKS AND CONTROLS | | | | |
| 22 | LOT | LABORATORY EQUIPMENT CONSISTING OF: - TWO-DOOR GLASS DISPLAY REFRIGERATOR - CHEST FREEZER - APPROX. 12 CU. FT. - MICROWAVE MOISTURE/SOLIDS ANALYZER - MILK ANALYZER - PROGRAMMABLE CRYOSCOPE - TABLE TOP ELECTRIC CONVEYORED OVEN - IMPINGER TYPE - AUTOCLAVE - STAINLESS STEEL THREE-DOOR REFRIGERATOR - BACTERIA TESTER, PH METER, TOP PAN BALANCE, ELECTRIC OVENS AND MINOR LABORATORY EQUIPMENT | UNIVERSAL-NOLIN GENERAL ELECTRIC CEM FOSS FOOD TECH ADVANCED INSTRUMENTS LINCOLN NAPCO POWERS | LABWAVE 9000 DAIRYLAB 2 403 1301 9000-D | LS4067 DL1078/0383 9804-003 3020505 | $9,000 |
| 23 | 1 | HTST WHEY PASTEURIZER CONSISTING OF: - STAINLESS STEEL PLATE HEAT EXCHANGER - APPROX. (115) PLATES - 20"W X 49"H, (3) DIVIDERS, MANUAL CLOSING - STAINLESS STEEL BALANCE TANK - 300 GAL. CAP. - STAINLESS STEEL BALANCE TANK - 100 GAL. CAP. - THREE-TIER LOOP - 3-1/2" DIA. PIPE - POSITIVE DISPLACEMENT PUMP - 2 HP - THREE-TIER LOOP - 3-1/2" DIA. PIPE - POSITIVE DISPLACEMENT PUMP - 10 HP - (3) STAINLESS STEEL CENTRIFUGAL PUMPS - STAINLESS STEEL CENTRIFUGAL PUMP - 7.5 HP - PNEUMATIC VALVES AND PROGRAMMABLE CONTROLS | WAUKESHA ALFA-LAVAL | 30 H7-RC | 3010086232 | $30,000 |

COMPANY NAME: ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 24 | 1 | STAINLESS STEEL SEPARATOR W/ AUTOMATIC SLUDGE REMOVAL TANK (NOTE: REPAIRED BY THE COMPANY THAT MAJOR REPAIRS ARE NEEDED) | WESTFALIA SEPARATOR | SAMM 15006 | 1644-350-4500 | $7,000 |
| 25 | 1 | STAINLESS STEEL CLARIFIER W/ AUTOMATIC SLUDGE REMOVAL (NOTE: REBUILT BY SEPARATOR INC. MAY 2001) | ALFA LAVAL | MRPX213 | 352851 | $30,000 |
| 26 | 1 | CREAM PRESS CONSISTING OF: -STAINLESS STEEL PLATE HEAT EXCHANGER- APPROX. (85) PLATES - 16"W X 46"H -BALANCE TANK, PUMP AND CONTROLS | APV | SR350SH | 22575 | $15,000 |
| 27 | 1 | [1989] REVERSE OSMOSIS MEMBRANE FILTERING SYSTEM FOR WHEY - FOUR-TIER, 9 TUBE X 15'L, CONSISTING OF: -(2) STAINLESS STEEL BALANCE TANKS - 150 GAL. CAP. -STAINLESS STEEL BALANCE TANK - 75 GAL. CAP. -(2) CENTRIFUGAL PUMPS - 40 HP FOR PRE-FEED -(2) CENTRIFUGAL PUMPS 40 HP FOR FEED -(5) CENTRIFUGAL PUMPS FOR RECIRCULATION -PROGRAMMABLE CONTROLLER -PNEUMATIC VALVES, SUPPORTS AND ACCESSORIES | NIRO | | 28142801 | $85,000 |
| 28 | 1 | [1989] UF FILTERING SYSTEM - THREE-TIER, 12 TUBE X 10'L, 60,000 LBS./HR., CONSISTING OF: -(4) STAINLESS STEEL CENTRIFUGAL PUMPS - APPROX. 10 HP -STAINLESS STEEL CENTRIFUGAL PUMPS - 10 HP -(2) STAINLESS STEEL BALANCE TANKS - 300 GAL. CAP. -PROGRAMMABLE CONTROLS -CIP THREE-TANK SYSTEM - 1600 GAL CAP. -PNEUMATIC VALVES, PUMPS AND PROGRAMMABLE CONTROLS | NIRO / OMRON | SYSMAC C51G / M-5000-A | 28142802 | $65,000 |
| 29 | 1 | STAINLESS STEEL OPEN TOP TANK - 44" X 44" X 22" | | | | $300 |

DALEY-HODKIN, LLC

MARCH 2004

PAGE 8

COMPANY NAME:  ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 30 | 1 | THREE TANK CIP SYSTEM<br>- (2) STAINLESS STEEL TANKS - 600 GAL. CAP.<br>- STAINLESS STEEL TANK - 800 GAL. CAP.<br>- PROGRAMMABLE CONTROLS | | | | $3,000 |
| 31 | 1 | [1973] VERTICAL JACKETED DAIRY SILO -<br>30,000 LB. CAP.<br>(NOTE: NOT IN USE) | WALKER | VHST-2337-R | N/A | $7,000 |
| 32 | 1 | THREE TANK CIP SYSTEM<br>W/ (3) STAINLESS STEEL TANKS - 500 GAL. CAP.<br>W/ PNEUMATIC VALVES AND PUMPS | CUSTOM | | | $7,000 |
| 33 | 2 | HORIZONTAL JACKETED STORAGE TANKS -<br>7,000 GAL. CAP., STAINLESS STEEL INTERNALS<br>W/ SPRAY BALLS AND PNEUMATIC VALVES | N/A | | | $6,000 |
| 34 | 1 | VERTICAL BOLTED STEEL STORAGE TANK -<br>APPROX. 30,000 GAL. CAP., SET ON CONCRETE PAD<br>(NOTE: NOT IN USE) | N/A | | | $4,000 |
| 35 | 1 | HORIZONTAL JACKETED STORAGE TANK -<br>7,000 GAL. CAP., STAINLESS STEEL FRONT AND<br>INTERNALS<br>W/ SPRAY BALLS AND PNEUMATIC VALVES | N/A | | | $3,500 |
| 36 | 2 | VERTICAL JACKETED DAIRY SILOS - 60,000 GAL. CAP.,<br>SIDE ENTERING AGITATOR, APPROX. 2 HP,<br>PNEUMATIC VALVES, SPRAY BALL AND<br>ACCESSORIES | DAIRY CRAFT | | 720255<br>4892 | $35,000 |
| 37 | 1 | VERTICAL JACKETED DAIRY SILO - 30,000 GAL. CAP.,<br>SIDE ENTERING AGITATOR, APPROX. 2 HP,<br>PNEUMATIC VALVES, SPRAY BALL AND<br>ACCESSORIES | N/A | | | $10,000 |
| 38 | 1 | HORIZONTAL JACKETED STORAGE TANK -<br>7,000 GAL. CAP., STAINLESS STEEL FRONT AND<br>INTERNALS<br>W/ SPRAY BALLS AND PNEUMATIC VALVE | N/A | | | $2,500 |

DALEY-HODKIN, LLC                                MARCH 2004                                                                    PAGE 6

COMPANY NAME: ST. LAWRENCE FOOD CORP,
DBA PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| 39 | 4 | [1987] STAINLESS STEEL DOME TOP PROCESSORS - 800 GAL. CAP., TOP TWO-SPEED AGITATOR, SPRAY BALL W/ PROGRAMMABLE CONTROLS (NOTE: DIFFICULT REMOVAL) | CHERRY-BURRELL | 600PAM EPDA | 3113 | $35,000 |
| | | | ALLEN-BRADLEY | SLC 5/04 | | |
| 40 | 1 | STAINLESS STEEL HTST MILK PASTEURIZER - 30,000 LBS./HR., CONSISTING OF: -STAINLESS STEEL PLATE HEAT EXCHANGER -BALANCE TANK - 300 GAL. CAP -FLOOP HOLDING TUBE -PNEUMATIC VALVE AND PUMP -PROGRAMMABLE CONTROLS (NOTE: BEING INSTALLED, VALUED AS COMPLETELY INSTALLED) | APV | SR6GLC5H | 22674 | $35,000 |
| | | | ALLEN-BRADLEY | | | |
| 41 | 1 | [2003] STAINLESS STEEL CHEESE DRAINING TABLE - 69" X 14" X 66" W/ (2) AGITATORS W/ UNLOADER - 8" DIA. X 6' W/ STAINLESS STEEL CHEESE PRESS AND WEIGH SCALE W/ PROGRAMMABLE SCALE HEAD W/ CONTROLS | KUSEL | DR128814 | 0403920 | $80,000 |
| | | | KUSEL | SE C-2 | 0403E1026 | |
| | | | RICE LAKE | 10-800 | | |
| 42 | 1 | STAINLESS STEEL CHEESE RING WASHER W/ HIGH PRESSURE PUMP | N/A | | | $5,000 |
| 43 | 1 | LPG FORKLIFT TRUCK - 3,250 LB. CAP, 3-STAGE MAST - 188" MAX. LIFT, CUSHION TIRES, OVERHEAD GUARD W/ SIDESHIFTER | TOYOTA | 42-5F0GCU18 | 62829 | $4,500 |
| 44 | 1 | CHEESE PACKAGING LINE CONSISTING OF: -(3) [2002] DOUBLE CHAMBER SHUTTLE TYPE VACUUM PACKAGING MACHINES W/ REMOTE VACUUM PUMPS -STAINLESS STEEL SHRINK TUNNEL - 15" X 40" X 10"H | MULTIVAC | C-500 | 1831 1830 1829 | $42,000 |
| | | | CUSTOM | | | |

DALEY-HODKIN, LLC

MARCH 2004

**COMPANY NAME:**  ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|---|---|---|---|---|---|---|
| | | · CONVEYORIZED METAL DETECTORS | SAFE LINE | BEL605 | 975015 | |
| | | · BOX EJECTOR | BELSON | SFAIR-50 | | |
| | | · (1997) CASE SEALER - TOP AND BOTTOM | BEST PACK | | | |
| | | · CONVEYOR SECTIONS, INLINE SCALE SYSTEM AND CONTROLS | | | | |
| 45 | 1 | VERTICAL BALING PRESS - 60" X 30" CHAMBER | GIVES RECYCLING | 4P50 | 0177 | $2,500 |
| 46 | 1 | [2003] STAINLESS STEEL AUTOMATIC ROLL FED VACUUM PACKAGING MACHINE W/ FORMING STATION, OVERWRAPPER, SEALING STATION AND TRIM STATION W/ REMOTE VACUUM PUMP W/ PRESSURE SENSITIVE LABELLER W/ PENDANT CONTROLLER W/ PROGRAMMABLE CONTROLS W/ INKJET PRINTER | MULTIVAC MR MULTIVAC VIDEOJET | R230 M44-18 | 2275 22716/44A | $180,000 |
| 47 | 1 | STAINLESS STEEL SHREDDER W/ MOTOR - 7.5 HP (NOTE: MODEL SUPPLIED BY THE COMPANY) | URSCHEL | RA-D 2735E AUTO FLUSH | N/A 0400091005 | $15,000 |
| 48 | LOT | PLANT AIR SYSTEM CONSISTING OF: · AIR DRYER - 250 SCFM · AIR DRYER - 250 SCFM | ARROW/ AIRTEK | SMART CYCLE SC220 | 99-9991E. | $9,500 |
| 49 | 1 | · HORIZONTAL TANK MOUNTED ROTARY SCREW AIR COMPRESSOR W/ (2) UNITS - 25 HP | INGERSOLL-RAND | T-30-A25 | 301-672,354 622228 | |
| | | · PACKAGED ROTARY SCREW AIR COMPRESSOR - 50 HP | INGERSOLL-RAND | SSR-EP-SC5E | G35022 1195097 | |
| | LOT | MAINTENANCE MACHINERY CONSISTING OF: · SHOP PRESS - 50 TON CAP. · DRILL PRESS - 17" · HORIZONTAL BAND SAW · DRILL PRESS - 15" · METAL CUTOFF SAW - 16" · ELECTRIC PIPE THREADER · BURNING OUTFIT | DELTA DAYTON N/A BRILLIANT RIDGID | 17-900 32999 400A | R8637 | $5,550 |

DALEY-HODKIN, LLC                                   MARCH 2004                                   PAGE 8

**COMPANY NAME:** ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|--------|-----|-------------|--------------|-------|---------------|----------------------------|
| | | - ARC WELDER | LINCOLN | TIG 175 | | |
| | | - PLASMA CUTTER | THERMAL DYNAMIRA | PAK38XL | | |
| 50 | LOT | - PUMPS CONSISTING OF:<br>- (8) STAINLESS STEEL CENTRIFUGAL PUMPS - 5 HP<br>- (4) STAINLESS STEEL CENTRIFUGAL PUMPS - 10 HP<br>- STAINLESS STEEL CENTRIFUGAL PUMP - 15 HP<br>- POSITIVE DISPLACEMENT PUMP - 2 HP<br>- POSITIVE DISPLACEMENT PUMP - 10 HP | WAUKESHA<br>WAUKESHA | 30<br>130 | 141434<br>341838-07 | $10,000 |
| 51 | 1 | LPG FORKLIFT TRUCK - APPROX. 4,000 LB. CAP., 2-STAGE MAST, CUSHION TIRES, OVERHEAD GUARD | CLARK | | | $2,000 |
| 52 | LOT | EQUIPMENT IN STORAGE INSIDE PLANT BUILDING CONSISTING OF:<br>- 6-LANE MECHANICAL SCALE SYSTEM W/ BAG MACHINE<br>- TUBE PACKAGING MACHINE<br>- (1997) TWO-STATION SHUTTLE VACUUM PACKAGING MACHINE W/ VACUUM PUMP<br>- STAINLESS STEEL PLATE HEAT EXCHANGER<br>- SHREDDER<br>- SHREDDER<br>- CONVEYOR, SMALL TANKS, KETTLES, MOTOR, DRIVES, ETC. | N/A<br>POLYCLIP MULTIVAC<br>URSCHEL<br>URSCHEL | AG-600 | 8251<br>1914<br>N/A | $15,000 |
| 53 | LOT | EQUIPMENT IN YARD STORAGE AREAS CONSISTING OF:<br>- VACUUM STUFFER<br>- FORM, FILL AND SEAL BAG MACHINE<br>- VACUUM PACKAGING MACHINE - 4-STATION<br>- CHEESE CUBER<br>- CONVEYORS, TANK, STANDS, CHUTES, ETC. | R&D<br>DEMAG<br>TRIANGLE | RA-D<br>CC<br>1000<br>SYS 21 ACCELERON<br>8610T | N/A<br>1914<br>N/A<br>17104<br>0722835 | $10,000 |
| 54 | LOT | - STAINLESS STEEL PIPING - 3" AND SMALLER, APPROX. 2,000 L.F. W/ ASSOCIATED PNEUMATIC VALVES | | | | $2,500 |

DALEY-HODKIN, LLC

MARCH 2004

COMPANY NAME: ST. LAWRENCE FOOD CORP.
D/B/A PRIMO FOODS
30 MAIN STREET
OGDENSBURG, NEW YORK

| ITEM # | QTY | DESCRIPTION | MANUFACTURER | MODEL | SERIAL NUMBER | ORDERLY LIQUIDATION VALUE |
|--------|-----|-------------|--------------|-------|---------------|---------------------------|
| 55 | LOT | GENERAL PLANT EQUIPMENT CONSISTING OF: SELF DUMPING HOPPERS, SCALES, FOAMERS, STAINLESS STEEL RINSE SINKS, STAINLESS STEEL TABLES, HAND AND POWER TOOLS | | | | $ 6,000 |
| 56 | LOT | OFFICE FURNITURE AND MACHINES CONSISTING OF: COPIERS, FAX MACHINES, OFFICE COMPUTERS, PHONE SYSTEMS, DESKS, CHAIRS, FILES CABINETS, ETC. | | | | $ 7,500 |

APPRAISAL TOTAL: $ 904,900

DALEY-HODKIN, LLC

MARCH 2004

PAGE 10

542285

2004 JUL 30 PM 12: 10

Attachment B

SCHEDULE "A"

PARCEL I:

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of New Bremen, County of Lewis, State of New York and being further described as follows:

BEGINNING at an iron pin with cap set at the intersection of the northerly highway limits of NYS Rte. 812 and the westerly road margin of Hopps Road;

THENCE S. 69 degrees 04' 59" W. passing through an iron pin with cap set at 66.59 feet and continuing a total distance of 86.66 feet to the easterly shoreline of Black River;

THENCE along the easterly shoreline of Black River a distance of 157.50 feet being situate N. 16 degrees 23' 35" W., 153.42 feet from the end of the last course;

THENCE N. 54 degrees 04' 59" E. passing through an iron pin with cap set a 20.44 feet and continuing a total distance of 67.52 feet to an iron pin with cap set at the westerly road margin of Hopps Road;

THENCE along the westerly road margin of Hopps Road a distance 171.96 feet to the point of beginning situate S. 24 degrees 03' 13" E., 170.68 feet from the end of the last course.

CONTAINING 0.249 acres of land more or less.

PARCEL II:

ALL THAT TRACT OR PARCEL OF LAND situate in the Town of New Bremen, County of Lewis, State of New York and being further described as follows:

BEGINNING at an iron pin with cap set at the intersection of the northerly highway limits of NYS Rte. 812 and the easterly road margin of Hopps Road;

THENCE along the easterly road margin of Hopps Road a distance of 240.11 feet to an iron pin with cap set being situate N. 25 degrees 44' 46" W., 240.21 feet from the point of beginning;

THENCE N. 54 degrees 04' 59" E. a distance of 544.67 feet to an iron pipe found;

THENCE S. 24 degrees 25' 01" E. passing through an iron pipe found at 247.98 feet and continuing a total distance of 293.02 feet to an iron pin with cap set at the northerly highway limits of NYS Rte. 812;

U2004-00089
08/06/2004 10:11AM
Page 3 of 4
Douglas P. Hanno, Lewis County Clerk  U

Schedule "A" (Continued)
Page 2

THENCE S. 55 degrees 01' 32" W. along the northerly highway limits of New York State Rte. 812 a distance of 221.28 feet to an iron pin with cap set;

THENCE S. 62 degrees 47' 13" W. along the northerly highway limits of New York State Rte. 812 a distance of 311.00 feet to the point of beginning.

CONTAINING 3.407 acres of land more or less.

SUBJECT to an easement conveyed to Central New York Power Corporation recorded in the Lewis County Clerk's Office in Liber 181 at Page 72 on June 8, 1938.

ALSO SUBJECT TO drainage rights conveyed to Department of Highways of the State of New York and recorded in the Lewis County Clerk's Office in Liber 2 at Page 263 on May 31, 1916.

ALSO SUBJECT TO an easement conveyed to Continental Telephone Company of Upstate New York and recorded in the Lewis County Clerk's Office in Liber 444 at Page 282 on May 23, 1984.

ALSO SUBJECT TO an easement conveyed to Contel of New York d/b/a GTE New York and recorded in the Lewis County Clerk's Office in Liber 543 at Page 276 on December 17, 1991.

IT BEING the intent to describe the parcels of land conveyed by Hoffman & Dudo, Inc. to Lewis County Dairy Corporation by bargain and sale deed recorded in the Lewis County Clerk's Office in Liber 574 at Page 345 on August 17, 1994.

U2004-00089
08/06/2004 10:11AM
Page: 4 of 4    U
Douglas P. Hanno, Lewis County Clerk

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A NAME & PHONE OF CONTACT AT FILER [optional]
Michelle Capone

B SEND ACKNOWLEDGMENT TO (Name and Address)

Development Authority of the North Country
317 Washington Street
Watertown, NY 13601

RECEIVED AT
ST LAW CO
CLERK OFC

2004 DEC 16  A 10 55

*02004-00140*
12-22-04

U2004-00140
12/22/2004, 12 25PM
Page 1 of 11

Douglas P Hanno, Lewis County Clerk    U

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1 DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| LEWIS COUNTY DAIRY CORP. | | | | |
| 1b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 120 Third Street | Brooklyn | NY | 11230 | USA |

| 1d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e TYPE OF ORGANIZATION | 1f JURISDICTION OF ORGANIZATION | 1g ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | corporation | New York | | ☑ NONE |

2 ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e TYPE OF ORGANIZATION | 2f JURISDICTION OF ORGANIZATION | 2g ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3 SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| DEVELOPMENT AUTHORITY OF THE NORTH COUNTRY | | | | |
| 3b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 317 Washington Street | Watertown | NY | 13601 | USA |

4 This FINANCING STATEMENT covers the following collateral

SEE ATTACHED SCHEDULE A.

| 5 ALTERNATIVE DESIGNATION [if applicable] | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6 This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS    Attach Addendum | | 7 Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8 OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV 05/22/02)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9 NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a ORGANIZATION'S NAME

OR **LEWIS COUNTRY DAIRY CORP.**

| 9b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|

10 MISCELLANEOUS

U2004-00140
12/22/2004 12 25PM
Page 2 of 11
Douglas P Hanno, Lewis County Clerk    U

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11 ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a ORGANIZATION'S NAME

| OR 11b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 11c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 11d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e TYPE OF ORGANIZATION | 11f JURISDICTION OF ORGANIZATION | 11g ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

12 ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

12a ORGANIZATION'S NAME

| OR 12b INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 12c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

13 This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing

14 Description of real estate

**Premises situate in the Town of New Bremen, County of Lewis and State of New York.**

16 Additional collateral description

15 Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest)

17 Check only if applicable and check only one box

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18 Check only if applicable and check only one box

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV 05/22/02)



U2004-00140
12/22/2004 12 25PM
Page 3 of 11
Douglas P Hanno. Lewis County Clerk    U

## SCHEDULE A

Damroe Pressure Wall Processor, with agitator, piping, valves, and associated equipment.

Bottle handling equipment, with labeler, label applicator, hot stamp printer, and associated furnishings, conveyors, connectors and supporting machinery.

Tri-Clover Pump with associated tubing, clamps, controllers and associated fittings.

PMO 50-gallon balanced tank.

APV Gaulin Model 1220MS18-2.5 TPS Homogenizer, serial number 88610146, with associated motor, valves and piping.

Heat exchanger.

Tank, curd mill, whey pump and line, loadout pump, associated pumping for all CIP piping, vats, etc.

Muzan diaphram pump.

Cherry Burrell carton filler model Q80-110, serial number 2124.

Excello stainless steel hydraulic caser, model C74-ST-19, with Texas Instruments controls.

Creamery package 1,000 gallon dome top processor, serial number 8829.

Cherry Burrell 600 gallon hinged lid processor.

Cherry Burrell 300 gallon hinged lid processor model PT, serial number 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.

Case washer with pump.

DeLaval Separator, model MRPX214, serial number 2898315.

Fogg 18-valve half gallon filler, model LH with screw capper and cap feeder.

Intact RM 572 conveyor assembly.

MC57 cutter.

Trays and cutting heads.

All equipment on the annexed list located at the site of Hoffman and Dudo, Inc., Route 812, Town of New Bremen, Lewis County, New York.

All other machinery, tools and equipment used in the operation of Lewis County Dairy Corp. located at Route 812, Town of New Bremen, Lewis County, New York.

→ SCHWERZMANN WISE    ☑005



# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938.

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE



P.O BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376 7031

## EQUIPMENT LIST

### OFFICE

1.   Swivel Desk Chair
2.   Wooden Book Case
3.   Coffee maker
4.   Steel 2 door cabinet/closet
5.   Desk
6.   4 - 3 line phone system (Smart talk 308)
7.   Texas Instrument (TI 504511 Calculator)
8.   Texas Instrument (TI5045 Calculator)
9.   Hole Punch
10.  Pencil sharpener
11.  Alarm clock digital sparticus
12.  Secretary's desk
13.  Tape dispenser (3)
14.  Chair office (office)
15.  Staples
16.  Wooden swivel office chair
17.  Coat tree
18.  Fire extinguisher (2)
19.  Oscilating fan
20.  Invoice holder/dispenser
21.  Shaw walker 4 drawer file
22.  Shaw walker 4 drawer fire safe file
23.  File holders and baskets (25)
24   Door alarm
25   Wall clock
26   Waste baskets (4)
27.  Plastic rug protector (for chair)
28.  6 drawer file box (wooden)
29.  Tape dispenser
30.  Various office supplies & catalogs

U2004-00140
12/22/2004 12 25PM
Page 4 of 11
Douglas P Hanno, Lewis County Clerk    U


PRODUCED IN N.Y.

# EXHIBIT A
# (Part 4 of 5)

06/30/2004 14:46 FAX 315 785 2591        DANC              → SCHWERZMANN WISE   ☑006



# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST,        LOWVILLE, NEW YORK  13387        315 - 376-7031

Page 2
Equipment List

U2004-00140
12/22/2004 12 26PM
Page  5 of 11
Douglas P. Hanno, Lewis County Clerk   U

### OUTSIDE AND TANK ROOM

31.  Picnic table
32.  3 whey tanks with s/s pipe and values
33.  Whey pump.
34.  Stect Cop tank
35. / Fire extinguisher
36.  Stainless truck ladder
37.  2 truck blocks
38.  Wooden extension ladder
39.  1 saw horse
40.  1 truck canvas
41.  1 can    sulfuric acid

### LAB

42.  1 electric hot water heater
43.  coat stand
44.  3 garbage cans
45.  sanyo refrigerator
46.  chest freezer
47.  Steel cabinet
48.  Wooden chair
49.  Wooden stool
50.  Wooden cabinet filled with supplies
51.  Brabendo moisture test
52.  1 plate drier
53.  p ph meter with probe
54.  Acid dispenser

55.  centrifuge
56.  test bottle shaker
57.  Balance scale
58.  Microscope
59.  DMC Slide Reader
60.  clock
61.  various bottles &supplies for l.
62.  scales



06/09/2004 14:49 FAX 315 785 2591    DANC    → SCHWERZMANN WISE    ☑007



# Hoffman and Dudo, Inc.

ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71    7508 STATE ST.    LOWVILLE, NEW YORK  13367    315 - 376-7031

page 3
Equipment list



U2004-00140
12/22/2004 12 26PM
Page 6 of 11
Douglas P Hanna, Lewis County Clerk.  U

## MAKE ROOM

| | |
|---|---|
| 63. Wooden desk | 89. milk unloading pump with line |
| 64. Store countertop with cabinets | 90. Aetlyn torch gaue & cart |
| 65. Toledo scale/ with printer | 91. s/s pin pail with hool pins |
| 66. Paper wrap dispenser | 92. steel COP tank |
| 67. Digital scale with printer | 93. Square s/s/ blance tank |
| 68. Cash register | |
| 69. Impulse sealer (small) | |
| 70. store display case (wooden) | |
| 71. Wooden stool | |
| 72. 4/ 20,000# s/s cheese vats | |
| 73. 2 cheese presses with 4 heads | |
| 74. 1 clock radio | |
| 75. 24 agitator paddles | |
| 76. 12 agitator forks | |
| 77. 8 s/s pails | |
| 78. 1 squeege | |
| 79. 2 s/s forks | |
| 80. 1 s/s table | |
| 81. 1 positive draw whey pump | |
| 82. s/s whey strainer | |
| 83. 2 saw horses | |
| 84. s/s balance tank with pump | |
| 85. 2 Toedo dial scales | |
| 86. 2 Frau separators | |
| 87. 3 s/s drip pans | |
| 88. salt bin with scoop | |



06/30/2004 14:49 FAX 315 785 2591    DANC    → SCHWERZMANN WISE    ☑008

# Hoffman and Dudo, Inc.

ESTABLISHED 1938

MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71         750B STATE ST.         LOWVILLE, NEW YORK  13367         315-376-7031



page 4
Equipment list

U2004-00140
12/22/2004 12 25PM
Page 7 of 11
Douglas P. Hanno, Lewis County Clerk    U

## UPPER MAKE ROOM

94.  Butter churn
95.  s/s/ tray with wheels
96.  s/s top table
97.  5 8' tables
98.  Balance scale
99.  hot plate
100.  acid tester with various tubes and bottles
101.  s/s/ butter frame
102  wooden stool
103.  air compressor
104.  standing fan
105.  2 vat pasturizers complete
106  1 Diari Kool ice bank cooler with compressor
107.  Steel Ladder
108.  S/S balance tank
109.  Cream pump
110.  Steel wash tank
111.  s/s station can
112.  Exhaust fan (window)
113.  Safe
114.  Lunch room table, 3 chairs, bench
115.  1 steel cabinet
116.  1 trash barrell

## BOILER HOUSE

117.  Refrigerator
118.  1 water syste, pump, etc.
119.  Inside oil tank
120.  Large boiler
121.  Small boiler
122.  Wooden step ladder
123.  Boiler water feed tank
124.  Shop vac
125.  Fire extinguisher

## LOADING DOCK AND BACK ROOM

126.  Lewis Shipper Pallet Lift
127.  (2) Compressor for display coolers
128.  Steam heater
129.  2 wheel cart (wooden)
130.  Deck plate
131.  Trash can
132.  River water system pressure tank
133.  Mammoth cheese press & hoop complete
134.  3 s/s milk tanks
135.  positive milk pump
136.  s/s wash tub (2 bay)
137.  1 5' Step ladder
138.  1 lift jack
139.  S/S balance tank
140.  Garbage cans



06/30/2004 14:49 FAX 315 785 2591        DANC              → SCHWERZMANN WISE  ☑009



## *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

### MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71          7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

page 5
Equipment lits

<u>LOADING DOCK AND BACK ROOM cont'd</u>



U2004-00140
12/22/2004 12 26PM
Page 8 of 11
U

Douglas P. Hanno, Lewis County Clerk

141.  Deli display case w/ compressor
142.  Eye wash station
143.  Lock out board
144.  Steel cabinet
145.  Sheeter
146.  Cheese cutter
147.  12' refrigerated display case
148.  1 electric pallet lift
149.  wash tubs
150.  Box tape sealer
151.  (2) wooden tables
152.  (3) wax tanks
153.  small s/s top table
154.  (3) Large wooden bench
155.  (5) shelf carts



08/30/2004 14 49 FAX 315 785 2591        DANC            → SCHWERZMANN WISE    Ø010

# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

Equipment List
Page 6

### SHOP

| | |
|---|---|
| 156. | Air compressor & tank |
| 157. | Vice |
| 158. | Pipe threader |
| 159. | Grind wheel – electric |
| 160. | Helarc Welder |
| 161. | Steel work bench |
| 162. | Mechanics wrench set |
| 163. | 5 agitators for parts. |
| 164. | 2 metal file cabinets |
| 165. | ½ inch drill |
| 166. | Tap & die set large |
| 167. | 1 screw driver set |
| 168. | 1 round pointed shovel |
| 169. | Snow shovels (3) |
| 170. | Greese guns (3) |
| 171. | Electric heater |
| 172. | Base board electric heater |
| 173. | Fire extinguisher |
| 174. | Fire extinguisher small (3) |
| 175. | Heli arc guage |
| 176. | Small wheeler pulley |
| 177. | Large wheel puller |
| 178. | Solder gun |
| 179. | 1 small      welder |
| 180. | 1 Hand sye |
| 181. | 1 large hand grinder |
| 182. | 1 large pipe cutter electric |
| 183. | 1 small air grinder |

U2004-00140
12/22/2004 12 25PM
Page  9 of 11    U
Douglas P. Hanno, Lewis County Clerk



## LEWIS COUNTY DAIRY CORP.

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being

PARCEL ONE:  SITUATE in the Town of New Bremen, County of Lewis and State of New York, bounded and described as follows, to wit: BEGINNING at a point in the center of the Old Road leading from Lowville to Croghan North 69 degrees East 139 feet from the East end of the old bridge crossing Black River at the Easterly margin of a right of way crossing said property and runs North 31 degrees West along the Easterly side of Right of Way 125 feet to a corner; thence South 75 degrees West crossing said Right of Way and along the North easterly boundary of State Land, so called, 100 feet plus or minus to the Easterly bank of Black River; thence along Black River as it crooks and turns a general North westerly direction 163 feet to a small Ash Tree blazed for the Northwesterly corner; thence North 60 degrees East through Olley land 658 feet to a post set for the Northeasterly corner in the line of a farm fence; thence South 18 degrees and 30 minutes East along farm fence 327 feet to the center of the State Road leading from Lowville to Croghan; thence South 60 degrees West along the center of the State Road 389 feet to an angle; thence South 69 degrees West along the approximate center of the Old Road 175 feet to the place of beginning, containing 4 and 35/100 acres of land be the same more or less.

PARCEL TWO:  all THAT TRACT OR PARCEL OF LAND, situate in the Town of New Bremen, County of Lewis, and State of New York, bounded and described as follows:  Beginning at a point in the center of the Old Road leading from Lowville to Croghan North 69 degrees East 139 feet from the East end of the old bridge crossing Black River at the Easterly margin of a Right of Way crossing said property and runs North 31 degrees West along the Easterly side of Right of Way 125 feet to a corner; thence South 75 degrees West crossing said Right of Way and along the Northeasterly boundary of State land, so called, 100 feet plus or minus to the Easterly bank of Black River; thence along Black River as it crooks and turns a general North Westerly direction 163 feet to a small Ash Tree blazed for the Northwesterly corner; thence North 60 degrees East through Olley land 408 feet to a corner; thence South 18 degrees and 30 minutes East 327 feet to the center of the State Road leading from Lowville to Croghan; thence South 60 degrees West along the center of the State Road 139 feet to an angle; thence South 69 degrees West along the approximate center of the Old Road 175 feet to the place of beginning.

U2004-00140
12/22/2004 12 25PM
Page  10 of 11
Douglas P. Hanno, Lewis County Clerk  U

<u>AFFIDAVIT</u>

STATE OF NEW YORK    )
COUNTY OF Lewis )    ss.:

ROBERT S. JURAVICH, being duly sworn, deposes and says that:

1.  I am the Executive Director of the Development Authority of the North Country.

2.  This affidavit is given in connection with the recording and filing in the Lewis         County Clerk's office of a financing statement filed for on behalf of the Development Authority of the North Country.

3.  The Authority is a public benefit corporation created by special act of the State Legislature under Title 29 of the Public Authorities Law.

4.  The Authority is exempt, under Section 2719 of the Public Authorities Law, from mortgage recording taxes and recording fees, to wit:

> ". . . nor shall the authority be required to pay any filing or recording fee or transfer tax of any kind on account of instruments filed or recorded by it or on its behalf. Mortgages made or financed (directly or indirectly) by the authority shall be exempt from the mortgage recording taxes imposed by article eleven of the tax law."

Robert S. Juravich

Sworn to before me on

December 20, 2004

Amy B. Austin
Notary Public

AMY B. AUSTIN
Notary Public, State of New York
Qualified in Jefferson County
Commission Expires 1-25-06
No. 4914343

U2004-00140
12/22/2004 12 25PM
Page  11 of 11

Douglas P Hanno, Lewis County Clerk   U

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A NAME & PHONE OF CONTACT AT FILER [optional]
Michelle Capone

B SEND ACKNOWLEDGMENT TO  (Name and Address)

> NCA
> 317 Washington Street
> Watertown, NY 13601

U2004- C00143
12-30-04

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1 DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a ORGANIZATION'S NAME
LEWIS COUNTY DAIRY CORP.

| | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| 1b INDIVIDUAL'S LAST NAME | | | |

| 1c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 120 Third Street | Brooklyn | NY | 11230 | US |

| 1d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e TYPE OF ORGANIZATION corporation | 1f JURISDICTION OF ORGANIZATION New York | 1g ORGANIZATIONAL ID #, if any | ☑ NONE |

2 ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a ORGANIZATION'S NAME

| | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| 2b INDIVIDUAL'S LAST NAME | | | |

| 2c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e TYPE OF ORGANIZATION | 2f JURISDICTION OF ORGANIZATION | 2g ORGANIZATIONAL ID #, if any | ☐ NONE |

3 SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a ORGANIZATION'S NAME
North Country Alliance Local Development Corporation

| | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| 3b INDIVIDUAL'S LAST NAME | | | |

| 3c MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 317 Washington Street | Watertown | NY | 13601 | US |

4 This FINANCING STATEMENT covers the following collateral

SEE ATTACHED SCHEDULE A.



U2004-00143
12/30/2004 11 43AM
Page  1 of 10
Douglas P. Hanno, Lewis County Clerk    U

| 5 ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
| 6 ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum | [if applicable] | 7 Check to REQUEST SEARCH REPORT(S) on Debtor(s) [optional]    [ADDITIONAL FEE] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8 OPTIONAL FILER REFERENCE DATA | | | | | | |

Lewis Co. Clerk

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| | 9a. ORGANIZATION'S NAME | | |
|---|---|---|---|
| OR | LEWIS COUNTY DAIRY CORP. | | |
| | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

**10. MISCELLANEOUS**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | NONE |
|---|---|---|---|---|---|

**12.** ☐ **ADDITIONAL SECURED PARTY'S** or ☐ **ASSIGNOR S/P'S   NAME** - insert only one name (12a or 12b)

| | 12a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**13.** This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☑ fixture filing.

**14.** Description of real estate

Premises situate in the Town of New Bremen, County of Lewis and State of New York

**16.** Additional collateral description

**15.** Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest)

Douglas P Hanno, Lewis County Clerk

U2004-00143
12/30/2004 11 43AM
Page 2 of 18
U

**17.** Check only if applicable and check only one box

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18.** Check only if applicable and check only one box

☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years
☐ Filed in connection with a Public-Finance Transaction — effective 30 years

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV 05/22/02)

LEWIS COUNTY DAIRY CORP.

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being

PARCEL ONE:   SITUATE in the Town of New Bremen, County of Lewis and State of New York, bounded and described as follows, to wit: BEGINNING at a point in the center of the Old Road leading from Lowville to Croghan North 69 degrees East 139 feet from the East end of the old bridge crossing Black River at the Easterly margin of a right of way crossing said property and runs North 31 degrees West along the Easterly side of Right of Way 125 feet to a corner; thence South 75 degrees West crossing said Right of Way and along the North easterly boundary of State Land, so called, 100 feet plus or minus to the Easterly bank of Black River; thence along Black River as it crooks and turns a general North westerly direction 163 feet to a small Ash Tree blazed for the Northwesterly corner; thence North 60 degrees East through Olley land 658 feet to a post set for the Northeasterly corner in the line of a farm fence; thence South 18 degrees and 30 minutes East along farm fence 327 feet to the center of the State Road leading from Lowville to Croghan; thence South 60 degrees West along the center of the State Road 389 feet to an angle; thence South 69 degrees West along the approximate center of the Old Road 175 feet to the place of beginning, containing 4 and 35/100 acres of land be the same more or less.

PARCEL TWO:   all THAT TRACT OR PARCEL OF LAND, situate in the Town of New Bremen, County of Lewis, and State of New York, bounded and described as follows:  Beginning at a point in the center of the Old Road leading from Lowville to Croghan North 69 degrees East 139 feet from the East end of the old bridge crossing Black River at the Easterly margin of a Right of Way crossing said property and runs North 31 degrees West along the Easterly side of Right of Way 125 feet to a corner; thence South 75 degrees West crossing said Right of Way and along the Northeasterly boundary of State land, so called, 100 feet plus or minus to the Easterly bank of Black River; thence along Black River as it crooks and turns a general North Westerly direction 163 feet to a small Ash Tree blazed for the Northwesterly corner; thence North 60 degrees East through Olley land 408 feet to a corner; thence South 18 degrees and 30 minutes East 327 feet to the center of the State Road leading from Lowville to Croghan; thence South 60 degrees, West along the center of the State Road 139 feet to an angle; thence South 69 degrees West along the approximate center of the Old Road 175 feet to the place of beginning.

U2004-00143
12/30/2004 11.43AM
Page 3 of 10

Douglas P. Hanno, Lewis County Clerk   U

Attachment C



U2004-00140
12/22/2004 12 25PM
Page 3 of 11
Douglas P Hanno, Lewis County Clerk    U

## SCHEDULE A

Damroe Pressure Wall Processor, with agitator, piping, valves, and associated equipment.

Bottle handling equipment, with labeler, label applicator, hot stamp printer, and associated furnishings, conveyors, connectors and supporting machinery.

Tri-Clover Pump with associated tubing, clamps, controllers and associated fittings.

PMO 50-gallon balanced tank.

APV Gaulin Model 1220MS18-2.5 TPS Homogenizer, serial number 88610146, with associated motor, valves and piping.

Heat exchanger.

Tank, curd mill, whey pump and line, loadout pump, associated pumping for all CIP piping, vats, etc.

Muzan diaphram pump.

Cherry Burrell carton filler model Q80-110, serial number 2124.

Excello stainless steel hydraulic caser, model C74-ST-19, with Texas Instruments controls.

Creamery package 1,000 gallon dome top processor, serial number 8829.

Cherry Burrell 600 gallon hinged lid processor.

Cherry Burrell 300 gallon hinged lid processor model PT, serial number 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.

Case washer with pump.

DeLaval Separator, model MRPX214, serial number 2898315.

Fogg 18-valve half gallon filler, model LH with screw capper and cap feeder.

Intact RM 572 conveyor assembly.

MC57 Cutter.

Trays and cutting heads.

All equipment on the annexed list located at the site of Hoffman and Dudo, Inc., Route 812, Town of New Bremen, Lewis County, New York.

All other machinery, tools and equipment used in the operation of Lewis County Dairy Corp. located at Route 812, Town of New Bremen, Lewis County, New York.

→ SCHWERZMANN WISE    ☑005

# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P.O BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376 7031



## EQUIPMENT LIST

### OFFICE

U2004-00140
12/22/2004 12 25PM
Page  4 of 11
Douglas P. Hanno, Lewis County Clerk    U

1.   Swivel Desk Chair
2.   Wooden Book Case
3.   Coffee maker
4.   Steel 2 door cabinet/closet
5.   Desk
6.   4 - 3 line phone system (Smart talk 308)
7.   Texas Instrument (TI 50451I Calculator)
8.   Texas Instrument (TI5045 Calculator)
9.   Hole Punch
10.  Pencil sharpener
11.  Alarm clock digital sparticus
12.  Secretary's desk
13.  Tape dispenser (3)
14.  Chair office (office)
15.  Staples
16.  Wooden swivel office chair
17.  Coat tree
18.  Fire extinguisher (2)
19.  Oscilating fan
20.  Invoice holder/dispenser
21.  Shaw walker 4 drawer file
22.  Shaw walker 4 drawer fire safe file
23.  File holders and baskets (25)
24   Door alarm
25   Wall clock
26   Waste baskets (4)
27.  Plastic rug protector (for chair)
28.  6 drawer file box (wooden)
29.  Tape dispenser
30.  Various office supplies & catalogs



00/00/2004 14:40 FAX 315 785 2591        DANC              → SCHWERZMANN WISE    ☑006

# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 · 376-7031

Page 2
Equipment list

U2004-00140
12/22/2004 12 26PM
Page 6 of 11
Douglas P. Hanno, Lewis County Clerk . U

### OUTSIDE AND TANK ROOM

31. Picnic table
32. 3 whey tanks with s/s pipe and values
33. whey pump
34. Stect Cap tank
35. Fire extinguisher
36. Stainless truck ladder
37. 2 truck blocks
38. Wooden extension ladder
39. 1 saw horse
40. 1 truck canvas
41. 1 can      sulfuric acid

### LAB

42. 1 electric hot water heater
43. coat stand
44. 3 garbage cans
45. sanyo refrigerator
46. chest freezer
47. Steel cabinet
48. Wooden chair
49. Wooden stool
50. Wooden cabinet filled with supplies
51. Brabendo moisture test
52. 1 plate drier
53. p ph meter with probe
54. Acid dispenser

55. centrifuge
56. test bottle shaker
57.- Balance scale
58. Microscope
59. DMC Slide Reader
60. clock
61. various bottles &supplies for L
62. scales



03/30/2004 14:49 FAX 315 785 2691     DANC     → SCHWERZMANN WISE   ☑007

# *Hoffman and Dudo, Inc.*

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE



P. O. BOX 71      7508 STATE ST.      LOWVILLE, NEW YORK  13367      315 - 376-7031

page 3
Equipment list

U2004-00140
12/22/2004 12 26PM
Page  6 of 11
Douglas P Hanna, Lewis County Clerk   U

## MAKE ROOM

63.  Wooden desk
64.  Store countertop with cabinets
65.  Toledo scale/ with printer
66.  Paper wrap dispenser
67.  Digital scale with printer
68.  Cash register
69.  Impulse sealer (small)
70.  store display case (wooden)
71.  Wooden stool
72.  4/ 20,000# s/s cheese vats
73.  2 cheese presses with 4 heads
74.  1 clock radio
75.  24 agitator paddles
76.  12 agitator forks
77.  8 s/s pails
78.  1 squeege
79.  2 s/s forks
80.  1 s/s table
81.  1 positive draw whey pump
82.  s/s whey strainer
83.  2 saw horses
84.  s/s balance tank with pump
85.  2 Toedo dial scales
86.  2 Frau separators
87.  3 s/s drip pans
88.  salt bin with scoop

89.  milk unloading pump with line
90.  Aetlyn torch gaue & cart
91.  s/s pin pail with hool pins
92.  steel COP tank
93.  Square s/s/ blance tank



08/30/2004 14:49 FAX 315 785 2591          DANC                    → SCHWERZMANN WISE  ☑008



# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71          750B STATE ST.          LOWVILLE, NEW YORK  13367          315 - 376-7031

page 4
Equipment list



U2004-00140
12/22/2004 12 25PM
Page 7 of 11

Douglas P. Hanno, Lewis County Clerk   U

### UPPER MAKE ROOM

| | |
|---|---|
| 94. | Butter churn |
| 95. | s/s tray with wheels |
| 96. | s/s top table |
| 97. | 5 8' tables |
| 98. | Balance scale |
| 99. | hot plate |
| 100. | acid tester with various tubes and bottles |
| 101. | s/s butter frame |
| 102 | wooden stool |
| 103. | air compressor |
| 104. | standing fan |
| 105. | 2 vat pasturizers complete |
| 106 | 1 Diari Kool ice bank cooler with compressor |
| 107. | Steel ladder |
| 108. | S/S balance tank |
| 109. | Cream pump |
| 110. | Steel wash tank |
| 111. | s/s station can |
| 112. | Exhaust fan (window) |
| 113. | Safe |
| 114. | Lunch room table, 3 chairs, bench |
| 115. | 1 steel cabinet |
| 116. | 1 trash barrell |

### BOILER HOUSE

| | |
|---|---|
| 117. | Refrigerator |
| 118. | 1 water syste, pump, etc. |
| 119. | Inside oil tank |
| 120. | Large boiler |
| 121. | Small boiler |
| 122. | Wooden step ladder |
| 123. | Boiler water feed tank |
| 124. | Shop vac |
| 125. | Fire extinguisher |

### LOADING DOCK AND BACK ROOM

| | |
|---|---|
| 126. | Lewis Shipper Pallet Lift |
| 127. | (2) Compressor for display coolers |
| 128. | Steam heater |
| 129. | 2 wheel cart (wooden) |
| 130. | Deck plate |
| 131. | Trash can |
| 132. | River water system pressure tank |
| 133. | Mammoth cheese press & hoop complete |
| 134. | 3 s/s milk tanks |
| 135. | positive milk pump |
| 136. | s/s wash tub (2 bay) |
| 137. | 1 5' Step ladder |
| 138. | 1 lift jack |
| 139. | S/S balance tank |
| 140. | Garbage cans |



06/30/2004 14:49 FAX 315 785 2591        DANC              → SCHWERZMANN WISE   ☒009



# Hoffman and Dudo, Inc.

ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71        7508 STATE ST.        LOWVILLE, NEW YORK  13367        315 - 376-7031

page 5
Equipment lits

## LOADING DOCK AND BACK ROOM cont'd



U2004-00140
12/22/2004 12 26PM
Page 8 of 11
U
Douglas P. Hanno, Lewis County Clerk

141.  Deli display case w/ compressor
142.  Eye wash station
143.  Lock out board
144.  Steel cabinet
145.  Sheeter
146.  Cheese cutter
147.  12' refrigerated display case
148.  1 electric pallet lift
149.  wash tubs
150.  Box tape sealer
151.  (2) wooden tables
152.  (3) wax tanks
153.  small s/s top table
154.  (3) Large wooden bench
155.  (5) shelf carts

PRODUCED
N.Y.
FARM STATE

06/28/2004 14 49 FAX 315 785 2591     DANC          → SCHWERZMANN WISE  ☒010



# Hoffman and Dudo, Inc.

### ESTABLISHED 1938

## MANUFACTURERS AND DISTRIBUTORS OF NEW YORK STATE CHEESE

P. O. BOX 71     7508 STATE ST.     LOWVILLE, NEW YORK  13367     315 - 376-7031

Equipment List
Page 6

### SHOP

156.  Air compressor & tank
157.  Vice
158.  Pipe threader
159.  Grind wheel — electric
160.  Heliarc Welder
161.  Steel work bench
162.  Mechanics wrench set
163.  5 agitators for parts.
164.  2 metal file cabinets
165.  ½ inch drill
166.  Tap & die set large
167.  1 screw driver set
168.  1 round pointed shovel
169.  Snow shovels (3)
170.  Greese guns (3)
171.  Electric heater
172.  Base board electric heater
173.  Fire extinguisher
174.  Fire extinguisher small (3)
175.  Heli arc guage
176.  Small wheeler pulley
177.  Large wheel puller
178.  Solder gun
179.  1 small       welder
180.  1 Hand sye
181.  1 large hand grinder
182.  1 large pipe cutter electric
183.  1 small air  grinder

U2004-00140
12/22/2004 12 25PM
Page 9 of 11     U

Douglas P. Hanno, Lewis County Clerk



Attachment D

COLLATERAL ATTACHMENT    9490S8    2004 Dec 06 PM12:41  pg. 1

QuantityDescriptionVendor: Urschel Laboratories Incorporated1Urschel Model CCD, SN: 45461Change Parts: Head Assy, Shred 124V, GL, 3S, SA, DR1Setting Block, 670 Shred, DD-D1Extra Parts: Knife, Slicing, V-Cut, SS, Pkg/96IVideo Tape, CC, Shred Head, NTSCVendor: NTI Communication1Alarm System1Installation of a Sony 1/2" CCD with HAD Waves Technology Hi Res. Color Camerainstallation of a Dedicated Micro Color Digital Video Recorder for 16 Cameras1Installation of a Indoor/Outdoor weather Resistance Camera Housing with bracket6Installation of a Vari Focal Auto Iras Lens1Installation of a Power Supply for 16 Cameras1Complete Installation and Programming of Access Control System capable of handling up to 256 doors with Anti Passback.200Proximity CardsComplete installation and required programming of an Avaya IP-403 System. Avaya IP Office is an all-in-one solution specially designed to meet the communications challenges facing the home office, small office and medium enterprise with 2 to 186 extensions.Vendor: Comet2Curd Drainage Case Model CSDR36.25IDispenser Table Model TSP301Pneumatic Mix Cutter and Drum Molds MC241Cheese Cooker Stretcher Unics Model BTR4Vendor: LDS Technologies Inc.1Reverse Osmosis Command System with Logical Interfaces Including CPU-43 and I/O modules.Vendor: Cyclotherm of Watertown, Inc.1LPF 60-C-2N Boiler, 200 P.S.I. S/N: 26003, Gas and #2 oil optionVendor: Pac 'n' Wrap Corporation3"A" Automatic continuous Frame Press. 40 lb., block stainless steel, 8-row 4x4x7 high adjustable P.S.I. with 168 stainless steel hoops; S/N's KOSLOD-41, KOSLOD-42, KOSLOD-43Vendor: General Machinery Corporation1One Model 3000 TU-WAY Pneumatic Cheese Portioner, designed to accommodate wire cuttable cheese up to 7" high, 11" wide and 14" long, with vertical and horizontal cutting frames set to cut 1 1/2" x 1 1/2" x 1/2" portions, and cutting blocks to match, all of stainless steel or otherwise easily cleaned construction, equipped with pneumatic controls, casters safety lockout door, cheese positioners angles discharge chute, ready to install and operate on delivery.

**950862          2004 Dec 10 PM12:39**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

UCC Direct Services
2727 Allen Parkway
Houston, TX 77019, USA
nyack@uccdirect.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # 200412056015624 Filedate: 06-DEC-04 | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] [or recorded] in the REAL ESTATE RECORDS. |
| --- | --- |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

6a. ORGANIZATION'S NAME

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| --- | --- | --- | --- |
| | | | |

7. CHANGED (NEW) or ADDED INFORMATION:

7a. ORGANIZATION'S NAME

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| --- | --- | --- | --- |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
| --- | --- | --- | --- | --- |
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

Quantity/Description/Vendor: Urschel Laboratories Incorporated/One new Urschel Laboratories Model CC-D Food Slicer, S/N: 4546/Vendor: NTI Communications/New Avaya Model IP-403 Voice and Data Communications System. The communications system is complete with 28 incoming/outgoing lines, 24 digital extensions, 2 analog extensions, 8 port 100BT switch terminals and a 6 port voice mail system. The system also includes a Gemini Alarm System, 16 zone security cameras with a sony digital video recorder and an access control system/Vendor: LDG Technologies Inc./Reverse Osmosis Command System with Logical Interfaces including CPU-43 and I/O modules/Vendor: Cyclotherm of Watertown, Inc./LPF 60-C-2N Boiler, 200 P.S.I. S/N: 26043, Gas and #2 oil option/Vendor: Pac 'n' Wrap Corporation/3"A" Automatic continuous Frame Press. 40 lb., black stainless steel, 8-row 4x4x7 high adjustable P.S.I. with 150 stainless steel hoops; S/N's KOSLOD-41, KOSLOD-42, KOSLOD-43/Vendor: General Machinery Corporation/One Model 3000 TU-WAY Pneumatic Cheese Portioner, designed to accommodate wire cuttable cheese up to 7" high, 11" wide and 14" long, with vertical and horizontal cutting frames set to cut 1 1/2" x 1 1/2" x 1/2" portions, and cutting blocks to match, all of stainless steel or otherwise easily cleaned construction, equipped with pneumatic controls, casters safety lockout door, cheese positioners angles discharge chute, ready to install and operate on delivery.

9. NAME OF SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

9a. ORGANIZATION'S NAME   INTERCHANGE BANK

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| --- | --- | --- | --- |
| | | | |

10. OPTIONAL FILER REFERENCE DATA NY-8-12781649-AHADAI

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## Filing Number-200412106033354

**Attachment E**

ST. LAWRENCE FOOD CORPORATION

008970          2005 FEB 16   AM 9:00

SCHEDULE "A"

Cleaver Brooks Boiler (800 HP)
  CB Packaged Boiler
  Model CB 400-800
  SN: L-85651

Cleaver Brooks Boiler (800 HP)
  CB Packaged Boiler
  Model CB 800 HP  Series 400
  SN: L-59963

Aurora Pump
  Model 431 with accessories
  SN: 04-1005881

Culture Vat
  Debelak Technical Systems
  Control Panel w/ 2 chart recorders
  ABB N/28405/6/6
  ABB N/28405/6/5
  Chemical pumps (2)
  Knight PMP Series
  SN: 892759
  SN: 892760
  Resource Controller Model 1055
  SN: L03-227459463

  Cooling System
  Three Heat Exchangers
  #1 Delta Model M3
  #2 Delta Model M6
  #3 Delta Model M3
  Stainless Steel Plates
  Packaged Cooling System 37586
  Skid Mounted Pump Model PS-30
  Three Pumps
  #1 30 GPM @ 60 TDH TEFC 460/3/60
  #1 30 GPM @ 60 TDH TEFC 460/3/60
  #1 35 GPM @ 60 TDH TEFC 460/3/60
  Heat Plates
  L003450E LCC (End)
  R023400 RAC
  R120400 RBA
  L1200505 LBB
  L120050E LBB (End)

A-966 Suction Bell Heater (j.w. stevens co)

Direct-Drive Wall Exhaust Fan (2)
  McMaster Part # 2187K18

Portable Heavy Duty Dehumidifier
  McMaster Part # 2129K32

Process Cheese Line
  11G cheese grinder for 40# blocks (#6761)
  20 HP motor cip attachments for top & front of
    grinder
  11S-300 Koss single screw 300lb cooker (#35005)
  500# scraped surface cone bottom (#3038)
  surge hopper existin gunit (#3038)
  Alfa laval SRU4-WLD PD 3' pump w/duplex
    shaft, 5hp c-face, gear reducer & SS
  base w/coupling guard
  dual wedge wire strainer assembly (#75010)
    with automatic switching
  500# scraped surface cone bottom
  surge hopper 1hp super E for adding (#8716)
    condiments
  Alfa laval SRU4-WLD PD 3' pump w/duplex
    shaft, 5hp C-face, gear reducer & SS
  base w/coupling guard
  cone bottom vacuum hopper w/ sediment (#8717)
  Alfa laval SRU4-WLD PD 3' pump w/duplex
    shaft, 5hp C-face gear reducer & SS
  base with coupling guard
  single lane box filler station for 3# to (#10511)
    to 6# fill
  single lane box filler indexing
  conveyor under filler 3# to 6# fills (#55172)
  control panel w/chart recorder; AB PLC high
    voltage panel, AC drives, motor starters &
    disconnect
  catwalk to support grinder, pallet of (#10510)
    of cheese & 1 person

**EXHIBIT A**

**FORM OF FACILITY A NOTE**

U.S. $2,000,000

New York, New York
As of August 22, 2005

FOR VALUE RECEIVED, AHAVA FOOD CORP., a corporation organized under the laws of New York (the "**Borrower**") promises to pay to the order of SIGNATURE BANK, a banking corporation organized under the laws of New York (the "**Bank**"), at its office located at 565 Fifth Avenue, New York, New York 10017 (or at such other place the Bank designates in writing) the principal sum of Two Million and 00/100 ($2,000,000), in lawful money of the United States of America and in immediately available funds, on the Facility A Maturity Date (as defined in the Credit Agreement (defined below)), and sooner as required below and under the Credit Agreement, in the manner provided in the Credit Agreement.

The Borrower further promises to pay principal as set forth in Section 2A.01 of the Credit Agreement from the date hereof until the Facility A Loan is paid in full, all at the Adjusted LIBO Rate and at the times set forth in the Credit Agreement.

This Note is the promissory note made pursuant to Section 2A.01 of that certain Master Credit Facility Agreement dated as of August 22, 2005 (as amended, modified or supplemented from time to time, the "**Credit Agreement**"), among the Borrower, St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank and evidences the Facility A Loan made by the Bank under the Credit Agreement, and in particular Section 2A.01 thereof. All capitalized terms not defined herein shall have the meanings given to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of principal upon the occurrence of an Event of Default, default rate(s) of interest and prepayments on the terms and conditions specified therein.

The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

This Note is subject in all respects to the Credit Agreement, including, without limitation, the interest rate limitation provisions in Section 8.17 thereof.

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles other than as set forth in Section 5-1401 of the New York General Obligations Law.

*[Signature appears on the following page.]*

A-1

HF 3082102v.7 #06406/0023

IN WITNESS WHEREOF, the undersigned has executed this Note or has caused this Note to be duly executed by a duly authorized officer, all as of the day and year first above written.

AHAVA FOOD CORP.

By:_____
          Name:
          Title:

A-2

**EXHIBIT B**

**FORM OF FACILITY B NOTE**

$5,500,000

New York, New York
As of August 2005

FOR VALUE RECEIVED, AHAVA FOOD CORP., a corporation organized under the laws of New York (the "**Borrower**"), hereby promises to pay to the order of SIGNATURE BANK, a banking corporation organized under the laws of New York (the "**Bank**") at its office located at 565 Fifth Avenue, New York, New York 10017, or at such other place the Bank designates in writing, the principal sum of Five Million Five Hundred Thousand Dollars and 00/100 ($5,500,000) or, if less, the then outstanding principal amount loaned by the Bank to the Borrower as Facility B Loans (as defined in the Credit Agreement (defined below)) pursuant to the Credit Agreement, in lawful money of the United States of America and in immediately available funds, on the Facility B Termination Date (defined below), or sooner if required under the Credit Agreement, and in the manner provided in the Credit Agreement.

The Borrower further promises to pay interest on the unpaid principal balance hereof, for the period such balance is outstanding, at the said office of the Bank, or at such other place as the Bank directs in writing, in like money, at the rate(s) of interest as provided in the Credit Agreement (for Facility B Loans) on the dates and in the manner provided in the Credit Agreement.

The date and amount of each Facility B Loan made by the Bank to the Borrower under the Credit Agreement, and each payment of principal thereof, shall be recorded by the Bank on its books and prior to any transfer of this Note (or, at the discretion of the Bank, at any other time), endorsed by the Bank on Schedule A attached hereto or any continuation thereof; provided however, that the failure of the Bank to make such a notation or any error therein shall not affect the obligation of the Borrower to repay the Facility B Loans made by the Bank in accordance with the Credit Agreement and this Note.

This Note is the promissory note made pursuant to Section 2B.02 of that certain Master Facility Credit Agreement dated as of August 2005 (as amended, modified or supplemented from time to time, the "**Credit Agreement**"), among the Borrower, St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank and evidences the Facility B Loans made by the Bank under the Credit Agreement. All capitalized terms not defined herein shall have the meanings given to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of principal upon the occurrence of an Event of Default, default rate(s) of interest and prepayments on the terms and conditions specified therein.

B-1

HF 3082102 v.7 #06406/0023

The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

This Note is subject in all respects to the Credit Agreement, including, without limitation, the interest rate limitation provisions in <u>Section 8.17</u> thereof.

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles except as set forth in Section 5-1401 of the New York General Obligations Law.

*[Signature appears on the following page.]*

B-2

HF 3082102 v.7 #06406/0023

IN WITNESS WHEREOF, the undersigned has executed this Note or has caused this Note to be duly executed by a duly authorized officer, all as of the day and year first above written.

AHAVA FOOD CORP.

By:_____
      Name:
      Title:

B-3

**SCHEDULE A**

| Loan | Date | Amount of Payment | Balance Outstanding | Notation By |
|------|------|-------------------|---------------------|-------------|
|      |      |                   |                     |             |

HF 3082102 v.7 #06406/0023

**EXHIBIT C**

**FORM OF BORROWING BASE CERTIFICATE**

dated:_____

| | | | | |
|---|---|---|---|---|
| I. | Gross Accounts receivable at | | $_____ | |
| II. | Less: | | | |
| | i. | Amounts greater than 90 days past invoice date | ( | ) |
| | ii. | Credits greater than 90 days past due date | ( | ) |
| | iii. | Cross-age @ 75% (90 days) | ( | ) |
| | iv. | Cooperative Dairy Marketing LLC | ( | ) |
| | v. | North Central Companies | ( | ) |
| | vi. | City Glatt | ( | ) |
| | vii. | Reserve for NSF customer checks | ( 25,000 | ) |
| | viii. | Contra accounts | ( | ) |
| | | | $_____ | |
| III. | Eligible accounts receivable (I-II) | | $_____ | |
| IV. | Advance rate | | 80% | |
| V. | Available account receivable (III* 80%) | | $_____ | |
| VI. | Ahava perpetual inventory at _____ | | $_____ | |
| VII. | Lewis County perpetual inventory at _____ | | $_____ | |
| VIII. | Total Finished Inventory (VII-VIII) at _____ | | $_____ | |
| IX. | Less: | | _____ | |
| X. | Eligible inventory (VIII-IX) | | $_____ | |
| XI. | Advance rate | | 40% | |
| XII. | Total available inventory  (VIII* 40%) (capped at the lesser of total available inventory and $1,000,000) | | _____ | |
| XIII. | Total available collateral (V+XII) | | $_____ | |
| XIV. | Revolving Credit Exposure | | $_____ | |
| XV. | Excess (Deficit) (XIII-XIV) | | $_____ | |

Certified Correct & Accurate:

_____
Moise Banayan, President
Ahava Food Corp.

C-1

HF 3082102 v.7 #06406/0023

**EXHIBIT D**

**FORM OF GUARANTY**

**JOINT AND SEVERAL
GUARANTY OF PAYMENT**

In order to induce SIGNATURE BANK (which together with its successors, endorsees and assigns, is hereinafter called the "**Bank**") to enter into the Loan Agreement (defined below) and to make advances, loans or extensions of credit, directly or indirectly, to AHAVA FOOD CORP. (hereinafter called "**Ahava**") and in consideration thereof and of any loans, advances, or other financial accommodations heretofore or hereafter granted by the Bank to or for the account of the Borrower, and to grant to the Borrower such renewals, extensions, forbearances, releases of collateral or other relinquishments of rights as the Bank may deem advisable, and for other valuable consideration, the receipt of which is hereby acknowledged, the Guarantors (as defined in the Loan Agreement; each Guarantor being hereinafter an "**undersigned**") hereby jointly and severally, absolutely and unconditionally guaranty to the Bank the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, and the full and prompt payment by the Borrower of all of its Indebtedness (as hereinafter defined), whether now existing or hereafter arising from time to time, and promises to pay to the Bank, or order, on demand, in lawful money of the United States, all of the Indebtedness of the Borrower, and all out-of-pocket costs and expenses, including reasonable attorneys fees and legal expenses, paid or incurred by the Bank in endeavoring to collect the Indebtedness, or any part thereof, and in enforcing this Guaranty. All payments made in connection with this Guaranty shall be in lawful money of the United States of America in immediately available funds.

1.      **Terms as Defined in Loan Agreement.**  Capitalized terms used herein, that are not otherwise defined herein, shall have the meanings given to them in the Loan Agreement.

2.      **Definition of Indebtedness.**  The term "**Indebtedness**" is used herein in its most comprehensive sense and includes the principal of and interest on and all other sums payable with respect to any and all advances, debts, reimbursements, obligations and liabilities of the Borrower to the Bank (including any interest which, but for the application of the provisions of the U.S. Bankruptcy Code, would have accrued on such amounts), heretofore, now or hereafter made, incurred, created, or arising, whether originally contracted with the Bank or with another and transferred to the Bank or otherwise acquired by the Bank, whether direct or indirect, absolute or contingent, voluntary or involuntary, joint or several, due or to become due, liquidated or unliquidated, determined or undetermined, secured or unsecured, matured or unmatured, has any right or power to assert any claim or defense to the validity or enforceability thereof.

3.      **Obligations.**  Each undersigned's obligations hereunder are independent of the obligations of the Borrower and of each other undersigned, and a separate action or actions may be brought and prosecuted against any undersigned, irrespective of whether an action is brought against the Borrower or any other undersigned, or whether the Borrower or any other undersigned is joined in any such action or actions. Each undersigned waives the benefit of any statute of limitations affecting such undersigned's liability hereunder or the enforcement hereof to the fullest extent permitted by law.

D-1

4.    **Indemnity**.  Each undersigned agrees to indemnify and hold the Bank harmless from and against all claims, actions, causes of action, demands, obligations, liabilities, losses, costs and expenses in connection with, on account of, or in any way relating to or arising from the Bank's transactions with any of the undersigned; provided, that the forgoing indemnification shall not extend to liabilities, damages, losses, obligations, judgments and expenses arising from the gross negligence or willful misconduct of the Bank.

5.    **Continuation of Terms**.  This Guaranty shall not be affected or impaired by any modifications, supplements, extensions or amendments of any contract or agreement to which the parties thereto may hereafter agree, nor by any modifications, releases or other alterations of any of the Indebtedness hereby guaranteed or of any security therefor, nor by any agreements or arrangements whatever with the Borrower or any other Person.

6.    **Acknowledgement**.  Each undersigned agrees that its liability hereunder shall remain unaffected in any way notwithstanding the fact that the Bank may, without notice or demand, from time to time and any number of times, take any or all of the following actions:

    (a)    renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon;

    (b)    take and hold security for the payment of this Guaranty or the Indebtedness from the Borrower, another undersigned or another Person, and exchange, enforce, waive and release any such security;

    (c)    apply such security and direct the order or manner of sale thereof as the Bank in its discretion may determine;

    (d)    release or substitute any other undersigned, guarantors, sureties, or endorsers of the Indebtedness; and

    (e)    assign, without notice, this Guaranty in whole or in part, or the Bank's rights hereunder, to any Person at any time in accordance with Section 8.14 of the Loan Agreement.

7.    **Waivers**.  Each undersigned waives all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Indebtedness guarantied hereunder, has destroyed any of such undersigned's rights of subrogation and reimbursement against the Borrower.  Each undersigned subordinates, and agrees not to assert, any right of subrogation, contribution, indemnity or reimbursement that such undersigned has or may have against the Borrower with respect to the Indebtedness guarantied hereunder until such time as the Indebtedness guarantied hereunder has been indefeasibly paid in full.  Each undersigned waives any right to require the Bank to (a) proceed against the Borrower, any other undersigned or any other Person; (b) proceed against or exhaust any security held from the Borrower or any other undersigned; or (c) pursue any other right or remedy in the Bank's power whatsoever.  Each undersigned waives any

HF 3082102 v.7 #06406/0023

defense arising by reason of any disability or other defense of the Borrower or any other undersigned, or by reason of the cessation from any cause whatsoever of the liability of the Borrower. Each undersigned agrees that nothing shall discharge or satisfy its liability hereunder except the full and indefeasible payment and performance of all of Ahava's Indebtedness and obligations to the Bank with interest. Ahava's Indebtedness and obligations shall not be considered indefeasibly paid until all payments to the Bank are no longer subject to any right, by any Person, to invalidate or set aside such payments or to seek to recoup the amount of such payments or to declare such payments to be fraudulent or preferential. In the event any portion of any such payments shall be set aside or restored, then each undersigned shall be jointly and severally liable for the full amount the Bank is required to repay, plus any costs and expenses (including attorneys fees) paid by the Bank in connection therewith. Any and all present and future debts and obligations of the Borrower to any undersigned are hereby postponed in favor of and subordinated to the full payment and performance of all of each undersigned's obligation under this Guaranty to the Bank. Each undersigned agrees that the Bank's books and records showing the account between the Bank and the Borrower shall be admissible in any action or proceeding and shall be binding upon each undersigned (and the Bank) for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. Each undersigned waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of default, notices of acceptance of this Guaranty and of the existence, creation or incurrence of new or additional Indebtedness, notice of any and all favorable and unfavorable information, financial or otherwise, about the Borrower or any other undersigned, heretofore, now or hereafter learned or acquired by the Bank and all other notices to which each undersigned might otherwise be entitled.

8.    **Maintenance of Information.** Each undersigned hereby represents to the Bank that the undersigned is and will remain informed of the financial condition of the Borrower and of all other circumstances which bear upon the risk of non-payment of the Indebtedness and any other obligations of the Borrower guarantied hereby. Each undersigned agrees that the Bank is not obligated to inform any undersigned of any such circumstances, whether now existing or hereafter arising, and that the Bank is not required to inquire into the powers of the Borrower or the officers, directors, partners, agents or other Related Parties acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guarantied hereunder.

9.    **Attorneys Fees.** Each undersigned agrees to pay reasonable attorneys fees (including the allocated costs of the Bank's in-house counsel) and all other costs and expenses which may be incurred by the Bank in the enforcement of this Guaranty or any claim hereunder.

10.    **Amendments In Writing.** No termination or modification of this Guaranty shall be effective for any purpose unless it is in writing and executed by an authorized officer of each undersigned and of the Bank.

11.    **Demand Payment.** Each undersigned agrees that upon the occurrence and during the continuing of any "Event of Default" under the Loan Agreement or any other Loan Documents, the undersigned, immediately following a demand in writing for payment from the Bank, shall pay the Bank the amount of the Indebtedness then due and owing. Each undersigned

D-3

further agrees that upon the acceleration by the Bank of the Indebtedness and the Bank's demand for payment thereof, the undersigned shall pay to the Bank the full amount of such accelerated Indebtedness.

12.    **Successors and Assigns.** The termination or dissolution of any or all of the undersigned shall not terminate this Guaranty. This Guaranty shall be binding upon the successors and assigns of each undersigned and shall inure to the benefit of the Bank, its successors and assigns.

13.    **Collateral; Right of Setoff.** As collateral security for the performance of this Guarantee and all other obligations of any or all of the undersigned to the Bank, whether now or hereafter owed to, or held by, the Bank and/or any Affiliate thereof, including, without limitation, the Indebtedness, each undersigned hereby grants to the Bank a security interest in and transfers and assigns to the Bank the following property: (i) any and all monies and/or other property now or hereafter held by the Bank and/or any Affiliate on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to such undersigned or in which such undersigned shall have any interest, (ii) any and all claims and demands, presently existing or hereafter arising, and all interest heretofore or hereafter accrued thereon, and any and all collateral or security interests relating thereto and the proceeds thereof, which such undersigned now has or may hereafter have or acquire against the Borrower (such claims and demands referred to herein as the "**Claims**") and (iii) any and all property of such undersigned now or hereafter subject to a security agreement, mortgage, pledge agreement, assignment, hypothecation or other document granting the Bank or any Affiliate a security interest or other lien or encumbrance and (iv) any and all collateral described in any and all credit accommodations, notes, loan agreements, and any other agreements and documents, now or hereafter existing, creating, evidencing, guaranteeing, securing or relating to any or all of the Indebtedness, together with all amendments, modifications, renewals, or extensions thereof and any additions and accessions thereto and substitutions therefore and the products and proceeds thereof. All of the property described in clauses (i), (ii), (iii), and (iv) above shall be collectively referred to herein as the "**Collateral**". The Bank at any time may, but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the Collateral, including stocks, bonds, and other securities, and the Bank or its nominee may demand, sue for, collect, receive and hold as like Collateral any or all interest, dividends and income thereon and if any securities are held in the name of Bank or its nominee. To the extent any Collateral is transferred into the Bank's (or an Affiliate's) own name, the Bank, at any time may, but shall not be obligated to, exercise all voting and other rights pertaining thereto as if the Bank were the absolute owner thereof, but the Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the Collateral against prior parties, or to take any action whatsoever in regard to the Collateral or any part thereof, all of which such undersigned assumes and agrees to do. Without limiting the generality of the foregoing, the Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any Collateral, unless such undersigned gives written notice to the Bank that such action shall be taken not more than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. At any time, without demand or notice, if permitted by applicable law, the Bank may setoff all deposits, credits, collateral and property, now or hereafter

D-4

# EXHIBIT A
# (Part 5 of 5)

in the possession, custody, safekeeping or control of the Bank or any of its Affiliates, or in transit to any of them, or any part thereof and apply the same to any of the Indebtedness even though unmatured and regardless of the adequacy of any other collateral securing the Indebtedness. **ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE INDEBTEDNESS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY OF THE UNDERSIGNED, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

14.    **Incorporation by Reference.** Sections 1.03, 8.04, 8.08, 8.09, 8.10, 8.18, 8.20, 8.21 and 8.22 of the Loan Agreement are hereby incorporated by reference into this Guaranty, and shall apply, <u>mutatis mutandis</u>, to this Guaranty.

[signatures appear on the following page.]

D-5

IN WITNESS WHEREOF, the undersigned have executed this Guaranty this 22nd day of August, 2005.

WITNESS/ATTEST:

ST. LAWRENCE FOOD CORP.

By: _____
_____          Name:
                                        Title:

LEWIS COUNTY DAIRY CORP.

By: _____
_____          Name:
                                        Title:

YONI REALTY, LLC

By: _____
_____          Name:
                                        Title:

MOISE BANAYAN

_____          _____

D-6

<u>**EXHIBIT E**</u>

**FORM OF**

**LANDLORD'S WAIVER AGREEMENT**

LANDLORD'S WAIVER AGREEMENT dated as of August __, 2005, made by, _____ having an address at _____ (the "the Landlord"), in favor of SIGNATURE BANK, a New York banking corporation (the "Bank").

**PRELIMINARY STATEMENTS**

(1) _____ (the "Tenant") is party to credit agreements of one kind or another with the Bank, including, without limitation that certain Master Credit Facility Agreement, dated as of August 22, 2005, among Ahava Food Corp., St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank (such credit agreements, collectively, as amended, modified, supplemented or restated from time to time being hereinafter, the "Credit Agreement").

(2) Pursuant to the Credit Agreement and to secure the payment and performance of all of the Tenant's obligations and liabilities to the Bank under the Credit Agreement (collectively, the "Tenant's Liabilities"), the Tenant granted to the Bank a security interest in and to all of the Tenant's equipment, inventory, accounts, chattel paper, instruments, deposit accounts, general intangibles and other obligations, whether now existing or hereafter acquired by the Tenant, wherever located, and all proceeds and products of any and all of the foregoing, together with certain other collateral granted to the Bank, all as more fully described in one or more security agreements (and referred to therein and herein on a collective basis as the "Collateral").

(3) Some or all of the Collateral is now and/or from time to time hereafter may be located at the Tenant's leased premises commonly known and described as _____ (the "Leased Premises"), which Leased Premises are owned and leased by the Landlord, in whole or in part, to the Tenant pursuant to an oral lease (as extended, amended, modified, supplemented, replaced or restated from time to time, the "Lease").

(4) The Tenant may request loans, advances or other financial accommodations from the Bank pursuant to the Credit Agreement, and the Bank, as a condition precedent to making such loans, advances or other financial accommodations available to the Tenant, requires that the Landlord execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the premises and in order to induce the Bank to make the loans, advances or other financial accommodations under the Credit Agreement, the parties hereto do agree as follows:

1. The Landlord waives each and every right that the Landlord now has or hereafter may have, under the laws of the State of _____, or by virtue of the Lease, or by virtue of the Tenant's occupation of the Leased Premises to distrain upon, or to claim or assert

E-1

any lien, right or title to any or all of the Collateral, which now is or hereafter may be located at the Leased Premises, whether for rent (in arrears or in advance) or for any other monetary obligation arising as a result of, or due to a default by, the Tenant under the Lease.

2.      The Landlord agrees that the Collateral (i) is and shall remain personal property notwithstanding the manner or mode of the attachment of any item of Collateral to the Leased Premises, and (ii) is not and shall not become or be deemed to be fixtures or to be property otherwise subject to the Landlord's rights under the Lease.

3.      The Landlord recognizes and acknowledges that the security interest of the Bank in the Collateral is superior to any lien, right, claim or title of any nature which the Landlord now has or hereafter may have or assert in or to the Collateral pursuant to statute, the Lease, other agreement or otherwise

4.      In the event of default by the Tenant in the payment or performance of any of the Tenant's Liabilities, but subject to all terms and provisions of the Lease, the Bank may remove the Collateral or any part thereof from the Leased Premises in accordance with the terms and conditions of the Lease, the Credit Agreement and statutory law pertaining thereto without objection, delay, hindrance or interference by the Landlord, and in such case the Landlord will make no claim or demand whatsoever against the Collateral. In the event of any such default by the Tenant, the Landlord agrees that, at the Bank's option, the Collateral may remain upon the Leased Premises for a period not to exceed thirty (30) days after the receipt by the Bank of written notice from the Landlord directing its removal; provided, however, that the Bank shall be required to pay all rent (of any nature whatsoever) due and payable under the terms of the Lease attributable to any period of time when the Bank is exercising the foregoing right (but not on account of rent arrears accruing prior to or after the Bank's exercise of such rights).

5.      The Bank may, without affecting the validity of this Agreement, extend, amend, modify, supplement or restate in any way, the Credit Agreement and the terms of payment or performance of any of the Tenant's Liabilities, without the consent of the Landlord and without giving notice thereof to the Landlord.

6.      This Agreement shall inure to the benefit of the successors and assigns of the Bank and shall be binding upon the heirs, personal representatives, successors and assigns of the Landlord.

7.      This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

8.      This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all which when taken together shall constitute one and the same agreement.

[Signatures appear on the following page.]

E-2

HF 3082102 v.7 #06406/0023

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the date first above written.

[LANDLORD]

By:_____
    Name:
    Title:


SIGNATURE BANK

By:_____
    Name:
    Title:


Agreed to and Acknowledged
this _____ day of August, 2005


[TENANT]

By:_____
    Name:
    Title:


E-3

**EXHIBIT F**

**WAREHOUSE NOTIFICATION AND ACKNOWLEDGMENT**

**OF SECURITY INTEREST**

_____, 20__

CERTIFIED MAIL/RETURN RECEIPT REQUESTED

[Name and Address of Addressee]

Gentlemen/Ladies:

Please be advised that Signature Bank ("Signature") may from time to time extend credit to Ahava Food Corp. (the "Borrower") and/or one or more of its affiliates either under that certain Master Credit Facility Agreement dated on or about August 22, 2005 (as the same may be hereafter amended, modified, supplemented, restated or replaced the "CA") or under other facilities. In connection with the CA and other financial accommodations provided by Signature, each of the Borrower, St. Lawrence Food Corp. ("SLF Corp"), Lewis County Dairy Corp. ("LCD Corp") and Yoni Realty, LLC ("YR LLC", and collectively with SLF Corp, LCD Corp, the "Corporate Guarantors"; and the Corporate Guarantors together with the Borrower, the "Collateral Grantors") has granted or will grant to Signature a security interest in, among other collateral, all of its existing and future inventory, including without limitation, all goods which may at any time now or hereafter be located on or in real property, buildings, rail cars or other equipment or facilities owned, leased or otherwise in your possession or control (collectively, the "Facilities").

By your signature below, you acknowledge receipt of the above notice of Signature's security interest and you agree to hold the collateral for its benefit, and agree to follow all instructions that Signature may from time to time hereafter give to you with respect to all goods of any of the Collateral Grantors and/or their affiliates which are at any time located on or in the Facilities.

For the present, Signature consents to your continuing to release goods pursuant to the instructions given you by the Borrower, or any authorized agent of any of the Collateral Grantors, but this consent may be terminated or changed at any time by notice to you from Signature. Upon being so notified by Signature you are to abide solely by Signature's instructions with respect to any of such goods and you are not to release any of the goods to any of the Collateral Grantors or to anyone else except according to written instructions that may be given to you from time to time by Signature.

F-1

You agree and acknowledge that you do not have, and in no event will you assert as against Signature, any lien, right of distraint or levy, right of offset, claim, deduction, counterclaim, security or other interest in any goods of any of the Collateral Grantors and/or their respective affiliates now or hereafter located in or on any of the Facilities, which might otherwise arise or exist in your favor pursuant to any agreement, common law, statute (including the United States Bankruptcy Code) or otherwise. You certify that you do not know of any security interest or other claim with respect to such goods other than the security interest which is the subject of this agreement. You agree and acknowledge that no negotiable or non-negotiable warehouse receipts, documents of title or similar instruments have been or will be issued by you with respect to any of the goods of any of the Collateral Grantors or their affiliates, except for nonnegotiable receipts naming Signature or such Collateral Grantors in an appropriate capacity. You shall not take any action purporting to encumber or transfer any interest in such goods. The provisions of this paragraph are intended to be solely for the benefit of Signature and shall not confer any rights upon any of the Collateral Grantors or anyone else other than Signature.

You further agree to allow Signature and its designees to enter upon and have access to the Facilities during business hours for the purpose of examining, removing, taking possession of or otherwise dealing with any goods of any of the Collateral Grantors and/or their affiliates at any time in your possession, or making copies of any books and records related thereto; provided, however, that Signature shall promptly pay to you the per diem charges (at the rate charged to such Collateral Grantors for storage immediately prior to the commencement of such exercise of access rights by Signature ) for each day when Signature is exercising such access rights at the Facilities. You agree that payment by Signature of any such sum shall not be construed as an assumption of any obligations of any of the Collateral Grantors to you.

You understand that Signature is relying upon this acknowledgement in connection with its financing arrangements with the Collateral Grantors. This agreement shall be binding upon your successors and assigns and shall inure to the benefit of Signature and its successors and assigns.

The consent of each of the Collateral Grantors hereto constitutes its acknowledgment that Signature may asset any of the rights set forth or referred to herein, and that the Borrower shall have no objection or claim with respect thereto.

*[Signatures appear on the following page.]*

F-2

HF 3082102 v.7 #06406/0023

Please acknowledge your agreement to the foregoing by signing in the space provided below.

Very truly yours,

**SIGNATURE BANK**

By: _____
               Its

CONFIRMED AND APPROVED IN ALL RESPECTS:

**AHAVA FOOD CORP.**

By: _____

**ST. LAWRENCE FOOD CORP.**

By: _____

**LEWIS COUNTY DAIRY CORP.**

By: _____

**YONI REALTY, LLC**

By: _____

The undersigned, being the Facilities owner or operator identified above, acknowledges its receipt and understanding of, and its consent and agreement to the foregoing Warehouse Notification and Acknowledgement of Security Interest in all respects.

_____

By: _____
          Its

Date Signed: _____

F-3

## EXHIBIT G

## FORM OF COMPLIANCE CERTIFICATE

### AHAVA FOOD CORP.
### Compliance Certificate of Officer

Re:    Master Credit Facility Agreement dated as of August 22, 2005 (the "Credit Agreement") among Ahava Food Corp. (the "Borrower"), St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and Signature Bank (the "Bank")

I, Moise Banayan, hereby certify that I am the President of AHAVA FOOD CORP., a New York corporation (the "Obligor"), and that, as such officer, I have access to their corporate records and am familiar with the matters herein certified, and I am authorized to execute and deliver this Certificate in the name and behalf of the Obligor, and that:

(a)    This certificate is being delivered pursuant to Section 5.03(i) of the Revolving Credit Agreement, dated as of August 22, 2005 (the "**Credit Agreement**"), between the Obligor and Signature Bank. The terms used in this certificate and not defined herein have the respective meanings specified in the Credit Agreement.

(b)    Except as set forth on Exhibit B attached hereto, no Event of Default exists.

(c)    Attached hereto as Exhibit A are the calculations demonstrating compliance with the financial covenants set forth in Sections 6.09, 6.10, and 6.11 of the Credit Agreement.

IN WITNESS WHEREOF, I have executed this certificate in the name and on behalf of the Obligor on (date)_____.

AHAVA FOOD CORP.

By: _____
          Name: Moise Banayan
          Title: President

G-1

## Exhibit (A)

As of _____

I.    **Section 6.09 Leverage Ratio**
      Calculation: Ratio of:
      (a)    Total Liabilities                    $_____
             to the sum of
      (b)    Tangible Net Worth
             plus Approved Sub. Debt              $_____
      Ratio (Actual) (a) / (b):                   _____

      Requirement:                                A maximum of 3.0 to 1.0
      Compliance: (Yes/No)                        _____

II.   **Section 6.10 Debt Service**
      Calculation: Ratio of :
      (a) EBITDA                                  $_____
      Minus: (b) Unfunded CAPEX                   $_____
      (a-b) Result                                $_____
      Divided by the sum of:
      (c) CPLTD                                   $_____
          plus
      (d) Interest                               $_____
      (c+d) Result                               $_____
      Ratio (Actual): (a-b) / (c+d):             _____
      Requirement:                               **1.25x Minimum**
      Compliance: (Yes/No):                      _____

III.  **Section 6.11 Net Loss**
      Requirement:                               Net profit $\geq$ $1.00 for each fiscal quarter
      Actual:                                    $_____

      Compliance: (Yes/No)                       _____


_____
Moise Banayan, President

G-2

HF 3082102 v.7 #06406/0023

**<u>Exhibit  (B)</u>**
(Events of Default)

_____
Moise Banayan, President

G-3

**SIGNATURE BANK**

**Schedule 3.06 – Actions Relating to**
**Ahava Food Corp. or the Obligors**

| Name of Plaintiff | Name of Defendant | Jurisdiction of Action | Amount in Controversy |
|---|---|---|---|
| American Equities Group, Inc. | Ahava Dairy Products Corp., Lewis County Dairy Corp, Ahava Food Corp. and Moise Banayan | U.S. Bankruptcy Court, S.D.N.Y. Adv. Pro. No. 01-2580 | $8,000,000 – Plaintiff alleges breach of payments by Ahava Dairy Products Corp. under a factor agreement; Defendants dispute the allegations and allege full payment |
| GE Capital | Ahava Food Corp. | NY Supreme Court Case No. 602140/2005 | $1,000,000 – Plaintiff alleges breach of payments by Ahava Food Corp. under an equipment lease; Defendant disputes the allegations and alleges improper equipment liens |

**SIGNATURE BANK**

**Schedule 3.11 – Subsidiaries or Affiliates of
Ahava Food Corp. or the Obligors**

1. No Obligor has any subsidiary.

2. The name, jurisdiction and ownership of each Obligor, all of which are affiliates of
each other, are as follows:

| Name of Obligor | Jurisdiction of Formation | Ownership of Equity Interests |
|---|---|---|
| Ahava Food Corp. | NY | Moise Banayan- Sole shareholder |
| St. Lawrence Food Corp. | NY | Moise Banayan - Sole shareholder |
| Lewis County Dairy Corp. | NY | Moise Banayan - Sole shareholder |
| Yoni Realty, LLC | NY | Moise Banayan - Sole Member |

3. Non-obligor affiliates:

| Name of Obligor | Jurisdiction of Formation | Ownership of Equity Interests |
|---|---|---|
| Ahava of California, LLC | CA | Moise Banayan - and Fariborz Banayan - Members |
| Ahava Dairy Products Corp. | NY | Moise Banayan – sole shareholder; company is defunct and conducts no business |
| Ahava Dairy Manufacturing Corp. | NY | Moise Banayan – sole shareholder; company is defunct and conducts no business |

**SIGNATURE BANK**

**Schedule 3.12 – Subordinated Debt of**
**<u>Ahava Food Corp. and the Obligors</u>**

Moise Banayan, from time to time, makes loans to one or more of the Obligors to finance the working capital needs of such entities.  Such loans do not bear interest, carry no maturity date and, as of the date hereof, aggregated $1,376,000, $876,000 of which is to be subordinated to Signature Bank.

**SIGNATURE BANK**

**Schedule 3.14 – Loans or Advances among
Ahava Food Corp. and the Obligors**

There are no loans or advances among Ahava Food Corp. and any of the Obligors other than the subordinated debt set forth on Schedule 3.12.

**SIGNATURE BANK**

**Schedule 3.18 – Environmental Matters of
Ahava Food Corp.
and the Obligors**

There are no exceptions.

**SIGNATURE BANK**

**Schedule 3.20 – Real Property Leasehold Interests of
Ahava Food Corp.
and the Obligors**

1.  The real property leasehold interest of the Obligors is as follows:

| Name of Landlord | Name of Tenant | Date of Lease | Leased Premises |
|---|---|---|---|
| New York Industrial Development Agency | Yoni Realty, LLC | 1/1/2004 | 236-280 Richards Street, Brooklyn, NY; Block 604, Lots 1,4,5,13,16 and 46; a/k/a 110 Beard Street, Brooklyn, NY 11231 |
| Yoni Realty, LLC | Ahava Food Corp. | 1/1/2004 | Same as above |

2.  No inventory of the Obligors is stored in a public warehouse.

**SIGNATURE BANK**

**Schedule 3.21 – The Bonds**

The New York City Industrial Development Agency (the "Agency") Industrial Development Revenue Bonds, Series 2004 (Ahava Food Corp. Project) (the "Bonds") are special obligations of the Agency issued under an Indenture of Trust, dated as of January 1, 2004 (the "Indenture"), between the Agency and The Bank of New York, New York, New York, as Trustee (the "Trustee"). The Bonds were issued to provide for the refunding of the Agency's Industrial Development Revenue Bonds, Series 2000A and Series 2000B (Ahava Food Corp. Project) (the "Prior Bonds"), which Prior Bonds were issued on June 8, 2000 to finance the acquisition, construction, renovation and equipping by the Agency of a manufacturing facility (the "Facility") consisting of the acquisition, improving, equipping, renovating and reconstructing an approximately 63,000 square foot existing manufacturing facility located at 236-280 Richards Street, and 118-126 Beard Street, Brooklyn, New York for the manufacturing, importing and distribution of kosher dairy products (the "Project").

The Facility was leased to the Agency by Yoni Realty, LLC (the "Lessee"), a limited liability company organized and existing under and by virtue of the laws of the State of New York, pursuant to a Company Lease Agreement dated as of January 1, 2004, between the Lessee and the Agency (the "Company Lease Agreement"). The Agency subleased the Facility back to Lessee pursuant to a Lease Agreement dated as of January 1, 2004 between the Lessee and the Agency (the "Lease Agreement") and the Lessee, as sublessor, subleased the Facility to Ahava Food Corp., a New York corporation (the "Sublessee" and sometimes collectively with the Lessee, the "Company") pursuant to a Sublease Agreement dated as of January 1, 2004 between the Lessee and the Sublessee, all to provide for the financing of a portion of the costs of the Project by the Agency.

The Bonds are secured by a letter of credit issued by Bank of America (the "L/C Bank") pursuant to a Credit Agreement between the Company and Merrill Lynch Business Credit (the "Credit Bank"). The Company entered into a reimbursement agreement with the Credit Bank, which agreement was secured by a mortgage on the Project. The Credit Bank has agreed to reimburse the L/C Bank for any draws under the L/C and the Company has agreed pursuant to the Reimbursement Agreement to reimburse the Credit Bank for any expenses or advances incurred by the Credit Bank.

The terms of the Bonds are set forth in the following Summary of Terms (with terms used with an initial capital letter having the meaning assigned to them in the Indenture):

| | |
|---|---|
| Issuer: | New York City Industrial Development Agency<br>110 William Street<br>New York, New York 10038 |
| Use of Proceeds: | The Bonds will be issued to provide financing for the current refunding of the outstanding amount of the |

Agency's $7,140,000 Industrial Development Revenue Bonds, Series 2000A and Series 2000B (Ahava Food Corp. Project) (the "Project").

**Description of the Bonds:**

The Bonds are authorized to be issued under and pursuant to the Act, a resolution of the Agency adopted on October 14, 2003 (the "Resolution") and an Indenture of Trust, dated as of January 1, 2004 (the "Indenture"). The Bonds are issued in book-entry only form and in authorized denominations of $100,000 or any integral multiple of $5,000 in excess thereof.

**Redemption Provisions:**

The Bonds are subject to optional redemption, extraordinary redemption and mandatory redemption as described herein.

**Interest Rate:**

Interest on the Bonds initially will be paid at the Weekly Interest Rate through the first Wednesday following the date of original issuance of the Bonds and thereafter at the lesser of (a) a Weekly Interest Rate as determined in accordance with the Indenture, (b) the maximum interest rate permitted by or enforceable under applicable law, and (c) the maximum interest rate specified by the Letter of Credit then in effect subject to adjustment as provided in the Indenture, as such Interest Rate may be adjusted from time to time in accordance with the Indenture, effective on Thursday.

**Interest Payment Date:**

The Interest Payment Date during the term of the Initial Letter of Credit, with respect to Bonds bearing interest at a Weekly Interest Rate, the first Thursday of the calendar month, provided such day is a Business Day, and if such day is not a Business Day, on the next succeeding Business Day, commencing February 5, 2004.

**Record Date:**

Record Date shall mean with respect to Bonds bearing interest at a Weekly Interest Rate, the calendar day immediately preceding each Interest Payment Date.

**Interest Rate Accrual:**

So long as the Bonds bear interest at the Weekly Interest Rate, the interest shall be payable for the period from Thursday of a calendar week through and including the next succeeding Wednesday. Bonds authenticated prior to the first Interest Payment Date shall bear interest from the date of the first authentication and delivery of Bonds. Bonds issued in exchange for or upon the registration of transfer of Bonds on or after the first Interest Payment Date thereon

shall bear interest from and including the Interest Payment Date next preceding the date of the authentication thereof, unless the date of such authentication shall be an Interest Payment Date to which interest on the Bonds has been paid in full or duly provided for, in which case they shall bear interest from and including such Interest Payment Date; provided that if, as shown by the records of the Trustee, interest on the Bonds shall be in default, Bonds issued in exchange for or upon the registration of transfer of Bonds shall bear interest from the date to which interest has been paid on the Bonds, or if no interest has been paid on the Bonds, the date of the first delivery of fully executed and authenticated Bonds.

<u>Weekly Interest Rate Mode:</u>

During each Weekly Interest Rate Period, the Bonds shall bear interest at the Weekly Interest Rate, determined by the Remarketing Agent initially no later than the first day of each Weekly Interest Rate Period and thereafter no later than Wednesday (or the next preceding Business Day, if such Wednesday is not a Business Day) of each week immediately preceding such Weekly Interest Period to be effective the following Thursday. Initially the Bonds shall bear interest at the initial Weekly Interest Rate from their date of issuance through the first Wednesday thereafter or February 4, 2004. The Weekly Interest Rate shall be the minimum rate of interest which, in the opinion of the Remarketing Agent, would be necessary to sell the Bonds on such date of determination in a secondary market sale at the principal amount thereof.

<u>Optional Tender for Purchase:</u>

When interest on the Bonds is payable at a Weekly Interest Rate, a Holder of any such Bonds may irrevocably tender such Bond for purchase by giving telephonic notice to the Remarketing Agent, confirmed in writing to the Remarketing Agent and the Tender Agent (addressed below) by 4:00 p.m., New York City time, on a Business Day stating the principal amount of the Bond, the Bond number and the date (which must be a Business Day at least seven days after the notice is given) on which such Bond is to be purchased. The Tender Agent shall promptly inform the Trustee of such notice, if applicable. In the case of a Bond to be purchased prior to an Interest Payment Date and after the Record Date in respect thereof, if the Holder is other than a Securities Depository or its nominee, the Holder shall deliver a due bill, in form satisfactory to the Trustee, for interest due on such Purchase Date.

**Mandatory Tender for Purchase:**    All Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase on the effective date of an Alternate Rate applicable thereto.  If such mandatory tender for purchase is required, the Notice of Mandatory Tender shall include the applicable information required by the Indenture.

All Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase upon the date of adjustment to a different Interest Rate Determination Method.  For such purposes, a Term Interest Rate shall be deemed not to differ from the immediately preceding Term Interest Rate Period to a day immediately preceding a Business Day.  If such mandatory tender for purchase is required, the Notice of Mandatory Tender shall include the applicable information required by the Indenture.

All Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase on the Business Day immediately prior to the substitution of a Substitute Letter of Credit unless prior to such date the Lessee shall deliver or cause delivery of a written confirmation from the Rating Agency to the effect that the substitution of the Substitute Letter of Credit will not, by itself, result in a reduction or withdrawal of its ratings then in effect on the Bonds secured by the Letter of Credit. If such mandatory tender for purchase is required, the Notice of Mandatory Tender shall (i) state the effective date of the substitution, (ii) describe the terms of the Substitute Letter of Credit to be provided, (iii) if applicable, state that one or more of the ratings then assigned to the Bonds secured by the Letter of Credit may be reduced or withdrawn and (iv) if available, state the Rating Category or Categories (including any refinements or graduations thereof) in which the Bonds secured by the Letter of Credit are expected to be rated by the Rating Agency on the effective date of the substitution.

At the option of the Credit Bank all Bonds secured by the Letter of Credit shall be subject to mandatory tender for purchase on the Business Day specified by the Credit Bank that is not more than five days after receipt by the Trustee of written direction by the Credit Bank, copies of which the Trustee shall give to the Lessee, the Tender Agent and Agency, to cause the mandatory repurchase of such Bonds as a result of the occurrence of an "Event of Default" under the Reimbursement Agreement.  If such mandatory tender for purchase is required, the Trustee will prepare and send a

notice in the form attached to the Indenture to all Holders of Bonds, the Agency, the Tender Agent, the Remarketing Agent, the Lessee and the Credit Bank by first class mail, postage prepaid, that such mandatory repurchase will occur on the Business Day specified by the Credit Bank that is not more than five days after the date of receipt by the Trustee of the written direction sent by the Credit Bank, that Holders of the Bonds shall have no right to retain their Bonds after such date so specified and upon such date all Bonds shall be purchased in whole at a Purchase Price equal to the principal amount thereof, without premium, plus accrued interest, if any, to, but excluding, the date of purchase.

**Security for Bonds:**

    Letter of Credit -

Pursuant to the terms of the WCMA Reimbursement and Security Agreement dated as of January 23, 2004 (the "Reimbursement Agreement") between the Lessee and Merrill Lynch Business Financial Services Inc. (the "Credit Bank"), the Credit Bank has caused Bank of America, N.A. (the "Bank") to issue an irrevocable, direct pay Letter of Credit issued, and dated the date of original issuance of the Bonds, the initial term of which will expire, unless earlier terminated or extended, on January 31, 2005. Under the Letter of Credit, the Trustee will be entitled to draw an amount not to exceed $6,950,000 in principal plus up to 50 days' accrued interest on the Bonds at an assumed rate of 10% per annum notwithstanding the actual rate borne by the Bonds from time to time, based on a 366-day year. The Letter of Credit will terminate upon the earliest to occur of (i) the date on which the Credit Bank honors any draft which has the effect of paying all principal and interest on the Bonds that are outstanding, or the portion of the Redemption Price thereof representing all of the principal and interest on the Bonds, (ii) the date on which the Credit Bank receives a certificate from the Trustee requesting the Bank to reduce to zero the amount available for drawings under the Letter of Credit; or, if later, the effective date specified in such certificate, (iii) the date on which the Credit Bank receives a certificate from the Trustee stating that the Trustee has been provided and has accepted a Substitute Letter of Credit or Substitute Credit Facility (as defined in the Indenture) or, if later, the effective date specified in such certificate, and (iv) the close of business on the fifteenth (15th) Business Day following receipt by the Trustee of written notice from the Credit Bank (a) that

an Event of Default, as defined in the Reimbursement Agreement, has occurred and is continuing, and (b) instructing the Trustee to cause acceleration of the Bonds pursuant to the terms of the Reimbursement Agreement, or (v) the close of business on January 31, 2005 or earlier or later as provided in the Letter of Credit. The Bonds are subject to mandatory redemption at par if the Letter of Credit expires or terminates and a substitute or alternate Letter of Credit is not in effect.

Lease Agreement -

The Lessee will be absolutely and unconditionally obligated pursuant to the Lease Agreement to make rental payments to the Trustee which in the aggregate will be sufficient to enable the Agency to pay when due (whether upon maturity, upon redemption or upon acceleration) the principal of, Sinking Fund Installments for, Redemption Price, if applicable, Purchase Price and interest on the Bonds as the same respectively become due.

Sublease Agreement -

The Sublessee will be absolutely and unconditionally obligated pursuant to the Sublease Agreement to make rental payments which, in the aggregate, will be sufficient to cover the payments required to be made by the Lessee under the Lease Agreement.

Guaranty Agreement -

The payments, obligations, covenants and agreements of the Lessee under the Lease Agreement, the payments, obligations and agreements of the Sublessee under the Sublease Agreement and the payment of the principal of, redemption premium, if applicable, purchase price, if any, and interest on the Bonds have been guaranteed by the Lessee, the Sublessee, Lewis County Dairy Corp., all as corporate guarantors and Moise Banayan, as individual guarantor (collectively, the "Guarantors") pursuant to the Guaranty Agreement.

# SCHEDULE 5.17(b)

## SPECIFIC EQUIPMENT TO BE PERFECTED UPON

# EXHIBIT B

FACILITY A NOTE



$,000,000

New York, New York
As of August 22, 2005

FOR VALUE RECEIVED, AHAVA FOOD CORP., a corporation organized under the laws of New York (the "**Borrower**") promises to pay to the order of SIGNATURE BANK, a banking corporation organized under the laws of New York (the "**Bank**"), at its office located at 565 Fifth Avenue, New York, New York 10017 (or at such other place the Bank designates in writing) the principal sum of Two Million and 00/100 ($2,000,000), in lawful money of the United States of America and in immediately available funds, on the Facility A Maturity Date (as defined in the Credit Agreement (defined below)), and sooner as required below and under the Credit Agreement, in the manner provided in the Credit Agreement.

The Borrower further promises to pay principal as set forth in Section 2A.01 of the Credit Agreement from the date hereof until the Facility A Loan is paid in full, all at the Adjusted LIBO Rate and at the times set forth in the Credit Agreement.

This Note is the promissory note made pursuant to Section 2A.01 of that certain Master Credit Facility Agreement dated as of August 22, 2005 (as amended, modified or supplemented from time to time, the "**Credit Agreement**"), among the Borrower, St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank and evidences the Facility A Loan made by the Bank under the Credit Agreement, and in particular Section 2A.01 thereof. All capitalized terms not defined herein shall have the meanings given to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of principal upon the occurrence of an Event of Default, default rate(s) of interest and prepayments on the terms and conditions specified therein.

The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

This Note is subject in all respects to the Credit Agreement, including, without limitation, the interest rate limitation provisions in Section 8.17 thereof.

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles other than as set forth in Section 5-1401 of the New York General Obligations Law.

*[Signature appears on the following page.]*

HF 3087608v.1 #06406/0023

IN WITNESS WHEREOF, the undersigned has executed this Note or has caused this Note to be duly executed by a duly authorized officer, all as of the day and year first above written.

AHAVA FOOD CORP.

By: _____
Name: Moses Bahayan
Title: President

Facility A Note

# EXHIBIT C

FACILITY B NOTE



$5,500,000

New York, New York
As of August 22, 2005

FOR VALUE RECEIVED, AHAVA FOOD CORP., a corporation organized under the laws of New York (the "Borrower"), hereby promises to pay to the order of SIGNATURE BANK, a banking corporation organized under the laws of New York (the "Bank") at its office located at 565 Fifth Avenue, New York, New York 10017, or at such other place the Bank designates in writing, the principal sum of Five Million Five Hundred Thousand Dollars and 00/100 ($5,500,000) or, if less, the then outstanding principal amount loaned by the Bank to the Borrower as Facility B Loans (as defined in the Credit Agreement (defined below)) pursuant to the Credit Agreement, in lawful money of the United States of America and in immediately available funds, on the Facility B Termination Date (defined below), or sooner if required under the Credit Agreement, and in the manner provided in the Credit Agreement.

The Borrower further promises to pay interest on the unpaid principal balance hereof, for the period such balance is outstanding, at the said office of the Bank, or at such other place as the Bank directs in writing, in like money, at the rate(s) of interest as provided in the Credit Agreement (for Facility B Loans) on the dates and in the manner provided in the Credit Agreement.

The date and amount of each Facility B Loan made by the Bank to the Borrower under the Credit Agreement, and each payment of principal thereof, shall be recorded by the Bank on its books and prior to any transfer of this Note (or, at the discretion of the Bank, at any other time), endorsed by the Bank on Schedule A attached hereto or any continuation thereof; provided however, that the failure of the Bank to make such a notation or any error therein shall not affect the obligation of the Borrower to repay the Facility B Loans made by the Bank in accordance with the Credit Agreement and this Note.

This Note is the promissory note made pursuant to Section 2B.02 of that certain Master Facility Credit Agreement dated as of August 22, 2005 (as amended, modified or supplemented from time to time, the "Credit Agreement"), among the Borrower, St. Lawrence Food Corp., Lewis County Dairy Corp., Yoni Realty, LLC, Moise Banayan and the Bank and evidences the Facility B Loans made by the Bank under the Credit Agreement. All capitalized terms not defined herein shall have the meanings given to them in the Credit Agreement.

The Credit Agreement provides for the acceleration of the maturity of principal upon the occurrence of an Event of Default, default rate(s) of interest and prepayments on the terms and conditions specified therein.

The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Note.

This Note is subject in all respects to the Credit Agreement, including, without limitation, the interest rate limitation provisions in Section 8.17 thereof.

IF 3087625v.1 #06406/0023

This Note shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to conflicts of law principles except as set forth in Section 5-1401 of the New York General Obligations Law.

*[Signature appears on the following page.]*

IN WITNESS WHEREOF, the undersigned has executed this Note or has caused this Note to be duly executed by a duly authorized officer, all as of the day and year first above written.

AHAVA FOOD CORP.

By: _____
Name: Moise Banayan
Title: President

# EXHIBIT D

# SECURITY AGREEMENT

SECURITY AGREEMENT (this "**Security Agreement**" or this "**Agreement**"), made this 22nd day of August, 2005, by and among AHAVA FOOD CORP., a New York corporation ("**Ahava**"), ST. LAWRENCE FOOD CORP., a New York corporation ("**SLF Corp**"), LEWIS COUNTY DAIRY CORP., a New York corporation ("**LCD Corp**"), YONI REALTY, LLC, a New York limited liability company ("**YR LLC**", and together with Ahava, SLF Corp, LCD Corp and YR LLC, the "**Grantors**", and each a "**Grantor**"), and SIGNATURE BANK, having an office at 565 Fifth Avenue, New York, New York 10017 its successors or assigns (together with its affiliates and subsidiaries, herein called the "**Bank**");

## W I T N E S S E T H:

In consideration of financial accommodations (arising from loan, advance, letter of credit, acceptance and/or other credit transactions) given or to be given or to be continued to one or more of the Grantors or to any other party(ies) at the request, or for the benefit, or upon the undertaking, of any or all of the Grantors by the Bank, the Grantors hereby agree with the Bank that, whenever any or all of the Grantors shall be at any time or times directly or contingently indebted, liable or obligated to the Bank in any manner whatsoever, the Bank shall have the following rights and the Grantors shall have the following obligations:

1.    **Security Interest; Definitions.**

(a)    As security for the due and punctual payment of any and all of the present and future Obligations (defined below), each Grantor hereby collaterally assigns, mortgages, pledges, hypothecates and grants to the Bank a first lien on and security interest in (subject only to Permitted Encumbrances (as defined in the Loan Agreement) all assets of such Grantor set forth, referred to, or listed on, Schedule I hereto and made a part hereof (all such assets being hereinafter referred to as the "**Collateral**").

(b)    Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement and, as used herein, the following terms shall have the following meanings:

"**Agreement**" or "**Security Agreement**" means this Security Agreement, including all schedules, exhibits and annexes hereto, as he same may be amended, restated, supplemented or otherwise modified from time to time.

"**Event of Default**" has the meaning set forth in Section 8 below.

"**Loan Agreement**" shall mean the Master Credit Facility Agreement, dated as of August 22, 2005, by and among the Grantors, Moise Banayan and the Bank, as the same may be amended, modified, restated, supplemented or otherwise modified from time to time.

"**Obligations**" means all liabilities and obligations, absolute or contingent, joint, several or independent, of any and all of the Grantors to the Bank, now or hereafter existing, due to or become due to, or held or to be held by, the Bank for its own account or as agent for another or others, whether created directly or acquired by assignment or otherwise and howsoever evidenced.

2.    **Title; Liens and Encumbrances.**

Each Grantor represents and warrants that such Grantor is, or to the extent that this Agreement states that the Collateral is to be acquired after the date hereof, will be, the owner of the Collateral, having good and marketable title thereto, free from any and all liens, security interests, encumbrances and claims, other than Permitted Encumbrances; no Grantor will create or assume or permit to exist any such lien, security interest, encumbrance or claim on or against the Collateral except for Permitted Encumbrances, and such Grantor will promptly notify the Bank of any such other claim, lien, security interest or other encumbrance, made or asserted in writing against the Collateral and will defend the Collateral against any claim, lien, security interest or other encumbrance, other than Permitted Encumbrances.

3.    **Representations and Warranties;**
      **Location of Collateral and Records;**
      **Business and Trade Names.**

(a)    Each Grantor represents and warrants that it has no place of business, offices where such Grantor's books of account and records are kept, or places where the Collateral consisting of goods (including equipment and inventory) is used, stored or located, except as set forth on Schedule II hereto, and covenants that such Grantor will promptly notify the Bank of any change in the foregoing representation. Each Grantor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to on Schedule II and at none other. Each Grantor further covenants that except for books and records delivered to the Bank or an agent for the Bank, no Grantor will store, use or locate any of the Collateral consisting of books and records at any place other than as listed on Schedule II hereto.

(b)    Each Grantor represents and warrants that it currently uses no business or trade names, except as set forth on Schedule II hereto, and covenants that such Grantor will promptly notify the Bank, in sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by such Grantor for billing purposes.

(c)    Each Grantor represents and warrants that to its knowledge it has complied and is in compliance in all material respects with all applicable provisions of the Fair Labor Standards Act, including, without limitation, the minimum wage and overtime rules of that Act, and covenants each Grantor will continue to comply with such Act.

4.    **Perfection of Security Interest.**

Each Grantor will cooperate with the Bank in the Bank's filing of one or more financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, in each case in order to perfect the Bank's security interest in the Collateral, in form satisfactory to the Bank. Each Grantor will pay all filing or recording costs with respect thereto, and all costs of filing or recording this Agreement or any other instrument, agreement or document executed and delivered pursuant hereto (including the cost of all federal, state or local mortgage, documentary, stamp or other similar taxes), in each case, in all public offices where filing or recording is deemed by the Bank to be necessary or desirable. Each Grantor hereby authorizes the Bank to take all action (including, without limitation, the filing of any Uniform Commercial Code Financing Statements or amendments thereto without the signature of such Grantor) that the Bank may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this Agreement.

5.    **General Covenants.**

Each Grantor shall:

(a)     furnish the Bank from time to time at the Bank's request written statements and schedules further identifying and describing the Collateral in such detail as the Bank may reasonably require;

(b)     advise the Bank promptly, in sufficient detail, of any substantially adverse change in the value of the Collateral, and of the occurrence of any event that is reasonably likely to have a material adverse effect on the value of the Collateral or on the Bank's security interest therein;

(c)     comply in all material respects with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, applicable to the Collateral or any part thereof or to the operation of such Grantor's business, provided that such Grantor may contest any acts, rules, regulations, orders and directions of such bodies or officials in any reasonable manner that will not, in the Bank's opinion, adversely affect its rights or the priority of its security interest in any of the Collateral;

(d)     perform and observe in all material respects all covenants, restrictions and conditions contained in any document, instrument or agreement executed in connection herewith providing for payment of taxes, maintenance of insurance and otherwise relating to the Collateral, as though such covenants, restrictions and conditions were fully set forth in this Agreement;

(e)     promptly notify the Bank of all disputes with account debtors involving amounts in excess of $25,000; and

(f)     promptly execute and deliver to the Bank such further deeds, mortgages, assignments, security agreements or other instruments, documents, certificates and assurances and take such further action as the Bank may from time to time in its sole discretion deem necessary to perfect, protect or enforce its security interest in the Collateral or otherwise to effectuate the intent of this Agreement and the Loan Documents.

6.     <u>Assignment of Insurance.</u>

At or prior to the execution hereof, the Grantors shall deliver to the Bank copies of, or certificates of the issuing companies with respect to, endorsements of any and all policies of insurance owned by any of the Grantors covering or in any manner relating to the Collateral, in form and substance reasonably satisfactory to the Bank, naming the Bank as an additional insured party as its interest may appear and indicating that no such policy will be cancelled or otherwise terminated without at least thirty (30) days' prior written notice from the insurer to the Bank and the Grantors agree that such no such policy will be reduced in coverage or amount without at least thirty (30) days' prior written notice to the Bank. As further security for the due payment and performance of the Obligations, the Grantors hereby collaterally assign to the Bank all sums, including returned or unearned premiums, that may become payable under or in respect of any policy of insurance owned by any Grantor covering or in any manner relating to the Collateral, and each Grantor hereby directs each insurance company issuing any such policy to make payment of sums directly to the Bank after the occurrence and during the continuance of an Event of Default (defined below). Each Grantor hereby appoints the Bank as its attorney-in-fact and authorizes the Bank in its or in the Bank's name to endorse any check or draft representing any such payment and to execute any proof of claim, subrogation receipt and any other document required by such insurance company as a condition to or otherwise in connection with such payment, and, upon the occurrence and during the continuation of an Event of Default, to cancel, assign or surrender any such policies. All such sums received by the

3

Bank shall be applied by the Bank to satisfaction of the Obligations or, to the extent that such sums represent unearned premiums in respect of any policy of insurance on the Collateral refunded by reason of cancellation, toward payment for similar insurance protecting the respective interests of the Grantors and the Bank, or as otherwise required by applicable law, and to the extent not so applied shall be paid over to the Grantors entitled thereto.

7.    **Collections.**

(a)    Subject to the other provisions of this Section 7, each Grantor may collect all checks, drafts, cash or other remittances (i) in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, (ii) in payment of any Collateral sold, transferred, leased or otherwise disposed of, or (iii) in payment of or in account of its accounts, contracts, contract rights, notes, drafts, acceptances, general intangibles, choses in action and all other forms of obligations relating to any of the Collateral so sold, transferred, or leased or otherwise disposed of, and all of the foregoing amounts so collected shall be held in trust by such Grantor for, an the property of, the Bank and shall not be commingled with other funds, money or property of such Grantor.

(b)    After the occurrence and during the continuance of an Event of Default, upon the written demand of the Bank for the payment of any Obligations, each Grantor will immediately upon receipt of all such checks, drafts, cash or other remittances in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, deliver any such items to the Bank accompanied by a remittance report in form supplied or approved by the Bank, such items to be delivered to the Bank in the same form received, endorsed or otherwise assigned by such Grantor where necessary to permit collection of such items and, regardless of the form of such endorsement. Each Grantor hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other notices with respect thereto.

(c)    Each Grantor will immediately upon receipt of all checks, drafts, cash or other remittances in payment for any Collateral sold, transferred, leased or otherwise disposed of, or in payment or on account of its accounts, contracts, contract rights, notes, drafts, acceptances, general intangibles, choses in action and all other forms of obligations relating to any of the Collateral so sold, transferred, leased or otherwise disposed of, deliver any such items to the Bank accompanied by a remittance report in form supplied or approved by the Bank, such items to be delivered to the Bank in the same form received, endorsed or otherwise assigned by such Grantor where necessary to permit collection of such items and, regardless of the form of such endorsement, such Grantor hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other notices with respect hereto.

(d)    Each Grantor will promptly notify the Bank in writing of the return or rejection of any goods represented by any accounts, contract rights or general intangibles and such Grantor shall forthwith account therefore to the Bank in cash without demand or notice and until such payment has been received by the Bank, such Grantor will receive and hold all such goods separate and apart, in trust for an subject to the security interest in favor of the Bank, and the Bank is authorized to sell, for such Grantor's account and at such Grantor's sole risk, all or any part of such goods.

(e)    After the occurrence and during the continuance of an Event of Default, each Grantor hereby authorizes and directs each Person (each, an **"Account Debtor"**) liable to such Grantor in respect of such Grantor's accounts, contract rights or general intangibles, upon the occurrence and during the continuance of an Event of Default and upon notice from the Bank to such Account Debtor,

4

to pay directly to the Bank all monies as and when due such Grantor from such Account Debtor, and upon such notice to such Account Debtor, to draw and deliver to the order of the Bank any and all checks and other instruments for the payment of or in respect of such Grantor's accounts, contract rights or general intangibles, and to accept the receipts of the Bank therefor.

(f)    All of the foregoing remittances shall be applied and credited by the Bank first to satisfaction of the Obligations then due and payable or as otherwise required by applicable law, and to the extent not so credited or applied, shall be paid over to the applicable Grantor.

8.    <u>Events of Default</u>.

Upon the occurrence and during the continuation of:

(a)    any "Event of Default" under the Loan Agreement;

(b)    non-payment when due of any of the Obligations other than those arising under the Loan Agreement;

(c)    the failure of a Grantor to perform any agreement on its part to be performed (other than the agreements, obligations and covenants referred to in the foregoing items (a) and (b)) hereunder or under the terms of any agreement, document or instrument (not constituting a Loan Document), governing any of the Obligations and such failure shall remain unremedied for a period of thirty (30) days following the occurrence of such failure; provided, however, if (i) no grace period is provided to the Obligor under the Loan Agreement or (ii) a grace period of a specific duration is provided to the Obligor under the Loan Agreement to cure any such failure, then such grace period (or lack thereof) shall apply to such failure;

(d)    at any time any representation in any financial or other statement of a Grantor (delivered to the Bank by or on behalf of a Grantor) is untrue or omits any material fact;

(e)    if a material adverse change shall occur in the financial condition of a Grantor, or a guarantor of any of the Obligations;

(f)    if a Grantor (or any endorser, guarantor or surety of or upon any of the Obligations) who is an individual shall die or become disabled, or (a Grantor which is a partnership, limited liability company or corporation) shall be dissolved or shall become insolvent (however evidenced);

(g)    upon the suspension of business by a Grantor, or upon the issuance of any warrant, process, or order of attachment, garnishment of lien and/or the filing of a lien as a result thereof against any of the property of a Grantor (or any endorser, guarantor or surety of or upon any of the Obligations) where the amount claimed is in excess of $50,000 in the aggregate; or

(h)    upon the making by a Grantor (or any endorser, guarantor or surety) of an assignment for the benefit of creditors under any bankruptcy, reorganization, arrangement

5

of debt, insolvency, readjustment of debt, composition, receivership, liquidation or dissolution law or statute of any jurisdiction,

then the Bank shall have the right, with or without notice to each Grantor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, to direct payment under any equipment lease, account, general intangible or other item to be made directly to the Bank, and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law.  Without limiting the generality of the foregoing, each Grantor agrees that the Bank shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as the Bank in its sole discretion may deem advisable, and it shall have the right to purchase at any such sale; and, if any Collateral shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, the Bank shall have the right, at its option, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate.  At the Bank's request, each Grantor shall assemble the Collateral and make it available to the Bank at places that the Bank shall select, whether at such Grantor's premises or elsewhere, and make available to the Bank, without rent, all of such Grantor's premises and facilities for the purpose of the Bank's taking possession of, removing or putting the Collateral in saleable or disposable form.  The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by the Bank, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which the Bank shall account to each Grantor for any surplus proceeds. If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Bank is legally entitled, each Grantor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the Loan Documents, and the reasonable fees of any attorneys employed by the Bank to collect such deficiency.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands against the Bank arising out of the repossession, removal, retention or sale of the Collateral.

9.    **Costs and Expenses.**

Any and all fees, out of pocket costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by the Bank, in connection with the preparation of this Agreement and all other documents relating hereto and the consummation of this transaction, the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral, or the enforcing, foreclosing, retaking, holding, storing, processing, selling or otherwise realizing upon the Collateral and the Bank's security interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to

6

which this Agreement relates, shall be borne and paid by the Grantors promptly after written demand by the Bank and until so paid shall be added to the principal amount of the Obligations and shall bear interest at the rate prescribed in Section 8.15 of the Loan Agreement or, if applicable, as prescribed in the case of a default or event of default under documentation governing other Obligations.

10.    **Power of Attorney.**

Each Grantor authorizes the Bank and does hereby make, constitute and appoint the Bank, and any officer or agent of the Bank, with full power of substitution, as such Grantor's true and lawful attorney-in-fact, with power, in its own name or in the name of such Grantor: (a) to endorse any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Bank; (b) to sign and endorse any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against any debtor, assignments, verifications and notices in connection with accounts, and other documents relating to Collateral; (c) to pay or discharge any taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (d) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (e) to open any safe deposit box or bank vault in order to take possession of any Collateral; and (f) generally, to do, at the Bank's option and at such grantor's expense, at any time, or from time to time, all acts and things that the Bank deems necessary to protect, preserve and realize upon the Collateral and the Bank's security interest therein; and such grantor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof; provided, however, that none of the actions described in clauses (a) through (e) of this sentence may be taken by the Bank unless and until an Event of Default has occurred and is continuing. This power of attorney shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding or the Bank shall have any remaining Commitment under the Loan Agreement or any other lending commitment to any Grantor.

11.    **Notices.**

All notices and other communications pursuant to this Agreement shall be given and deemed given in the manner prescribed by the Loan Agreement (and the applicable portion of the Loan Agreement is hereby incorporated herein by reference). Any party hereto may change the Person, address or telecopier number to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

12.    **Other Security.**

To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other Person then the Bank shall have the right in its sole discretion to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Bank's rights and remedies hereunder.

13.    **Deposits.**

Any and all deposits or other sums at any time credited by or due from the Bank to a Grantor, whether in regular or special depository accounts or otherwise, shall at all times constitute additional collateral for the Obligations, and, so long as an Event of Default shall have occurred and be

continuing, may be set-off by the Bank against any Obligations at any time whether or not they are then due and whether or not other collateral held by the Bank is considered to be adequate.

### 14.    Governing Law.

This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to principles of conflict of laws except as set forth in Section 5-1401 of the New York General Obligation Law.

### 15.    Miscellaneous.

(a)    Beyond the safe custody thereof, the Bank shall have no duty as to the collection of any Collateral in its possession or control or in the possession or control of any agent or nominee of the Bank, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(b)    No course of dealing between any Grantor and the Bank, nor any failure to exercise, nor any delay in exercising, on the part of the Bank, any right, power or privilege hereunder or under any of the other  Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)    All of the Bank's rights and remedies with respect to the Collateral, whether established hereby or by the other Loan Documents, or by any other agreements, instruments or documents or by law, shall be cumulative and may be exercised singly or concurrently.

(d)    The provisions of this Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

(e)    This Agreement is subject to modification only by a writing signed by the parties.

(f)    The benefits and burdens of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; provided, however, that the rights and obligations of any Grantor under this Agreement shall not be assigned or delegated without the prior written consent of the Bank, and any purported assignment or delegation without such consent shall be void.

(g)    EACH GRANTOR AND THE BANK MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR THE BANK TO EXTEND CREDIT.

(h)     Any content of this Agreement which is also addressed by the Loan Agreement shall be construed to the maximum extent possible as supplementary and complementary. If a conflict nonetheless shall be found to exist, the provision of Section 8.19 of the Loan Agreement shall prevail.

(i)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (A) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements of modifications set forth herein) (B) any reference herein to any Person shall be construed to include such Person's successors and assigns, (C) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (D) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules of this Agreement, and (E) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

16.     <u>Term of Agreement</u>.

The term of this Agreement shall commence on the date hereof and this Agreement shall continue in full force and effect, and be binding upon each Grantor, until all of the Obligations have been fully paid and performed (and the Commitment under the Loan Agreement and any other lending commitment of the Bank to a Grantor have been terminated), and such payment and performance (and termination) have been acknowledged in writing by the Bank, whereupon this Agreement shall terminate.

*[Signatures appear on the following page]*

**WITNESS** the execution of this Security Agreement as of the day and year first above written.

WITNESS:

Name: _Beth J. Spickler_

Name: _Beth J. Spickler_

Name: _Beth J. Spickler_

Name: _Beth J. Spickler_

Name: _Jessica Thaler_

**AHAVA FOOD CORP.**

By: _____
Name: Mose Poornejan
Title: President

**ST. LAWRENCE FOOD CORP.**

By: _____
Name: Mose Poornejan
Title: President

**LEWIS COUNTY DAIRY CORP.**

By: _____
Name: Mose Poornejan
Title: President

**YONI REALTY, LLC**

By: _____
Name: Mose Poornejan
Title: Manager

**SIGNATURE BANK**

By: _____
Name: Robert A. Brocht
Title: SVP

Security Agreement

## SCHEDULE I TO SECURITY AGREEMENT

(a)    All personal properties, personal assets and rights of each Grantor, wherever located, whether now owned or hereafter acquired or arising, including, without limitation, all personal property and fixtures of every kind and nature, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money (including, without limitation, the right to receive all payments in connection with any and all equipment leases made by each Grantor as lessor), insurance claims and proceeds, tort claims, and all general intangibles including, without limitation, all payment intangibles, all income, cash, dividends, redemptions, return of capital or other distributions (in each case consisting of cash, cash equivalents or marketable securities, and all licenses, permits, agreements of any kind or nature pursuant to which such Grantor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or other possess, use or have authority to possess or use property (whether tangible or intangible) of such grantor, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics.

(b)    Any and all additions and accessions to the foregoing, all substitutions and replacements therefor and all products and proceeds thereof.

All terms defined in the Uniform Commercial Code of the State of New York and used herein shall have the same definitions herein as now specified therein and as such terms may hereafter be amended; provided, however, the term "instrument" shall be such term as defined in Article 9 of the Uniform Commercial Code of the State of New York rather than Article 3.

## SCHEDULE II TO SECURITY AGREEMENT

**Chief Place of Business:**

**Ahava Food Corp:**

110 Beard Street, Brooklyn, NY  11231

**St. Lawrence Food Corp:**

30 Main Street, Ogdensburg, NY  13669

**Lewis County Dairy Corp:**

7705 State Route 812, Lowville, NY  13367

**Yoni Realty, LLC:**

110 Beard Street, Brooklyn, NY  11231


**Offices Where Records Are Kept:**

**Ahava:**

110 Beard Street, Brooklyn, NY  11231

**St. Lawrence Food Corp:**

SAME AS ABOVE

**Lewis County Dairy Corp:**

SAME AS ABOVE

**Yoni Realty LLC:**

SAME AS ABOVE


**Other Locations Where Collateral  Is Stored, Used or Located:**

**Ahava Food Corp.:**

SAME AS ABOVE

**St. Lawrence Food Corp:**

SAME AS ABOVE

**Lewis County Dairy Corp:**

SAME AS ABOVE

**Yoni Realty LLC:**

SAME AS ABOVE


**Business and Trade Names Used :**

**Ahava Food Corp.:**

Ahava Food Corp.

**St. Lawrence Food Corp:**

St. Lawrence Food Corp.

**Lewis County Dairy Corp:**

Lewis County Dairy Corp.

**Yoni Realty LLC:**

Yoni Realty, LLC

# EXHIBIT E

232577    2005 AUG 23 AM 11:00

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Kevin Johnson    212-592-1400

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Herrick Feinstein LLP
2 Park Avenue
New York, NY 10016

kjohnson@herrick.com

**CSC 50
DRAW DOWN**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Ahava Food Corp. | | | | |

| OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 110 Beard Street | Brooklyn | NY | 11231 | US |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID # if any | | NONE |
|---|---|---|---|---|---|---|
| | | Corporation | New York | | | |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

| OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID # if any | X NONE |
|---|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Signature Bank | | | | |

| OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 565 Fifth Avenue | New York | NY | 10017 | US |

4. This FINANCING STATEMENT covers the following collateral:

All personal property of Debtor (subject to the limitations set forth in the Security Agreement dated as of August 22, 2005, made by the Debtor, St Lawrence Food Corp., a New York corporation, Lewis County Dairy Corp., a New York corporation, and Yoni Realty, LLC, a New York limited liability company, in favor of the Secured Party, as the same may be amended, supplemented or restated from time to time), whether now owned or existing or hereafter acquired or arising, regardless of where located, and all products, proceeds, supporting obligations, substitutions, amendments and replacements thereof.

| 5. ALTERNATIVE DESIGNATION [if applicable] | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 | F#136608 |
|---|---|---|---|---|---|

| 8. OPTIONAL FILER REFERENCE DATA | A#222280 |
|---|---|
| Filed with: NY - Secretary of State    Imm 557184 .002 | |

FILING OFFICE COPY    UCC FINANCING STATEMENT (FORM UCC1) (REV 05/22/02)

**FILING NUMBER: 200508230918974**

232576          2005 AUG 23 AM 11:00

███████████████
███████████████
███████████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Kevin Johnson          212-592-1400

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Herrick Feinstein LLP
2 Park Avenue
New York, NY 10016

kjohnson@herrick.com

**CSC 50 DRAW DOWN**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Lewis County Dairy Corp | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 7705 Rt. 812 | Lowville | NY | 13367 | US |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID # if any |
|---|---|---|---|---|
| | | Corporation | New York | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID # if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Signature Bank | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 565 Fifth Avenue | New York | NY | 10017 | US |

4. This FINANCING STATEMENT covers the following collateral:

All personal property of Debtor (subject to the limitations set forth in the Security Agreement dated as of August 22, 2005, made by the Debtor, Ahava Food Corp., a New York corporation, St. Lawrence Food Corp., a New York corporation, and Yoni Realty, LLC, a New York limited liability company, in favor of the Secured Party, as the same may be amended, supplemented or restated from time to time), whether now owned or existing or hereafter acquired or arising, regardless of where located, and all products, proceeds, supporting obligations, substitutions, amendments and replacements thereof



| 5. ALTERNATIVE DESIGNATION [if applicable] | | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | F#136610 | A#222282 |
| Filed with: NY - Secretary of State | | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**FILING NUMBER: 200508230918962**

228673                    2007 AUG 29  PM 12: 30

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

# CSC 50
# DRAW DOWN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Banayan | Moise | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 51 Parker Boulevard | Monsey | NY | 10952 | USA |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Signature Bank | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 565 Fifth Avenue | New York | NY | 10017 | USA |

4. This FINANCING STATEMENT covers the following collateral:

Please see the attached Schedule A to this financing statement.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum  [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |
| File in New York | | | | | | |

*131586-6-810*

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

## FILING NUMBER: 200708290696966

EXHIBIT A
to   228673                    2007 AUG 29  PM 12: 30
UCC-1 Financing Statement
naming
Moise Banayan, as Debtor
and
Signature Bank, as Secured Party

1.     Description of Collateral.  The collateral this UCC-1 Financing Statement covers is all of Debtor's right, title and interest in, to and under all of the following, wherever located, and whether now owned or existing or hereafter arising or acquired from time to time (the "Pledged Collateral"):

        (i)      all of the Pledged Stock and the Additional Collateral and any certificates and instruments now or hereafter representing the Pledged Stock and the Additional Collateral;

        (ii)     all rights, interests and claims with respect to the Pledged Stock and Additional Collateral, including under any and all related agreements, instruments and other documents;

        (iii)    all books, records and other documentation of the Debtor related to the Pledged Stock and Additional Collateral.

2.     Operative Document.    This UCC-1 Financing Statement relates to the Pledge Agreement, dated as of August 27, 2007 (the "Pledge Agreement", as such Pledge Agreement may be amended, amended and restated, supplemented or otherwise modified from time to time), made by the Debtor in favor of the Secured Party (together with its successors and assigns).

3.     Definitions.    As used herein, the following capitalized terms shall have the following meanings, and such definitions shall be equally applicable to the singular and plural forms of the terms defined:

        "Additional Collateral" shall mean any and all (i) additional Capital Stock (as defined below) or other equity securities issued by, or interests in, any Issuer, whether certificated or uncertificated, (ii) warrants, options or other rights entitling the Debtor to acquire any interest in Capital Stock or other equity securities of or other equity interests in any Issuer, (iii) securities, property, interest, dividends and other payments and distributions issued as an addition to, in redemption of, in renewal or exchange for, in substitution or upon conversion of, or otherwise on account of, the Pledged Stock or such additional Capital Stock or other equity securities or other interests in any Issuer, and (iv) cash and non-cash proceeds of the Pledged Stock, and all supporting obligations, of any or all of the foregoing, in each case from time to time received or receivable by, or otherwise paid or distributed to or acquired by, the Debtor.

        "Capital Stock" shall mean as to any Person, all shares, interests, partnership interests, limited liability company interests, participations, rights in or other equivalents (however designated) of such Person's equity (however designated) and any rights, warrants or options exchangeable for or convertible into such shares, interests, participations, rights or other equity.

        "Issuer" shall mean Ahava Food Corp., a New York corporation ("Ahava"), St. Lawrence Food Corp., a New York corporation ("SLF"), Lewis County Dairy Corp., a New York corporation ("LCD"), and Schwartz & Sons Quality Distributors, Inc., a New York corporation ("Schwartz").

HF 3760027v.2 #06406/0023

"Pledged Stock" shall mean and include all of the issued and outstanding shares, whether now owned or hereafter acquired by the Debtor, of the Capital Stock of each Issuer including, without limitation all of the issued and outstanding stock of the Issuers listed on Exhibit A attached hereto, and, also, any shares, stock certificates, options or rights issued by any of the Issuer as an addition to, in substitution for, or in exchange for any such shares, and any and all proceeds thereof, now or hereafter owned or acquired by the Debtor.

All capitalized terms not defined herein shall have the meanings ascribed to them in the Pledge Agreement.

**EXHIBIT A**

| Issuer | Owner | Number of Shares | Certificate Number | Class | Ownership Percentage |
|---|---|---|---|---|---|
| Ahava Food Corp. | Moise Banayan | 200 | 1 | | 100% |
| St. Lawrence Food Corp. | Moise Banayan | 200 | 1 | | 100% |
| Lewis County Dairy Corp. | Moise Banayan | 200 | 1 | | 100% |
| Schwartz & Sons Quality Distributors, Inc. | Moise Banayan | 200 | 0 | | 100% |

228673

2007 AUG 29 PM 12: 30

HF 3760027v.2 #06406/0023

228674    2007 AUG 29 PM 12: 30

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

# CSC 50
# DRAW DOWN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| Banayan | Moize | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 51 Parker Boulevard | Monsey | NY | 10952 | USA |
| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | |
| Signature Bank | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 565 Fifth Avenue | New York | NY | 10017 | USA |

4. This FINANCING STATEMENT covers the following collateral:

Please see the attached Schedule A to this financing statement.

5. ALTERNATIVE DESIGNATION (if applicable):   LESSEE/LESSOR   CONSIGNEE/CONSIGNOR   BAILEE/BAILOR   SELLER/BUYER   AG. LIEN   NON-UCC FILING

6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   [if applicable]   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]   All Debtors   Debtor 1   Debtor 2

8. OPTIONAL FILER REFERENCE DATA
File in New York

*131586-5-SRL*

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

**FILING NUMBER: 200708290696978**

EXHIBIT A 228674       2007 AUG 29 PM 12: 30
to
UCC-1 Financing Statement
naming
Moize Banayan, as Debtor
and
Signature Bank, as Secured Party

1.   Description of Collateral.   The collateral this UCC-1 Financing Statement covers is all of Debtor's right, title and interest in, to and under all of the following, wherever located, and whether now owned or existing or hereafter arising or acquired from time to time (the "Pledged Collateral"):

        (i)     all of the Pledged Stock and the Additional Collateral and any certificates and instruments now or hereafter representing the Pledged Stock and the Additional Collateral;

        (ii)    all rights, interests and claims with respect to the Pledged Stock and Additional Collateral, including under any and all related agreements, instruments and other documents;

        (iii)   all books, records and other documentation of the Debtor related to the Pledged Stock and Additional Collateral.

2.   Operative Document.   This UCC-1 Financing Statement relates to the Pledge Agreement, dated as of August 27, 2007 (the "Pledge Agreement", as such Pledge Agreement may be amended, amended and restated, supplemented or otherwise modified from time to time), made by the Debtor in favor of the Secured Party (together with its successors and assigns).

3.   Definitions.   As used herein, the following capitalized terms shall have the following meanings, and such definitions shall be equally applicable to the singular and plural forms of the terms defined:

        "Additional Collateral" shall mean any and all (i) additional Capital Stock (as defined below) or other equity securities issued by, or interests in, any Issuer, whether certificated or uncertificated, (ii) warrants, options or other rights entitling the Debtor to acquire any interest in Capital Stock or other equity securities of or other equity interests in any Issuer, (iii) securities, property, interest, dividends and other payments and distributions issued as an addition to, in redemption of, in renewal or exchange for, in substitution or upon conversion of, or otherwise on account of, the Pledged Stock or such additional Capital Stock or other equity securities or other interests in any Issuer, and (iv) cash and non-cash proceeds of the Pledged Stock, and all supporting obligations, of any or all of the foregoing, in each case from time to time received or receivable by, or otherwise paid or distributed to or acquired by, the Debtor.

        "Capital Stock" shall mean as to any Person, all shares, interests, partnership interests, limited liability company interests, participations, rights in or other equivalents (however designated) of such Person's equity (however designated) and any rights, warrants or options exchangeable for or convertible into such shares, interests, participations, rights or other equity.

        "Issuer" shall mean Ahava Food Corp., a New York corporation ("Ahava"), St. Lawrence Food Corp., a New York corporation ("SLF"), Lewis County Dairy Corp., a New York corporation ("LCD"), and Schwartz & Sons Quality Distributors, Inc., a New York corporation ("Schwartz").

HF 3760027v.2 #06406/0023

"Pledged Stock" shall mean and include all of the issued and outstanding shares, whether now owned or hereafter acquired by the Debtor, of the Capital Stock of each Issuer including, without limitation all of the issued and outstanding stock of the Issuers listed on Exhibit A attached hereto, and, also, any shares, stock certificates, options or rights issued by any of the Issuer as an addition to, in substitution for, or in exchange for any such shares, and any and all proceeds thereof, now or hereafter owned or acquired by the Debtor.

All capitalized terms not defined herein shall have the meanings ascribed to them in the Pledge Agreement.

**EXHIBIT A**

| Issuer | Owner | Number of Shares | Certificate Number | Class | Ownership Percentage |
|---|---|---|---|---|---|
| Ahava Food Corp. | Moize Banayan | 200 | 1 | | 100% |
| St. Lawrence Food Corp. | Moize Banayan | 200 | 1 | | 100% |
| Lewis County Dairy Corp. | Moize Banayan | 200 | 1 | | 100% |
| Schwartz & Sons Quality Distributors, Inc. | Moize Banayan | 200 | 0 | | 100% |

228674

2007 AUG 29  PM 12: 30

HF 3760027v.2 #06406/0023

# EXHIBIT F

## JOINT AND SEVERAL
## GUARANTY OF PAYMENT

In order to induce SIGNATURE BANK (which together with its successors, endorsees and assigns, is hereinafter called the "**Bank**") to enter into the Loan Agreement (defined below) and to make advances, loans or extensions of credit, directly or indirectly, to AHAVA FOOD CORP. (hereinafter called "**Ahava**") and in consideration thereof and of any loans, advances, or other financial accommodations heretofore or hereafter granted by the Bank to or for the account of the Borrower, and to grant to the Borrower such renewals, extensions, forbearances, releases of collateral or other relinquishments of rights as the Bank may deem advisable, and for other valuable consideration, the receipt of which is hereby acknowledged, the Guarantors (as defined in the Loan Agreement; each Guarantor being hereinafter an "**undersigned**") hereby jointly and severally, absolutely and unconditionally guaranty to the Bank the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, and the full and prompt payment by the Borrower of all of its Indebtedness (as hereinafter defined), whether now existing or hereafter arising from time to time, and promises to pay to the Bank, or order, on demand, in lawful money of the United States, all of the Indebtedness of the Borrower, and all out-of-pocket costs and expenses, including reasonable attorneys fees and legal expenses, paid or incurred by the Bank in endeavoring to collect the Indebtedness, or any part thereof, and in enforcing this Guaranty. All payments made in connection with this Guaranty shall be in lawful money of the United States of America in immediately available funds.

1.     **Terms as Defined in Loan Agreement.** Capitalized terms used herein, that are not otherwise defined herein, shall have the meanings given to them in the Loan Agreement.

2.     **Definition of Indebtedness.** The term "**Indebtedness**" is used herein in its most comprehensive sense and includes the principal of and interest on and all other sums payable with respect to any and all advances, debts, reimbursements, obligations and liabilities of the Borrower to the Bank (including any interest which, but for the application of the provisions of the U.S. Bankruptcy Code, would have accrued on such amounts), heretofore, now or hereafter made, incurred, created, or arising, whether originally contracted with the Bank or with another and transferred to the Bank or otherwise acquired by the Bank, whether direct or indirect, absolute or contingent, voluntary or involuntary, joint or several, due or to become due, liquidated or unliquidated, determined or undetermined, secured or unsecured, matured or unmatured, has any right or power to assert any claim or defense to the validity or enforceability thereof.

3.     **Obligations.** Each undersigned's obligations hereunder are independent of the obligations of the Borrower and of each other undersigned, and a separate action or actions may be brought and prosecuted against any undersigned, irrespective of whether an action is brought against the Borrower or any other undersigned, or whether the Borrower or any other undersigned is joined in any such action or actions. Each undersigned waives the benefit of any statute of limitations affecting such undersigned's liability hereunder or the enforcement hereof to the fullest extent permitted by law.

4.     **Indemnity.** Each undersigned agrees to indemnify and hold the Bank harmless from and against all claims, actions, causes of action, demands, obligations, liabilities, losses, costs and expenses in connection with, on account of, or in any way relating to or arising from the Bank's transactions with any of the undersigned; provided, that the forgoing indemnification shall

not extend to liabilities, damages, losses, obligations, judgments and expenses arising from the gross negligence or willful misconduct of the Bank.

5. **Continuation of Terms.** This Guaranty shall not be affected or impaired by any modifications, supplements, extensions or amendments of any contract or agreement to which the parties thereto may hereafter agree, nor by any modifications, releases or other alterations of any of the Indebtedness hereby guarantied or of any security therefor, nor by any agreements or arrangements whatever with the Borrower or any other Person.

6. **Acknowledgement.** Each undersigned agrees that its liability hereunder shall remain unaffected in any way notwithstanding the fact that the Bank may, without notice or demand, from time to time and any number of times, take any or all of the following actions:

(a) renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon;

(b) take and hold security for the payment of this Guaranty or the Indebtedness from the Borrower, another undersigned or another Person, and exchange, enforce, waive and release any such security;

(c) apply such security and direct the order or manner of sale thereof as the Bank in its discretion may determine;

(d) release or substitute any other undersigned, guarantors, sureties, or endorsers of the Indebtedness; and

(e) assign, without notice, this Guaranty in whole or in part, or the Bank's rights hereunder, to any Person at any time in accordance with Section 8.14 of the Loan Agreement.

7. **Waivers.** Each undersigned waives all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Indebtedness guarantied hereunder, has destroyed any of such undersigned's rights of subrogation and reimbursement against the Borrower. Each undersigned subordinates, and agrees not to assert, any right of subrogation, contribution, indemnity or reimbursement that such undersigned has or may have against the Borrower with respect to the Indebtedness guarantied hereunder until such time as the Indebtedness guarantied hereunder has been indefeasibly paid in full. Each undersigned waives any right to require the Bank to (a) proceed against the Borrower, any other undersigned or any other Person; (b) proceed against or exhaust any security held from the Borrower or any other undersigned; or (c) pursue any other right or remedy in the Bank's power whatsoever. Each undersigned waives any defense arising by reason of any disability or other defense of the Borrower or any other undersigned, or by reason of the cessation from any cause whatsoever of the liability of the Borrower. Each undersigned agrees that nothing shall discharge or satisfy its liability hereunder except the full and indefeasible payment and performance of all of Ahava's Indebtedness and obligations to the Bank with interest. Ahava's Indebtedness and obligations shall not be considered indefeasibly paid until all payments to the Bank are no longer subject to any right, by any Person, to invalidate or set aside such payments or to seek to recoup the amount of such payments or to declare such payments to be fraudulent or preferential. In the event any portion of any such payments shall be

2

set aside or restored, then each undersigned shall be jointly and severally liable for the full amount the Bank is required to repay, plus any costs and expenses (including attorneys fees) paid by the Bank in connection therewith. Any and all present and future debts and obligations of the Borrower to any undersigned are hereby postponed in favor of and subordinated to the full payment and performance of all of each undersigned's obligation under this Guaranty to the Bank. Each undersigned agrees that the Bank's books and records showing the account between the Bank and the Borrower shall be admissible in any action or proceeding and shall be binding upon each undersigned (and the Bank) for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. Each undersigned waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of default, notices of acceptance of this Guaranty and of the existence, creation or incurrence of new or additional Indebtedness, notice of any and all favorable and unfavorable information, financial or otherwise, about the Borrower or any other undersigned, heretofore, now or hereafter learned or acquired by the Bank and all other notices to which each undersigned might otherwise be entitled.

8. **Maintenance of Information.** Each undersigned hereby represents to the Bank that the undersigned is and will remain informed of the financial condition of the Borrower and of all other circumstances which bear upon the risk of non-payment of the Indebtedness and any other obligations of the Borrower guaranteed hereby. Each undersigned agrees that the Bank is not obligated to inform any undersigned of any such circumstances, whether now existing or hereafter arising, and that the Bank is not required to inquire into the powers of the Borrower or the officers, directors, partners, agents or other Related Parties acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guarantied hereunder.

9. **Attorneys Fees.** Each undersigned agrees to pay reasonable attorneys fees (including the allocated costs of the Bank's in-house counsel) and all other costs and expenses which may be incurred by the Bank in the enforcement of this Guaranty or any claim hereunder.

10. **Amendments In Writing.** No termination or modification of this Guaranty shall be effective for any purpose unless it is in writing and executed by an authorized officer of each undersigned and of the Bank.

11. **Demand Payment.** Each undersigned agrees that upon the occurrence and during the continuing of any "Event of Default" under the Loan Agreement or any other Loan Documents, the undersigned, immediately following a demand in writing for payment from the Bank, shall pay the Bank the amount of the Indebtedness then due and owing. Each undersigned further agrees that upon the acceleration by the Bank of the Indebtedness and the Bank's demand for payment thereof, the undersigned shall pay to the Bank the full amount of such accelerated Indebtedness.

12. **Successors and Assigns.** The termination or dissolution of any or all of the undersigned shall not terminate this Guaranty. This Guaranty shall be binding upon the successors and assigns of each undersigned and shall inure to the benefit of the Bank, its successors and assigns.

13. **Collateral; Right of Setoff.** As collateral security for the performance of this Guarantee and all other obligations of any or all of the undersigned to the Bank, whether now or hereafter owed to, or held by, the Bank and/or any Affiliate thereof, including, without limitation,

3

the Indebtedness, each undersigned hereby grants to the Bank a security interest in and transfers and assigns to the Bank the following property: (i) any and all monies and/or other property now or hereafter held by the Bank and/or any Affiliate on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to such undersigned or in which such undersigned shall have any interest, (ii) any and all claims and demands, presently existing or hereafter arising, and all interest heretofore or hereafter accrued thereon, and any and all collateral or security interests relating thereto and the proceeds thereof, which such undersigned now has or may hereafter have or acquire against the Borrower (such claims and demands referred to herein as the "Claims") and (iii) any and all property of such undersigned now or hereafter subject to a security agreement, mortgage, pledge agreement, assignment, hypothecation or other document granting the Bank or any Affiliate a security interest or other lien or encumbrance and (iv) any and all collateral described in any and all credit accommodations, notes, loan agreements, and any other agreements and documents, now or hereafter existing, creating, evidencing, guaranteeing, securing or relating to any or all of the Indebtedness, together with all amendments, modifications, renewals, or extensions thereof and any additions and accessions thereto and substitutions therefore and the products and proceeds thereof. All of the property described in clauses (i), (ii), (iii), and (iv) above shall be collectively referred to herein as the "Collateral". The Bank at any time may, but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the Collateral, including stocks, bonds, and other securities, and the Bank or its nominee may demand, sue for, collect, receive and hold as like Collateral any or all interest, dividends and income thereon and if any securities are held in the name of Bank or its nominee. To the extent any Collateral is transferred into the Bank's (or an Affiliate's) own name, the Bank, at any time may, but shall not be obligated to, exercise all voting and other rights pertaining thereto as if the Bank were the absolute owner thereof, but the Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the Collateral against prior parties, or to take any action whatsoever in regard to the Collateral or any part thereof, all of which such undersigned assumes and agrees to do. Without limiting the generality of the foregoing, the Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any Collateral, unless such undersigned gives written notice to the Bank that such action shall be taken not more than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. At any time, without demand or notice, if permitted by applicable law, the Bank may setoff all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Bank or any of its Affiliates, or in transit to any of them, or any part thereof and apply the same to any of the Indebtedness even though unmatured and regardless of the adequacy of any other collateral securing the Indebtedness. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE INDEBTEDNESS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY OF THE UNDERSIGNED, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

14.    **Incorporation by Reference.** Sections 1.03, 8.04, 8.08, 8.09, 8.10, 8.18, 8.20, 8.21 and 8.22 of the Loan Agreement are hereby incorporated by reference into this Guaranty, and shall apply, mutatis mutandis, to this Guaranty.

4

IN WITNESS WHEREOF, the undersigned have executed this Guaranty this *22* day of August, 2005.

WITNESS/ATTEST:

ST. LAWRENCE FOOD CORP.

By: _____
     Name: Moise Banayan
     Title: President

LEWIS COUNTY DAIRY CORP.

By: _____
     Name: Moise Banayan
     Title: President

YONI REALTY, LLC

By: _____
     Name: Moise Banayan
     Title: Manager

_____
MOISE BANAYAN

# EXHIBIT G



# PROMISSORY NOTE

$750,000.00

January 24, 2007

On **March 23, 2007** (the "Maturity Date"), for value received, **Lewis County Dairy Corp.**, having its principle office at 7705 State Route 812, Lowville, New York 113367 (the "**Borrower**"), promises to pay to the order of **SIGNATURE BANK**, having an office at 565 Fifth Avenue, New York, NY 10017 (the "**Bank**"), at such office of the Bank or at such other place as the holder hereof may from time to time appoint in writing, in lawful money of the United States of America in immediately available funds, the principal sum of Seven Hundred Fifty Thousand and 00/100 ($750,000.00) Dollars or such lesser amount as may then be the aggregate unpaid principal balance of all loans made by the Bank to the Borrower hereunder (each a "Loan" and collectively the "Loans") as shown on the schedule attached to and made a part of this Note. The Borrower also promises to pay interest (computed on the basis of a 360 day year for actual days elapsed) at said office in like money on the unpaid principal amount of each Loan from time to time outstanding at a rate per annum, to be elected by the Borrower at the time each Loan is made, equal to either (i) a fluctuating rate equal to the Prime Rate plus 0% per annum, which rate will change when and as the Prime Rate changes (a Loan bearing interest at this rate is sometimes hereinafter called a "Prime Loan"), or (ii) a fixed rate of 2.25% per annum plus LIBOR for an Interest Period of 1 month (a Loan bearing interest at this rate is sometimes hereinafter called a "LIBOR Loan"); provided, however, that (a) no Interest Period with respect to a LIBOR Loan shall extend beyond the Maturity Date, (b) if any Interest Period would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day and (c) if prior to the end of any such Interest Period the Borrower and the Bank fail to agree upon a new Interest Period therefor so as to maintain such Loan as either a LIBOR Loan within the pertinent time set forth in Section 1 hereof, such LIBOR Loan shall automatically be converted into a Prime Loan at the end of such Interest Period and shall be maintained as such until a new Interest Period therefor is agreed upon. Interest on each Loan shall be payable monthly on the first day of each month commencing the first such day to occur after a Loan is made hereunder and, together with principal, on the Maturity Date. Interest on LIBOR Loans shall also be payable on the last day of each Interest Period applicable thereto. The Borrower further agrees that upon and following an Event of Default and/or after any stated or any accelerated maturity of Loans hereunder, all Loans shall bear interest (computed daily) at, (i) with respect to LIBOR Loans, a rate equal to the greater of 4% per annum in excess of the applicable Fixed Rate and 4% per annum in excess of the rate applicable to Prime Loans, payable on demand, and (ii) with respect to Prime Loans, a rate equal to 4% per annum in excess of the rate applicable to Prime Loans, payable on demand. Furthermore, if the entire amount of any principal and/or interest required to be paid pursuant to this Note is not paid in full within ten (10) days after the same is due, the Borrower shall further pay to the Bank a late fee equal to Five percent (5%) of the required payment. In no event shall interest payable hereunder be in excess of the maximum rate of interest permitted under applicable law. If any payment to be so made hereunder becomes due and payable on a day other than a



000002

0101

Business Day, such payment shall be extended to the next succeeding Business Day and, to the extent permitted by applicable law, interest thereon shall be payable at the then applicable rate during such extension, unless such Interest Period is with respect to a LIBOR Loan and the result of such extension would be to extend such Interest Period into another calendar month, in which event such Interest Period shall end on the immediately preceding Business Day.

All payments made in connection with this Note shall be in lawful money of the United States in immediately available funds. All such payments shall be applied first to the payment of all fees, expenses and other amounts due to the Bank (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after the occurrence of an Event of Default, payments will be applied to the obligations of the Borrower to the Bank as the Bank determines in its sole discretion. The Borrower hereby expressly authorizes the Bank to record on the attached schedule the amount and date of each Loan, the rate of interest thereon, Interest Period thereof and the date and amount of each payment of principal. All such notations shall be presumptive as to the correctness thereof; provided, however, the failure of the Bank to make any such notation shall not limit or otherwise affect the obligations of the Borrower under this Note.

In consideration of the granting of the Loans evidenced by this Note, the Borrower hereby agrees as follows:

1.    <u>Loan Requests</u>. Requests for LIBOR Loans, and for Interest Periods subsequent to the initial Interest Period applicable thereto, shall be made not less than three Business Days prior to the first day of each Interest Period for each such Loan. Requests for Prime Loans may be made up until 1 p.m. on the date the Loan is to be made. Any request for a Loan must be written. The Bank shall have no obligation to make any Loan hereunder.

2.    <u>Prepayment</u>. The Borrower may prepay any Prime Loan at any time in whole or in part without premium or penalty. Each such prepayment shall be made together with interest accrued thereon to and including the date of prepayment. LIBOR Loans may not be prepaid except as provided under Paragraph 3 of this Note.

3.    <u>Indemnity; Yield Protection</u>. The Borrower shall pay to the Bank, upon request of the Bank, such amount or amounts as shall be sufficient (in the reasonable opinion of the Bank) to compensate it for any loss, cost, or expense incurred as a result of: (i) any payment of a LIBOR Loan on a date other than the last day of the Interest Period for such Loan; (ii) any failure by Borrower to borrow a LIBOR Loan on the date specified by Borrower's written notice; (iii) any failure of Borrower to pay a LIBOR Loan on the date for payment specified in Borrower's written notice. Without limiting the foregoing, Borrower shall pay to Bank a "yield maintenance fee" in an amount computed as follows: The current rate for United States Treasury securities (bills on a discounted basis shall be converted to a bond equivalent) with a maturity date closest to the term chosen pursuant to the Fixed Rate Election as to which the prepayment is made, shall be subtracted from the LIBOR in effect at the time of prepayment. If the result is zero or a negative number, there shall be no yield maintenance fee. If the result is a positive number, then the resulting percentage shall be multiplied by the amount of the principal balance being prepaid. The resulting amount shall be divided by 360 and multiplied by the number of days remaining in the term chosen pursuant to the Fixed Rate Election as to which the prepayment is made. Said amount shall be


600002
0101

reduced to present value calculated by using the above referenced United States Treasury securities rate and the number of days remaining in the term chosen pursuant to the Fixed Rate Election as to which prepayment is made. The resulting amount shall be the yield maintenance fee due to Bank upon the payment of a LIBOR Loan. Each reference in this paragraph to "Fixed Rate Election" shall mean the election by Borrower of Loan to bear interest based on LIBOR. If by reason of an Event of Default, the Bank elects to declare the Loans and/or the Note to be immediately due and payable, then any yield maintenance fee with respect to a LIBOR Loan shall become due and payable in the same manner as though the Borrower has exercised such right of prepayment.

For the purpose of this Section 3 the determination by the Bank of such losses and reasonable expenses shall be conclusive if made reasonably and in good faith.

4.    Increased Costs.  If the Bank determines that the effect of any applicable law or government regulation, guideline or order or the interpretation thereof by any governmental authority charged with the administration thereof (such as, for example, a change in official reserve requirements which the Bank is required to maintain in respect of loans or deposits or other funds procured for funding such loans) is to increase the cost to the Bank of making or continuing LIBOR Loans hereunder or to reduce the amount of any payment of principal or interest receivable by the Bank thereon, then the Borrower will pay to the Bank on demand such additional amounts as the Bank may determine to be required to compensate the Bank for such additional costs or reduction. Any additional payment under this section will be computed from the effective date at which such additional costs have to be borne by the Bank. A certificate as to any additional amounts payable pursuant to this Section 4 setting forth the basis and method of determining such amounts shall be conclusive, absent manifest error, as to the determination by the Bank set forth therein if made reasonably and in good faith. The Borrower shall pay any amounts so certified to it by the Bank within 10 days of receipt of any such certificate.

5.    Alternate Rate of Interest.  In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a LIBOR Loan, the Bank shall have determined (a) that dollar deposits in the amount of the requested principal amount of such LIBOR Loan are not generally available in the London interbank market, (b) that the rate at which such dollar deposits are being offered will not adequately and fairly reflect the cost to the Bank of making or maintaining such LIBOR Loan during such Interest Period, or (c) that reasonable means do not exist for ascertaining LIBOR, the Bank shall, as soon as practicable thereafter, give written or telex notice of such determination to the Borrower. In the event of any such determination, until the circumstances giving rise to such notice no longer exist, no LIBOR Loans will be made hereunder. Each determination by the Bank hereunder shall be conclusive absent manifest error.

6.    Change in Legality.

(a)    Notwithstanding anything to the contrary herein contained, if any change in any law or regulation or in the interpretation thereof by any governmental authority charged with the administration or interpretation thereof shall make it unlawful for the Bank to make or maintain any LIBOR Loan, then, by written notice to the Borrower, the Bank may:

(i)   declare that LIBOR Loans will not thereafter be made by the Bank hereunder, whereupon the Borrower shall be prohibited from requesting LIBOR Loans from the Bank hereunder unless such declaration is subsequently withdrawn; and

(ii)   require that all outstanding LIBOR Loans made by it be converted to Prime Loans, in which event (x) all such LIBOR Loans shall be automatically converted to Prime Loans as of the effective date of such notice as provided in paragraph (b) below and (y) all payments and prepayments of principal which would otherwise have been applied to repay the converted LIBOR Loans shall instead be applied to repay the Prime Loans resulting from the conversion of such LIBOR Loans.

(b)   For purposes of this Section 6, a notice to the Borrower by the Bank pursuant to paragraph (a) above shall be effective, if lawful, on the last day of the then current Interest Period; in all other cases, such notice shall be effective on the day of receipt by the Borrower.

**Remainder of page intentionally left blank**



7.    Warranties and Representations.

☒ For Individuals     ☑ For Institutions

The Borrower represents and warrants that: a) it is duly organized, validly existing and in good standing under the laws of the state of its organization and is qualified to do business and is in good standing under the laws of every state where its failure to so qualify would have a material and adverse effect on the business, operations, property or other condition of the Borrower; b) the execution, issuance and delivery of this Note by the Borrower are within its organizational powers and have been duly authorized, and the Note is valid, binding and enforceable in accordance with its terms, and is not in violation of law or of the terms of the Borrower's organizational documents and does not result in the breach of or constitute a default under any indenture, agreement or undertaking to which the Borrower is a party or by which it or its property may be bound or affected; c) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Borrower of this Note, except those as have been obtained; d) the financial statements of the Borrower heretofore furnished to the Bank are complete and correct and fairly represent the financial condition of the Borrower and its subsidiaries as at the dates thereof and for the periods covered thereby, which financial condition has not materially, adversely, changed since the date of the most recently dated balance sheet heretofore furnished to the Bank; e) no Event of Default (as hereinafter defined) has occurred and no event has occurred which with the giving of notice or the lapse of time or both would constitute an Event of Default; f) the Borrower shall not use any part of the proceeds of any Loan to purchase or carry any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or to extend credit to others for the purpose of purchasing or carrying any margin stock; g) there is no pending or, to the knowledge of the Borrower, threatened action or proceeding affecting the Borrower before any court, governmental agency or arbitrator which, if determined adversely to the Borrower would have a materially adverse effect on the financial condition or operations of the Borrower except as described in the financial statements of the Borrower heretofore furnished to the Bank; and h) on the occasion of the granting of each Loan all representations and warranties contained herein shall be true and correct and with the same force and effect as though such representations and warranties had been made on and as of the date of the making of each such Loan.

8.    Events of Default.  Upon the occurrence of any of the following specified events of default (each an "Event of Default"): a) default in making any payment of principal, interest, or any other sum payable under this Note when due; or b) default by the Borrower or any Guarantor (i) of any other obligation hereunder or (ii) in the due payment of any other obligation owing to the Bank or (iii) under any other document, instrument and/or agreement with or in favor of the Bank; or c) default by Borrower or any Guarantor in the due payment of any other indebtedness for borrowed money or default in the observance or performance of any covenant or condition contained in any agreement or instrument evidencing, securing, or relating to any such indebtedness, which causes or permits the acceleration of the maturity thereof; or d) any representation or warranty made by the Borrower herein or in any certificate furnished by the Borrower in connection with the Loans evidenced hereby or pursuant to the provisions hereof,



proves untrue in any material respect; or e) the Borrower or any Guarantor becomes insolvent or bankrupt, is generally not paying its debts as they become due, or makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for the Borrower or any Guarantor or for the greater part of the properties of the Borrower or any Guarantor with the consent of the Borrower or such Guarantor, or if appointed without the consent of the Borrower or such Guarantor, such trustee or receiver is not discharged within 30 days, or bankruptcy, reorganization, liquidation or similar proceedings are instituted by or against the Borrower or any Guarantor under the laws of any jurisdiction, and if instituted against the Borrower or any Guarantor are consented to by it or remain undismissed for 30 days, or a writ or warrant of attachment or similar process shall be issued against a substantial part of the property of the Borrower or any Guarantor and shall not be released or bonded within 30 days after levy; or f) the mortgage or pledge of, creation of a security interest in, any assets of the Borrower, other than security interests in favor of the Bank; or g) the incurrence by the Borrower of any indebtedness for borrowed money, other than obligations owing to the Bank; h) the Bank shall have determined, in its sole discretion, that one or more conditions exist or events have occurred which have resulted or may result in a material adverse change in the business, properties or financial condition of the Borrower or any Guarantor as determined in the sole discretion of the Bank or one or more other conditions exist or events have occurred with respect to the Borrower or any Guarantor which the Bank deems materially adverse; then, in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Bank may declare the principal and the accrued interest in respect of all Loans under this Note to be, whereupon the Note shall become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Borrower.

9.     Collateral Security.  As collateral security for the payment of this Note and of all other notes and/or obligations or Liabilities (as hereinafter defined) of the Borrower, now or hereafter owned or held by the Bank, the Borrower grants the Bank a security interest in, pledges and assigns to the Bank all monies and/or other property now or hereafter held by the Bank (and/or any entity controlling, controlled by or under common control with the Bank, each such entity referred to herein as an "Affiliate") on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to the Borrower or in which the Borrower shall have any interest, all of which is hereinafter termed the collateral security. At any time, without demand or notice, the Bank may set off all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Bank or any Affiliate, or in transit to any of them, or any part thereof and apply the same to any of the Liabilities even though unmatured and regardless of the adequacy of any other collateral securing the Liabilities. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LIABILITIES, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY GUARANTOR OR OTHER PARTY OBLIGATED ON THIS NOTE, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED. The Bank at any time, before or after an Event or Default (as herein defined), may but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the collateral security, including stocks, bonds, and other securities, and the Bank or its nominee may demand, sue for, collect, receive and hold as like collateral security any or all interest, dividends and income thereon and if the securities are held in the name of the Bank or its nominee, the Bank may, after an Event of Default, exercise all voting and other rights pertaining thereto as if the Bank were the absolute owner

thereof; but the Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the collateral against prior parties, or to take any action whatsoever in regard to the collateral security or any part thereof, all of which the Borrower assumes and agrees to do. Without limiting the generality of the foregoing, the Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any of the collateral security, unless the Borrower gives written notice to the Bank that such action shall be taken not more than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. The term "Liabilities" shall include this Note and all other indebtedness and obligations and liabilities of any kind of the Borrower to the Bank, now or hereafter existing, arising directly between the Borrower and the Bank or acquired by assignment, conditionally or as collateral security by the Bank, absolute or contingent, joint and/or several, secure or unsecured, due or not due, contractual or tortious, liquidated or unliquidated, arising by operation of law or otherwise, direct or indirect, including, but without limiting the generality of the foregoing, indebtedness, obligations or liabilities to the Bank of the Borrower as a member of any partnership, syndicate, association or other group, and whether incurred by the Borrower as principal, surety, endorser, guarantor, accommodation party or otherwise. This Note and all of the aforementioned obligations and Liabilities are also secured by (a) any and all property of the Borrower and/or any guarantor and/or any other party obligated on this Note, now or hereafter subject to a security agreement, mortgage, pledge agreement, assignment, hypothecation or other document granting the Bank or an Affiliate a security interest or other lien or encumbrance and (b) any and all collateral described in any and all credit accommodations, notes, loan agreements, and any other agreements and documents, now or hereafter existing, creating, evidencing, guaranteeing, securing or relating to any or all of the Liabilities, together with all amendments, modifications, renewals, or extensions thereof.

10.     Definitions. As used herein:
        (a)     "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York are required or permitted by law to remain closed, except that "Business Day" in the context of a specific city shall mean any date on which commercial banks are open for business in that city.

        (b)     "Fixed Rate" means LIBOR, plus the applicable margin.

        (c)     "Guarantor" and "Guarantors" mean Ahava Food Corp., St. Lawrence Food Corp., Yoni Realty LLC and Moise Banayan and any other party guaranteeing payment or otherwise obligated on this Note.

        (d)     "Interest Period" means that period selected by the Borrower, within the limitations of the first paragraph of this Note, during which a Fixed Rate Loan may bear interest at the applicable Fixed Rate.

        (e)     "LIBOR" means, as applicable to any LIBOR Loan, the rate per annum (rounded upward, if necessary, to the nearest 1/32 of one percent) as determined on the basis of the offered rates for deposits in U.S. dollars, for a period of time comparable to such LIBOR Loan which appears on the Telerate page 3750 as of 11:00 a.m. London time on the day that is two London Business Days preceding the first day of such LIBOR Loan; provided, however, if the rate described above does not appear on the Telerate System on any applicable interest determination

date, LIBOR shall be the rate (rounded upwards as described above, if necessary) for deposits in dollars for a period substantially equal to the Interest Period on the Reuters Page "LIBO" (or such other page as may replace the LIBO Page on that service for the purpose of displaying such rates), as of 11:00 a.m.(London Time), on the day that is two (2) London Business Days prior to the beginning of such Interest Period. If both the Telerate and Reuters system are unavailable, then the rate for that date will be determined on the basis of the offered rates for deposits in U.S. dollars for a period of time comparable to such LIBOR Loan which are offered by four major banks in the London interbank market at approximately 11:00 a.m. London time, on the day that is two (2) London Business Days preceding the first day of such LIBOR Loan as selected by the Bank. The principal London office of each of the four major London banks will be requested to provide a quotation of its U.S. dollar deposit offered rate. If at least two such quotations are provided, the rate for the date will be the arithmetic mean of the quotations. If fewer than two quotations are provided as requested, the rate for that date will be determined on the basis of the rates quoted for loans in U.S. dollars to leading European banks for a period of time comparable to such LIBOR Loan offered by major banks in New York City at approximately 11:00 a.m. New York City time, on the day that is two London Business Days preceding the first day of such LIBOR Loan. In the event that the Bank is unable to obtain any such quotation as provided above, it will be deemed that LIBOR pursuant to a LIBOR Loan cannot be determined. In the event that the Board of Governors of the Federal Reserve System shall impose a Reserve Percentage with respect to LIBOR deposits of the Bank, then for any period during which such Reserve Percentage shall apply, LIBOR shall be equal to the amount determined above divided by an amount equal to 1 minus the Reserve Percentage. "Reserve Percentage" shall mean the maximum aggregate reserve requirement (including all basic, supplemental, marginal and other reserves) which is imposed on member banks of the Federal Reserve System against "Euro-currency Liabilities" as defined in Regulation D.

(f)    "Loan Documents" means each document, instrument or agreement executed pursuant hereto or in connection herewith, together with each other document, instrument or agreement made with or in favor of the Bank.

(g)    "Prime Rate" means the variable per annum rate of interest so designated from time to time by the Bank as its prime rate. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate being charged to any customer.

11.    Miscellaneous.
(a)    The Borrower agrees to pay on demand all of the Bank's costs and expenses, including reasonable counsel fees, in connection with collection of any sums due to the Bank and enforcement of its rights under this Note.

(b)    No modification or waiver of any provision of this Note shall be effective unless such modification or waiver shall be in writing and signed by a duly authorized officer of the Bank, and the same shall then be effective only for the period and on the conditions and for the specific instances specified in such writing. No failure or delay by the Bank in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any rights, power or privilege.

(c)     The Borrower hereby waives presentment, demand for payment, notice of protest, notice of dishonor, and any and all other notices or demands except as otherwise expressly provided for herein.

(d)     This Note shall be construed in accordance with and governed by the laws of the State of New York (excluding the laws applicable to conflicts or choice of law). The Borrower agrees that any suit for the enforcement of this Note or any of the other Loan Documents may be brought in the courts of the State of New York or any Federal court sitting therein and consents to the nonexclusive jurisdiction of such court and service of process in any such suit being made upon the Borrower by mail at the address set forth in the first paragraph of this Note. The Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.

(e)     The Bank may at any time pledge all or any portion of its rights under this Note and the other Loan Documents to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or enforcement thereof shall release the Bank from its obligations under any of such loan documents.

(f)     EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11(f).

(g)     The Bank shall have the unrestricted right at any time and from time to time, and without the consent of or notice to the Borrower or any other party obligated on this Note, to grant to one or more banks or other financial institutions (each, a "Participant") participating interests in the Bank's obligation to lend hereunder and/or any or all of the Loans held by the Bank hereunder. In the event of any such grant by the Bank of a participating interest to a Participant, whether or not upon notice to the Borrower, the Bank shall remain responsible for the performance of its obligations hereunder and the Borrower shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations hereunder. The Bank may furnish any information concerning the Borrower in its possession from time to time to prospective assignees and Participants, provided that the Bank shall require any such prospective assignee or Participant to agree in writing to maintain the confidentiality of such information.

(h)     This Note shall be binding upon and inure to the benefit of the Borrower, the Bank, all future holders of this Note and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights under this Note without the prior written consent of the Bank. The term "Bank" as used herein shall be deemed to include the Bank and its successors,



endorsees and assigns. The Bank shall have the unrestricted right at any time or from time to time, and without the Borrower's consent, to assign all or any portion of its rights and obligations hereunder to one or more banks or other financial institutions (each, an "Assignee"), and the Borrower agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Note and to any other documents, instruments and agreements executed in connection herewith as the Bank shall deem necessary to effect the foregoing. In addition, at the request of the Bank and any such Assignee, the Borrower shall issue one or more new promissory notes, as applicable, to any such Assignee and, if the Bank has retained any of its rights and obligations hereunder following such assignment, to the Bank, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by the Bank prior to such assignment and shall reflect the amount of Loans held by such Assignee and the Bank after giving effect to such assignment. Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by the Bank in connection with such assignment, and the payment by Assignee of the purchase price agreed to by the Bank, and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of the Bank hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by the Bank pursuant to the assignment documentation between the Bank and such Assignee, and the Bank shall be released from its obligations hereunder and thereunder to a corresponding extent.

(i)     This Note and the other Loan Documents are intended by the parties as the final, complete and exclusive statement of the transactions evidenced thereby. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Note and such other Loan Documents, and no party is relying on any promise, agreement or understanding not set forth in this Note or such other Loan Documents. Neither this Note nor any of such other Loan Documents may be amended or modified except by a written instrument describing such amendment or modification executed by the Borrower and the Bank.

(j)     This Note shall replace and supersede the Promissory Note made by the Borrower to the order of the Bank dated October 26, 2006 (the 'Prior Note'); provided, however, that the execution and delivery of the Note shall not in any circumstance be deemed to have terminated, extinguished or discharged the Borrower's indebtedness under such Prior Note, all of which indebtedness shall continue under and be governed by the Note and the documents, instruments and agreements executed pursuant hereto or in connection herewith. This Note is a replacement, consolidation, amendment and restatement of the Prior Note and IS NOT A NOVATION. The Borrower shall also pay and this Note shall also evidence any and all unpaid interest on the Loan made by the Bank to the Borrower pursuant to Prior Note, and at the interest rate specified therein, for which this Note has been issued as replacement therefore.

Lewis County Dairy Corp.

By: _Moise Banayan_

Moise Banayan
President

# EXHIBIT H

**CONTINUING GUARANTY**
(Corporation, Partnership, or Limited Liability Company, or
Limited Liability Partnership)

In order to induce SIGNATURE BANK (which together with its successors, endorsees and assigns, is hereinafter called "Bank") to make such advances, loans or extensions of credit, directly or indirectly, to **Lewis County Dairy Corp.** hereinafter, whether one or more, called "Borrower"), and in consideration thereof and of any loans, advances, or other financial accommodations heretofore or hereafter granted by Bank to or for the account of Borrower, and to grant to Borrower such renewals, extensions, forbearances, releases of collateral or other relinquishments of rights as the Bank may deem advisable, and for other valuable consideration, the receipt of which is hereby acknowledged, the undersigned **Ahava Food Corp.** (hereinafter called "Guarantor") who, if more than one, shall be jointly and severally liable hereunder, hereby absolutely unconditionally guaranties to Bank the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, the full and prompt payment and performance by Borrower of all of Borrower's Indebtedness (as hereinafter defined) and obligations to Bank, whether now existing or hereafter arising from time to time, and promise to pay to Bank, or order, on demand, in lawful money of the United States, all of Borrower's Indebtedness to Bank, and all costs and expenses, including attorneys fees and legal expenses, paid or incurred by Bank in endeavoring to collect the Indebtedness, or any part thereof, and in enforcing this Continuing Guaranty. All payments made in connection with this Guarantee shall be in lawful money of the United States of America in immediately available funds.

1.      **Definition of Indebtedness.** The term "Indebtedness" is used herein in its most comprehensive sense and includes the principal of and interest on and all other sums payable with respect to any and all advances, debts, obligations and liabilities of Borrower to Bank (including any interest which, but for the application of the provisions of the U.S. Bankruptcy Code, would have accrued on such amounts), heretofore, now or hereafter made, incurred, created, or arising, whether originally contracted with the Bank or with another and transferred to the Bank or otherwise acquired by the Bank, whether direct or indirect, absolute or contingent, voluntary or involuntary, due or to become due, liquidated or unliquidated, determined or undetermined, secured or unsecured, matured or unmatured however created, arising, or evidenced, whether Borrower may be liable thereon individually or jointly with others, and whether Borrower or any other party or person has any right or power to assert any claim or defense to the validity or enforceability thereof.

2.      **Termination.**   This Continuing Guaranty is continuing, unlimited, absolute, and unconditional. This Continuing Guaranty may be terminated by Guarantor only by an express, written notice to Bank of termination, and no notice



600009

of termination shall be effective until it is actually received by Bank. No notice of termination shall affect or impair the obligations of Guarantor with respect to any Indebtedness existing on the date Bank receives such notice, any interest thereon, or any expenses paid or incurred by Bank in endeavoring to collect the Indebtedness or any part thereof, or in enforcing this Continuing Guaranty. No notice of termination by Guarantor shall affect or impair the obligations of any other guarantor of the Indebtedness. No payment by Guarantor shall reduce Guarantor's obligations hereunder unless written notice to that effect is received by Bank at or prior to Bank's receipt of such payment.

**3.     Obligations.** Guarantor's obligations hereunder are independent of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against Guarantor, irrespective of whether an action is brought against Borrower or whether Borrower is joined in any such action or actions. Guarantor waives the benefit of any statute of limitations affecting Guarantor's liability hereunder or the enforcement hereof.

**4.     Indemnity.** Guarantor agrees to indemnify and hold Bank harmless from and against all claims, actions, causes of action, demands, obligations, liabilities, losses, costs, and expenses in connection with, on account of, or in any way relating to or arising from Bank's transactions with Borrower; <u>provided</u> that the foregoing indemnification shall not extend to liabilities, damages, losses, obligations, judgments and expenses arising from the gross negligence or willful misconduct of Bank.

**5.     Continuation of Terms.** This Continuing Guaranty shall not be affected or impaired by any modifications, supplements, extensions or amendments of any contract or agreement to which the parties thereto may hereafter agree, nor by any modifications, releases or other alterations of any of the Indebtedness hereby guarantied or of any security therefore, nor by any agreements or arrangements whatever with Borrower or anyone else.

**6.     Authorization.** Guarantor authorizes Bank, without notice or demand and without affecting Guarantor's liability hereunder, from time to time and any number of times, to take any or all of the following actions:

(a)     renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon;

(b)     take and hold security for the payment of this Continuing Guaranty or the Indebtedness, and exchange, enforce, waive and release any such security;

(c)     apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d)    release or substitute any other guarantors, sureties, or endorsers of the Indebtedness; and

(e)    assign, without notice, this Continuing Guaranty in whole or in part, or Bank's rights hereunder, to anyone at any time.

7.    **Waivers.**  Guarantor waives all rights and defenses arising out of an election of remedies by Bank, even though that election of remedies, such as non-judicial foreclosure with respect to security for the Indebtedness guarantied hereunder, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower. Guarantor waives any right of subrogation, contribution, indemnity or reimbursement that Guarantor has or may have against Borrower with respect to the Indebtedness guarantied hereunder until such time as the Indebtedness guarantied hereunder has been indefeasibly paid in full.  Guarantor waives any right to require Bank to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Bank's power whatsoever.  Guarantor waives any defense arising by reason of any disability or other defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower.  Guarantor agrees that nothing shall discharge or satisfy the liability of Guarantor hereunder except the full and indefeasible payment and performance of all of Borrower's Indebtedness and obligations to Bank with interest. Borrower's Indebtedness and obligations shall not be considered indefeasibly paid until all payments to Bank are no longer subject to any right, by any person, to invalidate or set aside such payments or to seek to recoup the amount of such payments or to declare such payments to be fraudulent or preferential.  In the event any portion of any such payments shall be set aside or restored, then Guarantor shall be liable for the full amount Bank is required to repay, plus any costs and expenses (including attorneys fees) paid by Bank in connection therewith.  Any and all present and future debts and obligations of Borrower to Guarantor are hereby postponed in favor of and subordinated to the full payment and performance of all Indebtedness of Borrower to Bank.  Guarantor agrees that Bank's books and records showing the account between Bank and Borrower shall be admissible in any action or proceeding and shall be binding upon Guarantor for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of default, notices of acceptance of this Continuing Guaranty and of the existence, creation or incurrence of new or additional indebtedness, notice of any and all favorable and unfavorable information, financial or other, about Borrower, heretofore, now or hereafter learned or acquired by Bank and all other notices to which Guarantor might otherwise be entitled.

8.    **Maintenance of Information.**  Guarantor hereby represents to Bank that Guarantor is and will remain informed of the financial condition of Borrower and of all other circumstances which bear upon the risk of non-payment of Borrower's Indebtedness and any other obligations of Borrower guarantied hereby. Guarantor agrees that Bank is not obligated to inform Guarantor of any such circumstances, whether now

existing or hereafter arising, and that Bank is not required to inquire into the powers of Borrower or the officers, directors, partners or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guarantied hereunder.

9. **Attorneys Fees.** Guarantor agrees to pay reasonable attorneys fees (including the allocated costs of Bank's in-house counsel) and all other costs and expenses which may be incurred by Bank in the enforcement of this Continuing Guaranty or any claim hereunder or under any other instrument or guaranty.

10. **Amendments In Writing.** No termination or modification of this Continuing Guaranty shall be effective for any purpose unless it is in writing and executed by an officer of Bank authorized to do so.

11. **Demand Payment.** Guarantor agrees that upon the occurrence of any default in payment of the Indebtedness or any "default" or "event of default" shall occur under any of the documents, instruments or agreements executed in connection with the Indebtedness, Guarantor, immediately following a demand for payment from Bank, shall pay Bank the full amount of the Indebtedness guarantied hereunder.

12. **Successors and Assigns.** The termination or dissolution of Guarantor shall not terminate this Continuing Guaranty. This Continuing Guaranty shall be binding upon the successors and assigns of Guarantor and shall inure to the benefit of Bank, its successors and assigns.

13. **Collateral; Right of Setoff.** As collateral security for the performance of this Guarantee and all other obligations of Guarantor to Bank, whether now or hereafter owed to, or held by, Bank (and/or any entity controlling, controlled by or under common control with Bank, each such entity referred to herein as an "Affiliate"), including, without limitation, the Indebtedness, Guarantor hereby grants to Bank a security interest in and transfers and assigns to Bank the following property: (i) any and all monies and/or other property now or hereafter held by Bank and/or any Affiliate on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to Guarantor or in which Guarantor shall have any interest, (ii) any and all claims and demands, presently existing or hereafter arising, and all interest heretofore or hereafter accrued thereon, and any and all collateral or security interests relating thereto and the proceeds thereof, which Guarantor now has or may hereafter have or acquire against Borrower (such claims and demands referred to herein as the "Claims") and (iii) any and all property of Guarantor now or hereafter subject to a security agreement, mortgage, pledge agreement, assignment, hypothecation or other document granting Bank or any Affiliate a security interest or other lien or encumbrance and (iv) any and all collateral described in any and all credit accommodations, notes, loan agreements, and any other agreements and documents, now or hereafter existing, creating, evidencing, guaranteeing, securing or relating to any or all of the Indebtedness, together with all amendments, modifications, renewals, or extensions thereof and any additions and accessions thereto and substitutions

therefore and the products and proceeds thereof. All of the property described in clauses (i), (ii), (iii), and (iv) above shall be collectively referred to herein as the "Collateral". Bank at any time may, but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the Collateral, including stocks, bonds, and other securities, and Bank or its nominee may demand, sue for, collect, receive and hold as like Collateral any or all interest, dividends and income thereon and if any securities are held in the name of Bank or its nominee. To the extent any Collateral is transferred into the Bank's (or an Affiliate's) own name, Bank, at any time may, but shall not be obligated to, exercise all voting and other rights pertaining thereto as if Bank were the absolute owner thereof, but Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the Collateral against prior parties, or to take any action whatsoever in regard to the Collateral or any part thereof, all of which Guarantor assumes and agrees to do. Without limiting the generality of the foregoing, Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any Collateral, unless Guarantor gives written notice to Bank that such action shall be taken not more than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. At any time, without demand or notice, if permitted by applicable law, Bank may setoff all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or any of its Affiliates, or in transit to any of them, or any part thereof and apply the same to any of the Indebtedness even though unmatured and regardless of the adequacy of any other collateral securing the Indebtedness. **ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE INDEBTEDNESS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER OR GUARANTOR, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

14.    **CHOICE OF LAW AND VENUE.**    THE VALIDITY OF THIS CONTINUING GUARANTY, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT AND THE RIGHTS OF GUARANTOR AND BANK SHALL BE DETERMINED UNDER, GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. GUARANTOR AND BANK AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS CONTINUING GUARANTY SHALL BE TRIED AND LITIGATED ONLY IN THE STATE COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK, THE FEDERAL COURTS WHOSE VENUE INCLUDES THE COUNTY OF NEW YORK, STATE OF NEW YORK, OR, AT THE SOLE OPTION OF BANK, IN ANY OTHER COURT IN WHICH BANK SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. GUARANTOR AND BANK EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN ANY

SUCH COURT, AND GUARANTOR AND BANK HEREBY WAIVE ANY OBJECTION WHICH EITHER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION AND HEREBY CONSENT TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY ANY SUCH COURT. FURTHERMORE, GUARANTOR AND BANK EACH WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF "FORUM NON CONVENIENS" OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 14</u>.

15.    WAIVER OF JURY TRIAL, SETOFF AND COUNTERCLAIM. GUARANTOR AND BANK MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY, AND GUARANTOR WAIVES THE RIGHT TO INTERPOSE ANY SETOFF OR COUNTERCLAIM, EACH IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS CONTINUING GUARANTY, OR ANY OTHER DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR WITH RESPECT TO THE OBLIGATIONS OF ANY OTHER PERSON OR PARTY (INCLUDING, WITHOUT LIMITATION, BORROWER), OR WITH RESPECT TO ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR BANK TO EXTEND CREDIT TO BORROWER. GUARANTOR AND BANK REPRESENT THAT THEY HAVE REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVE THEIR RESPECTIVE RIGHTS AND RIGHTS AS AFORESAID FOLLOWING CONSULTATION WITH LEGAL COUNSEL.    IN THE EVENT OF LITIGATION, A COPY OF THIS CONTINUING GUARANTY MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Remainder of page intentionally left blank**

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Continuing Guaranty this _5_ day of _April_, 2006.

**CORPORATION, PARTNERSHIP, OR LIMITED LIABILITY COMPANY OR LIMITED LIABILITY PARTNERSHIP SIGNORS:**

**IN THE PRESENCE OF:**

_____
Bank Officer

**Ahava Food Corp.**

By: _____
Name: _Moise Banayan_
Title:

110 Beard Street
Brooklyn, New York  11231

STATE OF NEW YORK)
                                , SS:
COUNTY OF _Kings_ )

On this _5_ day of _April_, _2006_, before me personally appeared _____ _Moise Banayan_ _____ and _____, to me known who, being duly sworn, deposes and says that (t)(s)he(y) is/are the _____ and _____ of _____ _Ahava Food Corp._ _____ the corporation described in and which executed the above instrument; that (t)(s)he(y) know(s) the seal of the corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and (t)(s)he(y) signed his(her)(their) name(s) by like order.

SUSAN G KELLMAN
Notary Public, State of New York
No. 01KE4600625
Qualified in New York County
Commission Expires July 31, 2002

_____
Notary Public

SUSAN G KELLMAN
Notary Public ... w York
No. ...
Qualified ...                    ty
Commissio... Sact

# EXHIBIT I

# FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT dated as of June 11, 2007 (this "Forbearance Agreement"), is entered into by and between AHAVA FOOD CORP., a New York corporation ("Ahava"), LEWIS COUNTY DAIRY CORP., a New York corporation ("LCD"; together with Ahava, the "Borrowers" and each individually a "Borrower"), ST. LAWRENCE FOOD CORP., a New York corporation ("SLF"), YONI REALTY, LLC, a New York limited liability company ("Yoni"), MOISE BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("MB"), ANA BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("AB"; together with SLF, Yoni and MB, collectively, the "Guarantors" and each individually a "Guarantor"; the Guarantors together with the Borrowers, collectively, the "Obligors" and each individually an "Obligor"), and SIGNATURE BANK, N.A. (the "Lender").

## WITNESSETH:

WHEREAS, the applicable Obligors and the Lender have entered into the agreements set forth on Schedule 1 attached hereto (collectively, the "Loan Documents"); and

WHEREAS, certain events of default described on Schedule 2 attached hereto (the "Existing Defaults") have occurred under the Loan Documents; and

WHEREAS, the Obligors have requested, and the Lender has agreed, notwithstanding the occurrence of the Existing Defaults, to forbear from exercising its rights and remedies under the Loan Documents, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and agreements hereinafter contained and in reliance on representations and warranties made by the Obligors, the parties hereto agree as follows:

1.  Definitions. Capitalized terms not otherwise defined in this Forbearance Agreement (including, without limitation, Schedule 1 attached hereto) shall have the meanings as provided in the Master Credit Agreement (as defined in Schedule 1 attached hereto). As used herein the following terms shall have the following meanings:

"Corporate Obligors" means Ahava, LCD, SLF and Yoni.

"Forbearance Documents" means this Forbearance Agreement and all other agreement, document, instrument and certificate executed by or on behalf of any Obligor in connection with delivered in connection with this Forbearance Agreement.

"Forbearance Termination Event" has the meaning set forth in Section 11 hereof.

"Termination Date" means September 11, 2007.

"Transaction Documents" means, collectively, the Forbearance Documents and the Loan Documents.

"Transaction Obligations" means, collectively, (i) the Obligations (as defined in Section 3(a) hereof) and (ii) any and all obligations, liabilities and indebtedness of the Obligors to the Lender under the Forbearance Documents, of whatever nature, character or description, howsoever arising and whether currently existing or arising hereafter.

2.    Reaffirmation of Loan Documents. Except as expressly provided otherwise in this Forbearance Agreement, all terms and conditions of each of the Loan Documents do and shall remain in full force and effect, and each Loan Document is and remains enforceable against each Obligor party thereto in accordance with its respective terms, and each Obligor shall fully, timely, and faithfully perform each of its obligations under the Loan Documents.

3.    Acknowledgement of Events of Default and Outstanding Balance; Effectiveness of Forbearance Agreement.

(a)    The Obligors acknowledge that the Existing Defaults have occurred. The Obligors acknowledge that the Lender has the absolute and unconditional right (i) to declare all loans (collectively, the "Loans") made to the applicable Borrowers pursuant to the applicable Loan Documents and all obligations, indebtedness and liabilities of the Obligors under the Loan Documents (collectively, the "Obligations") in each case immediately due and payable in full and (ii) to demand payment in full of the Obligations. The Obligors further acknowledge that as a result of the Existing Defaults, the Lender is entitled to exercise any of its rights and remedies immediately as provided in the Loan Documents, without further notice or opportunity to cure.

(b)    The Obligors acknowledge that as of the date hereof there is due and owing by the Obligors to the Lender under the Loan Documents, without setoff, counterclaim, adjustment, defense or right of reduction of any kind, the amounts set forth on Schedule 3 attached hereto.

(c)    The parties hereto agree that the execution and delivery of this Forbearance Agreement and any other Forbearance Documents shall not prejudice any right or rights which the Lender now has or may have in the future under any of the Loan Documents in the event of any other breach or violation of any term, condition, agreement or covenant set forth in this Forbearance Agreement or any of the other Transaction Documents.

4.    Loans; Payments; Change of Interest Rate.

(a)    The Obligors acknowledge that the Lender has no obligation to make any further Facility B Loans to Ahava under the Master Credit Agreement; provided, however, that the Lender in its sole and absolute discretion and notwithstanding the existence of the Existing Defaults may make one or more additional Facility B Loans to Ahava under the Master Credit Agreement during the term of this Forbearance Agreement provided that Ahava and the other Obligors comply with the terms and conditions of the Master Credit Agreement and the other Loan Documents (as defined therein) in all respects. The Obligors further acknowledge that the Lender's making of any Facility B Loans to Ahava under the Master Credit Agreement shall not be deemed a waiver by Lender of any Existing Default, and the failure of Lender to make a Facility B Loan to Ahava shall not give any Obligor any rights whatsoever against the Lender.

(b)    The Obligors acknowledge that the Lender has no obligation to make any further loans to LCD under the LCD 2007 Note; provided, however, that the Lender in its sole and absolute discretion and notwithstanding the existence of the Existing Defaults may make one or more additional loans to LCD under the LCD 2007 Note during the term of this Forbearance Agreement provided that LCD complies with the terms and

conditions of the LCD 2007 Note in all respects. The Obligors further acknowledge that the Lender's making of any loans to LCD under the LCD 2007 Note shall not be deemed a waiver by Lender of any Existing Default, and the failure of Lender to make a loan to LCD shall not give any Obligor any rights whatsoever against the Lender.

(c)    Provided that (i) the Obligors comply with all of the terms, conditions and covenants set forth in the Loan Documents and this Forbearance Agreement, and (ii) no Forbearance Termination Event occurs, the Obligors shall repay to the Lender the outstanding principal amount of the Facility A Loans in the following amounts on the following dates: (A) $33,333.33 on July 2, 2007; (B) $53,333.33 on August 2, 2007; and (C) the then remaining outstanding principal amount of the Facility A Loans on the Termination Date.

(d)    With respect to loans made under the Master Credit Agreement bearing (or to bear) interest at a rate determined by reference to the "Prime Rate" (as defined in the Master Credit Agreement), such interest rate shall be increased so that the unpaid principal amount of such loans shall bear interest at the rate per annum equal to the Prime Rate plus 1.0%.

(e)    With respect to loans made under the Master Credit Agreement bearing (or to bear) interest at a rate determined by reference to the "Adjusted LIBO Rate" (as defined in the Master Credit Agreement"), such interest rate shall be increased so that the unpaid principal amount of such loans shall bear interest at the rate per annum equal to the Adjusted LIBO Rate plus 3.0% (it is understood and agreed that such increase in the interest rate does not constitute the implementation of the default interest rate).

(f)    With respect to loans made under the LCD 2007 Note bearing (or to bear) interest at a rate determined by reference to the "Prime Rate" (as defined in the LCD 2007 Note), such interest rate shall be increased so that the unpaid principal amount of such loans shall bear interest at the rate per annum equal to the Prime Rate plus 1.0% (it is understood and agreed that such increase in the interest rate does not constitute the implementation of the default interest rate).

(g)    With respect to loans made under the LCD 2007 Note bearing (or to bear) interest at a rate determined by reference to "LIBOR" (as defined in the LCD 2007 Note), such interest rate shall be increased so that the unpaid principal amount of such loans shall bear interest at the rate per annum equal to LIBOR plus 3.0% (it is understood and agreed that such increase in the interest rate does not constitute the implementation of the default interest rate).

(h)    Provided that (i) the Obligors comply with all of the terms, conditions and covenants set forth in the Loan Documents, this Forbearance Agreement and the other Forbearance Documents, and (ii) no Forbearance Termination Event occurs, then the aggregate principal amount of all principal, interest, fees and other amounts payable under the Loan Documents (including, without limitation, the LCD 2007 Note) and this Forbearance Agreement shall be due and payable by the Obligors to Lender in full on the Termination Date.

(i)    Each payment (other than the payments with respect to the LCD 2007 Note) made pursuant to this Forbearance Agreement shall be applied against Costs and Expenses (as hereinafter defined), interest, principal and other amounts due hereunder

3

and the Loan Documents in such order as the Lender shall determine, in its sole and absolute discretion.

5.    Forbearance by Lender. Provided that all of the terms and conditions precedent as set forth in this Forbearance Agreement have been and continue to be satisfied, and provided that the Obligors comply with each and every term and condition of the Loan Documents, except the Existing Defaults, and this Forbearance Agreement and the other Forbearance Documents, the Lender agrees not to exercise any remedies under the Loan Documents until the occurrence of the Termination Date. The Obligors acknowledge that the Lender's agreement to forbear as described in this Forbearance Agreement is and constitutes good and valuable consideration in exchange for the Obligors' agreement to, and performance of, each of the terms and conditions of this Forbearance Agreement and the other Forbearance Documents.

6.    Costs and Expenses; Fees

(a)    Notwithstanding any other provision to the contrary, the Obligors agree to pay (i) all costs and expenses referred to in the Loan Documents and (ii) costs and expenses incurred by the Lender and its Affiliates in connection with the preparation, execution, delivery, amendment, proposed amendment, and enforcement of this Forbearance Agreement, any other Transaction Documents and the other instruments and documents to be delivered hereunder or otherwise in connection with the transactions contemplated hereby or thereby, the reasonable fees and out-of-pocket expenses of counsel for the Lender incurred by the Lender in connection with the preparation, negotiation, execution and delivery and review of this Forbearance Agreement and the other Forbearance Documents and with respect to advising the Lender as to its rights and responsibilities hereunder and under any of the other Transaction Documents and all recording, filing and registration fees, all appraisal (including, appraisals of equipment located at the locations set forth in Section 10(b) hereof), survey, title, insurance, environmental assessment, tax service, engineering, inspections and search fees, and other due diligence fees, and, if any of the Transaction Obligations or any portion thereof are not paid in full as and when due, all costs and expenses of the Lender incurred in attempting to enforce payment of the Transaction Obligations and in attempting to realize on any security or incurred in connection with the sale or disposition (or preparation for sale or disposition) of any security (collectively, the "Costs and Expenses"). The Obligors agree to pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify and hold the Lender harmless against all claims, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses and court costs) arising out of or relating to any claim by any broker, finder or similar person. The Obligors agree that their obligation to pay Costs and Expenses shall survive the termination of this Forbearance Agreement and the other Transaction Documents and the repayment of the Transaction Obligations and the failure to do so constitutes a default under this Forbearance Agreement.

(b)    The Obligors hereby authorize the Lender, without notice to the Obligors, to charge any account of the Obligors maintained by the Lender or its Affiliates in payment of the amounts due under this Section 6.

(c)    The Lender shall have the right, in its sole and absolute discretion, to apply any and all payments received by it from any Obligor first to Costs and Expenses.

(d)    The Obligors hereby jointly and severally agree to pay to the Lender a fee (the "Forbearance Fee") in an amount equal to $25,000, which fee shall be deemed earned by the Lender as of the Effective Date, and shall be due and payable by the Obligors to the Lender in immediately available funds upon the earliest of (i) the Termination Date, (ii) the date on which all the Obligations and all obligations and indebtedness of the Obligors to the Lender under the Forbearance Documents have been paid in full in cash, and (iii) the date on which (A) MB sells any portion of his equity interest in any of the Corporate Obligors or (B) any Corporate Obligor sells a substantial portion of its respective business and/or assets, in each case with respect to clauses (A) and (B) immediately above, to any person or entity that is not an Obligor or an affiliate of any Obligor.

7.    <u>Conditions Precedent</u>. This Forbearance Agreement shall become effective and be binding on and against the Lender as of the date (the "Effective Date"), when each of the following conditions (collectively, the "Conditions Precedent") shall have been satisfied, provided that such Conditions Precedent are satisfied on or before the date hereof:

(a)    the Lender shall have received counterparts of this Forbearance Agreement duly executed and delivered by each Obligor;

(b)    the Lender shall have received evidence, in form and substance reasonably satisfactory to the Lender, that the Obligors have engaged a consultant satisfactory to the Lender (the "Projections Consultant") to prepare rolling cash flow projections for Ahava, LCD, SLF and Yoni (on a combined basis) covering the period extending thirteen weeks from the Effective Date (the "Combined Projections");

(c)    the Obligors shall have reimbursed the Lender from their own funds for all of Lender's Costs and Expenses, including, without limitation, all attorneys' fees incurred by the Lender in connection with the terminated restructuring of the Ahava and LCD obligations and in connection with the preparation, negotiation, and execution of this Forbearance Agreement; and

(d)    no Forbearance Termination Event shall have occurred or exists.

8.    [Intentionally Omitted.]

9.    <u>Representations and Warranties</u>. The Obligors certify, represent, warrant and acknowledge that:

(a)    there are no claims, defenses, counterclaims or offsets against the Lender in connection with any of the Transaction Documents any nature whatsoever whether in law or in equity and Obligors hereby waive any such claims or defenses that any of the Obligors may raise against the Lender as a result of the Lender's agreeing to enter into this Forbearance Agreement;

(b)    the execution and delivery of this Forbearance Agreement and the other Forbearance Documents has been authorized by all necessary action on the part of Obligors, each Forbearance Document has been duly executed and delivered by the Obligors party thereto; and the Transaction Documents constitute the legal, valid and binding obligations of the Obligors enforceable against them in accordance with their

respective terms subject to applicable bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally, moratorium laws from time to time in effect and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(c)    neither the execution and delivery of the Forbearance Documents, nor the consummation by the Obligors of the transactions herein or therein contemplated, nor compliance with the terms, conditions and provisions hereof or thereof will conflict with or result in a breach of any of the terms, conditions or provisions of: (i) any other agreement or instrument to which the Obligors are now a party or by which they or their property is, or may be, bound or constitute a default thereunder, or result thereunder in the creation or imposition of any security interest, mortgage, lien, charge or encumbrance of any nature whatsoever upon any of Obligors' properties or assets; or (ii) any judgment or order, writ, injunction or decree of any court to which Obligors are subject;

(d)    no action of, or filing with, any governmental or public body or authority is required to authorize, or is otherwise required in connection with the execution, delivery and performance of any of the Forbearance Documents;

(e)    the representations and warranties set forth in each of the Transaction Documents are true and correct as of the date hereof in all material respects (except such representations and warranties that are rendered untrue as a result of the existence of the Existing Defaults); and

(f)    no Forbearance Termination Event has occurred or exists.

10.    <u>Certain Covenants of the Obligors</u>.

(a)    <u>Combined Projections</u>.  The Obligors agree to deliver or cause to be delivered to the Lender the Combined Projections, in form and substance reasonably satisfactory to the Lender, promptly after the completion thereof by a consultant reasonably satisfactory to the Lender.

(b)    <u>Appraisals</u>.  The Obligors acknowledge that the Lender shall cause to be obtained after the Effective Date appraisals of all equipment owned by any of the Obligors located at the following locations: (i) 30 Main Street, Ogdenburg, New York 13669; (ii) 7705 State Route 812, Lowville, New York 13367; (iii) 110 Beard Street, Brooklyn, New York 11231; and (iv) such other locations as determined by the Lender. The Obligors agree that the costs and expenses incurred in connection with such appraisals shall be borne by the Obligors, and the Obligors jointly and severally agree to pay all such costs and expenses. The Obligors further agree to permit (or shall cause the owner of such properties to permit) the Lender, any of its representatives and any appraiser visit such locations so that such appraisals may be performed.

(c)    <u>Post Closing Items</u>.  The Obligors agree to deliver to the Lender the following documents by no later than July 30, 2007, each in form and substance satisfactory to the Lender:

(i)    the tax return of Ahava for the fiscal year 2006, together with an officer's certificate signed by a senior officer of Ahava certifying that such tax return is a true and correct copy;

(ii)    the tax return of Yoni for 2006, together with an officer's certificate signed by a senior officer of Yoni certifying that such tax return is a true and correct copy;

(iii)    the tax return of LCD for 2006, together with an officer's certificate signed by a senior officer of LCD certifying that such tax return is a true and correct copy;

(iv)    the tax return of SLF for 2006, together with an officer's certificate signed by a senior officer of SLF certifying that such tax return is a true and correct copy;

(v)    the personal tax returns of MB for 2006, together with a certificate signed by MB certifying that such tax returns are true and correct copies;

(vi)    the personal tax returns of AB for 2006, together with a certificate signed by AB certifying that such tax returns are true and correct copies; and

(vii)    the reviewed financial statements of Yoni for the fiscal year ending December 31, 2006, together with an officer's certificate signed by a senior officer of Yoni certifying that such financial statements are true and correct copies.

In addition, the Obligors agree to deliver to the Lender by no later than June 30, 2007, in form and substance satisfactory to the Lender, the reviewed financial statements of Ahava for the fiscal year ending December 31, 2006, together with an officer's certificate signed by a senior officer of Ahava certifying that such financial statements are true and correct copies.

11.    Termination of Forbearance.  If there shall occur any of the following (each a "Forbearance Termination Event"):

(a)    any breach by any Obligor of any of the terms and conditions of this Forbearance Agreement or any of the other Forbearance Documents; or

(b)    any default or event of default under any of the Transaction Documents, except the Existing Defaults; or

(c)    any representation or warranty made by any Obligor herein or in any other Forbearance Documents (or any of its officers) in connection with this Forbearance Agreement and the other Forbearance Documents (including any and all schedules and/or exhibits hereto and thereto) shall prove to have been incorrect or misleading in any material respect when made; or

(d)    Morgan Stanley Mortgage Capital Inc. or any successor or assigns thereof ("Morgan Stanley") shall have declared a default or an event of default or otherwise accelerated the obligations of Yoni under the loan documentation (as amended,

modified or supplemented from time to time) evidencing the $9,100,000 financing extended to Yoni by Morgan Stanley in October 2006; or

(e)     the Projections Consultant ceases to be engaged by any of the Obligors prior to the completion of the Combined Projections,

then the Lender's agreement to forbear from the exercise of its rights and remedies shall immediately terminate without further notice or opportunity to cure, and the Lender may inter alia, immediately and without further notice, commence suit, seek the appointment of a receiver and fiscal agent of the Obligors' businesses and exercise any of its rights against any collateral securing the Transaction Obligations and/or pursuant to the Transaction Documents and applicable law.

12.     Release. Each Obligor hereby forever releases the Lender and each of its past, present and future Affiliates, and the respective directors, officers, employees, agents, representatives, agents and advisors of the Lender and such Affiliates, from any and all claims, demands, defenses, counterclaims and causes of action, contingent or non-contingent, known or unknown, on account of any and all matters of any kind, nature or thing arising from or with respect to the Obligations, the Loan Documents and/or any action or inaction of the Lender in connection with any of the foregoing, from the beginning of the world through the date hereof. Notwithstanding the foregoing, Obligors may pursue any and all rights of any of them to enforce the terms of this Forbearance Agreement.

13.     Successors and Assigns.

(a)     All covenants, agreements, representations and warranties made herein, in any other Forbearance Document or in certificates delivered in connection herewith or therewith by or on behalf of any Obligor shall survive the execution and delivery of this Forbearance Agreement and shall continue in full force and effect so long as the Transaction Obligations are outstanding and unpaid or any amounts due to the Lender under this Forbearance Agreement or the other Transaction Documents have not been paid, and shall bind and inure to the benefit of the successors and permitted assigns of the Obligors, whether so expressed or not, and all such covenants, agreements, representations and warranties shall inure to the benefit of the Lender's successors and assigns. No right or privilege is extended to any third party by the provisions thereof.

(b)     The Obligors may not assign their rights or delegate their obligations hereunder or any of the other Forbearance Documents without the prior written consent of the Lender, which consent may be granted or withheld in the Lender's sole and absolute discretion.

14.     Amendment and Waiver. No provision of this Forbearance Agreement or the other Transaction Documents may be changed or modified orally but only by an agreement in writing signed by the Obligors against whom such agreement is sought to be enforced and by the Lender. No provision of this Forbearance Agreement or the other Transaction Documents may be waived, or the discharge thereof acknowledged orally, but only by an agreement in writing signed by the party against whom the enforcement of any waiver or discharge is sought and then such waiver or discharge shall be effective only in the specific instance and for the specific purpose for which it was given. Except as expressly set forth in this Forbearance Agreement, nothing contained in this Forbearance Agreement shall be deemed as a waiver by the Lender of its rights and remedies against the Obligors. The Lender expressly reserves its rights and remedies, at law or equity, as against Obligors, with a waiver of none.

15.    Execution in Counterparts. This Forbearance Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which take together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Forbearance Agreement by telecopy or facsimile shall be effective as delivery of a manually executed counterpart of this Forbearance Agreement.

16.    Voluntary Agreement. The Obligors represent and warrant that they are represented by legal counsel of their choice, or, if they are not represented by counsel, that the decision not to be represented by counsel is a decision that the Obligors have freely made, that they are fully aware of the terms contained in this Forbearance Agreement and the other Forbearance Documents, and have voluntarily and without coercion or duress of any kind, entered into this Forbearance Agreement and the other Forbearance Documents.

17.    Merger and Integration. This Forbearance Agreement supersedes any negotiations, discussions, writings or other agreements between the parties concerning the forbearance, all of which hereby merged into this Forbearance Agreement, except that the Loan Documents and all obligations due thereunder shall remain in full force and effect.

18.    Negation of Partnership. The relationship between the Obligors on the one hand, and the Lender on the other, is that of debtor and creditor. Nothing contained in this Forbearance Agreement or any of the other Forbearance Documents will be deemed to create a partnership or joint venture, or to cause the Lender to be liable or responsible in any way for the actions, liabilities, debts or obligations of any of the Obligors or other party.

19.    Headings. The paragraph, section and other headings contained in this Forbearance Agreement are for reference purposes only and shall not control or affect the construction of this Forbearance Agreement or the interpretation hereof in any respect.

20.    Severability. Any provision of this Forbearance Agreement, which is prohibited or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such prohibition and unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

21.    Law Governing. THIS FORBEARANCE AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

22.    Consent to Jurisdiction.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Forbearance Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such federal court. Each of the Obligors hereto consents to the service of copies of any and all process which may be served in any such action or proceeding by the mailing of copies of such process to such Obligors at its address specified herein. Each

of the Obligors agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Forbearance Agreement or any other Transaction Document shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Forbearance Agreement or any other Transaction Document in the courts of any other jurisdiction.

(b)     Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Forbearance Agreement or any other Transaction Document in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

23.    _Waiver of Jury Trial_. EACH OF THE OBLIGORS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS FORBEARANCE AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, THE TRANSACTION OBLIGATIONS OR THE ACTIONS OF THE LENDER OR ANY OF ITS AFFILIATES IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.

24.    _Construction of Agreement_. The parties hereto agree that the terms and language of this Forbearance Agreement and the other Forbearance Documents were the result of negotiations between the parties and, as a result, there shall be no presumption that ambiguities, if any, in this Forbearance Agreement shall be resolved against either party. Any controversy over the construction of this Forbearance Agreement shall be decided neutrally, in light of its conciliatory purposes, and without regard to events of authorship or negotiation.

25.    _Further Assurances_. The Obligors shall perform such further acts and things and execute and deliver to the Lender such additional assignments, agreements, powers and instruments, as the Lender may reasonably require or reasonably deem advisable to carry into effect the purposes of this Forbearance Agreement and the other Transaction Documents or to better assure and confirm unto the Lender its rights, powers and remedies hereunder and thereunder.

26.    _Notices_. Except as expressly provided to the contrary in this Forbearance Agreement, any notice, request, demand, statement, authorization, approval or consent made hereunder shall be in writing and shall be hand delivered or sent by Federal Express, or other reputable courier service, or by postage pre-paid registered or certified mail, return receipt requested, or by telecopier, to the applicable address as set forth in Schedule 4, and shall be deemed given (i) when received at such address if hand delivered, sent by Federal Express or other reputable courier service, or telecopied, and (ii) five Business Days after being postmarked and addressed as follows if sent by registered or certified mail, return receipt requested.

27.    _Inducement_. In order to induce the Lender to enter into this Forbearance Agreement:

(a)     The Obligors confirm the validity and effectiveness of any guaranties made by the Obligors in favor of the Lender and hereby reaffirm all of their respective obligations under such guaranties and the other Loan Documents to which they are a party.

HF 3598643v.18 #06406/0023

(b)    The Obligors confirm the validity and effectiveness of any security agreements made by the Obligors in favor of the Lender and confirm that such security agreements secure payment of the Obligations.

(c)    The Obligors hereby reaffirm all of their respective duties, obligations and liabilities under the Loan Documents, all as amended (to the extent amended hereby) by this Forbearance Agreement.

(d)    Each Obligor hereby represents and warrants to the Lender that as of the date hereof none of the Obligors has any defense, claim, counterclaim, right of setoff, or cause of action of any kind whatsoever against the Lender or any of its past, present or future agents, employees and Affiliates. Each Obligor hereby forever releases the Lender and each of its past, present and future agents, employees and Affiliates from any and all claims, demands, defenses, counterclaims and causes of action, contingent or non-contingent, known or unknown, on account of any and all matters of any kind, nature or thing arising from or with respect to the Loans, this Forbearance Agreement, the Loan Documents as amended hereby (to the extent amended hereby) and/or any action or inaction of the Lender in connection with any of the foregoing, from the beginning of the world through the date hereof.

(e)    Each Obligor hereby further represents and warrants to the Lender that the Lender has provided all notices of default required under the Loan Documents and would be fully entitled to exercise remedies on account of the Existing Defaults, but the Lender has, in its sole discretion, elected not to do so at the present time. Such election, however, is without any waiver of the Existing Defaults and is subject to the conditions set forth in this Forbearance Agreement; and, absent such election, there would exist no impediment to the commencement of the exercise of remedies under the Loan Documents and the law.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

HF 3598643v.18 #06406/0023

11

IN WITNESS WHEREOF, the parties hereto have executed this Forbearance Agreement as of the day and year first above written or have caused these presents to be signed as of the day and year first above written.

AHAVA FOOD CORP.

By: _____
    Name:
    Title:

LEWIS COUNTY DAIRY CORP.

By: _____
    Name:
    Title:

ST. LAWRENCE FOOD CORP.

By: _____
    Name:
    Title

YONI REALTY, LLC

By: _____
    Name:
    Title

_____
MOISE BANAYAN, as an individual

_____
ANA BANAYAN, as an individual

[Signature Page to Forbearance Agreement]

SIGNATURE BANK, N.A.

By: _____

Name: _Reneene A. Prost_

Title: _SVP._

[Signature Page to Forbearance Agreement]

HF 3598643v.18 #06406/0023

SCHEDULE 1

## LOAN DOCUMENTS

1.      Master Credit Facility Agreement, dated as of August 22, 2005, by and among Ahava, SLF, LCD, Yoni, MB and the Lender (as amended to but not including the date hereof, the "Master Credit Agreement");

2.      Facility A Note, dated as of August 22, 2005, made by Ahava and payable to the order of the Lender in the principal amount of $2.0 million (as amended to but not including the date hereof, the "Facility A Note");

3.      Facility B Note, dated as of August 22, 2005, made by Ahava and payable to the order of the Lender in the principal amount of $5.5 million (as amended to but not including the date hereof, "Facility B Note");

4.      Joint and Several Guaranty of Payment, dated August 22, 2005, made by SLF, LCD, Yoni and MB in favor of the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "Original Guaranty");

5.      Security Agreement, dated as of August 22, 2005, by and among Ahava, SLF, LCD, Yoni and the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "Original Security Agreement");

6.      Subordination Agreement, dated as of August 22, 2005, between MB and the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "Subordination Agreement");

7.      Continuing Guaranty, dated as of October 7, 2005, made by LCD in favor of the Lender, (as amended or otherwise reaffirmed to but not including the date hereof, the "LCD 2005 Guaranty");

8.      Continuing General Security Agreement, dated as of October 7, 2005, by and between LCD and the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "LCD 2005 Security Agreement");

9.      Continuing Guaranty, dated April 5, 2006, made by Ahava in favor of the Lender, (as amended or otherwise reaffirmed to but not including the date hereof, the "Ahava 2006 Guaranty");

10.     Continuing Guaranty, dated March 29, 2006, made by SLF in favor of the Lender, (as amended or otherwise reaffirmed to but not including the date hereof, the "SLF 2006 Guaranty");

11.     Continuing Guaranty, dated March 29, 2006, made by Yoni in favor of the Lender, (as amended or otherwise reaffirmed to but not including the date hereof, the "Yoni 2006 Guaranty");

12.     Reaffirmation of Guaranty, dated as of February 7, 2007, made by Ahava, SLF, Yoni, MB and AB, individually, in favor of the Lender, (collectively, the "Reaffirmed Guaranty");

13.     Continuing General Security Agreement, dated as of March 28, 2006, by and between LCD and the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "LCD 2006 Security Agreement");

14

14.     Continuing General Security Agreement, dated as of March 28, 2006, by and between Ahava and the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "Ahava 2006 Security Agreement");

15.     Continuing General Security Agreement, dated as of March 28, 2006, by and between SLF and the Lender (as amended or otherwise reaffirmed to but not including the date hereof, the "SLF 2006 Security Agreement");

16.     Promissory Note, dated as of January 24, 2007, made by LCD and payable to the order of the Lender in the original principal amount of $750,000 (as amended to but not including the date hereof, the "LCD 2007 Note"); and

17.     Continuing Guaranty, dated January 15, 2007, made by AB in favor of the Lender as amended or otherwise reaffirmed to but not including the date hereof, the "AB 2007 Guaranty").

<u>SCHEDULE 2</u>

**EXISTING DEFAULTS**

1.    Each of the following judgments constitutes an "Event of Default" (as defined in the Master Credit Agreement) under Section 7.01(i) of the Master Credit Agreement:

(a)    the judgment entered against Ahava, LCD and MB in favor of M&I First National Leasing Corp. on January 12, 2007 in an amount in excess of $700,000 (the "First Judgment");

(b)    the judgment entered against Ahava, LCD and MB in favor of M&I First National Leasing Corp. on April 23, 2007 in an amount in excess of $60,000 (the "Second Judgment");

(c)    the judgment entered against LCD in favor of the Commissioner of Labor of the State of New York on or about November 2005 in an amount in excess of $62,000 (the "Third Judgment"); and

(d)    the judgment entered against LCD, Ahava and SLF in favor of Cape Vincent Milk Producers Cooperative, Inc., Marble City Bulk Milk Cooperative, Inc., Seaway Milk Producers Cooperative, Inc. and Northern New York Bulk Milk Producers Cooperative, Inc. on or about July 2006 in an amount in excess of $100,000 (the "Fourth Judgment", and together with the First Judgment, the Second Judgment and the Third Judgment, the "Judgments").

2.    Each of Ahava, LCD, SLF and MB failed to notify the Lender of the First Judgment for over six weeks, constituting an "Event of Default" (as defined in the Master Credit Agreement) under Section 5.06 of the Master Credit Agreement.

3.    The Judgments and failure to notify Lender of the First Judgment constitute an "Event of Default" (as defined in the LCD 2007 Note) under Section 8(b)(iii) of the LCD 2007 Note.

4.    As a result of the Second Judgment, liens securing the Second Judgment (collectively, the "Second Judgment Liens") were incurred on the accounts described on Annex I attached to this Schedule 2. The Second Judgment Liens constitute an "Event of Default" under Section 7.01(e) of the Master Credit Agreement, as they violate a covenant set forth in Section 6.01 of the Master Credit Agreement.

5.    The Judgments and the Second Judgment Liens constitute an "Event of Default" under Section 8(a) of the Original Security Agreement.

6.    The Second Judgment Liens constitute an "Event of Default" under Section 8(g) of the Original Security Agreement.

7.    The Second Judgment Liens constitute an "Event of Default" under Section 9 of the LCD 2005 Security Agreement.

8.    The Second Judgment Liens constitute an "Event of Default" under Section 10 of the LCD 2006 Security Agreement.

9.    The Second Judgment Liens constitute an "Event of Default" under Section 9 of the Ahava 2006 Security Agreement.

10.    LCD failed to pay on the Maturity Date (as defined in the LCD 2007 Note) the outstanding principal amount under the LDC 2007, together will all accrued interest thereon.

HF 3598643v.18 #06406/0023

<u>Annex I to Schedule 2</u>

<u>List of Accounts</u>

1.     Bank Name:     Sovereign Bank, 9512 Third Avenue, Brooklyn, NY 11209
       ABA Number:     231372691
       Account Holder:     Moise Banayan
       Account number:     3573060242
       In the Amount of:     $64,360.83

2.     Bank Name:     Sovereign Bank, 9512 Third Avenue, Brooklyn, NY 11209
       ABA Number:     231372691
       Account Holder:     Ahava Food Corp.
       Account number:     3690002858
       In the Amount of:     $31,433.25 which represented payments from the following:

| | |
|---|---|
| Jerusalem J2 Pizza: | $18,202.04 |
| Aviv Gourmet Food: | $8,000.00 |
| Kosher Discount: | $5,231.21 |

<u>SCHEDULE 3</u>

## AMOUNTS DUE AND OWING TO LENDER

The Obligors acknowledge that as of June 11, 2007 there is due and owing by the Obligors to the Lender, without setoff, counterclaim, adjustment, defense or right of reduction of any kind, on account of:

1.    the Facility A Loan under the Master Credit Agreement, the principal amount of $5,489,054.48 and interest in the amount of $55,395.25 for a total of $5,544,449.73;

2.    the Facility B Loan under the Master Credit Agreement, the principal amount of $1,300,000.07 and interest in the amount $2,733.61 for a total of $1,302,733.68; and

3.    the LCD 2007 Note, the principal amount of $750,000.00 and interest in the amount of $1,718.75 for a total of $751,718.75.

HF 3598643v.18 #06406/0023

SCHEDULE 4

## NOTICES

If to the Obligors at:

    c/o Ahava Food Corp.
    110 Beard Street
    Brooklyn, New York 11231
    Telecopier No.:  (718) 243-0700
    Attention:  Moise Banayan

With a copy to:

    Stein Riso Mantel, LLP
    The Chrysler Building
    405 Lexington Avenue
    New York, New York  10174
    Telecopier No.: (212) 559-6155
    Attention:  Dennis L. Stein, Esq.

If to the Bank:

    Signature Bank
    565 Fifth Avenue
    New York, New York  10017
    Telecopier No.: (646) 822-1833
    Attention: Robert Bloch

With a copy to:

    Herrick, Feinstein LLP
    Two Park Avenue
    New York, New York  10016
    Telecopier No.: (212) 592-1500
    Attention: Stephen D. Brodie, Esq.

# EXHIBIT J

## JOINDER AGREEMENT,
## WAIVER
## AND
## FIRST AMENDMENT TO FORBEARANCE AGREEMENT

This JOINDER AGREEMENT, WAIVER AND FIRST AMENDMENT TO FORBEARANCE AGREEMENT, dated as of August 27, 2007, is entered into by and among AHAVA FOOD CORP., a New York corporation ("Ahava"), LEWIS COUNTY DAIRY CORP., a New York corporation ("LCD"; together with Ahava, the "Borrowers" and, individually a "Borrower"), ST. LAWRENCE FOOD CORP., a New York corporation ("SLF"), YONI REALTY, LLC, a New York limited liability company ("Yoni"), MOISE BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("MB"), CHANA (a/k/a ANA) BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("AB", and together with the Borrowers, SLF, Yoni and MB, the "Existing Obligors", and each an "Existing Obligor"), SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC., a New York corporation (the "New Obligor", and together with the Existing Obligors, the "Obligors"); and SIGNATURE BANK (the "Lender").

## RECITALS

WHEREAS, the Existing Obligors and the Lender are parties to the Forbearance Agreement, dated as of June 11, 2007 (as amended, supplemented or otherwise modified to but not including the date hereof, the "Forbearance Agreement"), pursuant to which, subject to the terms and conditions set forth therein, the Lender has forbeared from exercising its rights and remedies under the Loan Documents (as defined in the Forbearance Agreement).

WHEREAS, the Existing Obligors have requested that the Lender add the New Obligor as a party to each of the Existing Loan Documents (as defined below) as (i) a "Guarantor" and "Obligor" party to the Existing Master Credit Agreement (defined below), (ii) an "Obligor", "Debtor" or "Grantor", as the case may be, party to the Existing Security Documents (as defined below) and (iii) a "Guarantor" or "undersigned", as the case may be, party to the Existing Guarantor Documents (as defined below) and, subject to the terms and conditions set forth herein, Lender has agreed to the same.

WHEREAS, the Existing Obligors have requested that the Lender add the New Obligor as a party to Forbearance Agreement as an "Obligor" and, on and subject to the terms and conditions set forth herein, Lender has agreed to the same.

WHEREAS, certain events of default under the Loan Documents (as defined in the Forbearance Agreement) and a Forbearance Termination Default (as defined in the Forbearance Agreement) have occurred, as set forth in Schedule 1 annexed hereto (the "Additional Defaults").

WHEREAS, the Obligors have requested the Lender to waive the Additional Defaults, and the Lender is willing to grant such waiver of the Additional Defaults, on and subject to the terms and conditions set forth herein.

WHEREAS, the Existing Obligors, the New Obligor and Lender desire to amend certain provisions of the Forbearance Agreement as set forth herein, on and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants and conditions herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Defined Terms</u>.

(a)    All capitalized terms used herein and not defined herein shall have the meanings assigned to them in the Forbearance Agreement.

(b)    As used herein, the following terms have the following meanings:

"<u>Additional Defaults</u>" has the meaning set forth in the recitals hereto.

"<u>Agreement</u>" means this Joinder Agreement and Amendment to Forbearance Agreement, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Conditions Precedent</u>" has the meaning set forth in Section 6 hereof.

"<u>Existing Guarantor Documents</u>" means, collectively, (a) the Original Guaranty, (b) the LCD 2005 Guaranty, (c) the Ahava 2006 Guaranty, (d) the SLF 2006 Guaranty, and (e) the Yoni 2006 Guaranty, as each may be amended, amended and restated, supplemented or otherwise modified from time to time; and "<u>Existing Guarantor Document</u>" means each of the foregoing.

"<u>Existing Loan Documents</u>" means, collectively, (a) the Existing Master Credit Agreement, (b) the Existing Guarantor Documents and (c) the Existing Security Documents; and "<u>Existing Loan Document</u>" means each of the foregoing.

"<u>Existing Master Credit Agreement</u>" means the Master Credit Agreement, as amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Existing Obligations</u>" means all "Obligations" (as such term is defined in the Forbearance Agreement (after giving effect to the amendments set forth in Section 3 hereof).

"<u>Existing Security Documents</u>" mean, collectively, (a) the Original Security Agreement, (b) the LCD 2005 Security Agreement, (c) the LCD 2006 Security Agreement, (d) the Ahava 2006 Security Agreement and (e) the SLF 2006 Security Agreement, as each of the foregoing may be amended, amended and restated, supplemented or otherwise modified from time to time; and "<u>Existing Security Document</u>" means each of the foregoing.

"<u>Forbearance Loan Documents</u>" means, collectively, the Forbearance Note, the Forbearance Guaranty Agreement, and the Forbearance Security Agreement (as each such term is defined in Section 3(d)(iii)).

"<u>Joinder/Waiver/Amendment Effective Date</u>" has the meaning set forth in Section 6 hereof.

"<u>New Obligor</u>" has the meaning set forth in the introductory paragraph hereof.

"New Obligor Collateral" has the meaning set forth in Section 2(e) hereof.

2.    Joinder of New Obligor.

(a)    Joinder to Existing Master Credit Agreement. By its execution of this Agreement below, the New Obligor hereby agrees to:

(i)    join in the Existing Master Credit Agreement as a "Guarantor" and an "Obligor";

(ii)    be bound as a "Guarantor" and an "Obligor" party to the Existing Master Credit Agreement by all of the terms, covenants, agreements, conditions and acknowledgements set forth in the Existing Master Credit Agreement to the same extent that it would have been bound if it had been a signatory to the Existing Master Credit Agreement on the date of the Existing Master Credit Agreement; and

(iii)    perform all obligations and duties required of it by the Existing Master Credit Agreement as a "Guarantor" and an "Obligor" party thereto.

(b)    Joinder to Existing Guarantor Documents. By its execution of this Agreement below, the New Obligor hereby agrees to:

(i)    join in each of the Existing Guarantor Documents as a "Guarantor" or an "undersigned" (as the case may be) party thereto;

(ii)    be bound as a "Guarantor" or an "undersigned" (as the case may be) party to each Existing Guarantor Document by all of the terms, covenants, agreements, conditions and acknowledgements set forth in such Existing Guarantor Document to the same extent that it would have been bound if it had been a signatory to such Existing Guarantor Document on the date of such Existing Guarantor Document; and

(iii)    perform all obligations and duties required of it by each Existing Guarantor Document as a "Guarantor" or an "undersigned" (as the case may be) party thereto.

(c)    Joinder to Existing Security Documents. By its execution of this Agreement below, the New Obligor hereby agrees to:

(i)    join in each of the Existing Security Documents as a "Grantor", "Debtor" or "Obligor" (as the case may be) party thereto;

(ii)    be bound as a "Grantor", "Debtor" or "Obligor" (as the case may be) party to each Existing Security Document by all of the terms, covenants, agreements, conditions and acknowledgements set forth in such Existing Security Document to the same extent that it would have been bound if it had been a signatory to such Existing Security Document on the date of such Existing Security Document; and

(iii)    perform all obligations and duties required of it by each Existing Security Document as a "Grantor", "Debtor" or "Obligor" (as the case may be) party thereto.

(d)    <u>Joinder to Forbearance Agreement</u>. By its execution of this Agreement below, the New Obligor hereby agrees to:

(i)    join in the Forbearance Agreement as an "Obligor" party thereto;

(ii)    be bound as an "Obligor" party to the Forbearance Agreement by all of the terms, covenants, agreements, conditions and acknowledgements set forth in the Forbearance Agreement to the same extent that it would have been bound if it had been a signatory to the Forbearance Agreement on the date of the Forbearance Agreement; and

(iii)    perform all obligations and duties required of it by the Forbearance Agreement as an "Obligor" party thereto.

(e)    <u>Grant of Security Interest</u>.

(i)    In furtherance of the grant of security interest in all of the New Obligor's right, title and interest in, to and under all "Collateral" (as such term is defined in each of the Existing Security Documents) (the "New Obligor Collateral") as a result of the New Obligor's joinder to the Existing Security Documents pursuant to Section 2(c) hereof and in order to secure the prompt payment when due, and performance of all of the Exiting Obligations, the New Obligor hereby grants to the Lender a first priority security interest in all of its right, title and interest in, to and under all the New Obligor Collateral, whether now owned or hereafter acquired or arising, and wherever located.

(ii)    The security interests granted by the New Obligor in the New Obligor Collateral shall attach to all the New Obligor Collateral without further action on the part of the Lender or the New Obligor. The New Obligor hereby authorizes the Lender to file financing statements that describe the New Obligor Collateral in any appropriate jurisdiction and with or without New Obligor's authentication or signature, and describing the New Obligor Collateral as "all assets" of the New Obligor. A carbon, photographic, electronic or other reproduction of a financing statement that covers the New Obligor Collateral, with or without New Obligor's authentication or signature, will be sufficient as a financing statement for any of the purposes specified by the UCC.

(f)    <u>Representations and Warranties</u>.  The New Obligor hereby represents and warrants to the Lender:

(i)    That the representations and warranties with respect to it contained in each of the Existing Loan Documents to which it joined by virtue of this Agreement or otherwise, are true and correct in all material respects on the date hereof as if made on and as of the date hereof.

(ii)    The exact legal name of the New Obligor and the type of organization the New Obligor is are set forth on <u>Schedule 2</u> attached hereto; the New Obligor is a registered organization organized or formed under the laws of the jurisdiction identified on such <u>Schedule 2</u>; the New Obligor is and has been at all times organized or formed under the laws of such jurisdiction; the taxpayer identification number and (if any) registered organization number of the New Obligor is set forth such <u>Schedule 2</u>; the mailing address, the chief place of business, chief executive office and the office where the New Obligor keeps its books and records relating to the New Obligor Collateral is located at the locations specified on such <u>Schedule 2</u>; and the owners of the equity interest in the New Obligor and the percentage of such equity interest such owner owns.

4

(g)    Acknowledgment.    The New Obligor expressly understands, agrees and acknowledges that Ahava, Yoni, SLF, LCD and the New Obligor are all affiliated entities by common ownership.

3.    Amendments to the Forbearance Agreement.    The Forbearance Agreement is hereby amended as follows:

(a)    Wherever the name "Signature Bank, N.A." appears in the Forbearance Agreement, such name is hereby amended to read as follows: "Signature Bank".

(b)    The defined term "Obligor" appearing in the first paragraph of the Forbearance Agreement is hereby deleted in its entirety.

(c)    The parenthetical, "(this "Forbearance Agreement")", appearing in the first paragraph of the Forbearance Agreement is hereby amended by deleting such parenthetical in its entirety and inserting in replacement thereof the following parenthetical: "(as amended, amended and restated, supplemented or otherwise modified from time to time, this "Forbearance Agreement")".

(d)    Section 1 of the Forbearance Agreement is hereby amended as follows:

(i)    The defined term "Corporate Obligors" is hereby amended and restated in its entirety to read as follows:

"Corporate Obligors" means Ahava, LCD, SLF, Schwartz and Yoni.

(ii)    The defined term "Forbearance Documents" is hereby amended and restated in its entirety to read as follows:

"Forbearance Documents" means (a) this Forbearance Agreement, (b) the Forbearance Loan Documents, and (c) all other agreements, documents, instruments and certificates executed and delivered by or on behalf of any Obligor in connection with this Forbearance Agreement.

(iii)    The defined term "Termination Date" is hereby amended and restated in its entirety to read as follows:

"Termination · Date" means September 11, 2007. Notwithstanding the foregoing in this definition of Termination Date, if the Lender shall have received from the Obligors prior to September 11, 2007 a copy of a fully executed commitment letter issued by another financial institution or financing company (the "Take-Out Creditor"), which letter shall be in form and substance satisfactory to the Lender in the Lender's good faith judgment, pursuant to which the Take-Out Creditor has committed to provide financing in an amount sufficient to pay the Lender in full all outstanding loans and other amounts (including, without limitation, the Transaction Obligations) owing to the Lender under the Transaction Documents (the "Take-Out Commitment Letter"), then, effective on the date of receipt by the Lender of the Take-Out

Commitment Letter, "Termination Date" shall mean September 25, 2007.

(iv)    The following new terms are hereby inserted in such Section 1 in alphabetical order:

"Coop 930 Lease Assignment" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

"Coop 930 Security Agreement" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

"Coop 1119 Lease Assignment" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

"Coop 1119 Security Agreement" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

"Forbearance Loan Documents" means, collectively, the following:

(i)    Promissory Note, dated as of the Joinder/Waiver/Amendment Effective Date, made by SLF and Ahava on a joint and several basis and payable to the order of the Lender in the original principal amount of $1,750,000 (as amended from time to time, the "Forbearance Note");

(ii)    Joint and Several Guaranty of Payment Agreement, dated as of the Joinder/Waiver/Amendment Effective Date, made by LCD, Schwartz, MB and AB in favor of the Lender (as amended from time to time, the "Forbearance Guaranty Agreement"); and

(iii)    Security Agreement, dated as of the Joinder/Waiver/Amendment Effective Date, made by Ahava, SLF, LCD and Schwartz in favor of the Lender (as amended from time to time, the "Forbearance Security Agreement").

"Joinder/Waiver/Amendment Agreement" means the Joinder Agreement and Amendment to Forbearance Agreement, dated as of Joinder/Waiver/Amendment Effective Date, by and among the Obligors and the Lender, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Joinder/Waiver/Amendment Effective Date" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

"MB Pledge Agreement" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

HF 3724331v.17 #06406/0023

"Monsey Mortgage" has the meaning set forth in the Joinder/Waiver/Amendment Agreement.

"Obligors" means, collectively, Ahava, LCD, SLF, Schwartz, Yoni, MB and AB.

"Schwartz" means Schwartz & Sons Quality Distributors, Inc., a New York corporation.

(e)    Section 4(h) of the Forbearance Agreement is hereby amended and restated in its entirety to read as follows:

(h)    Provided that (i) the Obligors comply with all of the terms, conditions and covenants set forth in the Loan Documents, this Forbearance Agreement and the other Forbearance Documents, and (ii) no Forbearance Termination Event occurs, then the aggregate principal amount of all principal, interest, fees and other amounts payable under the Loan Documents (including, without limitation, the LCD 2007 Note) and this Forbearance Agreement shall be due and payable by the Obligors to Lender in full on the Termination Date; provided, however, that Yoni shall have no liability in respect of amounts owing under the Forbearance Loan Documents.

(f)    Section 7(b) of the Forbearance Agreement is hereby amended and restated in its entirety to read as follows:

(b)    the Lender shall have received evidence, in form and substance reasonably satisfactory to the Lender, that the Obligors have engaged a consultant satisfactory to the Lender (the "Projections Consultant") to prepare rolling cash flow projections for Ahava, LCD, SLF and Yoni (on a combined basis) covering the period extending thirteen weeks from the Effective Date (the "Combined Projections"). The Projections Consultant shall work on a full time basis (i.e., a period no less than five (5) Business Days (as defined in the Existing Master Credit Agreement) per week) for the Obligors.

(g)    Section 8 of the Forbearance Agreement is hereby amended and restated in its entirety to read as follows:

Section 8. Short Term Loan. The parties hereto acknowledge and agree to the following

(a)    Subject to the satisfaction in full of the Conditions Precedent (as defined in the Joinder/Waiver/Amendment Agreement), and relying upon the representations and warranties herein set forth, the Lender agrees to make a short term loan to SLF on the Joinder/Waiver/Amendment Effective Date in the principal amount of $1.75 million (such short term loan referred to herein as the "Forbearance Loan").

(b)    Any amounts of the Forbearance Loan paid or repaid may not be reborrowed. The proceeds of the Forbearance Loan shall be used to pay accounts payable and operating costs of Ahava and/or SLF. The Forbearance Loan made shall be evidenced by the Forbearance Note. The Forbearance Note shall require,

7

among other things, that the outstanding principal amount of the Forbearance Loan shall repaid in full on the Termination Date, or such earlier date as may be required pursuant to the terms of the Forbearance Note.

(h)    SCHEDULE 1 to the Forbearance Agreement is hereby amended by adding at the end thereof the following new paragraphs:

18.    Joinder/Waiver/Amendment Agreement.
19.    Monsey Mortgage.
20.    Coop 1119 Security Agreement.
21.    Coop 930 Security Assignment.
22.    Coop 1119 Lease Assignment.
23.    Coop 930 Lease Assignment.
24.    MB Pledge Agreement

(i)    SCHEDULE 2 to the Forbearance Agreement is hereby amended by adding to such schedule the Additional Defaults.

4.    Waiver. The Lender hereby waives the Additional Defaults.

5.    Forbearance Fee. The Obligors hereby jointly and severally agree to pay to the Lender a fee (the "Additional Forbearance Fee") in an amount equal to $50,000, which fee shall be deemed earned by the Lender as of the Joinder/Waiver/Amendment Effective Date, and shall be due and payable by the Obligors to the Lender in immediately available funds upon the earliest of (i) the Termination Date, (ii) the date on which all the Transaction Obligations and all obligations and indebtedness of the Obligors to the Lender under the Forbearance Documents have been paid in full in cash, and (iii) the date on which (A) MB sells any portion of his equity interest in any of the Corporate Obligors or (B) any Corporate Obligor sells a substantial portion of its respective business and/or assets, in each case with respect to clauses (A) and (B) immediately above, to any person or entity that is not an Obligor or an affiliate of any Obligor. It is understood and agreed that the Additional Forbearance Fee is in addition to the Forbearance Fee referred to in, and required to be paid pursuant to, Section 6(d) of the Forbearance Agreement.

6.    Conditions Precedent. This Agreement, the joinders set forth in Section 2 hereof, the amendments set forth in Section 3 hereof and the waiver set forth in Section 4 hereof, in each case shall become effective as of the date hereof (the "Joinder/Waiver/Amendment Effective Date") when each of the following conditions ("Conditions Precedent") shall have been satisfied; provided that such conditions are satisfied on or before the date hereof:

(a)    the Lender shall have received counterparts of this Agreement duly executed and delivered by each Obligor;

(b)    the Lender shall have received each of the Forbearance Loan Documents, in form and substance satisfactory to the Lender, duly executed and delivered by each Obligor party thereto;

(c)    the Lender shall have received:

(i)    a duly executed opinion of counsel to the Obligors other than MB or AB (the "Corporate Obligors") covering only the valid existence of the Corporate Obligors and their due authorization of the Forbearance Documents, in the form attached hereto as Exhibit A.

(ii)    copies of UCC, tax, judgment lien searches and bankruptcy and pending lawsuit searches (or equivalent reports or searches), each of a recent date listing all effective financing statements, lien notices, or comparable documents that name any Obligor as debtor and that are filed in those state and county jurisdictions where any Obligor is organized and such other searches that the Lender deems necessary for the appropriate, the results of which shall be reasonably satisfactory to the Lender;

(iii)    such documents, agreements, instruments, financing statements and certificates (including, without limitation incumbency certificates and resolutions) as the Lender may reasonably request relating to the organization, existence and good standing of each Obligor that is not an individual, the authorization of the transactions contemplated hereby and any other legal matters relating to thereto, all in form and substance satisfactory to the Lender and its counsel;

(iv)    the Mortgage (Fee), dated as of July 23, 2007, between MB and AB and the Lender covering the premises located at 51 Parker Boulevard, Monsey, New York 10952-1449 (as the same may be amended from time to time, the "Monsey Mortgage");

(v)    the Security Agreement, dated as of August 27, 2007, by and between MB and the Lender covering the cooperative of MB located at 1119 Ocean Parkway, Brooklyn, New York (the "Coop 1119") (as the same may be amended from time to time, the "Coop 1119 Security Agreement");

(vi)    the Security Agreement, dated as of August 27, 2007, by and between MB and the Lender covering the cooperative of MB located at 930 East 7th Street, Brooklyn, New York (the "Coop 930") (as the same may be amended from time to time, the "Coop 930 Security Agreement");

(vii)    the Assignment of Proprietary Lease, dated as of August 27, 2007, by and between MB and the Lender covering the Coop 1119 (as the same may be amended from time to time, the "Coop 1119 Lease Assignment");

(viii)    the Assignment of Proprietary Lease, dated as of August 27, 2007, by and between MB and the Lender covering the Coop 930 (as the same may be amended from time to time, the "Coop 930 Lease Assignment"); and

(ix)    Pledge Agreement, dated as of August 27, 2007 by MB in favor of the Bank (as amended, amendment and restated, supplemented, or modified from time to time, the "MB Pledge Agreement");

(d)    the Obligors shall have reimbursed the Lender from their own funds for all of Lender's Costs and Expenses, including, without limitation, all attorneys' fees incurred by the Lender in connection with the preparation, negotiation, execution and delivery of this Agreement, the Forbearance Loan Documents and any other documents, agreements and certificates executed and delivered in connection with this Agreement; and

(e)    each of the representations and warranties set forth in Sections 2(f) and 8 hereof shall be true and correct in all respects; and

7.    Reaffirmation, Ratification and Release.  In order to induce the Lender to enter this Agreement:

(a)    The Existing Obligors hereby confirm the validity and effectiveness of any guaranties made by the Existing Obligors in favor of the Lender and of any other Transaction Documents to which any of the Existing Obligors is a party, and hereby reaffirm all of their respective obligations under such guaranties and the other Transaction Documents to which they are a party.

(b)    The Existing Obligors confirm and ratify in all respects the validity and effectiveness of any security agreements made by the Existing Obligors in favor of the Lender and confirm that such security agreements secure payment of the Obligations.

(c)    The Existing Obligors hereby reaffirm all of their respective duties, obligations and liabilities under the Transaction Documents, all as amended by the Forbearance Agreement or by this Agreement (to the extent amended thereby or hereby).

(d)    The Existing Obligors hereby ratify and reaffirm all of the representations and warranties set forth in the Transaction Documents, and confirm that each such representation and warranty is true and correct in all material respects as of the date hereof (except to the extent that such representations and warranties expressly relate to an earlier date, in which case, such representations and warranties are true and correct as of such date), except such representations and warranties that are rendered untrue as a result of the existence of the Existing Defaults and the Additional Defaults.

(e)    Each Obligor hereby represents and warrants to the Lender that as of the date hereof and as of the Joinder/Waiver/Amendment Effective Date, none of the Obligors has any defense, claim, counterclaim, right of setoff, or cause of action of any kind whatsoever against the Lender or any of its past, present or future agents, employees and Affiliates. Each Obligor hereby forever releases the Lender and each of its past, present and future agents, employees and Affiliates from any and all claims, demands, defenses, counterclaims and causes of action, contingent or non-contingent, known or unknown, on account of any and all matters of any kind, nature or thing arising from or with respect to the Loan, this Forbearance Agreement, this Agreement, the Loan Documents as amended by the Forbearance Agreement or by this Agreement (to the extent amended thereby or hereby) and/or any action or inaction of the Lender in connection with any of the foregoing, from the beginning of the world through the date hereof.

(f)    The amendments set forth herein are limited precisely as written and shall not be deemed to be an amendment to, consent to or a waiver of any other term or condition of any of the Transaction Documents. All references in the Forbearance Agreement shall be deemed to be references to the Forbearance Agreement as the same may be amended, supplemented or otherwise modified from time to time (including by this Agreement).

(g)    AB hereby acknowledges and agrees that, "Ana Banayan" is also known as "Chana Banayan". Accordingly, AB, the other Obligors and the Lender hereby acknowledge and agree that all references in any of the Transaction Documents to "Ana Banayan" are hereby amended to read "Chana Banayan", and to the extent that AB executed any of the Transaction Documents as "Ana Banayan", AB shall be deemed to have executed such Transaction Documents as Chana Banayan.

8.    Representations and Warranties.  To induce Lender to enter into this Agreement, the Obligors hereby certify, represent, warrant and acknowledge to the Lender that, as of the date hereof and as of the Effective Date:

(a)     each of the representations and warranties set forth in Section 9 of the Forbearance Agreement (after giving effect to the amendments and the waiver set forth in Sections 3 and 4 hereof, respectively) is true and correct in all respects as of the date hereof and as of the Effective Date; and

(b)     no Forbearance Termination Event has occurred and is continuing.

9.     <u>Miscellaneous</u>.

(a)     <u>Successors and Assigns</u>.  The provisions of Section 13 of the Forbearance Agreement are hereby incorporated herein, *mutatis mutandis*, as if a part hereof.

(b)     <u>Amendment and Waiver</u>. Neither this Agreement nor any provision hereof may be waived, amended, changed or modified except pursuant to an agreement complying with Section 14 of the Forbearance Agreement.

(c)     <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which take together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

(d)     <u>Headings</u>. The paragraph, section and other headings contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation hereof in any respect.

(e)     <u>Severability</u>. Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such prohibition and unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(f)     <u>Law Governing</u>. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

(g)     <u>Consent to Jurisdiction</u>.  The provisions of Section 22 of the Forbearance Agreement are hereby incorporated herein, *mutatis mutandis*, as if a part hereof.

(h)     <u>Waiver of Jury Trial</u>. EACH OF THE OBLIGORS HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION DOCUMENTS OR THE ACTIONS OF THE LENDER OR ANY OF ITS AFFILIATES IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.

(i)     <u>Agreement Concerning Tax Refunds</u>. As security for (i) the obligations of each AB and MB under the Forbearance Guaranty Agreement and (ii) the Transaction Obligations of each AB and MB (such obligations referred to in clause (i) and (ii) immediately above are collectively referred to as the "<u>MB/AB Obligations</u>"), AB and MB hereby assign to the Lender and grant a security interest to the Lender, in and to all of their right, title and interest in and to any tax refund payable to one or both of

them from any Governmental Authority (as defined in the Existing Master Credit Agreement), including the United States Treasury and the New York State Department of Taxation and Finance. Upon receipt of any such refund, AB and/or MB (as applicable) will immediately endorse and deliver the same to the Lender. The Lender shall hold any such sum and all income earned thereon as cash collateral in a deposit account with the Lender, pursuant to the Lender's standard assignment of deposit account documentation. The Lender agrees to hold all such cash collateral, and not apply the same against the MB/AB Obligations, until such time as the Lender shall have reasonably determined that it has realized substantially all that it can expect to realize from collateral provided by the Corporate Obligors. AB and MB further agree to enter into any additional documentation reasonably requested by the Lender in order to further assure the Lender with respect to the assignment of such tax refunds.

(j)    <u>Acknowledgement</u>.  Each Obligor expressly acknowledges that the Lender shall not be under any obligation of any kind to cover any check overdrafts, advance additional funds or extend credit beyond what is expressly provided for in the Forbearance Agreement (as amended pursuant to Section 3 of this Agreement) and the Forbearance Loan Documents, and further acknowledge that the Obligors have no expectation that any such credit or privileges will be extended after the date hereof by the Lender, notwithstanding the Lender's having elected to extend credit (absent any obligation) to do so in the past.

[REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

HF 3724331v.17 #06406/0023

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the day and year first above written.

AHAVA FOOD CORP.

By: _Moise Banayan_
Name:
Title:

LEWIS COUNTY DAIRY CORP.

By: _Moise Banayan_
Name:
Title:

ST. LAWRENCE FOOD CORP.

By: _Moise Banayan_
Name:
Title:

YONI REALTY, LLC

By: _Moise Banayan_
Name:
Title:

SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.

By: _Moise Banayan_
Name:
Title:

_Moise Banayan_
MOISE BANAYAN, as an individual

_____
CHANA (a/k/a Ana) BANAYAN, as an individual

[Signature Page to Joinder Agreement, Waiver and Amendment to Forbearance Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the day and year first above written.

AHAVA FOOD CORP.

By: _____
    Name:
    Title:


LEWIS COUNTY DAIRY CORP.

By: _____
    Name:
    Title:


ST. LAWRENCE FOOD CORP.

By: _____
    Name:
    Title:


YONI REALTY, LLC

By: _____
    Name:
    Title:


SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.

By: _____
    Name:
    Title:


_____
MOISE BANAYAN, as an individual

_____
CHANA (a/k/a Ana) BANAYAN, as an individual

[Signature Page to Joinder Agreement, Waiver and Amendment to Forbearance Agreement]

SIGNATURE BANK

By: _____

Name: _Thomas Kasueka_

Title: _SVP, Group Director_

[Signature Page to Joinder Agreement, Waiver and Amendment to Forbearance Agreement]

SCHEDULE 1

**EXISTING DEFAULTS**

1.     An "Event of Default" under (and as defined in) the Master Credit Agreement resulting from Ahava failing to pay interest on certain loans outstanding under the Master Credit Agreement for the month of [_____], 2007 (the "Primary Default").

2.     A "Forbearance Termination Event" and certain events of default under certain of the other Loan Documents in each case resulting from the Primary Default.

SCHEDULE 2

Exact Legal Name; Jurisdiction of Organization; Taxpayer Identification Number; Registered
Organization Number; Mailing Address; Chief Executive Office; Ownership Interest

| | |
|---|---|
| Exact Legal Name of New Obligor | Schwartz & Sons Quality Distributors, Inc. |
| Type of Organization: | Corporation |
| Jurisdiction of Organization: | New York |
| Organizational Identification Number: | N/A |
| Federal Tax Identification Number: | 20-8833752 |
| Mailing address, chief place of business, chief executive office and office where the New Obligor keeps its books and records relating to the New Obligor Collateral: | 110 Beard Street<br>Brooklyn, NY 11231 |
| Owner of the equity interest in the New Obligor and the percentage of such equity interest such owner owns: | Moise Banayan - 100% of the equity interest of the New Obligor |

## Exhibit A

FORM OF LEGAL OPINION

# EXHIBIT K

*EXECUTION VERSION*

**PLEDGE AGREEMENT**

This PLEDGE AGREEMENT, dated as of August 27, 2007 (the "Agreement"), made by MOISE BANAYAN, an individual having a residence at 51 Park Boulevard, Mosey, New York 10952 (the "Pledgor") in favor of SIGNATURE BANK, (together with its successors and assigns, herein called the "Bank").

## RECITALS:

A.      Reference is made to the Forbearance Agreement, dated as of June 11, 2007, as amended by the Joinder Agreement, Waiver and First Amendment to Forbearance Agreement, dated as of the date hereof (as the same may be further amended, amended and restated, modified or supplemented from time to time, the "Forbearance Agreement"), by and among Ahava Food Corp., a New York corporation ("Ahava"), St. Lawrence Food Corp., a New York corporation ("SLF"), Lewis County Dairy Corp., a New York corporation ("LCD"), Schwatrz & Sons Quality Distributors, Inc., a New York corporation ("Schwartz"), Chana Banyan ("CB"), Yoni Realty, LLC ("Yoni"), the Pledgor, and the Bank.

B.      Pledgor will receive substantial benefits from the execution, delivery, and performance of the obligations of the Transaction Documents (as defined in the Forbearance Agreement) and, is therefore, willing to enter into this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged the parties hereto agree as follows:

1.      Definitions.

A.      All capitalized terms that are not defined herein but that are defined in the Forbearance Agreement shall have the respective meanings ascribed thereto therein.

B.      As used in this Agreement, the following terms have the following meanings:

"Additional Collateral" shall mean any and all (i) additional Capital Stock (as defined below) or other equity securities issued by, or interests in, any Issuer, whether certificated or uncertificated, (ii) warrants, options or other rights entitling the Pledgor to acquire any interest in Capital Stock or other equity securities of or other equity interests in any Issuer, (iii) securities, property, interest, dividends and other payments and distributions issued as an addition to, in redemption of, in renewal or exchange for, in substitution or upon conversion of, or otherwise on account of, the Pledged Stock or such additional Capital Stock or other equity securities or other interests in any Issuer, and (iv) cash and non-cash proceeds of the Pledged Stock, and all supporting obligations, of any or all of the foregoing, in each case from time to time received or receivable by, or otherwise paid or distributed to or acquired by, the Pledgor.

"Agreement" shall mean this Pledge Agreement, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"Capital Stock" shall mean as to any Person, all shares, interests, partnership interests, limited liability company interests, participations, rights in or other equivalents (however designated) of

such Person's equity (however designated) and any rights, warrants or options exchangeable for or convertible into such shares, interests, participations, rights or other equity.

"Event of Default" shall mean a Forbearance Termination Event

"Issuer" shall mean Ahava, SLF, LCD, and Schwartz

"Pledged Collateral" shall have the meaning set forth in Section 2A.

"Pledged Stock" shall mean and include all of the issued and outstanding shares, whether now owned or hereafter acquired by the Pledgor, of the Capital Stock of each Issuer including, without limitation all of the issued and outstanding stock of the Issuers listed on Exhibit A attached hereto, and, also, any shares, stock certificates, options or rights issued by any of the Issuer as an addition to, in substitution for, or in exchange for any such shares, and any and all proceeds thereof, now or hereafter owned or acquired by the Pledgor.

"Secured Obligations" shall mean all Transaction Obligations.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Bank's security interest in any item or portion of the Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

2.     Security Interest.

A.     As collateral security for the due payment and performance of all Secured Obligations, the Pledgor hereby pledges and grants to the Bank a lien on and security interest in and to all of the right, title and interest of the Pledgor in, to and under (i) all of the Pledged Stock and the Additional Collateral and any certificates and instruments now or hereafter representing the Pledged Stock and the Additional Collateral, (ii) all rights, interests and claims with respect to the Pledged Stock and Additional Collateral, including under any and all related agreements, instruments and other documents, (iii) all books, records and other documentation of the Pledgor related to the Pledged Stock and Additional Collateral and (iv) any and all proceeds of the Pledged Stock and the Additional Collateral, in each case whether now existing or owned or hereafter arising or acquired and wherever located (collectively, the "Pledged Collateral").

B.     If the Pledgor shall become entitled to receive or shall receive any Additional Collateral, the Pledgor shall accept any such instruments as the Bank's agent, shall hold them in trust for the Bank, and shall deliver them forthwith to the Bank in the exact form received, with the Pledgor's endorsement when necessary and/or appropriate stock powers duly executed in blank, to be held by the Bank, subject to the terms hereof, as further collateral security for the Secured Obligations.

C.     Any or all shares of the Pledged Collateral held by the Bank hereunder may, at the option of the Bank or its nominee, be registered in the name of the Bank or its nominee after the occurrence and during the continuance of any Event of Default, and the Bank or its nominee may thereafter, without notice, exercise all voting and corporate rights at any meeting of any corporation issuing any of the shares included in the Pledged Collateral and exercise any and all rights of conversion,

- 2-

exchange, subscription or any other rights, privileges or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including, without limitation, the right to receive dividends payable thereon, and the right to exchange, at its discretion, any and all of the Pledged Collateral upon the merger, consolidation, reorganization, recapitalization or other readjustment of any corporation issuing any of such shares or upon the exercise by any such issuer of any right, privilege or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Bank shall have no duty to exercise any of the aforesaid rights, privileges or options and shall not be responsible for any failure to do so or delay in so doing.

D.    In the event of the occurrence and during the continuance of any Event of Default, the Bank shall have the right to require that all cash dividends payable with respect to any part of the Pledged Collateral be paid to the Bank to be held by the Bank as additional security hereunder until applied to the Secured Obligations.

E.    In the event of the occurrence and during the continuance of any Event of Default, the Bank without demand for performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of private sale) to or upon the Pledgor or any other Person (all and each of which demands, advertisements and/or notices are, to the extent permitted by law, hereby expressly waived), may forthwith collect, receive, appropriate and realize upon the Pledged Collateral, or any part thereof, and/or may forthwith sell, assign, give an option or options to purchase, contract to sell or otherwise dispose of and deliver said Pledged Collateral, or any part thereof, in one or more parcels in a private sale or sales at any of the Bank's offices or elsewhere at such prices and on such terms (including, without limitation, a requirement that any purchaser of all or any part of the Pledged Collateral shall be required to purchase the shares constituting the Pledged Collateral for investment and without any intention to make a distribution thereof) as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk, with the right to the Bank (to the extent permitted by law) or any purchaser upon any such sale or sales, to purchase the whole or any part of the Pledged Collateral so sold, free of any right or equity of redemption in the Pledgor, which right or equity is hereby expressly waived and released. In addition to the rights and remedies given to the Bank hereunder or otherwise, the Bank shall have all of the rights and remedies of a secured party at law or in equity or under the UCC.

F.    The proceeds of any collection, recovery, receipt, appropriation, realization or sale as aforesaid, shall be applied against the Secured Obligations in such order as determined by the Bank in its sole discretion.

G.    The Bank need not give more than five (5) days notice of the time and place of any public sale or of the time after which a private sale may take place and such notice shall be deemed to be reasonable notification of such matters.

H.    In the event that the proceeds of any collection, recovery, receipt, appropriation, realization, or sale as aforesaid are insufficient to pay all amounts to which the Bank is legally entitled, the Pledgor will be liable for the deficiency.

3.    <u>Representations and Warranties.</u> The Pledgor represents and warrants that:

- 3 -

A.    The Pledged Collateral owned by the Pledgor is owned directly and beneficially and of record by the Pledgor;

B.    The shares of the Pledged Collateral with respect to each Issuer constitute one hundred percent (100%) of all of the issued and outstanding shares of the Capital Stock of such Issuer;

C.    All of the shares of the Pledged Collateral have been duly and validly issued, are fully paid and non-assessable and are owned by the Pledgor free and clear of any pledge, mortgage, hypothecation, lien, charge, encumbrance or any security interest in such shares or the proceeds thereof, except for the security interest granted to the Bank hereunder; and

D.    Upon delivery of the certificates representing any of the Pledged Collateral to the Bank or an agent for the Bank, the Bank's security interest therein shall be a perfected security interest in such Pledged Collateral and, subject to Article 9 of the UCC, the proceeds thereof, subject to no prior security interest, Lien, charge or encumbrance or to any agreement purporting to grant to any third party a security interest in the property or assets of the Pledgor that would include the Pledged Collateral.

4.    Covenants.

A.    The Pledgor hereby covenants that, except with the prior written consent of the Bank (which consent may be withheld in the Bank's sole discretion), the Pledgor will not:

(i)    sell, convey or otherwise dispose of any shares of the Pledged Stock owned or any interest therein, nor will the Pledgor create, incur or permit to exist any pledge, mortgage, lien, charge, encumbrance or any security interest whatsoever with respect to any of such Pledged Stock or the proceeds thereof other than that created hereby; or

(ii)    consent to or approve the issuance of any additional shares of any class of the issuer of the Pledged Stock.

B.    The Pledgor warrants and will defend the Bank's right, title, special property and security interest in and to the Pledged Collateral against the claims of any Person.

5.    The Pledgor recognizes that the Bank may be unable to effect a public sale of all or a part of the Pledged Collateral, and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgor acknowledges that any such private sales may be at places and on terms less favorable to the seller than if sold at public sales and that the Bank has no obligation to delay sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act of 1933, as amended.

6.    The Pledgor shall at any time and from time to time upon the written request of the Bank, execute and deliver such further documents and do such further acts and things as the Bank may reasonably request in order to effect the purposes of this Agreement, including, without limitation, delivering to the Bank irrevocable proxies in respect of the Pledged Collateral in form and substance reasonably satisfactory to the Bank.

7.    The Pledgor hereby appoints the Bank its attorney-in-fact, with full power and authority in the place and stead of the Pledgor and in the name of the Pledgor, or otherwise, from time to time in

- 4 -

the Bank's discretion to take any action and to execute any instrument consistent with the terms of this Agreement which the Bank may deem necessary or advisable to accomplish the purposes hereof (but the Bank shall not be obligated to and shall have no liability to the Pledgor or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. The Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

8.    Miscellaneous.

A.    Beyond the exercise of reasonable care to assure the safe custody of the Pledged Collateral while held hereunder, the Bank shall have no duty or liability to preserve rights pertaining thereto, and shall be relieved of all responsibility for the Pledged Collateral upon surrendering it to the Pledgor or in accordance with the Pledgor's instructions.

B.    No failure on the part of the Bank to exercise, no course of dealing with respect to, and no delay on the part of the Bank in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Bank be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law or otherwise available, including, without limitation, the rights and remedies of a secured party under the UCC.

C.    If any clause or provision shall be held illegal, invalid or unenforceable in whole or in part in any jurisdiction, then such illegality, invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision in this Agreement in any jurisdiction.

9.    Any notice, request, approval, consent or other communication hereunder shall be given to the addresses and otherwise made in accordance with Section 26 of the Forbearance Agreement.

10.    This Agreement shall create a continuing security interest in the Pledged Collateral and shall (i) be binding upon the Pledgor and its successors and assigns and (ii) inure, together with the rights and remedies of the Bank hereunder, to the benefit of the Bank and each of its successors, transferees and assigns; provided, however, that the Pledgor may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Bank (and any attempted assignment or transfer by the Pledgor without such consent shall be null and void).

11.    No modification of, amendment to, termination of, change to or waiver of any provision of this Agreement shall be effective unless and until it shall be in writing and signed by the Bank and the Pledgor, and then such modification, amendment, termination, change or waiver shall be effective only in the specific instance and for the purpose for which given.

12.    Governing Law; Consent to Jurisdiction; Venue; Service of Process.

A.    THIS AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK,

- 5 -

WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS EXCEPT AS SET FORTH IN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK.

B.     THE PLEDGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE BANK MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST THE PLEDGOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

C.     THE PLEDGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. THE PLEDGOR IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

D.     THE PLEDGOR HEREBY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 22 OF THE FORBEARANCE AGREEMENT. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE BANK TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

13.     WAIVER OF JURY TRIAL.  THE PLEDGOR AND THE BANK MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY. THE PLEDGOR HEREBY AGREES THAT IT WILL NOT INITIATE OR BRING A SET-OFF OR COUNTERCLAIM IN THE SAME PROCEEDING IN WHICH THE BANK'S ACTION IS BROUGHT, UNLESS FAILURE TO DO SO WOULD RESULT IN A FORFEITURE OF THE CLAIM, IN EACH CASE IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN.  EXCEPT AS PROHIBITED BY LAW, THE PLEDGOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE PLEDGOR CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE BANK HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER.

- 6 -

14.     As long as this Agreement shall remain in effect:

A.     The Pledgor hereby irrevocably authorizes the Bank at any time and from time to time to, and the Bank may at any time and from time to time, file financing statements, continuation statements and amendments thereto that describe the Pledged Collateral as all assets of the Pledgor or words of similar effect and which contain any other information required by the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether the Pledgor is an organization, the type of organization and any organization identification number issued to the Pledgor. The Pledgor agrees to furnish any such information to the Bank promptly upon request. Any such financing statements, continuation statements or amendments may be signed by the Bank on behalf of the Pledgor, and may be filed at any time in any jurisdiction.

B.     The Pledgor hereby ratifies its authorization for the Bank to file in any relevant jurisdiction any financing statements relating to the Pledged Collateral if filed prior to the date hereof.

C.     The Pledgor shall at any time and from time to time take such steps as the Bank may reasonably request for the Bank (a) to obtain an acknowledgement, in form and substance satisfactory to the Bank, of any bailee having possession of any of the Pledged Collateral that the bailee holds such Pledged Collateral for the Bank, (b) to obtain "control" of any investment property (as such term is defined in the UCC), with any agreements establishing control to be in form and substance satisfactory to the Bank, and (c) otherwise to insure the continued perfection and priority of the Bank's security interest in any of the Pledged Collateral and of the preservation of its rights therein.

15.     When all the Secured Obligations have been indefeasibly paid in full this Agreement shall terminate. Upon termination of this Agreement, the Pledged Collateral shall be released from the Lien of this Agreement. Upon such release or any release of Pledged Collateral or any part thereof in accordance with the provisions of the Transaction Docuemnts and this Agreement, the Bank shall, promptly after the request and at the sole cost and expense of the Pledgor, assign, transfer and deliver to the Pledgor, against receipt and without recourse to or representation or warranty by the Bank, such of the Pledged Collateral or any part thereof to be released (in the case of a release) as may be in possession of the Bank and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Pledged Collateral, proper documents and instruments (including UCC-3 termination financing statements or releases) acknowledging the termination hereof or the release of such Pledged Collateral, as the case may be.

16.     All obligations of the Pledgor hereunder shall be absolute and unconditional irrespective of:

(i)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Obligor;

(ii)     any lack of validity or enforceability of any of the Transaction Documents, or any other agreement or instrument relating thereto;

(iii)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from any of the Transaction Documents or any other agreement or instrument relating thereto;

- 7 -

(iv)     any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(v)     any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, or any of the Transaction Documents except as specifically set forth in a waiver granted pursuant to the provisions hereof; or

(vi)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Obligor.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

- 8-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PLEDGOR:

By: _____
MOISE BANAYAN, individually

[Signature page to Pledge Agreement]

BANK:

SIGNATURE BANK

By: _____

Name: Thomas Kasutka

Title: SVP, group director

[Signature page to Pledge Agreement]

**EXHIBIT A**

| Issuer | Owner | Number of Shares | Certificate Number | Class | Ownership Percentage |
|---|---|---|---|---|---|
| Ahava Food Corp. | Moise Banayan | 200 | 1 | | 100% |
| St. Lawrence Food Corp. | Moise Banayan | 200 | 1 | | 100% |
| Lewis County Dairy Corp. | Moise Banayan | 200 | 1 | | 100% |
| Schwartz & Sons Quality Distributors, Inc. | Moise Banayan | 200 | 0 | | 100% |

HF 3745374v.7 #06406/0023

# EXHIBIT L

ORIGIN
COPY

# PROMISSORY NOTE

$1,750,000.00

August 27, 2007
New York, New York

On September 11, 2007 (the "Maturity Date"), for value received, ST. LAWRENCE FOOD CORP., a New York corporation ("SLF"), and AHAVA FOOD CORP., a New York corporation ("Ahava" and, together with SLF, collectively, the "Borrowers" and each, individually, a "Borrower"), each hereby jointly and severally promises to pay to the order of SIGNATURE BANK, having an office at 565 Fifth Avenue, New York, NY 10017 (the "Bank"), at such office of the Bank or at such other place as the holder hereof may from time to time appoint in writing, in lawful money of the United States of America in immediately available funds, the principal sum of ONE MILLION SEVEN HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($1,750,000.00) or such lesser amount as may then be the aggregate unpaid principal balance of the loan made by the Bank to the Borrowers pursuant to the Forbearance Agreement (the "Loan") as shown on the schedule attached to and made a part of this Promissory Note (this "Note"). Each Borrower also jointly and severally promises to pay interest (computed on the basis of a 360 day year for actual days elapsed) at said office in like money on the unpaid principal amount of the Loan from time to time outstanding at a rate per annum equal to a fluctuating rate equal to the Prime Rate (defined below) plus 3% per annum, which rate will change when and as the Prime Rate changes. Interest on the Loan shall be payable monthly on the first day of each month commencing the first such day to occur after such Loan is made hereunder and, together with principal, on the Maturity Date. Each Borrower further agrees that upon and following an Event of Default (as defined below) and/or after any stated or any accelerated maturity of the Loan hereunder, the Loan shall bear interest (computed daily) at a rate equal to 4% per annum in excess of the rate applicable to the Loan, payable on demand. Furthermore, if the entire amount of any principal and/or interest required to be paid pursuant to this Note is not paid in full within ten (10) days after the same is due, each Borrower shall jointly and severally pay to the Bank a late fee equal to five percent (5%) of the required payment. In no event shall interest payable hereunder be in excess of the maximum rate of interest permitted under applicable law. If any payment to be so made hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, to the extent permitted by applicable law, interest thereon shall be payable at the then applicable rate during such extension.

All payments made in connection with this Note shall be in lawful money of the United States of America in immediately available funds. All such payments shall be applied first to the payment of all fees, expenses and other amounts due to the Bank (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after the occurrence of an Event of Default, payments will be applied to the obligations of the Borrowers to the Bank as the Bank determines in its sole discretion. Each Borrower hereby expressly authorizes the Bank to record on the attached schedule the amount and date of the Loan, the rate of interest thereon and the date and amount of each payment of principal. All such notations shall be presumptive as to the correctness thereof; provided, however, the failure of the Bank to make any such notation shall not limit or otherwise affect the obligations of the Borrowers under this Note.

This Note is executed and delivered in connection with the Forbearance Agreement, dated as of June 11, 2007, as amended by a Joinder Agreement, Waiver and First Amendment to Forbearance Agreement, dated as of the date hereof (as the same may be further amended, amended and restated, modified or supplemented from time to time, the "Forbearance Agreement"), by and among the Borrowers, Lewis

County Dairy Corp., Yoni Realty, LLC, Schwartz & Sons Quality Distributors, Inc., Moise Banayan, Chana Banayan and the Bank. This Note evidences the Loan made hereunder, which Loan is the "Forbearance Loan" referred to in Section 8 of the Forbearance Agreement.

In consideration of the granting of the Loan evidenced by this Note, the Borrower hereby agrees as follows:

Section 1.     [Intentionally Omitted]

Section 2.     Payments and Prepayments.

(a) Prepayments. The Borrowers may prepay the Loan at any time in whole or in part without premium or penalty. Each such prepayment shall be made together with interest accrued thereon to and including the date of prepayment.

(b) Scheduled Repayments. The Borrowers shall jointly and severally repay to the Bank the aggregate principal amount of the Loan outstanding on the Maturity Date, together with all accrued and unpaid interest thereon.

Section 3.     Warranties and Representations. Each Borrower represents and warrants that: (a) it is duly organized, validly existing and in good standing under the laws of the state of its organization and is qualified to do business and is in good standing under the laws of every state where its failure to so qualify would have a material and adverse effect on the business, operations, property or other condition of such Borrower; (b) the execution, issuance and delivery of this Note by such Borrower are within its organizational powers and have been duly authorized, and the Note is valid, binding and enforceable in accordance with its terms, and is not in violation of law or of the terms of such Borrower's organizational documents and does not result in the breach or constitute a default under any indenture, agreement or undertaking to which such Borrower is a party or by which it or its property may be bound or affected; (c) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by such Borrower of this Note, except those as have been obtained; (d) the financial statements of such Borrower heretofore furnished to the Bank are complete and correct and fairly represent the financial condition of such Borrower and its subsidiaries as at the dates thereof and for the periods covered thereby, which financial condition has not materially, adversely, changed since the date of the most recently dated balance sheet heretofore furnished to the Bank; (e) no Event of Default (as hereinafter defined) has occurred and no event has occurred which with the giving of notice or the lapse of time or both would constitute an Event of Default (other than the Existing Defaults (as defined in the Forbearance Agreement); (f) such Borrower shall not use any part of the proceeds of the Loan to purchase or carry any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or to extend credit to others for the purpose of purchasing or carrying any margin stock; (g) there is no pending or, to the knowledge of such Borrower, threatened action or proceeding affecting such Borrower before any court, governmental agency or arbitrator which, if determined adversely to such Borrower would have a materially adverse effect on the financial condition or operations of such Borrower except as described in the financial statements of such Borrower heretofore furnished to the Bank (except as described in the definition of Existing Defaults and the Additional Defaults); and (h) on the occasion of the granting of the Loan all representations and warranties contained herein shall be true and correct and with the same force and effect as though such representations and warranties had been made on and as of the date of the making of the Loan.

Section 4.     Events of Default. Upon the occurrence of any of the following specified events of default (each an "Event of Default"): (a) default in making any payment of principal, interest, or any

other sum payable under this Note when due; or (b) default by any Borrower or any Guarantor (i) of any Obligation or (ii) in the due payment of any Obligation owing to the Bank or (iii) under any other Forbearance Loan Document; or (c) default by any Borrower or any Guarantor in the due payment of any other indebtedness for borrowed money or default in the observance or performance of any covenant or condition contained in any agreement or instrument evidencing, securing, or relating to any such indebtedness, which causes or permits the acceleration of the maturity thereof; or (d) any representation or warranty made by a Borrower herein or in any certificate furnished by a Borrower in connection with the Loan evidenced hereby or pursuant to the provisions hereof, proves untrue in any material respect; or (e) any Borrower or any Guarantor becomes insolvent or bankrupt, is generally not paying its debts as they become due, or makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for any Borrower or any Guarantor or for the greater part of the properties of such Borrower or such Guarantor with the consent of such Borrower or such Guarantor, or if appointed without the consent of such Borrower or such Guarantor, such trustee or receiver is not discharged within 30 days, or bankruptcy, reorganization, liquidation or similar proceedings are instituted by or against any Borrower or any Guarantor under the laws of any jurisdiction, and if instituted against any Borrower or any Guarantor are consented to by it or remain undismissed for 30 days, or a writ or warrant of attachment or similar process shall be issued against a substantial part of the property of any Borrower or any Guarantor and shall not be released or bonded within 30 days after levy; or (f) the mortgage or pledge of, creation of a security interest in, any assets of any Borrower or Guarantor, other than security interests in favor of the Bank; or (g) the incurrence by any Borrower of any indebtedness for borrowed money, other than obligations owing to the Bank; or (h) the Bank shall have determined, in its sole discretion, that one or more conditions exist or events have occurred which have resulted or may result in a material adverse change in the business, properties or financial condition of any Borrower or any Guarantor as determined in the sole discretion of the Bank or one or more other conditions exist or events have occurred with respect to any Borrower or any Guarantor which the Bank deems materially adverse; or (i) the occurrence of any Forbearance Termination Event (as defined in the Forbearance Agreement); or (j) the occurrence of any "Event of Default" (as defined in the Security Agreement); then, in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Bank may declare the principal and the accrued interest in respect of the Loan under this Note to be, whereupon the Note shall become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Borrower.

Notwithstanding anything contained above in this Section 4 to the contrary, to the extent that an Existing Default (as defined in the Forbearance Agreement) constitutes an Event of Default, then such Event of Default shall be deemed waived to the same extent as such Existing Default is so waived pursuant to the Forbearance Agreement, and shall be subject to the Forbearance Agreement.

**Section 5.** <u>Collateral Security</u>. As collateral security for the payment of this Note and of all Borrower Obligations (as hereinafter defined) of any Borrower, now or hereafter owned or held by the Bank, each Borrower grants the Bank a security interest in, pledges and assigns to the Bank all monies and/or other property now or hereafter held by the Bank (and/or any entity controlling, controlled by or under common control with the Bank, each such entity referred to herein as an "<u>Affiliate</u>") on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to such Borrower or in which such Borrower shall have any interest, all of which is hereinafter termed the collateral security. At any time, without demand or notice, the Bank may set off all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Bank or any Affiliate, or in transit to any of them, or any part thereof and apply the same to any of the Borrower Obligations even though unmatured and regardless of the adequacy of any other collateral securing the Borrower Obligations. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE BORROWER OBLIGATIONS, PRIOR TO

EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF ANY BORROWER OR ANY GUARANTOR OR OTHER PARTY OBLIGATED ON THIS NOTE, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED. The Bank at any time, before or after an Event or Default (as herein defined), may but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the collateral security, including stocks, bonds, and other securities, and the Bank or its nominee may demand, sue for, collect, receive and hold as like collateral security any or all interest, dividends and income thereon and if the securities are held in the name of the Bank or its nominee, the Bank may, after an Event of Default, exercise all voting and other rights pertaining thereto as if the Bank were the absolute owner thereof; but the Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the collateral against prior parties, or to take any action whatsoever in regard to the collateral security or any part thereof, all of which the Borrowers assume and agree to do. Without limiting the generality of the foregoing, the Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any of the collateral security, unless a Borrower gives written notice to the Bank that such action shall be taken not more than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. This Note and all of the Obligations are also secured by the Forbearance Security Agreement (as defined in the Forbearance Agreement).

## Section 6.    Definitions. As used herein:

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York are required or permitted by law to remain closed, except that "Business Day" in the context of a specific city shall mean any date on which commercial banks are open for business in that city.

"Borrower Obligations" means all Obligations of the Borrowers.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America, any state thereof or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Event of Default" has the meaning set forth in Section 4 hereof.

"Forbearance Agreement" has the meaning set forth above in this Note.

"Guarantors" means, collectively, Lewis County Dairy Corp., Schwartz & Sons Quality Distributors, Inc., Moise Banayan, and Chana Banayan.

"Guaranty Agreement" means the Joint and Several Guaranty of Payment Agreement, dated as of the date hereof by the Guarantors and the Bank, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time. For avoidance of doubt the Guaranty Agreement is the Forbearance Guaranty Agreement referred to in the Forbearance Agreement.

"Obligations" means (a) obligations of Borrower and the Guarantors from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding under any Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) on the Loan, when and as due,

whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any proceeding under any Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding), of the Borrower and the Guarantors under the Forbearance Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of the Borrower and the Guarantors under or pursuant to the Forbearance Loan Documents.

"Person" shall mean any natural person, limited liability company, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"Prime Rate" means the variable per annum rate of interest so designated from time to time by the Bank as its prime rate. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate being charged to any customer.

"Security Agreement" means the Security Agreement, dated as of the date hereof by the Guarantors, the Borrowers and the Bank, as the same may be amended, supplemented, amended and restated, supplemented or otherwise modified from time to time. For avoidance of doubt the Security Agreement is the Forbearance Security Agreement referred to in the Forbearance Agreement.

**Section 7.    Joint and Several Liability of the Borrowers.**

(a)    Each Borrower is accepting joint and several liability for all the Borrower Obligations in consideration of the financial accommodations to be provided by the Bank under this Note, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrower to accept joint and several liability for the Borrower Obligations.

(b)    Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the Borrower Obligations, it being the intention of the parties hereto that all the Borrower Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)    If and to the extent that any Borrower shall fail to make any payment with respect to any of the Borrower Obligations as and when due or to perform any of the Borrower Obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such Borrower Obligation.

(d)    The Borrower Obligations of each Borrower constitute absolute and unconditional, full recourse Borrower Obligations of such Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Note or any other Forbearance Loan Document or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Note, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of the Loan issued under or pursuant to the Forbearance Loan Documents, notice of the occurrence of any Event of Default, or of any demand for any payment under this Note or any other Forbearance Loan Document, notice of any action at any time taken or omitted by the Bank under or in respect of any of the Borrower Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Note and any other Forbearance Loan Document (except as otherwise provided in this Note or therein). Each Borrower hereby assents to, and waives notice of, any extension or

postponement of the time for the payment of any of the Borrower Obligations, the acceptance of any payment of any of the Borrower Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by the Bank at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Note or any other Forbearance Loan Document, any and all other indulgences whatsoever by the Bank in respect of any of the Borrower Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Borrower Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of the Bank with respect to the failure by any Borrower to comply with any of its respective Borrower Obligations, including any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 7 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Borrower Obligations, it being the intention of each Borrower that, so long as any of the Borrower Obligations remain unsatisfied, the Borrower Obligations of such Borrower shall not be discharged except by performance and then only to the extent of such performance. The Borrower Obligations of each Borrower shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or the Bank. The joint and several liability of the Borrowers hereunder, shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, membership, constitution or place of formation of any of the Borrowers or the Bank.

(f)    Each Borrower represents and warrants to the Bank that such Borrower is currently informed of the financial condition of each of the Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Borrower Obligations.

(g)    The provisions of this Section 7 are made for the benefit of the Bank and their respective successors and assigns, and may be enforced by it or them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Bank or any successor or assign of the Bank first to marshal any of its or their claims or to exercise any of its or their rights against any of the Borrowers or to exhaust any remedies available to it or them against any of the Borrowers or to resort to any other source or means of obtaining payment of any of the Borrower Obligations or to elect any other remedy. The provisions of this Section 7 shall remain in effect until all of the Borrower Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Borrower Obligations, is rescinded or must otherwise be restored or returned by the Bank upon the insolvency, bankruptcy or reorganization of any of the Borrowers, or otherwise, the provisions of this Section 7 will forthwith be reinstated in effect, as though such payment had not been made.

(h)    Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrower with respect to any liability incurred by it hereunder or under any of the other Forbearance Loan Documents, any payments made by it to the Bank with respect to any of the Borrower Obligations or any collateral security therefor until such time as all of the Borrower Obligations have been paid in full in cash. Any claim which any Borrower may have against the other Borrower with respect to any payments to the Bank hereunder or under any other Forbearance Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Borrower Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Borrower Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Borrower Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)    Each of the Borrowers hereby agrees that, after the occurrence and during the continuance of any Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Borrower Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Borrower Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for the Bank, and such Borrower shall deliver any such amounts to the Bank for application to the Borrower Obligations.

## Section 8.    Miscellaneous.

(a)    The Borrowers jointly and severally agree to pay on demand all of the Bank's costs and expenses, including reasonable counsel fees, in connection with collection of any sums due to the Bank and enforcement of its rights under this Note.

(b)    No modification or waiver of any provision of this Note shall be effective unless such modification or waiver shall be in writing and signed by a duly authorized officer of the Bank, and the same shall then be effective only for the period and on the conditions and for the specific instances specified in such writing. No failure or delay by the Bank in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any rights, power or privilege.

(c)    The Borrowers hereby waive presentment, demand for payment, notice of protest, notice of dishonor, and any and all other notices or demands except as otherwise expressly provided for herein.

(d)    This Note shall be construed in accordance with and governed by the laws of the State of New York (excluding the laws applicable to conflicts or choice of law). Each Borrower agree that any suit for the enforcement of this Note or any of the other Forbearance Loan Documents may be brought in the courts of the State of New York or any Federal court sitting therein and consents to the nonexclusive jurisdiction of such court and service of process in any such suit being made upon the Borrower by mail at the address set forth in the first paragraph of this Note. The Borrowers hereby waive any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.

(e)    The Bank may at any time pledge all or any portion of its rights under this Note and the other Forbearance Loan Documents to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or enforcement thereof shall release the Bank from its obligations under any of such Forbearance Loan Documents.

(f)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO

HF 3639754v.10 #06406/0023                    7

ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.

(g)    The Bank shall have the unrestricted right at any time and from time to time, and without the consent of or notice to the Borrowers or any other party obligated on this Note, to grant to one or more banks or other financial institutions (each, a "Participant") participating interests in the Bank's obligations (if any) to lend hereunder and/or any or all of the Loan held by the Bank hereunder. In the event of any such grant by the Bank of a participating interest to a Participant, whether or not upon notice to the Borrowers, the Bank shall remain responsible for the performance of its obligations hereunder and the Borrowers shall continue to deal solely and directly with the Bank in connection with the Bank's rights and obligations hereunder. The Bank may furnish any information concerning the Borrower in its possession from time to time to prospective assignees and Participants, provided that the Bank shall require any such prospective assignee or Participant to agree in writing to maintain the confidentiality of such information.

(h)    This Note shall be binding upon and inure to the benefit of the Borrowers, the Bank, all future holders of this Note and their respective successors and assigns, except that the Borrowers may not assign or transfer any of its rights under this Note without the prior written consent of the Bank. The term "Bank" as used herein shall be deemed to include the Bank and its successors, endorsees and assigns. The Bank shall have the unrestricted right at any time or from time to time, and without the Borrower's consent, to assign all or any portion of its rights and obligations hereunder to one or more banks or other financial institutions (each, an "Assignee"), and the Borrowers agree that they shall execute, or cause to be executed, such documents, including without limitation, amendments to this Note and to any other documents, instruments and agreements executed in connection herewith as the Bank shall deem necessary to effect the foregoing. In addition, at the request of the Bank and any such Assignee, the Borrowers shall issue one or more new promissory notes, as applicable, to any such Assignee and, if the Bank has retained any of its rights and obligations hereunder following such assignment, to the Bank, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by the Bank prior to such assignment and shall reflect the amount of the Loan held by such Assignee and the Bank after giving effect to such assignment. Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by the Bank in connection with such assignment, and the payment by Assignee of the purchase price agreed to by the Bank, and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of the Bank hereunder (and under any and all other guaranties, documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by the Bank pursuant to the assignment documentation between the Bank and such Assignee, and the Bank shall be released from its obligations hereunder and thereunder to a corresponding extent.

(i)    Neither this Note nor any of such other Forbearance Loan Documents may be amended or modified except by a written instrument describing such amendment or modification executed by the Borrowers and the Bank.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Borrower has executed and delivered this Note as of the day and year first written above.

ST. LAWRENCE FOOD CORP.

By: _____
Name: Moise Banayan
Title:   President

AHAVA FOOD CORP.

By: _____
Name: Moise Banayan
Title:   President

[Signature Page to Note]

# EXHIBIT M

*EXECUTION VERSION*

## JOINT AND SEVERAL GUARANTY OF PAYMENT AGREEMENT

This JOINT AND SEVERAL GUARANTY OF PAYMENT AGREEMENT (this "**Guaranty**"), dated as of August 27, 2007, made by LEWIS COUNTY DAIRY CORP., a New York corporation ("**LCD**"), SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC., a New York corporation ("**Schwartz**"), MOISE BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("**MB**"), and CHANA BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("**CB**" and, together with LCD, Schwartz and MB, collectively, the "**Guarantors**" and each, individually, a "**Guarantor**"), in favor of SIGNATURE BANK, having an office at 565 Fifth Avenue, New York, New York 10017 (together with its successors and assigns, herein called the "**Bank**").

### RECITALS:

**A.**     Reference is made to the Forbearance Agreement, dated as of June 11, 2007, as amended by a Joinder Agreement, Waiver and First Amendment to Forbearance Agreement, dated as of the date hereof (as the same may be further amended, amended and restated, modified or supplemented from time to time, the "**Forbearance Agreement**"), by and among made by and among the Guarantors, the Borrower (as defined below), Yoni Realty, LLC ("**Yoni**") and the Bank.

**B.**     Reference is made to the Promissory Note, dated the date hereof, made by St. Lawrence Food Corp., a New York corporation ("**SLF**"), and Ahava Food Corp., a New York corporation ("**Ahava**"; and SLF and Ahava are collectively and individually referred to herein as the "**Borrower**") and payable to the order of the Bank in the original principal amount of $1.75 million (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Forbearance Note**").

**C.**     Pursuant to the Forbearance Note and Section 8 of the Forbearance Agreement, the Bank has agreed to make the loan to the Borrower on a joint and several basis, on and subject to the terms and conditions set forth therein.

**D.**     Each Guarantor will receive substantial benefits from the execution, delivery, and performance of the obligations of the Forbearance Loan Documents (as defined in the Forbearance Agreement) and each is, therefore, willing to enter into this Guaranty..

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the Guarantors hereby agree with the Bank, as follows:

### AGREEMENT:

**1.**     Guaranty.     In order to induce the Bank to make such the loan to the Borrowers on a joint and several basis pursuant to the Forbearance Note and Section 8 of the Forbearance Agreement, and in consideration thereof, and to grant to the Borrower such renewals, extensions, forbearances, releases of collateral or other relinquishments of rights as the Bank may deem advisable in its sole discretion, and for other valuable consideration, the receipt of which is hereby acknowledged, the Guarantors hereby jointly and severally, absolutely and unconditionally guaranty to the Bank the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, and the full and prompt payment by the Borrower of all of all Indebtedness (as defined below), whether now existing or hereafter arising from time to time, and promises to pay to the Bank, or order, on demand, in lawful money of the United States of America, all of the Indebtedness of the Borrower, and all out-of-pocket costs and

expenses, including reasonable attorneys fees and legal expenses, paid or incurred by the Bank in endeavoring to collect the Indebtedness, or any part thereof, and in enforcing this Guaranty. All payments made in connection with this Guaranty shall be in lawful money of the United States of America in immediately available funds.

2.    **Terms as Defined in Loan Agreement.** Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Forbearance Note.

3.    **Other Definitions.** As used herein the following capitalized terms shall have the following meanings:

"**Event of Default**" shall have the meaning set forth in the Forbearance Note.

"**Indebtedness**" shall mean all Obligations (as defined in the Forbearance Note) of the Borrower.

"**Person**" shall mean any natural person, limited liability company, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

4.    **Obligations.** Each Guarantor's obligations hereunder are independent of the obligations of the Borrower and of each other Guarantor, and a separate action or actions may be brought and prosecuted against any Guarantor, irrespective of whether an action is brought against the Borrower or any other Guarantor, or whether the Borrower or any other Guarantor is joined in any such action or actions. Each Guarantor waives the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof to the fullest extent permitted by law.

5.    **Indemnity.** Each Guarantor agrees to indemnify and hold the Bank harmless from and against all claims, actions, causes of action, demands, obligations, liabilities, losses, costs and expenses in connection with, on account of, or in any way relating to or arising from the Bank's transactions with any of the Guarantors; provided, that the forgoing indemnification shall not extend to liabilities, damages, losses, obligations, judgments and expenses arising from the gross negligence or willful misconduct of the Bank.

6.    **Continuation of Terms.** This Guaranty shall not be affected or impaired by any modifications, supplements, extensions or amendments of any contract or agreement to which the parties thereto may hereafter agree, nor by any modifications, releases or other alterations of any of the Indebtedness hereby guarantied or of any security therefor, nor by any agreements or arrangements whatever with the Borrower or any other Person.

7.    **Acknowledgement.** Each Guarantor agrees that its liability hereunder shall remain unaffected in any way notwithstanding the fact that the Bank may, without notice or demand, from time to time and any number of times, take any or all of the following actions:

(a)    renew, compromise, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon;

(b)    take and hold security for the payment of this Guaranty or the Indebtedness from the Borrower, another Guarantor or another Person, and exchange, enforce, waive and release any such security;

2

HF 3639848v.5 #06406/0023

(c)    apply such security and direct the order or manner of sale thereof as the Bank in its discretion may determine;

(d)    release or substitute any other Guarantor, guarantors, sureties, or endorsers of the Indebtedness; and

(e)    assign, without notice, this Guaranty in whole or in part, or the Bank's rights hereunder, to any Person at any time.

8.    **Waivers**. Each Guarantor waives all rights and defenses arising out of an election of remedies by the Bank, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Indebtedness guarantied hereunder, has destroyed any of such Guarantor's rights of subrogation and reimbursement against the Borrower. Each Guarantor subordinates, and agrees not to assert, any right of subrogation, contribution, indemnity or reimbursement that such Guarantor has or may have against the Borrower with respect to the Indebtedness guarantied hereunder until such time as the Indebtedness guarantied hereunder has been indefeasibly paid in full. Each Guarantor waives any right to require the Bank to (a) proceed against the Borrower, any other Guarantor or any other Person; (b) proceed against or exhaust any security held from the Borrower or any other Guarantor; or (c) pursue any other right or remedy in the Bank's power whatsoever. Each Guarantor waives any defense arising by reason of any disability or other defense of the Borrower or any other Guarantor, or by reason of the cessation from any cause whatsoever of the liability of the Borrower. Each Guarantor agrees that nothing shall discharge or satisfy its liability hereunder except the full and indefeasible payment and performance of all of the Indebtedness and obligations to the Bank with interest. The Indebtedness and obligations shall not be considered indefeasibly paid until all payments to the Bank are no longer subject to any right, by any Person, to invalidate or set aside such payments or to seek to recoup the amount of such payments or to declare such payments to be fraudulent or preferential. In the event any portion of any such payments shall be set aside or restored, then each Guarantor shall be jointly and severally liable for the full amount the Bank is required to repay, plus any costs and expenses (including attorneys fees) paid by the Bank in connection therewith. Any and all present and future debts and obligations of the Borrower to any Guarantor are hereby postponed in favor of and subordinated to the full payment and performance of all of each Guarantor's obligation under this Guaranty to the Bank. Each Guarantor agrees that the Bank's books and records showing the account between the Bank and the Borrower shall be admissible in any action or proceeding and shall be binding upon each Guarantor (and the Bank) for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. Each Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notices of protest, notices of dishonor, notices of default, notices of acceptance of this Guaranty and of the existence, creation or incurrence of new or additional Indebtedness, notice of any and all favorable and unfavorable information, financial or otherwise, about the Borrower or any other Guarantor, heretofore, now or hereafter learned or acquired by the Bank and all other notices to which each Guarantor might otherwise be entitled.

9.    **Maintenance of Information**. Each Guarantor hereby represents to the Bank that the Guarantor is and will remain informed of the financial condition of the Borrower and of all other circumstances which bear upon the risk of non-payment of the Indebtedness and any other obligations of the Borrower guarantied hereby. Each Guarantor agrees that the Bank is not obligated to inform any Guarantor of any such circumstances, whether now existing or hereafter arising, and that the Bank is not required to inquire into the powers of the Borrower or the officers, directors, partners, agents or other related parties acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guarantied hereunder.

10.    **Attorneys Fees.** Each Guarantor agrees to pay reasonable attorneys fees (including the allocated costs of the Bank's in-house counsel) and all other costs and expenses which may be incurred by the Bank in the enforcement of this Guaranty or any claim hereunder.

11.    **Amendments In Writing.** No termination or modification of this Guaranty shall be effective for any purpose unless it is in writing and executed by an authorized officer of each Guarantor and of the Bank.

12.    **Demand Payment.** Each Guarantor agrees that upon the occurrence and during the continuing of any "Event of Default", the Guarantor, immediately following a demand in writing for payment from the Bank, shall pay the Bank the amount of the Indebtedness then due and owing. Each Guarantor further agrees that upon the acceleration by the Bank of the Indebtedness and the Bank's demand for payment thereof, the Guarantor shall pay to the Bank the full amount of such accelerated Indebtedness.

13.    **Successors and Assigns.** The termination or dissolution of any or all of the Guarantor shall not terminate this Guaranty. This Guaranty shall be binding upon the successors and assigns of each Guarantor and shall inure to the benefit of the Bank, its successors and assigns; provided, however, that no Guarantor may assign any of its rights or obligations hereunder without the prior written consent of the Bank.

14.    **Collateral; Right of Setoff.** As collateral security for the performance of this Guarantee and all other obligations of any or all of the Guarantor to the Bank, whether now or hereafter owed to, or held by, the Bank and/or any affiliate thereof, including, without limitation, the Indebtedness, each Guarantor hereby grants to the Bank a security interest in and transfers and assigns to the Bank the following property: (i) any and all monies and/or other property now or hereafter held by the Bank and/or any affiliate on deposit, in safekeeping, or otherwise, for the account of or to the credit of or belonging to such Guarantor or in which such Guarantor shall have any interest, (ii) any and all claims and demands, presently existing or hereafter arising, and all interest heretofore or hereafter accrued thereon, and any and all collateral or security interests relating thereto and the proceeds thereof, which such Guarantor now has or may hereafter have or acquire against the Borrower (such claims and demands referred to herein as the "Claims") and (iii) any and all property of such Guarantor now or hereafter subject to a security agreement, mortgage, pledge agreement, assignment, hypothecation or other document granting the Bank or any affiliate a security interest or other lien or encumbrance and (iv) any and all collateral described in any and all credit accommodations, notes, loan agreements, and any other agreements and documents, now or hereafter existing, creating, evidencing, guaranteeing, securing or relating to any or all of the Indebtedness, together with all amendments, modifications, renewals, or extensions thereof and any additions thereto and accessions thereto and substitutions therefore and the products and proceeds thereof. All of the property described in clauses (i), (ii), (iii), and (iv) above shall be collectively referred to herein as the "Collateral". The Bank at any time may, but shall not be obligated to, transfer into or out of its own name or that of its nominee all or any of the Collateral, including stocks, bonds, and other securities, and the Bank or its nominee may demand, sue for, collect, receive and hold as like Collateral any or all interest, dividends and income thereon and if any securities are held in the name of Bank or its nominee. To the extent any Collateral is transferred into the Bank's (or an affiliate's) own name, the Bank, at any time may, but shall not be obligated to, exercise all voting and other rights pertaining thereto as if the Bank were the absolute owner thereof, but the Bank shall not be obligated to demand payment of, protest, or take any steps necessary to preserve any rights in the Collateral against prior parties, or to take any action whatsoever in regard to the Collateral or any part thereof, all of which such Guarantor assumes and agrees to do. Without limiting the generality of the foregoing, the Bank shall not be obligated to take any action in connection with any conversion, call, redemption, retirement or any other event relating to any Collateral, unless such Guarantor gives written notice to the Bank that such action shall be taken not more

4

than thirty (30) days prior to the time such action may first be taken and not less than ten (10) days prior to the expiration of the time during which such action may be taken. At any time, without demand or notice, if permitted by applicable law, the Bank may setoff all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of the Bank or any of its affiliates, or in transit to any of them, or any part thereof and apply the same to any of the Indebtedness even though unmatured and regardless of the adequacy of any other collateral securing the Indebtedness. ANY AND ALL RIGHTS TO REQUIRE THE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE INDEBTEDNESS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER OR ANY OF THE GUARANTORS, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

15.    **Terms Generally.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Guaranty in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Guaranty and (e) the word "property" shall be construed to refer to any and all tangible and intangible properties, including cash, securities, accounts and contract rights.

16.    **Applicable Law.** This Guaranty shall be construed in accordance with and governed by the laws of the State of New York, without regard to principles of conflict of laws except as set forth in Section 5-1401 of the New York General Obligation Law.

17.    **Severability.** In case any one or more of the provisions contained in this Guaranty should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

18.    **Counterparts.** This Guaranty may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

19.    **Headings.** Section headings used herein are for convenience of reference only and are not to affect the construction of or be taken into consideration in interpreting this Guaranty.

20.    **Waiver of Jury Trial.**  THE GUARANTORS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF OR OTHERWISE RELATING TO THIS GUARANTY OR ANY OF THE OTHER FORBEARANCE LOAN DOCUMENTS.

21.    **Right of Setoff.** If an Event of Default shall have occurred and be continuing, the Bank is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply and all deposits (general or special, time or demand, provisional or final) at any time held and

HF 3639848v.5 #06406/0023

other obligations at any time owing by the Bank to or for the credit or the account of the Guarantors, against any or all of the obligations of any or all of the Guarantors now or hereafter existing under this Guaranty held by the Bank, irrespective of whether or not the Bank shall have made any demand under this Guaranty and although such obligations may be unmatured. The rights of the Bank under this Section 21 are in addition to any other rights and remedies (including other rights of setoff) which the Bank may have under any other Transaction Document, under the law or otherwise.

22.    **Jurisdiction; Consent to Service of Process.**

(a)    Each of the Guarantors hereby irrevocably and unconditionally submit themselves and their property to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court for any thereof, in any action or proceeding arising out of or relating to this Guaranty, or for recognition or enforcement of any judgment, and each of the parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Guaranty shall affect any right that the Bank may otherwise have to bring any action or proceeding relating to this Guaranty against any or all of the Guarantors or any of their properties in the courts of any other jurisdiction.

(b)    The Guarantors hereby irrevocably and unconditionally waive to the fullest extent they may legally effectively do so, any objection which they now or may hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Guaranty in any court referred to in paragraph (a) of this Section 22. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Guaranty irrevocably consents to service of process in the manner provided for notices in Section 26 of the Forbearance Agreement. Nothing in this Guaranty will affect the right of any party to this Guaranty to serve process in any other manner permitted by law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

HF 3639848v.5 #06406/0023

6

IN WITNESS WHEREOF, each Guarantor and the Bank have caused this Guaranty to be duly executed and delivered as of the date first above written.

GUARANTORS:

LEWIS COUNTY DAIRY CORP.

By: _____
    Name:
    Title:

SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.

By: _____
    Name:

_____
MOISE BANAYAN, Individually

_____
CHANA BANAYAN, Individually

[Signature Page to Joint and Several Guaranty of Payment Agreement]

IN WITNESS WHEREOF, each Guarantor and the Bank have caused this Guaranty to be duly executed and delivered as of the date first above written.

GUARANTORS:

LEWIS COUNTY DAIRY CORP.

By: _____
     Name:
     Title:

SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.

By: _____
     Name:

_____
MOISE BANAYAN, Individually

_____
CHANA BANAYAN, Individually

[Signature Page to Joint and Several Guaranty of Payment Agreement]

BANK:

SIGNATURE BANK

By: _____
Name: Thomas Kasulka
Title: SVP, group Director

[Signature Page to Joint and Several Guaranty of Payment Agreement]

# EXHIBIT N

*EXECUTION VERSION*

## SECURITY AGREEMENT

This SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of August 27, 2007, made by AHAVA FOOD CORP., a New York corporation ("**Ahava**"), ST. LAWRENCE FOOD CORP., a New York corporation ("**SLF**"), LEWIS COUNTY DAIRY CORP., a New York corporation ("**LCD**"), and SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC., a New York corporation ("**Schwartz**" and, together with Ahava, SLF and LCD, collectively, the "**Grantors**" and each, individually, a "**Grantor**"), in favor of SIGNATURE BANK, having an office at 565 Fifth Avenue, New York, New York 10017 (together with its successors and assigns, herein called the "**Bank**").

### RECITALS:

A.     Reference is made to the Forbearance Agreement, dated as of June 11, 2007, as amended by a Joinder Agreement, Waiver and First Amendment to Forbearance Agreement, dated as of the date hereof (as the same may be further amended, amended and restated, modified or supplemented from time to time, the "**Forbearance Agreement**"), by and among the Grantors, Moise Banayan ("**MB**"), Chana Banyan ("**CB**"), Yoni Realty, LLC ("**Yoni**"), and the Bank.

B.     Reference is made to the Promissory Note, dated the date hereof, made by SLF and Ahava (collectively and individually referred to herein as the "**Borrower**"), payable to the order of the Bank in the original principal amount of $1.75 million (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Forbearance Note**").

C.     Pursuant to the Forbearance Note and Section 8 of the Forbearance Agreement, the Bank has agreed to make a loan to the Borrower on a joint and several basis, on and subject to the terms and conditions set forth therein.

D.     The Grantors (other than SLF and Ahava), MB and CB have, pursuant to the Joint and Several Guaranty of Payment Agreement, unconditionally guaranteed the Obligations (defined below).

E.     Each Grantor will receive substantial benefits from the execution, delivery, and performance of the obligations of the Forbearance Loan Documents (as defined in the Forbearance Agreement) and each is, therefore, willing to enter into this Agreement.

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor and the Bank hereby agree as follows:

### AGREEMENT:

1.     <u>Security Interest; Definitions.</u>

(a)     As security for the due and punctual payment and performance of any and all of the present and future Obligations (defined below), each Grantor hereby collaterally assigns, mortgages, pledges, hypothecates and grants to the Bank a first lien on and security interest in (subject only to Permitted Encumbrances (defined below)) all assets of such Grantor set forth, referred to, or listed on, <u>Schedule I</u> hereto and made a part hereof (all such assets being hereinafter referred to as the "**Collateral**").

(b)    Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Forbearance Note.

(c)    As used herein, the following terms shall have the following meanings:

"**Account Debtor**" has the meaning set forth in Section 7(e) below.

"**Agreement**" means this Security Agreement, including all schedules, exhibits and annexes hereto, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Borrower**" has the meaning set forth in the recitals hereto.

"**Collateral**" has the meaning set forth in Section 1(a) above.

"**Event of Default**" has the meaning set forth in Section 8 below.

"**Forbearance Agreement**" has the meaning set forth in the recitals hereto.

"**Forbearance Note**" has the meaning set forth in the recitals hereto.

"**Obligations**" has the meaning set forth in the Forbearance Note.

"**Permitted Encumbrances**" means (i) "Permitted Encumbrances" (as such term is defined in the Master Credit Agreement (as defined in the Forbearance Agreement)) and (ii) Liens (as such term is defined in the Master Credit Agreement) created in favor of the Bank securing the Obligations.

2.    **Title; Liens and Encumbrances.**

Each Grantor represents and warrants that such Grantor is, or to the extent that this Agreement states that the Collateral is to be acquired after the date hereof, will be, the owner of the Collateral, having good and marketable title thereto, free from any and all liens, security interests, encumbrances and claims, other than Permitted Encumbrances; no Grantor will create or assume or permit to exist any such lien, security interest, encumbrance or claim on or against the Collateral except for Permitted Encumbrances, and such Grantor will promptly notify the Bank of any such other claim, lien, security interest or other encumbrance, made or asserted in writing against the Collateral and will defend the Collateral against any claim, lien, security interest or other encumbrance, other than Permitted Encumbrances.

3.    **Representations and Warranties; Location of Collateral and Records; Business and Trade Names.**

(a)    Each Grantor represents and warrants that it has no place of business, offices where such Grantor's books of account and records are kept, or places where the Collateral consisting of goods (including equipment and inventory) is used, stored or located, except as set forth on Schedule II hereto, and covenants that such Grantor will promptly notify the Bank of any change in the foregoing representation. Each Grantor shall at all times maintain its records as to the Collateral at its chief place of business at the address referred to on Schedule II and at none other. Each Grantor further covenants that except for books and records delivered to the Bank or an agent for the Bank, no

2

Grantor will store, use or locate any of the Collateral consisting of books and records at any place other than as listed on Schedule II hereto.

(b)    Each Grantor represents and warrants that it currently uses no business or trade names, except as set forth on Schedule II hereto, and covenants that such Grantor will promptly notify the Bank, in sufficient detail, of any changes in, additions to, or deletions from the business or trade names used by such Grantor for billing purposes.

(c)    Each Grantor represents and warrants that to its knowledge it has complied and is in compliance in all material respects with all applicable provisions of the Fair Labor Standards Act, including, without limitation, the minimum wage and overtime rules of such Act, and covenants each Grantor will continue to comply with such Act.

4.    <u>Perfection of Security Interest.</u>

Each Grantor will cooperate with the Bank in the Bank's filing of one or more financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law, in each case in order to perfect the Bank's security interest in the Collateral, in form satisfactory to the Bank. Each Grantor will pay all filing or recording costs with respect thereto, and all costs of filing or recording this Agreement or any other instrument, agreement or document executed and delivered pursuant hereto (including the cost of all federal, state or local mortgage, documentary, stamp or other similar taxes), in each case, in all public offices where filing or recording is deemed by the Bank to be necessary or desirable. Each Grantor hereby authorizes the Bank to take all action (including, without limitation, the filing of any Uniform Commercial Code Financing Statements or amendments thereto without the signature of such Grantor) that the Bank may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this Agreement.

5.    <u>General Covenants.</u>

Each Grantor shall:

(a)    furnish the Bank from time to time at the Bank's request written statements and schedules further identifying and describing the Collateral in such detail as the Bank may reasonably require;

(b)    advise the Bank promptly, in sufficient detail, of any substantially adverse change in the value of the Collateral, and of the occurrence of any event that is reasonably likely to have a material adverse effect on the value of the Collateral or on the Bank's security interest therein;

(c)    comply in all material respects with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, applicable to the Collateral or any part thereof or to the operation of such Grantor's business, provided that such Grantor may contest any acts, rules, regulations, orders and directions of such bodies or officials in any reasonable manner that will not, in the Bank's opinion, adversely affect its rights or the priority of its security interest in any of the Collateral;

(d)    perform and observe in all material respects all covenants, restrictions and conditions contained in any document, instrument or agreement executed in connection herewith providing for payment of taxes, maintenance of insurance and otherwise relating to the Collateral, as though such covenants, restrictions and conditions were fully set forth in this Agreement;

3

(e)     promptly notify the Bank of all disputes with account debtors involving amounts in excess of $25,000; and

(f)     promptly execute and deliver to the Bank such further deeds, mortgages, assignments, security agreements or other instruments, documents, certificates and assurances and take such further action as the Bank may from time to time in its sole discretion deem necessary to perfect, protect or enforce its security interest in the Collateral or otherwise to effectuate the intent of this Agreement and the other Forbearance Loan Documents.

6.     <u>Assignment of Insurance.</u>

At or prior to the execution hereof, the Grantors shall deliver to the Bank copies of, or certificates of the issuing companies with respect to, endorsements of any and all policies of insurance owned by any of the Grantors covering or in any manner relating to the Collateral, in form and substance reasonably satisfactory to the Bank, naming the Bank as an additional insured party as its interest may appear and indicating that no such policy will be cancelled or otherwise terminated without at least thirty (30) days' prior written notice from the insurer to the Bank and the Grantors agree that such no such policy will be reduced in coverage or amount without at least thirty (30) days' prior written notice to the Bank. As further security for the due payment and performance of the Obligations, the Grantors hereby collaterally assign to the Bank all sums, including returned or unearned premiums, that may become payable under or in respect of any policy of insurance owned by any Grantor covering or in any manner relating to the Collateral, and each Grantor hereby directs each insurance company issuing any such policy to make payment of sums directly to the Bank after the occurrence and during the continuance of an Event of Default (defined below). Each Grantor hereby appoints the Bank as its attorney-in-fact and authorizes the Bank in its or in the Bank's name to endorse any check or draft representing any such payment and to execute any proof of claim, subrogation receipt and any other document required by such insurance company as a condition to or otherwise in connection with such payment, and, upon the occurrence and during the continuation of an Event of Default, to cancel, assign or surrender any such policies. All such sums received by the Bank shall be applied by the Bank to satisfaction of the Obligations or, to the extent that such sums represent unearned premiums in respect of any policy of insurance on the Collateral refunded by reason of cancellation, toward payment for similar insurance protecting the respective interests of the Grantors and the Bank, or as otherwise required by applicable law, and to the extent not so applied shall be paid over to the Grantors entitled thereto.

7.     <u>Collections.</u>

(a)     Subject to the other provisions of this Section 7, each Grantor may collect all checks, drafts, cash or other remittances (i) in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, (ii) in payment of any Collateral sold, transferred, leased or otherwise disposed of, or (iii) in payment of or in account of its accounts, contracts, contract rights, notes, drafts, acceptances, general intangibles, choses in action and all other forms of obligations relating to any of the Collateral so sold, transferred, or leased or otherwise disposed of, and all of the foregoing amounts so collected shall be held in trust by such Grantor for, an the property of, the Bank and shall not be commingled with other funds, money or property of such Grantor.

(b)     After the occurrence and during the continuance of an Event of Default, upon the written demand of the Bank for the payment of any Obligations, each Grantor will immediately upon receipt of all such checks, drafts, cash or other remittances in payment of any of its accounts, contract rights or general intangibles constituting part of the Collateral, deliver any such items to the

4

Bank accompanied by a remittance report in form supplied or approved by the Bank, such items to be delivered to the Bank in the same form received, endorsed or otherwise assigned by such Grantor where necessary to permit collection of such items and, regardless of the form of such endorsement. Each Grantor hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other notices with respect thereto.

      (c)     Each Grantor will immediately upon receipt of all checks, drafts, cash or other remittances in payment for any Collateral sold, transferred, leased or otherwise disposed of, or in payment or on account of its accounts, contracts, contract rights, notes, drafts, acceptances, general intangibles, choses in action and all other forms of obligations relating to any of the Collateral so sold, transferred, leased or otherwise disposed of, deliver any such items to the Bank accompanied by a remittance report in form supplied or approved by the Bank, such items to be delivered to the Bank in the same form received, endorsed or otherwise assigned by such Grantor where necessary to permit collection of such items and, regardless of the form of such endorsement, such Grantor hereby waives presentment, demand, notice of dishonor, protest, notice of protest and all other notices with respect hereto.

      (d)     Each Grantor will promptly notify the Bank in writing of the return or rejection of any goods represented by any accounts, contract rights or general intangibles and such Grantor shall forthwith account therefore to the Bank in cash without demand or notice and until such payment has been received by the Bank, such Grantor will receive and hold all such goods separate and apart, in trust for an subject to the security interest in favor of the Bank, and the Bank is authorized to sell, for such Grantor's account and at such Grantor's sole risk, all or any part of such goods.

      (e)     After the occurrence and during the continuance of an Event of Default, each Grantor hereby authorizes and directs each Person (each, an "**Account Debtor**") liable to such Grantor in respect of such Grantor's accounts, contract rights or general intangibles, upon the occurrence and during the continuance of an Event of Default and upon notice from the Bank to such Account Debtor, to pay directly to the Bank all monies as and when due such Grantor from such Account Debtor, and upon such notice to such Account Debtor, to draw and deliver to the order of the Bank any and all checks and other instruments for the payment of or in respect of such Grantor's accounts, contract rights or general intangibles, and to accept the receipts of the Bank therefor.

      (f)     All of the foregoing remittances shall be applied and credited by the Bank first to satisfaction of the Obligations then due and payable or as otherwise required by applicable law, and to the extent not so credited or applied, shall be paid over to the applicable Grantor.

    **8.**    <u>Events of Default</u>.

      Upon the occurrence and during the continuation of any of the following (each an "<u>Event of Default</u>"):

      (a)     any Event of Default (as defined in the Forbearance Note) shall occur;

      (b)     non-payment when due of any of the Obligations;

      (c)     the failure of a Grantor to perform any agreement on its part to be performed (other than the agreements, obligations and covenants referred to in the foregoing items (a) and (b)) hereunder or under any of the Forbearance Loan Documents, governing any of the Obligations and

such failure shall remain unremedied for a period of thirty (30) days following the occurrence of such failure;

(d)     at any time any representation in any financial or other statement of a Grantor (delivered to the Bank by or on behalf of a Grantor) is untrue or omits any material fact;

(e)     if a material adverse change shall occur in the financial condition of a Grantor, or a guarantor of any of the Obligations;

(f)     if a Grantor (or any endorser, guarantor or surety of or upon any of the Obligations) who is an individual shall die or become disabled, or (a Grantor which is a partnership, limited liability company or corporation) shall be dissolved or shall become insolvent (however evidenced);

(g)     upon the suspension of business by a Grantor, or upon the issuance of any warrant, process, or order of attachment, garnishment of lien and/or the filing of a lien as a result thereof against any of the property of a Grantor (or any endorser, guarantor or surety of or upon any of the Obligations) where the amount claimed is in excess of $50,000 in the aggregate; or

(h)     upon the making by a Grantor (or any endorser, guarantor or surety) of an assignment for the benefit of creditors under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, composition, receivership, liquidation or dissolution law or statute of any jurisdiction,

then the Bank shall have the right, with or without notice to each Grantor, as to any or all of the Collateral, by any available judicial procedure or without judicial process, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral, to direct payment under any equipment lease, account, general intangible or other item to be made directly to the Bank, and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, each Grantor agrees that the Bank shall have the right to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions, all as the Bank in its sole discretion may deem advisable, and it shall have the right to purchase at any such sale; and, if any Collateral shall require rebuilding, repairing, maintenance, preparation, or is in process or other unfinished state, the Bank shall have the right, at its option, to do such rebuilding, repairing, preparation, processing or completion of manufacturing, for the purpose of putting the Collateral in such saleable or disposable form as it shall deem appropriate. At the Bank's request, each Grantor shall assemble the Collateral and make it available to the Bank at places that the Bank shall select, whether at such Grantor's premises or elsewhere, and make available to the Bank, without rent, all of such Grantor's premises and facilities for the purpose of the Bank's taking possession of, removing or putting the Collateral in saleable or disposable form. The proceeds of any such sale, lease or other disposition of the Collateral shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like, and to the reasonable attorneys' fees and legal expenses incurred by the Bank, and then to satisfaction of the Obligations, and to the payment of any other amounts required by applicable law, after which the Bank shall account to each Grantor for any surplus proceeds. If, upon the sale, lease or other disposition of the Collateral, the proceeds thereof are insufficient to pay all amounts to which the Bank is legally entitled, each Grantor will be liable for the deficiency, together with interest thereon, at the rate prescribed in the Forbearance Note, and the reasonable fees of any

6

attorneys employed by the Bank to collect such deficiency. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands against the Bank arising out of the repossession, removal, retention or sale of the Collateral.

Notwithstanding anything contained above in this Section 8 to the contrary, to the extent that an Existing Default or an Additional Default (as defined in the Forbearance Agreement) constitutes an Event of Default, then such Event of Default shall be deemed waived to the same extent as such Existing Default or Additional Default is so waived pursuant to the Forbearance Agreement, and shall be subject to the Forbearance Agreement.

9.    Costs and Expenses.

Any and all fees, out of pocket costs and expenses, of whatever kind or nature, including the reasonable attorneys' fees and legal expenses incurred by the Bank, in connection with the preparation of this Agreement and all other documents relating hereto and the consummation of this transaction, the filing or recording of financing statements and other documents (including all taxes in connection therewith) in public offices, the payment or discharge of any taxes, insurance premiums, encumbrances or otherwise protecting, maintaining or preserving the Collateral, or the enforcing, foreclosing, retaking, holding, storing, processing, selling or otherwise realizing upon the Collateral and the Bank's security interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions or proceedings arising out of or related to the transaction to which this Agreement relates, shall be borne and paid by the Grantors promptly after written demand by the Bank and until so paid shall be added to the principal amount of the Obligations and shall bear interest at the default rate set forth in the Forbearance Note of the amount overdue or, if applicable, as prescribed in the case of a default or event of default under documentation governing other Obligations.

10.    Power of Attorney.

Each Grantor authorizes the Bank and does hereby make, constitute and appoint the Bank, and any officer or agent of the Bank, with full power of substitution, as such Grantor's true and lawful attorney-in-fact, with power, in its own name or in the name of such Grantor: (a) to endorse any notes, checks, drafts, money orders, or other instruments of payment (including payments payable under or in respect of any policy of insurance) in respect of the Collateral that may come into possession of the Bank; (b) to sign and endorse any invoice, freight or express bill, bill of lading, storage or warehouse receipts, drafts against any debtor, assignments, verifications and notices in connection with accounts, and other documents relating to Collateral; (c) to pay or discharge any taxes, liens, security interests or other encumbrances at any time levied or placed on or threatened against the Collateral; (d) to demand, collect, receipt for, compromise, settle and sue for monies due in respect of the Collateral; (e) to open any safe deposit box or bank vault in order to take possession of any Collateral; and (f) generally, to do, at the Bank's option and at such grantor's expense, at any time, or from time to time, all acts and things that the Bank deems necessary to protect, preserve and realize upon the Collateral and the Bank's security interest therein; and such grantor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof; provided, however, that none of the actions described in clauses (a) through (e) of this sentence may be taken by the Bank unless and until an Event of Default has occurred and is continuing. This power of attorney shall be irrevocable for the term of this Agreement and thereafter as long as any of the Obligations shall be outstanding.

11.    Notices.

HF 363970lv.7 #06406/0023

All notices and other communications pursuant to this Agreement shall be given and deemed given in the manner prescribed by the Forbearance Agreement (and the applicable portion of the Forbearance Agreement is hereby incorporated herein by reference). Any party hereto may change the Person, address or telecopier number to whom or which notices are to be given hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed.

12.    <u>Other Security</u>.

To the extent that the Obligations are now or hereafter secured by property other than the Collateral or by the guarantee, endorsement or property of any other Person then the Bank shall have the right in its sole discretion to pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of the Bank's rights and remedies hereunder.

13.    <u>Deposits</u>.

Any and all deposits or other sums at any time credited by or due from the Bank to a Grantor, whether in regular or special depository accounts or otherwise, shall at all times constitute additional collateral for the Obligations, and, so long as an Event of Default shall have occurred and be continuing, may be set-off by the Bank against any Obligations at any time whether or not they are then due and whether or not other collateral held by the Bank is considered to be adequate.

14.    <u>Governing Law</u>.

This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to principles of conflict of laws except as set forth in Section 5-1401 of the New York General Obligation Law.

15.    <u>Miscellaneous</u>.

(a)    Beyond the safe custody thereof, the Bank shall have no duty as to the collection of any Collateral in its possession or control or in the possession or control of any agent or nominee of the Bank, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(b)    No course of dealing between any Grantor and the Bank, nor any failure to exercise, nor any delay in exercising, on the part of the Bank, any right, power or privilege hereunder or under any of the other Forbearance Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(c)    All of the Bank's rights and remedies with respect to the Collateral, whether established hereby or by the other Forbearance Loan Documents, or by any other agreements, instruments or documents or by law, shall be cumulative and may be exercised singly or concurrently.

(d)    The provisions of this Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

8

(e)     This Agreement is subject to modification only by a writing signed by the parties hereto.

(f)     The benefits and burdens of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; provided, however, that the rights and obligations of any Grantor under this Agreement shall not be assigned or delegated without the prior written consent of the Bank, and any purported assignment or delegation without such consent shall be void.

(g)     EACH GRANTOR AND THE BANK MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER FORBEARANCE LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR THE BANK TO EXTEND CREDIT.

(h)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (A) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements of modifications set forth herein) (B) any reference herein to any Person shall be construed to include such Person's successors and assigns, (C) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (D) all references herein to Sections and Schedules shall be construed to refer to Sections and Schedules of this Agreement, and (E) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**16.     Term of Agreement.**

The term of this Agreement shall commence on the date hereof and this Agreement shall continue in full force and effect, and be binding upon each Grantor, until all of the Obligations have been fully paid and performed (and any lending commitment of the Bank to a Grantor have been terminated), and such payment and performance (and termination) have been acknowledged in writing by the Bank, whereupon this Agreement shall terminate.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

HF 3639701v.7 #06406/0023

IN WITNESS WHEREOF, each Grantor and the Bank have caused this Agreement to be duly executed and delivered as of the date first above written.

GRANTORS:

**AHAVA FOOD CORP.**

By: _____
Name:
Title:

**ST. LAWRENCE FOOD CORP.**

By: _____
Name:
Title:

**LEWIS COUNTY DAIRY CORP.**

By: _____
Name:
Title:

**SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.**

By: _____
Name:
Title:

[Signature Page to Security Agreement]

BANK:

**SIGNATURE BANK**

By: _[signature]_
Name: Thomas Kasulka
Title: SVP, Group Director

[Signature Page to Security Agreement]

## SCHEDULE I TO SECURITY AGREEMENT

(a)    All personal properties, personal assets and rights of each Grantor, wherever located, whether now owned or hereafter acquired or arising, including, without limitation, all personal property and fixtures of every kind and nature, all goods (including, without limitation, inventory, equipment and any accessions thereto), all instruments (including, without limitation, promissory notes), all documents, all accounts, all chattel paper (whether tangible or electronic), all deposit accounts, all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), all securities and all other investment property, all supporting obligations, any other contract rights or rights to the payment of money (including, without limitation, the right to receive all payments in connection with any and all equipment leases made by each Grantor as lessor), all insurance claims and proceeds, all commercial tort claims, and all general intangibles, including, without limitation, all payment intangibles, all income, cash, dividends, redemptions, return of capital or other distributions (in each case consisting of cash, cash equivalents or marketable securities), all patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, trade marks, customer lists and goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which such Grantor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of such Grantor, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics, and all books and records relating to any of the foregoing.

(b)    Any and all additions and accessions to the foregoing, all substitutions and replacements therefor and all products and proceeds thereof.

All terms defined in the Uniform Commercial Code of the State of New York and used herein shall have the same definitions herein as now specified therein and as such terms may hereafter be amended; provided, however, the term "instrument" shall be such term as defined in Article 9 of the Uniform Commercial Code of the State of New York rather than Article 3.

## SCHEDULE II TO SECURITY AGREEMENT

**Grantors' Chief Places of Business:**

Ahava:

110 Beard Street, Brooklyn, NY 11231

SLF:

30 Main Street, Ogdenburg, NY 13669

LCD:

7705 State Route 812, Lowville, NY 13367

Schwartz:

110 Beard Street, Brooklyn, NY 11231

**Offices Where Records Are Kept:**

Ahava:

110 Beard Street, Brooklyn, NY 11231

SLF:

110 Beard Street, Brooklyn, NY 11231

LCD:

110 Beard Street, Brooklyn, NY 11231

Schwartz:

110 Beard Street, Brooklyn, NY 11231

**Other Locations Where Collateral Is Stored, Used or Located:**

Ahava:

110 Beard Street, Brooklyn, NY 11231

**SLF:**

110 Beard Street, Brooklyn, NY 11231

**LCD:**

110 Beard Street, Brooklyn, NY 11231

**Schwartz:**

110 Beard Street, Brooklyn, NY 11231

<u>**Business and Trade Names Used by Grantors:**</u>

**Ahava:**

Ahava Food Corp.

Morning Select

Slim U

Ahava

New Square

Best Mooo

Primo

Miki

Kahal

Table Select

**SLF:**

St. Lawrence Food Corp.

**LCD:**

Lewis County Dairy Corp.

**Schwartz:**

None

- 14 -

# EXHIBIT O

## SECOND AMENDMENT TO FORBEARANCE AGREEMENT

This SECOND AMENDMENT TO FORBEARANCE AGREEMENT (this "Agreement"), dated as of September 11, 2007, is entered into by and among AHAVA FOOD CORP., a New York corporation ("Ahava"), LEWIS COUNTY DAIRY CORP., a New York corporation ("LCD"; together with Ahava, the "Borrowers" and, individually a "Borrower"), ST. LAWRENCE FOOD CORP., a New York corporation ("SLF"), YONI REALTY, LLC, a New York limited liability company ("Yoni"), MOISE BANAYAN (a/k/a MOIZ), an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("MB"), CHANA (a/k/a ANA) BANAYAN, an individual residing at 51 Park Boulevard, Monsey, New York 10952 ("AB"), SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC., a New York corporation ("Schwartz", and together with the Borrowers, SLF, Yoni and MB, and AB the "Obligors", and each an "Obligor"), and SIGNATURE BANK (the "Lender").

### RECITALS

WHEREAS, the Obligors and the Lender are parties to the Forbearance Agreement, dated as of June 11, 2007 (as amended, supplemented or otherwise modified to but not including the date hereof, the "Forbearance Agreement"), pursuant to which, subject to the terms and conditions set forth therein, the Lender has forbeared from exercising its rights and remedies under the Loan Documents (as defined in the Forbearance Agreement).

WHEREAS, the Obligors and Lender desire to amend certain provisions of the Forbearance Agreement as set forth herein, on and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants and conditions herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Defined Terms. All capitalized terms used herein and not defined herein shall have the meanings assigned to them in the Forbearance Agreement.

2.    Amendment to the Forbearance Agreement. Section 1 of the Forbearance Agreement is hereby amended as follows: the defined term "Termination Date" is hereby amended and restated in its entirety to read as follows: "Termination Date" means October 5, 2007.

3.    Conditions Precedent. This Agreement and the amendment set forth in Section 2 hereof, shall become effective as of the date hereof (the "Amendment Effective Date") when the Lender shall have received counterparts of this Agreement duly executed and delivered by each Obligor.

4.    Reaffirmation, Ratification and Release. In order to induce the Lender to enter this Agreement:

(a)    The Obligors hereby confirm the validity and effectiveness of any guaranties made by the Obligors in favor of the Lender and of any other Transaction Documents to which any of the Obligors is a party, and hereby reaffirm all of their respective obligations under such guaranties and the other Transaction Documents to which they are a party.

(b)    The Obligors confirm and ratify in all respects the validity and effectiveness of any security agreements made by the Obligors in favor of the Lender and confirm that such security agreements secure payment of the Transaction Obligations.

(c)    The Obligors hereby reaffirm all of their respective duties, obligations and liabilities under the Transaction Documents.

(d)    The Obligors hereby ratify and reaffirm all of the representations and warranties set forth in the Transaction Documents, and confirm that each such representation and warranty is true and correct in all material respects as of the date hereof (except to the extent that such representations and warranties expressly relate to an earlier date, in which case, such representations and warranties are true and correct as of such date), except such representations and warranties that are rendered untrue as a result of the existence of the Existing Defaults and the Additional Defaults.

(e)    Each Obligor hereby represents and warrants to the Lender that as of the date hereof and as of the Amendment Effective Date, none of the Obligors has any defense, claim, counterclaim, right of setoff, or cause of action of any kind whatsoever against the Lender or any of its past, present or future agents, employees and Affiliates. Each Obligor hereby forever releases the Lender and each of its past, present and future agents, employees and Affiliates from any and all claims, demands, defenses, counterclaims and causes of action, contingent or non-contingent, known or unknown, on account of any and all matters of any kind, nature or thing arising from or with respect to any of the Transaction Documents and any transactions contemplated therein and/or any action or inaction of the Lender in connection with any of the foregoing, from the beginning of the world through the date hereof.

(f)    The amendment set forth herein is limited precisely as written and shall not be deemed to be an amendment to, consent to or a waiver of any other term or condition of any of the Transaction Documents.

5.    Miscellaneous.

(a)    Successors and Assigns.  The provisions of Section 13 of the Forbearance Agreement are hereby incorporated herein, *mutatis mutandis,* as if a part hereof.

(b)    Amendment.  Neither this Agreement nor any provision hereof may be waived, amended, changed or modified except pursuant to an agreement complying with Section 14 of the Forbearance Agreement.

(c)    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which take together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

(d)    Severability.  Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such prohibition and unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

2

      (e)    <u>Law Governing</u>. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

      (f)    <u>Consent to Jurisdiction and Waiver of Jury Trial</u>. The provisions of Section 22 and Section 23 of the Forbearance Agreement are hereby incorporated herein, *mutatis mutandis*, as if a part hereof.

        [REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

3

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the day and year first above written.

AHAVA FOOD CORP.

By: _____
Name: MOISE BANAYAN
Title:

LEWIS COUNTY DAIRY CORP.

By: _____
Name: MOISE BANAYAN
Title:

ST. LAWRENCE FOOD CORP.

By: _____
Name: MOISE BANAYAN
Title:

YONI REALTY, LLC

By: _____
Name: MOISE BANAYAN
Title:

SCHWARTZ & SONS QUALITY DISTRIBUTORS, INC.

By: _____
Name: MOISE BANAYAN
Title:

_____
MOISE (a/k/a MOIZ) BANAYAN, as an individual

_____
CHANA (a/k/a Ana) BANAYAN, as an individual

[Signature Page to Second Amendment to Forbearance Agreement]

HF 3800566v.3 #06406/0023

SIGNATURE BANK

By: _____

Name: Robert K. Brett

Title: SVP.

[Signature Page to Second Amendment to Forbearance Agreement]

HF 3800566v.3 #06406/0023

# EXHIBIT P
# (Part 1 of 5)

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583386          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583386 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP        TOTAL | | .00 | |

SIGN 00017

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583386          0

MONOGRAM CHECKING          1500583386                                    ?

Summary

  Previous Balance as of March    01, 2007                        .00

  There was no deposit activity during this statement period

  Ending Balance as of   March    31, 2007                        .00

Rates for this statement period - Overdraft
Mar 01, 2007   12.250000 %

SIGN 00018

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        174

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal.  ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500812660    MONOGRAM CHECKING | | 240,282.87 | 4,007.27 |
| RELATIONSHIP | TOTAL | | 4,007.27 |

SIGN 00019

```
                                              PRIVATE CLIENT GROUP 161
                                              565 FIFTH AVENUE
                                              NEW YORK, NY 10017


        AHAVA FOOD CORP.                    9-161
        OPERATING ACCT.
        110 BEARD ST.
        BROOKLYN NY  11231

                                        For info call our toll-free Signature Line
                                        1-866-sigline or visit signatureny.com

                                            Primary Account: 1500812660        174
```

MONOGRAM CHECKING          1500812660                                              ?

Summary

```
     Previous Balance as of March      01, 2007                          240,282.87
        42 Credits                                                     2,673,829.10
       259 Debits                                                      2,910,104.70
     Ending Balance as of    March    31, 2007                             4,007.27
```

Deposits and Other Credits

```
Mar 01   DEPOSIT                                                           92,217.88
Mar 01   ZBA/TBA TRANSFER IN                                              103,904.94
         ZBA/SWEEP TRANSFER FROM      1500583785
Mar 02   DEPOSIT                                                              833.00
Mar 05   DEPOSIT                                                              187.80
Mar 05   DEPOSIT                                                          145,258.37
Mar 06   DEPOSIT                                                            2,713.30
Mar 06   DEPOSIT                                                          118,230.24
Mar 07   DEPOSIT                                                           46,368.78
Mar 08   INCOMING WIRE TRANSFER                                            5,407.95
         REF#  20070308B6B7261F00035403081549FT01
         FROM: GMB DAIRY INC              ABA:    TDOMCATTT
         BANK: TORONTO DOMINION BANK
Mar 08   DEPOSIT                                                           71,237.01
Mar 08   WEB TRANSFER    WEB CREDIT                                        86,293.10
         WEB XFR FROM: 1500583785
Mar 09   DEPOSIT                                                           93,243.91
Mar 12   DEPOSIT                                                            1,500.00
Mar 12   DEPOSIT                                                          113,267.47
Mar 13   DEPOSIT                                                           54,963.72
Mar 14   DEPOSIT                                                           99,694.62
Mar 14   WEB TRANSFER    WEB CREDIT                                         7,029.88
         WEB XFR FROM: 1500583785
Mar 15   DEPOSIT ADJUSTMENT                                                     .03
Mar 15   INCOMING WIRE TRANSFER                                           19,766.00
         REF#  20070315B6B7261F00043203151657FT01
         FROM: TECNOLOGIAS NARCISO, S.A. DE C.V.  ABA:   890011161
```

SIGN 00020

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660      174

| Date | Description | |
|------|-------------|--:|
| | BANK: BASE INTERNACIONAL CASA DE BOLSA | |
| Mar 15 | DEPOSIT | 108,625.79 |
| Mar 15 | WEB TRANSFER     WEB CREDIT | 40,164.29 |
| | WEB XFR FROM: 1500583785 | |
| Mar 16 | DEPOSIT | 21,300.00 |
| Mar 16 | DEPOSIT | 119,322.27 |
| Mar 19 | DEPOSIT | 2,398.57 |
| Mar 19 | DEPOSIT | 10,991.26 |
| Mar 19 | DEPOSIT | 118,811.90 |
| Mar 20 | INCOMING WIRE TRANSFER | 1,309.19 |
| | REF#  20070320B6B7261F00027803201541FT01 | |
| | FROM: FOODFEST INTERNATIONAL 2000 INC    ABA: | |
| | BANK: RBC CENTRE ST BR THORNHILL | |
| Mar 20 | DEPOSIT | 5,250.00 |
| Mar 20 | DEPOSIT | 104,390.12 |
| Mar 21 | DEPOSIT | 91,311.06 |
| Mar 22 | DEPOSIT | 167,814.02 |
| Mar 23 | DEPOSIT | 5,572.99 |
| Mar 23 | DEPOSIT | 21,300.00 |
| Mar 23 | DEPOSIT | 142,338.34 |
| Mar 26 | DEPOSIT | 255,552.94 |
| Mar 27 | DEPOSIT | 113,086.56 |
| Mar 28 | DEPOSIT | 3,353.06 |
| Mar 28 | DEPOSIT | 169,677.70 |
| Mar 29 | WEB TRANSFER     WEB CREDIT | 24,221.57 |
| | WEB XFR FROM: 1500583785 | |
| Mar 30 | INCOMING WIRE TRANSFER | 7,005.88 |
| | REF#  20070330B6B7261F00056503301701FT01 | |
| | FROM: GMB DAIRY INC              ABA:    TDOMCATTT | |
| | BANK: TORONTO DOMINION BANK | |
| Mar 30 | WEB TRANSFER     WEB CREDIT | 239.17 |
| | WEB XFR FROM: 1500583785 | |
| Mar 30 | WEB TRANSFER     WEB CREDIT | 77,674.42 |
| | WEB XFR FROM: 1500583785 | |

Withdrawals and Other Debits

| Date | Description | |
|------|-------------|--:|
| Mar 01 | WITHDRAWAL       UNUSED FEE | 24.63 |
| Mar 01 | RETURNED DEPOSIT ITEM | 187.80 |

SIGN 00021

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


AHAVA FOOD CORP.                          9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          174

| Date | Description | | | Amount |
|---|---|---|---|---|
| Mar 01 | AUTOMATED PAYMENT      ck/ref no.     5852349 | | | 6,624.97 |
| | STATE FARM RO 27    SFPP          17 S 1017043617 | | | |
| Mar 01 | ZBA/TBA TRANSFER OUT | | | 514.60 |
| | ZBA/SWEEP TRANSFER TO      1500583416 | | | |
| Mar 01 | ZBA/TBA TRANSFER OUT | | | 1,092.31 |
| | ZBA/SWEEP TRANSFER TO      1500583408 | | | |
| Mar 01 | ZBA/TBA TRANSFER OUT | | | 8,418.67 |
| | ZBA/SWEEP TRANSFER TO      1500583769 | | | |
| Mar 01 | ZBA/TBA TRANSFER OUT | | | 23,435.25 |
| | ZBA/SWEEP TRANSFER TO      1500583750 | | | |
| Mar 02 | WITHDRAWAL       PRIN&INTPYMT | | | 41,772.48 |
| Mar 02 | PRE-AUTHORIZED WD | | | 103,904.94 |
| Mar 02 | RETURNED DEPOSIT ITEM | | | 590.00 |
| Mar 02 | ZBA/TBA TRANSFER OUT | | | 750.00 |
| | ZBA/SWEEP TRANSFER TO      1500583769 | | | |
| Mar 02 | ZBA/TBA TRANSFER OUT | | | 5,782.57 |
| | ZBA/SWEEP TRANSFER TO      1500583750 | | | |
| Mar 02 | ZBA/TBA TRANSFER OUT | | | 10,324.91 |
| | ZBA/SWEEP TRANSFER TO      1500583408 | | | |
| Mar 02 | ZBA/TBA TRANSFER OUT | | | 15,222.99 |
| | ZBA/SWEEP TRANSFER TO      1500583416 | | | |
| Mar 02 | ZBA/TBA TRANSFER OUT | | | 24,532.72 |
| | ZBA/SWEEP TRANSFER TO      1500812725 | | | |
| Mar 05 | DEPOSIT ADJUSTMENT | | | .04 |
| Mar 05 | RETURNED DEPOSIT ITEM | | | 788.80 |
| Mar 05 | RETURNED DEPOSIT ITEM | | | 1,924.50 |
| Mar 05 | ZBA/TBA TRANSFER OUT | | | 9,067.07 |
| | ZBA/SWEEP TRANSFER TO      1500583416 | | | |
| Mar 05 | ZBA/TBA TRANSFER OUT | | | 9,183.35 |
| | ZBA/SWEEP TRANSFER TO      1500583408 | | | |
| Mar 05 | ZBA/TBA TRANSFER OUT | | | 19,535.84 |
| | ZBA/SWEEP TRANSFER TO      1500583769 | | | |
| Mar 05 | ZBA/TBA TRANSFER OUT | | | 26,447.55 |
| | ZBA/SWEEP TRANSFER TO      1500583750 | | | |
| Mar 06 | WEB TRANSFER     WEB DEBIT | | | 1,000.00 |
| | WEB XFR TO: 1500583394 | | | |
| Mar 07 | WEB TRANSFER     WEB DEBIT | | | 1,585.93 |
| | WEB XFR TO: 1500583408 | | | |
| Mar 07 | WEB TRANSFER     WEB DEBIT | | | 5,116.29 |
| | WEB XFR TO: 1500583416 | | | |

SIGN 00022

Statement Period
From March   01, 2007
To   March   31, 2007
Page   5 of 10

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660      174

| Date | Description | |
|------|-------------|---|
| Mar 07 | WEB TRANSFER    WEB DEBIT | 9,942.71 |
| | WEB XFR TO: 1500583394 | |
| Mar 07 | WEB TRANSFER    WEB DEBIT | 12,554.78 |
| | WEB XFR TO: 1500583769 | |
| Mar 07 | WEB TRANSFER    WEB DEBIT | 14,148.18 |
| | WEB XFR TO: 1500583750 | |
| Mar 07 | WEB TRANSFER    WEB DEBIT | 132,400.07 |
| | WEB XFR TO: 1500583785 | |
| Mar 08 | PRE-AUTHORIZED WD | 1,097.42 |
| Mar 08 | DEPOSIT ADJUSTMENT | .05 |
| Mar 08 | RETURNED DEPOSIT ITEM | 331.00 |
| Mar 08 | RETURNED DEPOSIT ITEM | 1,500.00 |
| Mar 08 | RETURNED DEPOSIT ITEM | 2,260.75 |
| Mar 09 | WITHDRAWAL      I93058179 FEE | 239.17 |
| Mar 09 | WITHDRAWAL      I93058183 FEE | 546.08 |
| Mar 09 | DEPOSIT ADJUSTMENT | 1.26 |
| Mar 12 | DEPOSIT ADJUSTMENT | .87 |
| Mar 12 | RETURNED DEPOSIT ITEM | 291.00 |
| Mar 12 | RETURNED DEPOSIT ITEM | 2,107.57 |
| Mar 12 | WEB TRANSFER    WEB DEBIT | 115,189.54 |
| | WEB XFR TO: 1500583785 | |
| Mar 13 | DEPOSIT ADJUSTMENT | .48 |
| Mar 13 | WEB TRANSFER    WEB DEBIT | 90,811.56 |
| | WEB XFR TO: 1500583785 | |
| Mar 14 | RETURNED DEPOSIT ITEM | 3.00 |
| Mar 15 | AUTOMATED PAYMENT    ck/ref no.    6007804 | 710.50 |
| | NEW YORK LIFE    INS. PREM.    C7284671 | |
| Mar 16 | DEPOSIT ADJUSTMENT | .61 |
| Mar 16 | RETURNED DEPOSIT ITEM | 5,250.00 |
| Mar 19 | RETURNED DEPOSIT ITEM | 1,218.25 |
| Mar 19 | WEB TRANSFER    WEB DEBIT | 153,249.72 |
| | WEB XFR TO: 1500583785 | |
| Mar 20 | DEPOSIT ADJUSTMENT | .37 |
| Mar 20 | WEB TRANSFER    WEB DEBIT | 127,976.43 |
| | WEB XFR TO: 1500583785 | |
| Mar 21 | RETURNED DEPOSIT ITEM | 75.00 |
| Mar 21 | RETURNED DEPOSIT ITEM | 21,300.00 |
| Mar 21 | WEB TRANSFER    WEB DEBIT | 81,407.64 |
| | WEB XFR TO: 1500583785 | |

Statement Period
From March    01, 2007
To   March    31, 2007
Page   6  of  10

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


AHAVA FOOD CORP.                        9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        174

| Date | Description | | |
|---|---|---|---|
| Mar 22 | DEPOSIT ADJUSTMENT | | .15 |
| Mar 22 | WEB TRANSFER     WEB DEBIT | | 44,188.40 |
| | WEB XFR TO: 1500583785 | | |
| Mar 22 | AUTOMATED PAYMENT     ck/ref no.    6072536 | | 2,145.00 |
| | COMMERCIAL LEASE     LEASE PMT    516-0060045-000 | | |
| Mar 23 | DEPOSIT ADJUSTMENT | | 1.10 |
| Mar 23 | WEB TRANSFER     WEB DEBIT | | 156,153.09 |
| | WEB XFR TO: 1500583785 | | |
| Mar 26 | DEPOSIT ADJUSTMENT | | .40 |
| Mar 26 | RETURNED DEPOSIT ITEM | | 3,520.00 |
| Mar 26 | RETURNED DEPOSIT ITEM | | 3,723.95 |
| Mar 26 | WEB TRANSFER     WEB DEBIT | | 163,794.36 |
| | WEB XFR TO: 1500583785 | | |
| Mar 27 | DEPOSIT ADJUSTMENT | | .06 |
| Mar 27 | RETURNED DEPOSIT ITEM | | 1,000.00 |
| Mar 27 | RETURNED DEPOSIT ITEM | | 3,353.06 |
| Mar 27 | WEB TRANSFER     WEB DEBIT | | 205,059.81 |
| | WEB XFR TO: 1500583785 | | |
| Mar 28 | PRE-AUTHORIZED WD | | 4,415.83 |
| Mar 28 | RETURNED DEPOSIT ITEM | | 220.00 |
| Mar 28 | RETURNED DEPOSIT ITEM | | 436.80 |
| Mar 28 | RETURNED DEPOSIT ITEM | | 534.72 |
| Mar 28 | RETURNED DEPOSIT ITEM | | 1,672.00 |
| Mar 28 | RETURNED DEPOSIT ITEM | | 5,230.56 |
| Mar 28 | RETURNED DEPOSIT ITEM | | 21,300.00 |
| Mar 28 | WEB TRANSFER     WEB DEBIT | | 99,897.29 |
| | WEB XFR TO: 1500583785 | | |
| Mar 28 | AUTOMATED PAYMENT     ck/ref no.    6135211 | | 351.29 |
| | NEW YORK LIFE     INS. PREM.    62 860 529 | | |
| Mar 28 | AUTOMATED PAYMENT     ck/ref no.    6135194 | | 429.50 |
| | NEW YORK LIFE     INS. PREM.    48 227 452 | | |
| Mar 29 | RETURNED DEPOSIT ITEM | | 446.40 |
| Mar 29 | RETURNED DEPOSIT ITEM | | 500.00 |
| Mar 29 | AUTOMATED PAYMENT     ck/ref no.    6153703 | | 6,624.97 |
| | STATE FARM RO 27    SFPP    17 S 1017043617 | | |
| Mar 30 | WITHDRAWAL     I93058179 FEE | | 239.17 |
| Mar 30 | WITHDRAWAL     I93058183 FEE | | 545.75 |
| Mar 30 | RETURNED DEPOSIT ITEM | | 140.27 |
| Mar 30 | RETURNED DEPOSIT ITEM | | 1,000.00 |

SIGN 00024

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        174

| Date | Description | |
|------|-------------|--|
| Mar 30 | OD Finance Charge | 324.13 |

Checks by Serial Number

| Date | Serial | Amount | Date | Serial | Amount |
|------|--------|--------|------|--------|--------|
| Mar 16 | 316 | 6.00 | Mar 05 | 45882 * | 1,028.80 |
| Mar 02 | 45070 * | 1,000.00 | Mar 08 | 45886 * | 73.00 |
| Mar 29 | 45071 | 1,000.00 | Mar 29 | 45889 * | 8,813.79 |
| Mar 02 | 45430 * | 17,000.00 | Mar 14 | 45890 | 1,038.00 |
| Mar 14 | 45505 * | 5.00 | Mar 05 | 45891 | 3,075.00 |
| Mar 15 | 45532 * | 20,000.00 | Mar 06 | 45892 | 2,679.38 |
| Mar 29 | 45535 * | 21,409.60 | Mar 05 | 45893 | 213.20 |
| Mar 05 | 45539 * | 15,000.00 | Mar 06 | 45895 * | 342.00 |
| Mar 01 | 45609 * | 2,500.00 | Mar 02 | 45896 | 6,250.00 |
| Mar 01 | 45623 * | 3,436.58 | Mar 08 | 45898 * | 7,848.75 |
| Mar 01 | 45624 | 1,157.24 | Mar 05 | 45900 * | 3,750.00 |
| Mar 08 | 45625 | 4,291.98 | Mar 01 | 45901 | 330.00 |
| Mar 01 | 45743 * | 3,550.36 | Mar 05 | 45902 | 961.73 |
| Mar 01 | 45746 * | 2,893.00 | Mar 02 | 45905 * | 250.00 |
| Mar 08 | 45752 * | 500.00 | Mar 05 | 45906 | 2,909.89 |
| Mar 07 | 45753 | 2,016.90 | Mar 14 | 45907 | 793.71 |
| Mar 02 | 45787 * | 5,250.00 | Mar 08 | 45912 * | 1,000.00 |
| Mar 26 | 45816 * | 18.00 | Mar 01 | 45916 * | 67.81 |
| Mar 09 | 45819 * | 180.00 | Mar 02 | 45917 | 45.00 |
| Mar 06 | 45820 | 16,729.22 | Mar 05 | 45918 | 52.00 |
| Mar 01 | 45822 * | 90.00 | Mar 14 | 45919 | 9,984.00 |
| Mar 07 | 45824 * | 100.00 | Mar 13 | 45920 | 13,680.00 |
| Mar 02 | 45825 | 360.00 | Mar 08 | 45921 | 13,549.44 |
| Mar 02 | 45827 * | 360.00 | Mar 13 | 45922 | 15,997.50 |
| Mar 02 | 45833 * | 360.00 | Mar 13 | 45923 | 15,997.50 |
| Mar 05 | 45839 * | 15,997.50 | Mar 13 | 45924 | 14,068.89 |
| Mar 05 | 45840 | 12,942.44 | Mar 13 | 45925 | 11,452.97 |
| Mar 15 | 45841 | 3,943.22 | Mar 05 | 45927 * | 4,951.26 |
| Mar 22 | 45842 | 3,219.13 | Mar 15 | 45928 | 15,997.50 |
| Mar 01 | 45852 * | 13,428.00 | Mar 15 | 45929 | 15,997.50 |
| Mar 06 | 45858 * | 3,500.00 | Mar 21 | 45930 | 3,980.00 |
| Mar 08 | 45864 * | 160.00 | Mar 02 | 45931 | 89.25 |
| Mar 05 | 45866 * | 1,916.78 | Mar 05 | 45934 * | 20.00 |
| Mar 05 | 45870 * | 13,496.02 | Mar 26 | 45936 * | 72.00 |
| Mar 01 | 45874 * | 100.00 | Mar 01 | 45939 * | 114.00 |
| Mar 13 | 45879 | 14.86 | Mar 27 | 45940 | 241.50 |

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        174

| Date   | Serial Nbr | Amount    | Date   | Serial Nbr | Amount    |
|--------|------------|-----------|--------|------------|-----------|
| Mar 07 | 45941      | 1,916.23  | Mar 14 | 45994      | 52,423.54 |
| Mar 02 | 45944 *    | 49.45     | Mar 12 | 45995      | 5,000.00  |
| Mar 07 | 45945      | 107.39    | Mar 14 | 45996      | 75,046.66 |
| Mar 05 | 45947 *    | 3,300.00  | Mar 15 | 45997 *    | 36,624.77 |
| Mar 12 | 45948      | 233.64    | Mar 13 | 45999 *    | 188.00    |
| Mar 12 | 45949      | 3,155.87  | Mar 12 | 46000      | 14.56     |
| Mar 05 | 45950      | 9,370.00  | Mar 16 | 46001      | 180.00    |
| Mar 07 | 45953 *    | 50,046.88 | Mar 15 | 46002      | 250.00    |
| Mar 05 | 45954      | 5,000.00  | Mar 13 | 46003      | 861.00    |
| Mar 07 | 45955      | 73,258.38 | Mar 12 | 46004      | 6,503.08  |
| Mar 06 | 45956      | 37,201.58 | Mar 19 | 46005      | 793.71    |
| Mar 28 | 45958 *    | 2,384.10  | Mar 14 | 46006      | 565.00    |
| Mar 02 | 45959      | 2,222.00  | Mar 12 | 46007      | 400.00    |
| Mar 09 | 45960      | 100.00    | Mar 12 | 46008      | 468.63    |
| Mar 07 | 45961      | 74.00     | Mar 16 | 46009      | 2,437.29  |
| Mar 05 | 45962      | 594.96    | Mar 21 | 46010      | 2,771.96  |
| Mar 12 | 45963      | 2,092.56  | Mar 30 | 46011      | 374.71    |
| Mar 13 | 45965 *    | 1,696.54  | Mar 20 | 46012      | 11,961.00 |
| Mar 12 | 45966      | 21.95     | Mar 20 | 46013      | 15,997.50 |
| Mar 15 | 45969 *    | 3,055.36  | Mar 21 | 46014      | 16,850.70 |
| Mar 27 | 45970      | 5,308.60  | Mar 26 | 46015      | 15,320.25 |
| Mar 07 | 45971      | 645.00    | Mar 26 | 46016      | 12,646.61 |
| Mar 06 | 45976 *    | 115.00    | Mar 28 | 46017      | 13,966.20 |
| Mar 13 | 45977      | 3,468.00  | Mar 28 | 46018      | 15,997.50 |
| Mar 08 | 45978      | 275.00    | Mar 19 | 46019      | 2,213.34  |
| Mar 07 | 45979      | 487.20    | Mar 13 | 46020      | 45.00     |
| Mar 15 | 45980      | 9,984.00  | Mar 30 | 46021      | 360.00    |
| Mar 07 | 45981      | 3,009.90  | Mar 12 | 46022      | 1,728.00  |
| Mar 13 | 45982      | 201.44    | Mar 12 | 46023      | 1,566.00  |
| Mar 06 | 45983      | 705.00    | Mar 15 | 46024      | 577.62    |
| Mar 08 | 45984      | 602.17    | Mar 22 | 46025      | 500.00    |
| Mar 08 | 45985      | 1,206.00  | Mar 20 | 46027 *    | 1,582.80  |
| Mar 08 | 45986      | 1,274.00  | Mar 08 | 46037 *    | 945.00    |
| Mar 13 | 45987      | 318.92    | Mar 15 | 46038      | 150.00    |
| Mar 16 | 45988      | 600.00    | Mar 26 | 46039      | 7,000.00  |
| Mar 12 | 45989      | 372.18    | Mar 22 | 46040      | 3,941.65  |
| Mar 07 | 45990      | 1,000.00  | Mar 27 | 46041      | 1,000.00  |
| Mar 08 | 45991      | 720.76    | Mar 27 | 46043 *    | 250.00    |
| Mar 29 | 45993 *    | 1,100.00  | Mar 26 | 46047 *    | 5,194.92  |

SIGN 00026

Statement Period
From March   01, 2007
To   March   31, 2007
Page   9 of 10

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660      174

| Date   | Serial Nbr | Amount    | Date   | Serial Nbr | Amount   |
|--------|-----------|-----------|--------|-----------|----------|
| Mar 28 | 46049 *   | 52,486.98 | Mar 28 | 46070     | 3,000.00 |
| Mar 28 | 46050     | 68,668.21 | Mar 27 | 46071     | 500.00   |
| Mar 29 | 46051     | 36,366.46 | Mar 30 | 46074 *   | 253.75   |
| Mar 23 | 46054 *   | 1,510.00  | Mar 23 | 46075     | 2,108.00 |
| Mar 27 | 46055     | 365.00    | Mar 28 | 46076     | 1,258.60 |
| Mar 23 | 46056     | 43.87     | Mar 26 | 46077     | 1,942.00 |
| Mar 28 | 46058 *   | 215.00    | Mar 28 | 46078     | 4,000.00 |
| Mar 28 | 46059     | 451.20    | Mar 27 | 46079     | 37.92    |
| Mar 29 | 46060     | 213.20    | Mar 28 | 46080     | 691.63   |
| Mar 27 | 46061     | 352.34    | Mar 28 | 46081     | 3,000.00 |
| Mar 26 | 46067 *   | 1,055.00  | Mar 28 | 46105 *   | 1,323.00 |
| Mar 23 | 46069 *   | 1,754.00  | Mar 29 | 46107 *   | 1,200.00 |

* Indicates break in check sequence

Daily Balances

| Feb 28 | 240,282.87  | Mar 16 | 153,249.72 |
|--------|-------------|--------|------------|
| Mar 01 | 368,440.47  | Mar 19 | 127,976.43 |
| Mar 02 | 133,157.16  | Mar 20 | 81,407.64  |
| Mar 05 | 117,076.60  | Mar 21 | 46,333.40  |
| Mar 06 | 175,747.96  | Mar 22 | 156,153.09 |
| Mar 07 | 86,293.10-  | Mar 23 | 163,794.36 |
| Mar 08 | 23,012.14   | Mar 26 | 205,059.81 |
| Mar 09 | 115,189.54  | Mar 27 | 100,678.08 |
| Mar 12 | 90,811.56   | Mar 28 | 24,221.57- |
| Mar 13 | 7,029.88-   | Mar 29 | 77,674.42- |
| Mar 14 | 40,164.29-  | Mar 30 | 4,007.27   |
| Mar 15 | 21,101.35   |        |            |

SIGN 00027

Statement Period
From March   01, 2007
To   March   31, 2007
Page  10 of  10

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        174

Rates for this statement period - Overdraft
Mar 01, 2007  12.250000 %

SIGN 00028

Statement
From April   01, 2007
To   April   30, 2007
Page   1 of   6

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660         51

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal.  ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500812660 | MONOGRAM CHECKING | 4,007.27 | 172,777.62 |
| | RELATIONSHIP        TOTAL | | 172,777.62 |

SIGN 00029

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        51

MONOGRAM CHECKING          1500812660                                        ?

Summary

| | | |
|---|---|---:|
| Previous Balance as of April | 01, 2007 | 4,007.27 |
| 38 Credits | | 2,000,494.58 |
| 88 Debits | | 1,831,724.23 |
| Ending Balance as of    April | 30, 2007 | 172,777.62 |

Deposits and Other Credits

| | | |
|---|---|---:|
| Apr 02 | DEPOSIT ADJUSTMENT | .01 |
| Apr 02 | DEPOSIT | 324.13 |
| Apr 02 | DEPOSIT | 19,595.08 |
| Apr 03 | TELEPHONE TRANSFER | 10,582.32 |
| | TELEPHONE TRANSFER FROM: 1500583785 | |
| Apr 04 | DEPOSIT | 694.86 |
| Apr 04 | TELEPHONE TRANSFER | 14,683.32 |
| | TELEPHONE TRANSFER FROM: 1500583785 | |
| Apr 04 | TELEPHONE TRANSFER | 42,459.39 |
| | TELEPHONE TRANSFER FROM: 1500583785 | |
| Apr 05 | DEPOSIT ADJUSTMENT | 1.10 |
| Apr 05 | DEPOSIT | 26,332.10 |
| Apr 05 | WEB TRANSFER     WEB CREDIT | 7,490.58 |
| | WEB XFR FROM: 1500583785 | |
| Apr 06 | DEPOSIT | 4,349.80 |
| Apr 06 | DEPOSIT | 9,318.63 |
| Apr 06 | DEPOSIT | 14,058.11 |
| Apr 06 | WEB TRANSFER     WEB CREDIT | 139,563.88 |
| | WEB XFR FROM: 1500583785 | |
| Apr 09 | DEPOSIT | 5,990.65 |
| Apr 09 | TELEPHONE TRANSFER | 841.20 |
| | TELEPHONE TRANSFER FROM: 1500583785 | |
| Apr 10 | DEPOSIT | 5,019.25 |
| Apr 11 | DEPOSIT | 46,401.99 |
| Apr 12 | DEPOSIT ADJUSTMENT | .20 |
| Apr 12 | DEPOSIT | 34,863.24 |
| Apr 13 | DEPOSIT ADJUSTMENT | .22 |

SIGN 00030

```
                                              Statement Period
                              From  April   01, 2007
                              To    April   30, 2007
                              Page   3 of   6


                              PRIVATE CLIENT GROUP 161
                              565 FIFTH AVENUE
                              NEW YORK, NY 10017
```

```
        AHAVA FOOD CORP.                    9-161
        OPERATING ACCT.
        110 BEARD ST.
        BROOKLYN NY  11231
```

```
                              For info call our toll-free Signature Line
                              1-866-sigline or visit signatureny.com

                              Primary Account: 1500812660       51
```

| Date | Description | |
|------|-------------|---|
| Apr 13 | DEPOSIT | 34,151.46 |
| Apr 16 | INCOMING WIRE TRANSFER | 1,219.75 |
| | REF# 20070416B6B7261F00039004161518FT01 | |
| | FROM: FOODFEST INTERNATIONAL 2000 INC    ABA: | |
| | BANK: RBC CENTRE ST BR THORNHILL | |
| Apr 16 | DEPOSIT | 31,155.77 |
| Apr 16 | DEPOSIT | 42,356.90 |
| Apr 16 | DEPOSIT | 47,976.41 |
| Apr 17 | DEPOSIT | 54,487.02 |
| Apr 18 | DEPOSIT | 50,545.95 |
| Apr 18 | DEPOSIT | 62,418.85 |
| Apr 19 | DEPOSIT | 60,301.92 |
| Apr 20 | DEPOSIT | 209,075.54 |
| Apr 23 | DEPOSIT | 234,033.12 |
| Apr 23 | WEB TRANSFER    WEB CREDIT | 103,000.00 |
| | WEB XFR FROM: 1500583785 | |
| Apr 24 | DEPOSIT | 97,362.05 |
| Apr 25 | DEPOSIT | 89,898.05 |
| Apr 26 | DEPOSIT | 130,174.85 |
| Apr 27 | DEPOSIT | 149,733.40 |
| Apr 30 | DEPOSIT | 220,033.48 |

Withdrawals and Other Debits

| Date | Description | |
|------|-------------|---|
| Apr 02 | WEB TRANSFER    WEB DEBIT | 4,007.27 |
| | WEB XFR TO: 1500583785 | |
| Apr 03 | WITHDRAWAL     UNUSED FEES | 40.37 |
| Apr 04 | WITHDRAWAL     PRIN&INT PYMT | 42,459.39 |
| Apr 06 | DEPOSIT ADJUSTMENT | .80 |
| Apr 09 | DEPOSIT ADJUSTMENT | .20 |
| Apr 10 | RETURNED DEPOSIT ITEM | 500.00 |
| Apr 10 | RETURNED DEPOSIT ITEM | 500.00 |
| Apr 11 | RETURNED DEPOSIT ITEM | 1,150.00 |
| Apr 11 | WEB TRANSFER    WEB DEBIT | 10,009.70 |
| | WEB XFR TO: 1500583785 | |
| Apr 12 | WEB TRANSFER    WEB DEBIT | 41,695.02 |
| | WEB XFR TO: 1500583785 | |
| Apr 13 | WEB TRANSFER    WEB DEBIT | 34,094.34 |
| | WEB XFR TO: 1500583785 | |
| Apr 16 | WEB TRANSFER    WEB DEBIT | 34,131.68 |

SIGN 00031

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660       51

| Date | Description | | |
|------|-------------|---|---|
| | WEB XFR TO: 1500583785 | | |
| Apr 16 | AUTOMATED PAYMENT      ck/ref no.   6327595 | | 710.50 |
| | NEW YORK LIFE     INS. PREM.   C7284671 | | |
| Apr 17 | WEB TRANSFER     WEB DEBIT | | 86,998.33 |
| | WEB XFR TO: 1500583785 | | |
| Apr 18 | WEB TRANSFER     WEB DEBIT | | 46,015.82 |
| | WEB XFR TO: 1500583785 | | |
| Apr 19 | WEB TRANSFER     WEB DEBIT | | 91,964.80 |
| | WEB XFR TO: 1500583785 | | |
| Apr 20 | DEPOSIT ADJUSTMENT | | .01 |
| Apr 20 | WEB TRANSFER     WEB DEBIT | | 58,289.02 |
| | WEB XFR TO: 1500583785 | | |
| Apr 23 | WITHDRAWAL      INT PYMT | | 102,192.42 |
| Apr 23 | DEPOSIT ADJUSTMENT | | 72.00 |
| Apr 23 | WEB TRANSFER     WEB DEBIT | | 180,471.54 |
| | WEB XFR TO: 1500583785 | | |
| Apr 23 | AUTOMATED PAYMENT      ck/ref no.   6396467 | | 2,145.00 |
| | COMMERCIAL LEASE     LEASE PMT   516-0060045-000 | | |
| Apr 24 | WEB TRANSFER     WEB DEBIT | | 198,463.50 |
| | WEB XFR TO: 1500583785 | | |
| Apr 25 | CM WIRE TRANSFER | | 36,405.21 |
| | REF# 20070425B6B7262F000060 | | |
| | TO:  Signature Bank              ABA:   021000018 | | |
| | BANK: BANK OF NEW YORK      ACCT# 8900517425 | | |
| Apr 25 | WEB TRANSFER     WEB DEBIT | | 97,362.05 |
| | WEB XFR TO: 1500583785 | | |
| Apr 26 | RETURNED DEPOSIT ITEM | | 500.00 |
| Apr 26 | RETURNED DEPOSIT ITEM | | 987.20 |
| Apr 26 | WEB TRANSFER     WEB DEBIT | | 53,492.84 |
| | WEB XFR TO: 1500583785 | | |
| Apr 27 | DEPOSIT ADJUSTMENT | | 30.00 |
| Apr 27 | RETURNED DEPOSIT ITEM | | 393.77 |
| Apr 27 | RETURNED DEPOSIT ITEM | | 520.00 |
| Apr 27 | RETURNED DEPOSIT ITEM | | 7,000.00 |
| Apr 27 | WEB TRANSFER     WEB DEBIT | | 128,687.65 |
| | WEB XFR TO: 1500583785 | | |
| Apr 30 | DEPOSIT ADJUSTMENT | | .35 |
| Apr 30 | WEB TRANSFER     WEB DEBIT | | 141,789.63 |
| | WEB XFR TO: 1500583785 | | |

SIGN 00032

From April    01, 2007
To    April    30, 2007
Page    5 of  6

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        51

| Apr 30 | AUTOMATED PAYMENT | ck/ref no. | 6477716 | 351.29 |
|--------|-------------------|------------|---------|--------|
|        | NEW YORK LIFE     | INS. PREM. | 62 860 529 | |
| Apr 30 | AUTOMATED PAYMENT | ck/ref no. | 6477698 | 429.50 |
|        | NEW YORK LIFE     | INS. PREM. | 48 227 452 | |

Checks by Serial Number

| Date | Serial | | Amount | Date | Serial | | Amount |
|------|--------|--|--------|------|--------|--|--------|
| Apr 13 | 413 | | 5.00 | Apr 02 | 46089 | * | 106.37 |
| Apr 06 | 45536 | * | 10,650.46 | Apr 02 | 46090 | | 52.90 |
| Apr 06 | 45540 | * | 15,000.00 | Apr 05 | 46091 | | 52,688.09 |
| Apr 13 | 45758 | * | 15.00 | Apr 02 | 46092 | | 7,000.00 |
| Apr 20 | 45888 | * | 20,000.00 | Apr 05 | 46093 | | 74,203.09 |
| Apr 30 | 45894 | * | 16,474.72 | Apr 05 | 46094 | | 36,390.90 |
| Apr 02 | 45903 | * | 188.00 | Apr 04 | 46099 | * | 145.00 |
| Apr 19 | 45932 | * | 12.90 | Apr 02 | 46103 | * | 541.47 |
| Apr 12 | 45975 | * | 769.10 | Apr 18 | 46106 | * | 4,000.00 |
| Apr 23 | 46026 | * | 500.00 | Apr 03 | 46109 | * | 115.00 |
| Apr 04 | 46029 | * | 244.80 | Apr 03 | 46110 | | 250.00 |
| Apr 04 | 46030 | | 2,388.08 | Apr 18 | 46111 | | 6,000.00 |
| Apr 04 | 46031 | | 1,365.26 | Apr 18 | 46112 | | 9,000.00 |
| Apr 06 | 46032 | | 2,916.48 | Apr 16 | 46113 | | 35,000.00 |
| Apr 17 | 46033 | | 5,679.40 | Apr 23 | 46114 | | 13,459.61 |
| Apr 20 | 46034 | | 3,047.35 | Apr 23 | 46115 | | 21,540.39 |
| Apr 23 | 46035 | | 805.20 | Apr 30 | 46116 | | 13,335.40 |
| Apr 20 | 46036 | | 876.00 | Apr 30 | 46117 | | 16,664.60 |
| Apr 18 | 46042 | * | 2,000.00 | Apr 05 | 46118 | | 275.00 |
| Apr 19 | 46046 | * | 2,000.00 | Apr 05 | 46120 | * | 200.00 |
| Apr 02 | 46048 | * | 22,230.02 | Apr 04 | 46121 | | 600.25 |
| Apr 03 | 46063 | * | 14,277.95 | Apr 04 | 46122 | | 442.05 |
| Apr 04 | 46083 | * | 3,000.00 | Apr 17 | 46123 | | 2,791.80 |
| Apr 11 | 46084 | | 3,287.12 | Apr 20 | 46124 | | 2,535.64 |
| Apr 11 | 46085 | | 269.85 | Apr 05 | 46138 | * | 2,140.00 |
| Apr 02 | 46087 | * | 382.78 | | | | |

* Indicates break in check sequence

Statement of
From April    01, 2007
To    April    30, 2007
Page   6 of   6

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                 9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660      51

Daily Balances

| | | | |
|---|---|---|---|
| Mar 31 | 4,007.27 | Apr 16 | 86,998.33 |
| Apr 02 | 10,582.32- | Apr 17 | 46,015.82 |
| Apr 03 | 14,683.32- | Apr 18 | 91,964.80 |
| Apr 04 | 7,490.58- | Apr 19 | 58,289.02 |
| Apr 05 | 139,563.88- | Apr 20 | 182,616.54 |
| Apr 06 | 841.20- | Apr 23 | 198,463.50 |
| Apr 09 | 5,990.45 | Apr 24 | 97,362.05 |
| Apr 10 | 10,009.70 | Apr 25 | 53,492.84 |
| Apr 11 | 41,695.02 | Apr 26 | 128,687.65 |
| Apr 12 | 34,094.34 | Apr 27 | 141,789.63 |
| Apr 13 | 34,131.68 | Apr 30 | 172,777.62 |

Rates for this statement period - Overdraft
Apr 01, 2007   12.250000 %

SIGN 00034

```
                                              Statement Period
                                    From May    01, 2007
                                    To  May    31, 2007
                                    Page   1 of   6


                                    PRIVATE CLIENT GROUP 161
                                    565 FIFTH AVENUE
                                    NEW YORK, NY 10017


AHAVA FOOD CORP.                9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

                                    For info call our toll-free Signature Line
                                    1-866-sigline or visit signatureny.com

                                    Primary Account: 1500812660        11


              *                              *
     FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
     BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
              *                              *
```

Signature Relationship Summary                    Opening Bal.            Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500812660     MONOGRAM CHECKING                   172,777.62              1,529.91-

               RELATIONSHIP        TOTAL                                   1,529.91-

SIGN 00035

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        11

MONOGRAM CHECKING          1500812660                                    ?·

Summary

| | | |
|---|---|---|
| Previous Balance as of May | 01, 2007 | 172,777.62 |
| 28 Credits | | 1,635,761.83 |
| 70 Debits | | 1,810,069.36 |
| Ending Balance as of   May | 31, 2007 | 1,529.91- |

Deposits and Other Credits

| | | | |
|---|---|---|---|
| May 01 | DEPOSIT ADJUSTMENT | | 1.00 |
| May 01 | DEPOSIT | | 68,537.85 |
| May 02 | WEB TRANSFER     WEB CREDIT | | 41,954.72 |
| | WEB XFR FROM: 1500583785 | | |
| May 03 | RETURNED CHECK | | 15,000.00 |
| May 03 | DEPOSIT | | 93,354.51 |
| May 03 | WEB TRANSFER     WEB CREDIT | | 1,000.00 |
| | WEB XFR FROM: 1500583785 | | |
| May 04 | DEPOSIT | | 8,100.00 |
| May 04 | DEPOSIT | | 149,677.19 |
| May 07 | DEPOSIT | | 740.40 |
| May 07 | DEPOSIT | | 126,704.73 |
| May 08 | DEPOSIT | | 80.00 |
| May 08 | DEPOSIT | | 72,360.91 |
| May 09 | DEPOSIT | | 66,506.70 |
| May 10 | DEPOSIT | | 2,500.00 |
| May 10 | DEPOSIT | | 127,067.64 |
| May 11 | DEPOSIT | | 122,098.45 |
| May 14 | DEPOSIT ADJUSTMENT | | .20 |
| May 14 | DEPOSIT | | 81,287.94 |
| May 15 | DEPOSIT | | 119,310.97 |
| May 16 | DEPOSIT | | 45,270.60 |
| May 17 | INCOMING WIRE TRANSFER | | 926.31 |
| | REF# 20070517B6B7261F00027205171421FT01 | | |
| | FROM: FOODFEST INTERNATIONAL 2000 INC    ABA: | | |
| | BANK: RBC CENTRE ST BR THORNHILL | | |
| May 17 | RETURNED CHECK | | 11,048.04 |

From May    01, 2007
To   May    31, 2007
Page  3 of  6

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

```
AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231
```

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        11

| Date | Description | |
|------|-------------|---|
| May 17 | RETURNED CHECK | 14,140.46 |
| May 17 | DEPOSIT | 41,756.82 |
| May 18 | DEPOSIT | 74,437.69 |
| May 21 | DEPOSIT | 125,626.77 |
| May 22 | DEPOSIT | 74,670.93 |
| May 22 | DEPOSIT         LOAN ADV | 151,601.00 |

Withdrawals and Other Debits

| Date | Description | |
|------|-------------|---|
| May 01 | RETURNED DEPOSIT ITEM | 740.40 |
| May 01 | WEB TRANSFER    WEB DEBIT | 166,152.65 |
| | WEB XFR TO: 1500583785 | |
| May 01 | AUTOMATED PAYMENT      ck/ref no.    6497174 | 6,624.97 |
| | STATE FARM RO 27     SFPP         17 S 1017043617 | |
| May 02 | WITHDRAWAL       PRIN&INT PYMT | 41,954.72 |
| May 02 | WEB TRANSFER    WEB DEBIT | 67,798.45 |
| | WEB XFR TO: 1500583785 | |
| May 03 | DEPOSIT ADJUSTMENT | 1.55 |
| May 03 | RETURNED DEPOSIT ITEM | 751.35 |
| May 04 | DEPOSIT ADJUSTMENT | 10,609.21 |
| May 04 | RETURNED DEPOSIT ITEM | 681.30 |
| May 04 | RETURNED DEPOSIT ITEM | 4,150.73 |
| May 04 | WEB TRANSFER    WEB DEBIT | 6,805.27 |
| | WEB XFR TO: 1500583750 | |
| May 04 | WEB TRANSFER    WEB DEBIT | 7,563.92 |
| | WEB XFR TO: 1500583408 | |
| May 04 | WEB TRANSFER    WEB DEBIT | 7,971.72 |
| | WEB XFR TO: 1500583394 | |
| May 04 | WEB TRANSFER    WEB DEBIT | 9,671.27 |
| | WEB XFR TO: 1500583416 | |
| May 04 | WEB TRANSFER    WEB DEBIT | 54,936.61 |
| | WEB XFR TO: 1500583785 | |
| May 07 | DEPOSIT ADJUSTMENT | 1.30 |
| May 07 | WEB TRANSFER    WEB DEBIT | 3,317.34 |
| | WEB XFR TO: 1500583416 | |
| May 07 | WEB TRANSFER    WEB DEBIT | 4,772.31 |
| | WEB XFR TO: 1500583394 | |
| May 07 | WEB TRANSFER    WEB DEBIT | 49,977.90 |
| | WEB XFR TO: 1500583785 | |
| May 07 | WEB TRANSFER    WEB DEBIT | 76,100.60 |

SIGN 00037

Statement Period
From May     01, 2007
To   May     31, 2007
Page   4 of  6

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        11

| Date | Description | |
|------|-------------|---|
| | WEB XFR TO: 1500883630 | |
| May 08 | DEPOSIT ADJUSTMENT | .20 |
| May 08 | WEB TRANSFER     WEB DEBIT | 552.88 |
| | WEB XFR TO: 1500583408 | |
| May 08 | WEB TRANSFER     WEB DEBIT | 1,454.00 |
| | WEB XFR TO: 1500583394 | |
| May 08 | WEB TRANSFER     WEB DEBIT | 3,307.22 |
| | WEB XFR TO: 1500583416 | |
| May 08 | WEB TRANSFER     WEB DEBIT | 37,743.19 |
| | WEB XFR TO: 1500583785 | |
| May 08 | WEB TRANSFER     WEB DEBIT | 59,386.54 |
| | WEB XFR TO: 1500883630 | |
| May 09 | DEPOSIT ADJUSTMENT | .05 |
| May 09 | RETURNED DEPOSIT ITEM | 2,500.00 |
| May 09 | WEB TRANSFER     WEB DEBIT | 72,440.71 |
| | WEB XFR TO: 1500883630 | |
| May 10 | WEB TRANSFER     WEB DEBIT | 64,006.65 |
| | WEB XFR TO: 1500883630 | |
| May 11 | DEPOSIT ADJUSTMENT | .21 |
| May 11 | RETURNED DEPOSIT ITEM | 520.00 |
| May 11 | WEB TRANSFER     WEB DEBIT | 129,417.64 |
| | WEB XFR TO: 1500883630 | |
| May 14 | CM WIRE TRANSFER | 14,611.08 |
| | REF#  20070514B6B7262F000240 | |
| | TO:   Signature Bank        ABA:   021000018 | |
| | BANK: BANK OF NEW YORK      ACCT# 8900517425 | |
| May 14 | WEB TRANSFER     WEB DEBIT | 105,266.87 |
| | WEB XFR TO: 1500883630 | |
| May 15 | RETURNED DEPOSIT ITEM | 2,500.00 |
| May 15 | WEB TRANSFER     WEB DEBIT | 65,966.56 |
| | WEB XFR TO: 1500883630 | |
| May 15 | AUTOMATED PAYMENT     ck/ref no.   6647218 | 710.50 |
| | NEW YORK LIFE      INS. PREM.    C7284671 | |
| May 16 | WEB TRANSFER     WEB DEBIT | 116,810.97 |
| | WEB XFR TO: 1500883630 | |
| May 17 | WEB TRANSFER     WEB DEBIT | 19,981.10 |
| | WEB XFR TO: 1500883630 | |
| May 18 | RETURNED DEPOSIT ITEM | 930.00 |
| May 18 | RETURNED DEPOSIT ITEM | 27,409.34 |

SIGN 00038

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        11

| Date | Description | | |
|------|-------------|---|---|
| May 18 | WEB TRANSFER     WEB DEBIT | | 67,871.63 |
| | WEB XFR TO: 1500883630 | | |
| May 21 | CM WIRE TRANSFER | | 35,049.89 |
| | REF# 20070521B6B7262F000134 | | |
| | TO:    Signature Bank | ABA:   021000018 | |
| | BANK: BANK OF NEW YORK | ACCT# 8900517425 | |
| May 21 | DEPOSIT ADJUSTMENT | | .02 |
| May 21 | WEB TRANSFER     WEB DEBIT | | 40,257.53 |
| | WEB XFR TO: 1500883630 | | |
| May 22 | TELEPHONE TRANSFER | | 30,000.00 |
| | TELEPHONE TRANSFER TO: 1500583416 | | |
| May 22 | WEB TRANSFER     WEB DEBIT | | 88,071.86 |
| | WEB XFR TO: 1500883630 | | |
| May 22 | TELEPHONE TRANSFER | | 121,601.00 |
| | TELEPHONE TRANSFER TO: 1500583785 | | |
| May 22 | AUTOMATED PAYMENT     ck/ref no.   6718511 | | 2,145.00 |
| | COMMERCIAL LEASE     LEASE PMT   516-0060045-000 | | |
| May 23 | MISC DEBIT        LEGAL FEE | | 125.00 |
| May 23 | MISC DEBIT        RESTRAINING | | 14,875.00 |
| May 23 | RETURNED DEPOSIT ITEM | | 1,008.35 |
| May 23 | TELEPHONE TRANSFER | | 59,670.93 |
| | TELEPHONE TRANSFER TO: 1500883630 | | |
| May 25 | RETURNED DEPOSIT ITEM | | 125.00 |
| May 25 | RETURNED DEPOSIT ITEM | | 396.56 |

Checks by Serial Number

| May 02 | 45072 | 1,000.00 | May 16 | 45974 | 11,048.04 |
|--------|-------|----------|--------|-------|-----------|
| May 02 | 45541 * | 15,000.00 | May 16 | 46086 * | 101.00 |
| May 03 | 45576 * | 2,000.00 | May 04 | 46133 * | 2,912.17 |
| May 21 | 45701 * | 360.00 | May 04 | 46134 | 8,908.45 |
| May 10 | 45964 * | 150.00 | May 11 | 46135 | 5,587.20 |
| May 07 | 45972 * | 25,000.00 | May 11 | 46136 | 10,724.17 |
| May 16 | 45973 | 14,140.46 | May 18 | 46137 | 5,840.82 |

* Indicates break in check sequence

SIGN 00039

Statement Period
From May        01, 2007
To   May        31, 2007
Page   6 of   6

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                     9-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        11

Daily Balances

| | | | |
|---|---|---|---|
| Apr 30 | 172,777.62 | May 14 | 66,677.06 |
| May 01 | 67,798.45 | May 15 | 116,810.97 |
| May 02 | 16,000.00- | May 16 | 19,981.10 |
| May 03 | 90,601.61 | May 17 | 67,871.63 |
| May 04 | 134,168.15 | May 18 | 40,257.53 |
| May 07 | 102,443.83 | May 21 | 90,216.86 |
| May 08 | 72,440.71 | May 22 | 74,670.93 |
| May 09 | 64,006.65 | May 23 | 1,008.35- |
| May 10 | 129,417.64 | May 25 | 1,529.91- |
| May 11 | 105,266.87 | | |

Rates for this statement period - Overdraft
May 01, 2007   12.250000 %

SIGN 00040

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

                    *
     FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
     BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                              *

Signature Relationship Summary                Opening Bal.        Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500812660     MONOGRAM CHECKING              1,529.91-            1,107.69

               RELATIONSHIP        TOTAL                          1,107.69

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

MONOGRAM CHECKING        1500812660                                                  ?

Summary

| | | |
|---|---|---:|
| Previous Balance as of June | 01, 2007 | 1,529.91- |
| 6 Credits | | 13,351.51 |
| 4 Debits | | 10,713.91 |
| Ending Balance as of | June    30, 2007 | 1,107.69 |

Deposits and Other Credits

| | | | |
|---|---|---|---:|
| Jun 01 | MISC CREDIT | 10609.21 USD | 10,519.21 |
| Jun 04 | MISC CREDIT | | 364.61 |
| Jun 04 | RETURNED CHECK | | 1,000.00 |
| Jun 06 | RETURNED CHECK | | 360.00 |
| Jun 06 | DEPOSIT | | 396.56 |
| Jun 15 | INCOMING WIRE TRANSFER | | 711.13 |
| | REF# 20070615B6B7261F00026206151309FT01 | | |
| | FROM: FOODFEST INTERNATIONAL 2000 INC    ABA: | | |
| | BANK: RBC CENTRE ST BR THORNHILL | | |

Withdrawals and Other Debits

| | | | |
|---|---|---|---:|
| Jun 01 | LOAN PAYMENT     CLPAYMENT | | 364.61 |
| | TRANSFER FROM LOANS    75000000000094090470001006 | | |
| Jun 01 | MISC DEBIT      RESTRAIN 5/23 | | 8,989.30 |

Checks by Serial Number

| | | | | | | |
|---|---|---:|---|---|---|---:|
| Jun 01 | 45073 | 1,000.00 | Jun 04 | 45702 * | | 360.00 |

        * Indicates break in check sequence

Daily Balances

| | | | | |
|---|---:|---|---|---:|
| May 31 | 1,529.91- | | Jun 06 | 396.56 |
| Jun 01 | 1,364.61- | | Jun 15 | 1,107.69 |
| Jun 04 | 360.00- | | | |

SIGN 00042

Statement Period
From June    01, 2007
To   June    30, 2007
Page   3 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

SIGN 00043

Statement Period
From July   01, 2007
To   July   31, 2007
Page   1 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY   11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

*
                                                    *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                                   *

Signature Relationship Summary                 Opening Bal.            Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500812660      MONOGRAM CHECKING              1,107.69                      .00

            RELATIONSHIP        TOTAL                                        .00

SIGN 00044

From July   01, 2007
To   July   31, 2007
Page   2 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        0

MONOGRAM CHECKING        1500812660                                                    ?

Summary

| | | |
|---|---|---|
| Previous Balance as of July | 01, 2007 | 1,107.69 |
| 6 Credits | | 50,891.68 |
| 9 Debits | | 51,999.37 |
| Ending Balance as of   July | 31, 2007 | .00 |

Deposits and Other Credits
| | | | | |
|---|---|---|---|---|
| Jul 05 | DEPOSIT | | | 41,378.26 |
| Jul 10 | ACH | ck/ref no.   7235312 | | 2,252.25 |
| | COMMERCIAL LEASE | LEASE PMT | 516-0060045-000 | |
| Jul 12 | RETURNED CHECK | | | 360.00 |
| Jul 12 | DEPOSIT | | | 3,332.72 |
| Jul 13 | DEPOSIT | | | 360.00 |
| Jul 24 | INCOMING WIRE TRANSFER | | | 3,208.45 |
| | REF#  20070724B6B7261F0002810724150 7FT01 | | | |
| | FROM: FOODFEST INTERNATIONAL 2000 INC    ABA: | | | |
| | BANK: RBC CENTRE ST BR THORNHILL | | | |

Withdrawals and Other Debits
| | | | | |
|---|---|---|---|---|
| Jul 06 | WITHDRAWAL | UNUSED FEE | | 70.68 |
| Jul 06 | WITHDRAWAL | PRIN&INT PYMT | | 42,376.27 |
| Jul 09 | AUTOMATED PAYMENT | ck/ref no.   7235312 | | 2,252.25 |
| | COMMERCIAL LEASE | LEASE PMT | 516-0060045-000 | |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 930.00 |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 930.00 |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 930.00 |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 941.72 |
| Jul 27 | MISC DEBIT | ADM RESTRAINT | | 3,208.45 |

Checks by Serial Number
| | | |
|---|---|---|
| Jul 11 | 45703 | 360.00 |

SIGN 00045

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

                    Primary Account: 1500812660          0

Daily Balances
  Jun 30        1,107.69           Jul 11      4,052.72-
  Jul 05       42,485.95           Jul 12        360.00-
  Jul 06           39.00           Jul 13           .00
  Jul 09        2,213.25-          Jul 24      3,208.45
  Jul 10           39.00           Jul 27           .00

Rates for this statement period - Overdraft
Jul 01, 2007   12.250000 %

SIGN 00046

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

*
                                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                    *

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500812660 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| RELATIONSHIP | TOTAL | | .00 | |

SIGN 00047

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                        8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660            0

MONOGRAM CHECKING          1500812660                                        ?

Summary

  Previous Balance as of August    01, 2007                                .00

  There was no deposit activity during this statement period

  Ending Balance as of    August    31, 2007                                .00

Rates for this statement period - Overdraft
Aug 01, 2007   12.250000 %

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660        0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500812660 | MONOGRAM CHECKING | | .00 | 1,477.70 |
| | RELATIONSHIP | TOTAL | | 1,477.70 |

SIGN 00049

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

                        For info call our toll-free Signature Line
                        1-866-sigline or visit signatureny.com

                         Primary Account: 1500812660          0


MONOGRAM CHECKING          1500812660                                    ?


Summary

    Previous Balance as of September 01, 2007                         .00
          2 Credits                                            41,659.43
          4 Debits                                             40,181.73
    Ending Balance as of    September 30, 2007                  1,477.70


Deposits and Other Credits
    Sep 14   INCOMING WIRE TRANSFER                             40,181.73
             REF#  20070914B6B7261F0002I809141319FT01
             FROM: MARKET ADMINISTRATOR UNDER      ABA:   026009593
             BANK:
    Sep 18   DEPOSIT                                             1,477.70

Withdrawals and Other Debits
    Sep 18   WITHDRAWAL      INT PYMT                            3,083.34
    Sep 18   WITHDRAWAL      INT PYMT                            4,052.87
    Sep 18   WITHDRAWAL      INT PYMT                            8,750.00
    Sep 18   WITHDRAWAL      PRIN&INTPYMT                       24,295.52

Daily Balances
    Aug 31            .00              Sep 18        1,477.70
    Sep 14      40,181.73

Rates for this statement period - Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY   11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500812660 | MONOGRAM CHECKING | 1,477.70 | 33,808.10 | |
| | RELATIONSHIP        TOTAL | | 33,808.10 | |

SIGN 00051

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                         8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660         0

MONOGRAM CHECKING           1500812660                                           ?

Summary

    Previous Balance as of October   01, 2007                        1,477.70
             2 Credits                                              32,330.40
    Ending Balance as of    October  31, 2007                       33,808.10

Deposits and Other Credits
Oct 12  DEPOSIT                                                     10,140.20
Oct 12  DEPOSIT                                                     22,190.20

Daily Balances
Sep 30        1,477.70              Oct 12        33,808.10

Rates for this statement period - Overdraft
Oct 01, 2007   13.750000 %

SIGN 00052

![Signature Bank logo]

SIGNATURE BANK

Statement Period
From November 01, 2007
TO   November 30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                                8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660                 0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

Signature Relationship Summary

|  |  | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS |  |  |  |
| 1500812660 | MONOGRAM CHECKING | 33,808.10 | .00 |
|  | RELATIONSHIP     TOTAL |  | .00 |

SIGN 01062



Statement Period
From November  01, 2007
To   November  30, 2007
Page   2 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

MONOGRAM CHECKING          1500812660                                                    ?

Summary

Previous Balance as of November  01, 2007
        1 Debits                                                            33,808.10
Ending Balance as of    November  30, 2007                                  33,808.10
                                                                                  .00

Withdrawals and Other Debits
Nov 15   PRE-AUTHORIZED WD
                                                                            33,808.10

Daily Balances
  Oct 31          33,808.10              Nov 15          .00

Rates for this statement period - Overdraft
Nov 01, 2007    13.500000 %

SIGN 01063

**EXHIBIT P**
**(Part 2 of 5)**

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394        79

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583394 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP    TOTAL | | .00 | |

SIGN 00053

From March   01, 2007
To   March   31, 2007
Page   2 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394        79

MONOGRAM CHECKING        1500583394                                    ?

Summary

Previous Balance as of March    01, 2007                              .00
      17 Credits                                               79,245.53
      81 Debits                                                79,245.53
Ending Balance as of    March    31, 2007                            .00


Deposits and Other Credits

| Date | Description | | Amount |
|------|-------------|--|-------:|
| Mar 06 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500812660 | | 1,000.00 |
| Mar 07 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500812660 | | 9,942.71 |
| Mar 08 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 11,572.90 |
| Mar 09 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 4,677.46 |
| Mar 12 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 4,779.06 |
| Mar 13 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 1,226.60 |
| Mar 14 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 280.00 |
| Mar 15 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 2,117.60 |
| Mar 19 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 628.31 |
| Mar 21 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 11,251.64 |
| Mar 22 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 14,273.88 |
| Mar 23 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 5,588.46 |
| Mar 26 | WEB TRANSFER    WEB CREDIT | | |
|        | WEB XFR FROM: 1500583785 | | 5,078.15 |
| Mar 27 | WEB TRANSFER    WEB CREDIT | | 1,449.08 |

SIGN 00054

Statement of
From March   01, 2007
To   March   31, 2007
Page   3 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394        79

| Date | Description | |
|------|-------------|--|
| | WEB XFR FROM: 1500583785 | |
| Mar 28 | WEB TRANSFER    WEB CREDIT | 1,644.27 |
| | WEB XFR FROM: 1500583785 | |
| Mar 29 | WEB TRANSFER    WEB CREDIT | 783.38 |
| | WEB XFR FROM: 1500583785 | |
| Mar 30 | WEB TRANSFER    WEB CREDIT | 2,952.03 |
| | WEB XFR FROM: 1500583785 | |

Withdrawals and Other Debits

| Date | | | | |
|------|--|--|--|--|
| Mar 06 | AUTOMATED PAYMENT | ck/ref no.   5905960 | | 10,177.03 |
| | TAX SERVICE 702 | PMT IMPND   G9912-007977682 | | |
| Mar 20 | AUTOMATED PAYMENT | ck/ref no.   6054343 | | 10,213.12 |
| | TAX SERVICE 702 | PMT IMPND   G9912-008032633 | | |

Checks by Serial Number

| Date | Serial | Amount | Date | Serial | Amount |
|------|--------|--------|------|--------|--------|
| Mar 23 | 14495 | | Mar 12 | 14554 | 864.21 |
| Mar 09 | 14529 * | 442.72 | Mar 14 | 14555 | 424.53 |
| Mar 16 | 14530 | 628.31 | Mar 07 | 14556 | 723.60 |
| Mar 08 | 14531 | 640.99 | Mar 07 | 14557 | 1,171.11 |
| Mar 07 | 14532 | 1,386.35 | Mar 08 | 14558 | 357.60 |
| Mar 20 | 14533 | 1,038.52 | Mar 08 | 14559 | 852.15 |
| Mar 08 | 14534 | 624.43 | Mar 09 | 14560 | 793.31 |
| Mar 09 | 14535 | 813.89 | Mar 07 | 14561 | 932.32 |
| Mar 07 | 14536 | 1,556.14 | Mar 08 | 14562 | 792.06 |
| Mar 23 | 14538 * | 1,245.58 | Mar 06 | 14563 | 765.68 |
| Mar 08 | 14539 | 758.62 | Mar 09 | 14564 | 726.36 |
| Mar 07 | 14540 | 847.44 | Mar 07 | 14565 | 344.48 |
| Mar 08 | 14541 | 651.61 | Mar 09 | 14566 | 483.65 |
| Mar 09 | 14542 | 203.63 | Mar 07 | 14567 | 502.92 |
| Mar 09 | 14544 * | 683.69 | Mar 07 | 14568 | 713.32 |
| Mar 07 | 14545 | 714.00 | Mar 07 | 14569 | 657.81 |
| Mar 07 | 14546 | 73.48 | Mar 13 | 14570 | 280.00 |
| Mar 07 | 14547 | 819.36 | Mar 26 | 14571 | 442.72 |
| Mar 09 | 14548 | 631.81 | Mar 29 | 14572 | 628.31 |
| Mar 12 | 14550 | 362.39 | Mar 23 | 14573 | 641.00 |
| Mar 14 | 14550 | 700.42 | Mar 21 | 14574 | 1,352.69 |
| Mar 29 | 14551 | 420.99 | Mar 29 | 14575 | 1,038.52 |
| Mar 07 | 14552 | 1,130.57 | Mar 22 | 14576 | 474.91 |
| Mar 14 | 14553 | 992.65 | Mar 21 | 14577 | 813.89 |

SIGN 00055

Statement Page 5
From March   01, 2007
To   March   31, 2007
Page   4 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                         9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          79

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Mar 21 | 14578 | 1,556.14 | Mar 21 | 14596 * | 783.01 |
| Mar 23 | 14579 | 1,245.57 | Mar 21 | 14597 | 1,106.01 |
| Mar 22 | 14580 | 758.63 | Mar 22 | 14598 | 1,021.73 |
| Mar 21 | 14581 | 847.44 | Mar 21 | 14599 | 852.16 |
| Mar 27 | 14582 | 651.61 | Mar 21 | 14600 | 766.33 |
| Mar 22 | 14584 * | 719.02 | Mar 21 | 14601 | 932.33 |
| Mar 21 | 14585 | 698.40 | Mar 21 | 14602 | 792.07 |
| Mar 21 | 14586 | 73.48 | Mar 22 | 14603 | 766.12 |
| Mar 21 | 14587 | 735.76 | Mar 26 | 14604 | 726.36 |
| Mar 22 | 14588 | 631.81 | Mar 21 | 14605 | 725.53 |
| Mar 28 | 14589 | 362.39 | Mar 21 | 14606 | 617.09 |
| Mar 23 | 14590 | 700.42 | Mar 22 | 14607 | 502.92 |
| Mar 28 | 14591 | 420.99 | Mar 22 | 14608 | 713.32 |
| Mar 21 | 14592 | 1,130.57 | Mar 21 | 14609 | 490.98 |
| Mar 27 | 14593 | 992.66 | Mar 26 | 14610 | 280.00 |
| Mar 29 | 14594 | 864.21 | | | |

* Indicates break in check sequence

Daily Balances

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| Feb 28 | .00 | Mar 19 | .00 |
| Mar 06 | 9,942.71- | Mar 20 | 11,251.64- |
| Mar 07 | 11,572.90- | Mar 21 | 14,273.88- |
| Mar 08 | 4,677.46- | Mar 22 | 5,588.46- |
| Mar 09 | 4,779.06- | Mar 23 | 5,078.15- |
| Mar 12 | 1,226.60- | Mar 26 | 1,449.08- |
| Mar 13 | 280.00- | Mar 27 | 1,644.27- |
| Mar 14 | 2,117.60- | Mar 28 | 783.38- |
| Mar 15 | .00 | Mar 29 | 2,952.03- |
| Mar 16 | 628.31- | Mar 30 | .00 |

SIGN 00056

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394         79

Rates for this statement period - Overdraft
Mar 01, 2007   12.250000 %

SIGN 00057

Statement Period
From April   01, 2007
To   April   30, 2007
Page   1 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          3

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

Signature Relationship Summary                     Opening Bal.              Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583394     MONOGRAM CHECKING                          .00                      .00

               RELATIONSHIP        TOTAL                                          .00

SIGN 00058

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          3

MONOGRAM CHECKING          1500583394                              ?

Summary

    Previous Balance as of April     01, 2007                              .00
        3 Credits                                              3,915.19
        4 Debits                                               3,915.19
    Ending Balance as of     April     30, 2007                              .00


Deposits and Other Credits
Apr 04    TELEPHONE TRANSFER
          TELEPHONE TRANSFER FROM: 1500583785                    424.53
Apr 05    WEB TRANSFER     WEB CREDIT
          WEB XFR FROM: 1500583785                             2,401.90
Apr 17    WEB TRANSFER     WEB CREDIT
          WEB XFR FROM: 1500583785                             1,088.76

Withdrawals and Other Debits
Apr 05    WEB TRANSFER     WEB DEBIT
          WEB XFR TO: 1500583408                               2,401.90

Checks by Serial Number
Apr 16    14543          544.38     Apr 03    14595 *        424.53
Apr 16    14583 *        544.38

          * Indicates break in check sequence

Daily Balances
Mar 31          .00              Apr 16      1,088.76-
Apr 03      424.53-             Apr 17          .00
Apr 04          .00


SIGN 00059

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394         3

Rates for this statement period - Overdraft
Apr 01, 2007   12.250000 %

SIGN 00060

Statement Period
From May   01, 2007
To   May   31, 2007
Page   1 of   4

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394      40

*                                    *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                    *

Signature Relationship Summary                    Opening Bal.            Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583394     MONOGRAM CHECKING                        .00                    .00

               RELATIONSHIP          TOTAL                                     .00

SIGN 00061

Statement Period
From May    01, 2007
To   May    31, 2007
Page   2 of   4

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394        40

MONOGRAM CHECKING        1500583394                                ?

Summary

Previous Balance as of May    01, 2007                              .00
     10 Credits                                              43,959.53
     42 Debits                                               43,959.53
Ending Balance as of   May    31, 2007                              .00

Deposits and Other Credits
May 02  WEB TRANSFER    WEB CREDIT                           11,004.50
        WEB XFR FROM: 1500583785
May 03  WEB TRANSFER    WEB CREDIT                           11,332.56
        WEB XFR FROM: 1500583785
May 04  WEB TRANSFER    WEB CREDIT                            7,971.72
        WEB XFR FROM: 1500812660
May 07  WEB TRANSFER    WEB CREDIT                            4,772.31
        WEB XFR FROM: 1500812660
May 08  WEB TRANSFER    WEB CREDIT                            1,454.00
        WEB XFR FROM: 1500812660
May 09  WEB TRANSFER    WEB CREDIT                              790.17
        WEB XFR FROM: 1500883630
May 10  WEB TRANSFER    WEB CREDIT                            1,038.52
        WEB XFR FROM: 1500883630
May 14  WEB TRANSFER    WEB CREDIT                            1,241.08
        WEB XFR FROM: 1500883630
May 15  WEB TRANSFER    WEB CREDIT                            1,354.67
        WEB XFR FROM: 1500883630
May 22  WEB TRANSFER    WEB CREDIT                            3,000.00
        WEB XFR FROM: 1500883630

Withdrawals and Other Debits
May 01  AUTOMATED PAYMENT    ck/ref no.    6498013           10,157.06
        TAX SERVICE 702     PMT IMPND     G9912-008201646
May 23  MISC DEBIT     RESTRAINING                            3,000.00

SIGN 00062

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394        40

Checks by Serial Number

| May 04 | 104689 | 442.72 | May 03 | 104709 | 992.66 |
|--------|--------|--------|--------|--------|--------|
| May 14 | 104690 | 628.31 | May 03 | 104710 | 864.21 |
| May 02 | 104691 | 640.99 | May 04 | 104711 | 609.67 |
| May 02 | 104692 | 1,353.01 | May 02 | 104712 | 424.53 |
| May 09 | 104693 | 1,038.52 | May 11 | 104713 | 458.35 |
| May 07 | 104694 | 522.39 | May 04 | 104714 | 659.40 |
| May 03 | 104695 | 813.89 | May 03 | 104715 | 1,142.08 |
| May 02 | 104696 | 1,556.14 | May 03 | 104716 | 816.35 |
| May 03 | 104697 | 1,245.58 | May 03 | 104717 | 852.15 |
| May 02 | 104698 | 758.62 | May 08 | 104718 | 790.17 |
| May 01 | 104699 | 847.44 | May 02 | 104719 | 932.32 |
| May 07 | 104700 | 651.61 | May 04 | 104720 | 792.06 |
| May 03 | 104701 | 544.38 | May 02 | 104721 | 857.68 |
| May 02 | 104702 | 719.25 | May 14 | 104722 | 726.36 |
| May 11 | 104703 | 782.73 | May 02 | 104723 | 746.81 |
| May 02 | 104704 | 891.73 | May 02 | 104724 | 651.63 |
| May 04 | 104705 | 1,215.66 | May 02 | 104725 | 502.92 |
| May 04 | 104706 | 631.81 | May 02 | 104726 | 713.32 |
| May 03 | 104707 | 700.42 | May 02 | 104727 | 583.61 |
| May 04 | 104708 | 420.99 | May 07 | 104728 | 280.00 |

Daily Balances

| Apr 30 | .00 | May 09 | 1,038.52- |
|--------|-----|--------|-----------|
| May 01 | 11,004.50- | May 10 | .00 |
| May 02 | 11,332.56- | May 11 | 1,241.08- |
| May 03 | 7,971.72- | May 14 | 1,354.67- |
| May 04 | 4,772.31- | May 15 | .00 |
| May 07 | 1,454.00- | May 22 | 3,000.00 |
| May 08 | 790.17- | May 23 | .00 |

SIGN 00063

Statement Period
From May   01, 2007
To   May   31, 2007
Page   4 of   4

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          40

Rates for this statement period - Overdraft
May 01, 2007   12.250000 %

SIGN 00064

Statement Period
From June      01, 2007
To   June      30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

*                                    *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                    *

Signature Relationship Summary                 Opening Bal.              Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583394      MONOGRAM CHECKING                      .00                     .00

                RELATIONSHIP        TOTAL                                      .00

SIGN 00065

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

MONOGRAM CHECKING          1500583394                                          ?

Summary

Previous Balance as of June     01, 2007                                    .00

There was no deposit activity during this statement period

Ending Balance as of    June    30, 2007                                    .00

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

SIGN 00066

Statement Period
From July   01, 2007
To   July   31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

                    *                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                              *

Signature Relationship Summary                    Opening Bal.          Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583394     MONOGRAM CHECKING                        .00                   .00

               RELATIONSHIP          TOTAL                                    .00

SIGN 00067

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

MONOGRAM CHECKING            1500583394                                          ?

Summary

  Previous Balance as of July     01, 2007                                    .00

  There was no deposit activity during this statement period

  Ending Balance as of    July     31, 2007                                   .00

Rates for this statement period - Overdraft
.Jul 01, 2007   12.250000 %

SIGN 00068

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394              0

*
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                          *

| Signature Relationship Summary | Opening Bal. | Closing Bal. ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583394    MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP         TOTAL | | .00 |

SIGN 00069

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394            0

MONOGRAM CHECKING          1500583394                                        ?

Summary

  Previous Balance as of August    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    August   31, 2007                              .00

Rates for this statement period - Overdraft
Aug 01, 2007   12.250000 %

SIGN 00070

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583394    MONOGRAM CHECKING | | .00 | .00 |
| RELATIONSHIP | TOTAL | | .00 |

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                         8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

MONOGRAM CHECKING          1500583394                                              ?

Summary

Previous Balance as of September 01, 2007                                      .00

There was no deposit activity during this statement period

Ending Balance as of    September 30, 2007                                     .00

Rates for this statement period - Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

SIGN 00072

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394        0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583394 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| | RELATIONSHIP | TOTAL | .00 | |

SIGN 00073

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

MONOGRAM CHECKING          1500583394                                        ?

Summary

  Previous Balance as of October   01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    October   31, 2007                            .00

Rates for this statement period - Overdraft
Oct 01, 2007   13.750000 %

SIGN 00074

*Signature*
SIGNATURE BANK

Statement Period
From  November 01, 2007
To    November 30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER 150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

Signature Relationship Summary

| | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583394 | MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP | TOTAL | | .00 |

SIGN 01064



PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583394                    0

MONOGRAM CHECKING          1500583394                                        ?

Summary

Previous Balance as of November  01, 2007
                                                                        .00

There was no deposit activity during this statement period

Ending Balance as of    November  30, 2007
                                                                        .00

Rates for this statement period - Overdraft
Nov 01, 2007   13.500000 %

SIGN 01065

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY   11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883622 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP          TOTAL | | .00 | |

SIGN 00075

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                        8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                                    ?

Summary

Previous Balance as of March      07, 2007                              .00
     1 Credits                                                        38.44
     1 Debits                                                         38.44
Ending Balance as of     March    31, 2007                             .00

Deposits and Other Credits
  Mar 14  WEB TRANSFER    WEB CREDIT
          WEB XFR FROM: 1500583785                                    38.44

Withdrawals and Other Debits
  Mar 12  AUTOMATED PAYMENT      ck/ref no.   5966460                 38.44
          DELUXE BUS SYS.    BUS PRODS    24118772

Daily Balances
  Mar 07              .00              Mar 14              .00
  Mar 12          38.44-

Rates for this statement period - Overdraft
Mar 07, 2007   12.250000 %

SIGN 00076

Statement Page of
From April   01, 2007
To   April   30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


AHAVA FOOD CORP.                          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

                            For info call our toll-free Signature Line
                            1-866-sigline or visit signatureny.com

                            Primary Account: 1500883622          0


            IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
            NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
            THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
            THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
            INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
            IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
            CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
            SECTION.

Signature Relationship Summary                   Opening Bal.          Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500883622       MONOGRAM CHECKING                       .00                   .00

            RELATIONSHIP          TOTAL                                        .00


SIGN 00077

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                              ?

Summary

  Previous Balance as of April    01, 2007                           .00

  There was no deposit activity during this statement period

  Ending Balance as of    April    30, 2007                          .00

Rates for this statement period - Overdraft
Apr 01, 2007   12.250000 %

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                     8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622        0

                    *                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                              *

Signature Relationship Summary                    Opening Bal.          Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500883622      MONOGRAM CHECKING                        .00                   .00

        RELATIONSHIP          TOTAL                                            .00

SIGN 00079

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                                    ?

Summary

  Previous Balance as of May     01, 2007                               .00

  There was no deposit activity during this statement period

  Ending Balance as of   May     31, 2007                               .00

Rates for this statement period - Overdraft
May 01, 2007   12.250000 %

SIGN 00080

Statement Period
From June    01, 2007
To   June    30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                        8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

                    *
                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                        *

Signature Relationship Summary              Opening Bal.        Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500883622      MONOGRAM CHECKING                .00                .00

              RELATIONSHIP        TOTAL                             .00

SIGN 00081

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622              0

MONOGRAM CHECKING          1500883622                                        ?

Summary

  Previous Balance as of June    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of   June    30, 2007                              .00

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

SIGN 00082

```
                                          PRIVATE CLIENT GROUP 161
                                          565 FIFTH AVENUE
                                          NEW YORK, NY 10017


        AHAVA FOOD CORP.               8-161
        OPERATING ACCOUNT
        P. O. BOX 310628
        BROOKLYN NY  11231

                                    For info call our toll-free Signature Line
                                    1-866-sigline or visit signatureny.com

                                       Primary Account: 1500883622        0

              *                              *
        FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
        BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
              *                              *
```

Signature Relationship Summary                    Opening Bal.        Closing Bal.   ?

```
BANK DEPOSIT ACCOUNTS
1500883622     MONOGRAM CHECKING                    .00                  .00

          RELATIONSHIP        TOTAL                                      .00
```

SIGN 00083

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                                    ?

Summary

  Previous Balance as of July    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    July    31, 2007                            .00

Rates for this statement period - Overdraft
Jul 01, 2007   12.250000 %

SIGN 00084

Statement of
From August    01, 2007
To   August    31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

*
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                    *

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883622 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP    TOTAL | | .00 | |

SIGN 00085

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                                    ?

Summary

  Previous Balance as of August    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    August   31, 2007                              .00

Rates for this statement period - Overdraft
Aug 01, 2007  12.250000 %

SIGN 00086

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                        8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622        0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883622 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP        TOTAL | | .00 | |

SIGN 00087

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                                    ?

Summary

 Previous Balance as of September 01, 2007                              .00

 There was no deposit activity during this statement period

 Ending Balance as of   September 30, 2007                              .00

Rates for this statement period - Overdraft
Sep 19, 2007  13.750000 %
Sep 01, 2007  14.250000 %

SIGN 00088

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883622 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| RELATIONSHIP | TOTAL | | .00 | |

SIGN 00089

Statement Period
From  October   01, 2007
To    October   31, 2007
Page   2 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

MONOGRAM CHECKING          1500883622                                    ?

Summary

 Previous Balance as of October   01, 2007                          .00

 There was no deposit activity during this statement period

 Ending Balance as of    October   31, 2007                          .00

Rates for this statement period - Overdraft
Oct 01, 2007  13.750000 %

SIGN 00090

Statement Period
From November 01, 2007
To  November 30, 2007
Page  1 of  2

SIGNATURE BANK

SIGNATURE BANK

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500883622 | MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP | TOTAL | | .00 |

SIGN 01066

Signature
SIGNATURE BANK

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883622                    0

MONOGRAM CHECKING          1500883622                                                   7

Summary

  Previous Balance as of November  01, 2007                                       .00

  There was no deposit activity during this statement period

  Ending Balance as of    November 30, 2007                                       .00

Rates for this statement period - Overdraft
Nov 01, 2007  13.500000 %

SIGN 01067

# EXHIBIT P
# (Part 3 of 5)

Statement Period
From March  01, 2007
To   March   31, 2007
Page  1 of  7

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          235

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

Signature Relationship Summary                    Opening Bal.         Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583408      MONOGRAM CHECKING                        .00              378.76-

              RELATIONSHIP          TOTAL                                 378.76-

SIGN 00091

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        235

MONOGRAM CHECKING        1500583408                                    ?

Summary

Previous Balance as of March    01, 2007                          .00
     21 Credits                                             115,894.69
    240 Debits                                              116,273.45
Ending Balance as of    March   31, 2007                       378.76-

Deposits and Other Credits

| Date | Description | | Amount |
|------|-------------|--|-------:|
| Mar 01 | ZBA/TBA TRANSFER IN | | 1,092.31 |
| | ZBA/SWEEP TRANSFER FROM | 1500812660 | |
| Mar 02 | ZBA/TBA TRANSFER IN | | 10,324.91 |
| | ZBA/SWEEP TRANSFER FROM | 1500812660 | |
| Mar 05 | ZBA/TBA TRANSFER IN | | 9,183.35 |
| | ZBA/SWEEP TRANSFER FROM | 1500812660 | |
| Mar 07 | WEB TRANSFER    WEB CREDIT | | 1,585.93 |
| | WEB XFR FROM: 1500812660 | | |
| Mar 08 | WEB TRANSFER    WEB CREDIT | | 5,550.35 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 09 | WEB TRANSFER    WEB CREDIT | | 8,214.52 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 12 | WEB TRANSFER    WEB CREDIT | | 971.87 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 13 | WEB TRANSFER    WEB CREDIT | | 6,824.60 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 14 | WEB TRANSFER    WEB CREDIT | | 5,507.10 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 15 | WEB TRANSFER    WEB CREDIT | | 2,165.97 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 16 | WEB TRANSFER    WEB CREDIT | | 7,948.76 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 19 | WEB TRANSFER    WEB CREDIT | | 1,856.94 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 20 | WEB TRANSFER    WEB CREDIT | | 8,006.80 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 21 | WEB TRANSFER    WEB CREDIT | | 4,452.79 |

SIGN 00092

Statement Period
From March 01, 2007
To March 31, 2007
Page 3 of 7

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY 11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408      235

| Date | Description | |
|------|-------------|--|
| | WEB XFR FROM: 1500583785 | |
| Mar 22 | WEB TRANSFER    WEB CREDIT | 4,595.98 |
| | WEB XFR FROM: 1500583785 | |
| Mar 23 | WEB TRANSFER    WEB CREDIT | 8,736.87 |
| | WEB XFR FROM: 1500583785 | |
| Mar 26 | WEB TRANSFER    WEB CREDIT | 1,500.37 |
| | WEB XFR FROM: 1500583785 | |
| Mar 27 | WEB TRANSFER    WEB CREDIT | 8,291.75 |
| | WEB XFR FROM: 1500583785 | |
| Mar 28 | WEB TRANSFER    WEB CREDIT | 2,043.54 |
| | WEB XFR FROM: 1500583785 | |
| Mar 29 | WEB TRANSFER    WEB CREDIT | 5,739.03 |
| | WEB XFR FROM: 1500583785 | |
| Mar 30 | WEB TRANSFER    WEB CREDIT | 11,300.95 |
| | WEB XFR FROM: 1500583785 | |

Withdrawals and Other Debits

| Date | Description | | | |
|------|-------------|--|--|--|
| Mar 02 | AUTOMATED PAYMENT | ck/ref no. | 5875090 | 8,319.32 |
| | TAX SERVICE 702 | PMT IMPND | H1833-007972634 | |
| Mar 08 | AUTOMATED PAYMENT | ck/ref no. | 5936691 | 8,214.52 |
| | TAX SERVICE 702 | PMT IMPND | H1833-007988842 | |
| Mar 15 | AUTOMATED PAYMENT | ck/ref no. | 6013107 | 7,948.76 |
| | TAX SERVICE 702 | PMT IMPND | H1833-008019267 | |
| Mar 22 | AUTOMATED PAYMENT | ck/ref no. | 6082992 | 8,660.54 |
| | TAX SERVICE 702 | PMT IMPND | H1833-008044240 | |
| Mar 29 | AUTOMATED PAYMENT | ck/ref no. | 6156592 | 9,282.84 |
| | TAX SERVICE 702 | PMT IMPND | H1833-008068811 | |

Checks by Serial Number

| Date | Serial | Amount | Date | Serial | Amount |
|------|--------|--------|------|--------|--------|
| Mar 28 | 18275 | 375.96 | Mar 07 | 18797 * | 336.40 |
| Mar 19 | 18670 * | 261.13 | Mar 07 | 18798 | 318.02 |
| Mar 02 | 18687 * | 426.98 | Mar 05 | 18799 | 552.88 |
| Mar 02 | 18743 * | 277.55 | Mar 05 | 18800 | 116.97 |
| Mar 02 | 18744 | 273.35 | Mar 13 | 18801 | 479.29 |
| Mar 01 | 18748 * | 649.56 | Mar 07 | 18802 | 561.79 |
| Mar 05 | 18755 * | 142.72 | Mar 05 | 18803 | 246.29 |
| Mar 02 | 18759 * | 159.65 | Mar 05 | 18804 | 447.93 |
| Mar 01 | 18793 * | 278.67 | Mar 07 | 18805 | 649.57 |
| Mar 01 | 18794 | 164.08 | Mar 05 | 18806 | 280.74 |

SIGN 00093

Statement Period
From March   01, 2007
To   March   31, 2007
Page   4 of   7

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        235

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Mar 05 | 18807 | 290.85 | Mar 05 | 18846 | 387.60 |
| Mar 05 | 18808 | 270.47 | Mar 12 | 18847 | 172.92 |
| Mar 02 | 18809 | 415.41 | Mar 06 | 18848 | 276.99 |
| Mar 05 | 18810 | 369.10 | Mar 06 | 18849 | 454.13 |
| Mar 06 | 18811 | 489.92 | Mar 07 | 18850 | 235.57 |
| Mar 05 | 18812 | 155.37 | Mar 07 | 18851 | 286.36 |
| Mar 07 | 18813 | 246.66 | Mar 07 | 18852 | 420.52 |
| Mar 05 | 18814 | 210.35 | Mar 07 | 18853 | 200.54 |
| Mar 05 | 18815 | 423.36 | Mar 13 | 18854 | 264.21 |
| Mar 16 | 18816 | 238.02 | Mar 16 | 18855 | 371.69 |
| Mar 05 | 18817 | 390.14 | Mar 13 | 18856 | 552.89 |
| Mar 05 | 18818 | 262.76 | Mar 12 | 18857 | 155.13 |
| Mar 06 | 18819 | 364.89 | Mar 13 | 18858 | 419.76 |
| Mar 07 | 18820 | 179.71 | Mar 14 | 18859 | 578.30 |
| Mar 05 | 18821 | 176.54 | Mar 12 | 18860 | 241.72 |
| Mar 05 | 18822 | 192.53 | Mar 12 | 18861 | 366.66 |
| Mar 14 | 18823 | 159.60 | Mar 20 | 18862 | 649.56 |
| Mar 05 | 18824 | 267.13 | Mar 12 | 18863 | 266.29 |
| Mar 05 | 18825 | 237.46 | Mar 12 | 18864 | 445.15 |
| Mar 05 | 18826 | 425.22 | Mar 14 | 18865 | 380.21 |
| Mar 07 | 18827 | 322.72 | Mar 09 | 18866 | 259.80 |
| Mar 07 | 18828 | 197.30 | Mar 13 | 18867 | 369.10 |
| Mar 05 | 18829 | 345.47 | Mar 13 | 18868 | 338.15 |
| Mar 05 | 18830 | 368.81 | Mar 12 | 18869 | 233.93 |
| Mar 02 | 18831 | 452.65 | Mar 13 | 18870 | 225.90 |
| Mar 07 | 18832 | 307.14 | Mar 12 | 18871 | 210.82 |
| Mar 07 | 18833 | 310.25 | Mar 09 | 18872 | 296.58 |
| Mar 05 | 18834 | 540.58 | Mar 16 | 18873 | 325.00 |
| Mar 07 | 18835 | 150.30 | Mar 12 | 18874 | 383.45 |
| Mar 07 | 18836 | 283.06 | Mar 12 | 18875 | 333.44 |
| Mar 07 | 18837 | 155.23 | Mar 13 | 18876 | 445.12 |
| Mar 05 | 18838 | 369.46 | Mar 14 | 18877 | 184.23 |
| Mar 07 | 18839 | 151.35 | Mar 12 | 18878 | 173.61 |
| Mar 05 | 18840 | 316.25 | Mar 12 | 18879 | 164.46 |
| Mar 05 | 18841 | 203.79 | Mar 14 | 18880 | 197.90 |
| Mar 05 | 18842 | 243.31 | Mar 12 | 18881 | 249.36 |
| Mar 07 | 18843 | 237.86 | Mar 12 | 18882 | 274.07 |
| Mar 05 | 18844 | 243.91 | Mar 13 | 18883 | 354.26 |
| Mar 05 | 18845 | 705.36 | Mar 16 | 18884 | 249.88 |

SIGN 00094

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        235

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Mar 13 | 18885 | 149.61 | Mar 21 | 18925 | 344.27 |
| Mar 12 | 18886 | 506.73 | Mar 19 | 18926 | 227.83 |
| Mar 09 | 18887 | 415.49 | Mar 19 | 18927 | 169.57 |
| Mar 21 | 18888 | 410.87 | Mar 19 | 18928 | 203.29 |
| Mar 12 | 18889 | 305.99 | Mar 29 | 18929 | 245.67 |
| Mar 13 | 18890 | 467.14 | Mar 29 | 18930 | 245.72 |
| Mar 13 | 18891 | 100.57 | Mar 19 | 18931 | 460.07 |
| Mar 13 | 18892 | 262.10 | Mar 19 | 18932 | 243.30 |
| Mar 12 | 18893 | 214.55 | Mar 20 | 18933 | 433.90 |
| Mar 12 | 18894 | 352.31 | Mar 20 | 18934 | 117.66 |
| Mar 13 | 18895 | 180.53 | Mar 26 | 18935 | 114.39 |
| Mar 12 | 18896 | 313.84 | Mar 19 | 18936 | 282.65 |
| Mar 12 | 18897 | 188.75 | Mar 28 | 18937 | 189.69 |
| Mar 13 | 18898 | 310.27 | Mar 19 | 18938 | 334.94 |
| Mar 13 | 18899 | 191.38 | Mar 19 | 18939 | 249.04 |
| Mar 16 | 18900 | 166.28 | Mar 19 | 18940 | 386.12 |
| Mar 12 | 18901 | 705.35 | Mar 19 | 18941 | 287.33 |
| Mar 12 | 18902 | 326.39 | Mar 21 | 18942 | 149.59 |
| Mar 14 | 18903 | 126.12 | Mar 19 | 18943 | 514.27 |
| Mar 14 | 18904 | 339.07 | Mar 20 | 18944 | 506.90 |
| Mar 23 | 18905 | 372.00 | Mar 21 | 18945 | 292.89 |
| Mar 16 | 18906 | 187.37 | Mar 21 | 18946 | 268.87 |
| Mar 12 | 18907 | 239.68 | Mar 19 | 18947 | 259.69 |
| Mar 13 | 18908 | 396.82 | Mar 20 | 18948 | 559.81 |
| Mar 14 | 18909 | 200.54 | Mar 19 | 18949 | 149.32 |
| Mar 19 | 18910 | 252.97 | Mar 19 | 18950 | 344.39 |
| Mar 21 | 18911 | 384.81 | Mar 19 | 18951 | 184.30 |
| Mar 19 | 18912 | 552.88 | Mar 21 | 18952 | 359.13 |
| Mar 19 | 18913 | 155.87 | Mar 19 | 18953 | 146.37 |
| Mar 21 | 18915 * | 569.25 | Mar 19 | 18954 | 304.70 |
| Mar 19 | 18916 | 242.95 | Mar 19 | 18955 | 135.95 |
| Mar 19 | 18917 | 341.11 | Mar 20 | 18956 | 317.28 |
| Mar 20 | 18918 | 649.58 | Mar 19 | 18957 | 239.73 |
| Mar 19 | 18919 | 371.67 | Mar 21 | 18958 | 240.33 |
| Mar 20 | 18920 | 277.54 | Mar 19 | 18959 | 705.36 |
| Mar 20 | 18921 | 227.87 | Mar 21 | 18960 | 255.95 |
| Mar 16 | 18922 | 318.70 | Mar 22 | 18961 | 76.33 |
| Mar 21 | 18923 | 369.10 | Mar 20 | 18962 | 245.13 |
| Mar 21 | 18924 | 392.03 | Mar 23 | 18963 | 326.22 |

SIGN 00095

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408              235

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Mar 21 | 18964 | 186.63 | Mar 26 | 18996 | 258.31 |
| Mar 21 | 18965 | 171.72 | Mar 26 | 18997 | 308.46 |
| Mar 20 | 18966 | 467.56 | Mar 29 | 18998 | 405.44 |
| Mar 21 | 18967 | 200.54 | Mar 28 | 18999 | 184.16 |
| Mar 30 | 18968 | 378.76 | Mar 26 | 19000 | 345.46 |
| Mar 29 | 18969 | 404.65 | Mar 26 | 19001 | 331.89 |
| Mar 27 | 18970 | 552.88 | Mar 23 | 19002 | 523.41 |
| Mar 28 | 18971 | 160.72 | Mar 28 | 19003 | 292.89 |
| Mar 28 | 18973 * | 484.39 | Mar 28 | 19004 | 269.52 |
| Mar 26 | 18974 | 243.48 | Mar 26 | 19005 | 370.09 |
| Mar 28 | 18976 * | 649.57 | Mar 28 | 19006 | 627.10 |
| Mar 26 | 18977 | 461.92 | Mar 26 | 19007 | 104.92 |
| Mar 26 | 18978 | 277.54 | Mar 26 | 19008 | 356.58 |
| Mar 26 | 18979 | 222.61 | Mar 26 | 19009 | 162.02 |
| Mar 23 | 18980 | 278.74 | Mar 26 | 19010 | 361.21 |
| Mar 28 | 18981 | 369.10 | Mar 26 | 19011 | 196.19 |
| Mar 28 | 18982 | 409.01 | Mar 26 | 19012 | 345.66 |
| Mar 26 | 18983 | 259.11 | Mar 26 | 19013 | 134.14 |
| Mar 26 | 18984 | 247.44 | Mar 29 | 19014 | 258.14 |
| Mar 26 | 18985 | 397.50 | Mar 26 | 19015 | 202.53 |
| Mar 29 | 18986 | 245.67 | Mar 26 | 19016 | 705.35 |
| Mar 29 | 18987 | 212.82 | Mar 28 | 19017 | 352.94 |
| Mar 26 | 18988 | 395.59 | Mar 26 | 19018 | 139.38 |
| Mar 26 | 18989 | 413.71 | Mar 27 | 19019 | 397.09 |
| Mar 27 | 18990 | 463.64 | Mar 28 | 19020 | 326.23 |
| Mar 28 | 18991 | 183.58 | Mar 28 | 19021 | 236.01 |
| Mar 26 | 18992 | 260.21 | Mar 28 | 19022 | 248.38 |
| Mar 26 | 18993 | 235.42 | Mar 27 | 19023 | 429.39 |
| Mar 28 | 18994 | 379.78 | Mar 27 | 19024 | 200.54 |
| Mar 26 | 18995 | 440.64 | | | |

* Indicates break in check sequence

SIGN 00096

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        235

Daily Balances

| Feb 28 | .00 | Mar 19 | 8,006.80- |
| Mar 06 | 1,585.93- | Mar 20 | 4,452.79- |
| Mar 07 | 5,550.35- | Mar 21 | 4,595.98- |
| Mar 08 | 8,214.52- | Mar 22 | 8,736.87- |
| Mar 09 | 971.87- | Mar 23 | 1,500.37- |
| Mar 12 | 6,824.60- | Mar 26 | 8,291.75- |
| Mar 13 | 5,507.10- | Mar 27 | 2,043.54- |
| Mar 14 | 2,165.97- | Mar 28 | 5,739.03- |
| Mar 15 | 7,948.76- | Mar 29 | 11,300.95- |
| Mar 16 | 1,856.94- | Mar 30 | 378.76- |

Rates for this statement period - Overdraft
Mar 01, 2007   12.250000 %

SIGN 00097

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408      147

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal.  ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583408    MONOGRAM CHECKING | | 378.76- | 8,917.70- |
| | | | |
| RELATIONSHIP    TOTAL | | | 8,917.70- |

Statement of
From April   01, 2007
To    April   30, 2007
Page   2 of  5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        147

MONOGRAM CHECKING          1500583408                                              ?

Summary

      Previous Balance as of April     01, 2007                                  378.76-
           13 Credits                                                         50,278.79
          149 Debits                                                          58,817.73
      Ending Balance as of    April    30, 2007                                8,917.70-


Deposits and Other Credits
Apr 02  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                                 378.76
Apr 03  TELEPHONE TRANSFER
        TELEPHONE TRANSFER FROM: 1500583785                                   13,038.27
Apr 04  TELEPHONE TRANSFER
        TELEPHONE TRANSFER FROM: 1500583785                                    6,048.61
Apr 05  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583394                                               2,401.90
Apr 06  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               1,117.38
Apr 09  TELEPHONE TRANSFER
        TELEPHONE TRANSFER FROM: 1500583785                                      237.62
Apr 20  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               5,549.15
Apr 23  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                                 701.04
Apr 24  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               8,194.97
Apr 25  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               2,313.96
Apr 26  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               1,092.07
Apr 27  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               8,154.28
Apr 30  WEB TRANSFER     WEB CREDIT
        WEB XFR FROM: 1500583785                                               1,050.78

SIGN 00099

Statement Period
From April   01, 2007
To   April   30, 2007
Page   3 of  5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408      147

## Withdrawals and Other Debits

| Date | Description | | ck/ref no. | | Amount |
|------|-------------|--|------------|--|--------|
| Apr 19 | AUTOMATED PAYMENT | | ck/ref no. | 6378780 | 5,549.15 |
| | TAX SERVICE 702 | PMT IMPND | H1833-008155299 | | |
| Apr 26 | AUTOMATED PAYMENT | | ck/ref no. | 6449614 | 7,873.54 |
| | TAX SERVICE 702 | PMT IMPND | H1833-008179695 | | |

## Checks by Serial Number

| Date | Serial | Amount | Date | Serial | Amount |
|------|--------|--------|------|--------|--------|
| Apr 03 | 18914 | 352.45 | Apr 02 | 19055 | 240.35 |
| Apr 03 | 18972 * | 472.45 | Apr 04 | 19056 | 219.77 |
| Apr 02 | 19025 * | 283.63 | Apr 04 | 19057 | 329.58 |
| Apr 05 | 19026 | 277.05 | Apr 03 | 19058 | 445.74 |
| Apr 05 | 19027 | 326.92 | Apr 02 | 19059 | 258.97 |
| Apr 03 | 19028 | 552.88 | Apr 02 | 19060 | 402.91 |
| Apr 02 | 19029 | 140.13 | Apr 04 | 19061 | 317.29 |
| Apr 03 | 19030 | 277.54 | Apr 02 | 19062 | 295.95 |
| Apr 03 | 19031 | 249.62 | Apr 02 | 19063 | 602.40 |
| Apr 04 | 19032 | 631.88 | Apr 02 | 19064 | 528.58 |
| Apr 02 | 19033 | 242.79 | Apr 03 | 19065 | 465.73 |
| Apr 02 | 19034 | 394.20 | Apr 02 | 19066 | 439.86 |
| Apr 02 | 19035 | 649.56 | Apr 02 | 19067 | 664.27 |
| Apr 02 | 19036 | 344.02 | Apr 02 | 19068 | 144.53 |
| Apr 02 | 19037 | 292.15 | Apr 03 | 19069 | 343.28 |
| Apr 02 | 19038 | 277.54 | Apr 02 | 19070 | 318.91 |
| Apr 02 | 19039 | 288.42 | Apr 02 | 19071 | 367.02 |
| Apr 02 | 19040 | 308.66 | Apr 02 | 19072 | 414.75 |
| Apr 03 | 19041 | 443.28 | Apr 02 | 19073 | 313.45 |
| Apr 03 | 19042 | 557.15 | Apr 02 | 19074 | 300.00 |
| Apr 02 | 19043 | 231.42 | Apr 02 | 19075 | 192.11 |
| Apr 02 | 19044 | 224.67 | Apr 03 | 19076 | 347.14 |
| Apr 04 | 19045 | 176.76 | Apr 02 | 19077 | 239.33 |
| Apr 02 | 19046 | 307.46 | Apr 02 | 19078 | 725.57 |
| Apr 05 | 19047 | 245.66 | Apr 02 | 19079 | 319.12 |
| Apr 05 | 19048 | 267.75 | Apr 03 | 19081 * | 277.05 |
| Apr 02 | 19049 | 385.03 | Apr 03 | 19082 | 263.04 |
| Apr 02 | 19050 | 124.19 | Apr 02 | 19083 | 544.97 |
| Apr 02 | 19051 | 331.13 | Apr 06 | 19084 | 237.62 |
| Apr 02 | 19052 | 536.34 | Apr 04 | 19085 | 250.25 |
| Apr 03 | 19053 | 351.70 | Apr 04 | 19086 | 275.83 |
| Apr 02 | 19054 | 429.82 | Apr 02 | 19087 | 583.62 |

SIGN 00100

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        147

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Apr 04 | 19088 | 200.54 | Apr 23 | 109237 | 195.49 |
| Apr 26 | 109198 * | 125.15 | Apr 23 | 109238 | 113.31 |
| Apr 26 | 109199 | 155.59 | Apr 24 | 109239 | 124.61 |
| Apr 23 | 109200 | 552.88 | Apr 23 | 109240 | 201.64 |
| Apr 23 | 109201 | 170.31 | Apr 23 | 109241 | 705.36 |
| Apr 25 | 109203 * | 376.73 | Apr 23 | 109242 | 180.86 |
| Apr 23 | 109204 | 250.24 | Apr 23 | 109243 | 68.74 |
| Apr 23 | 109205 | 271.89 | Apr 23 | 109245 * | 319.12 |
| Apr 24 | 109206 | 649.56 | Apr 23 | 109246 | 223.76 |
| Apr 23 | 109207 | 412.23 | Apr 23 | 109247 | 191.60 |
| Apr 23 | 109208 | 182.23 | Apr 24 | 109248 | 415.28 |
| Apr 23 | 109209 | 165.32 | Apr 24 | 109249 | 251.05 |
| Apr 24 | 109210 | 453.88 | Apr 30 | 109250 | 258.60 |
| Apr 23 | 109211 | 193.09 | Apr 30 | 109253 * | 138.46 |
| Apr 25 | 109212 | 78.87 | Apr 30 | 109256 * | 236.14 |
| Apr 23 | 109213 | 252.07 | Apr 30 | 109257 | 331.37 |
| Apr 23 | 109214 | 212.49 | Apr 30 | 109259 * | 490.08 |
| Apr 27 | 109215 | 207.45 | Apr 30 | 109260 | 499.16 |
| Apr 23 | 109216 | 528.52 | Apr 27 | 109261 | 385.83 |
| Apr 23 | 109217 | 48.86 | Apr 30 | 109263 * | 264.32 |
| Apr 24 | 109218 | 157.27 | Apr 30 | 109265 * | 118.66 |
| Apr 25 | 109219 | 93.45 | Apr 30 | 109266 | 376.94 |
| Apr 23 | 109220 | 110.22 | Apr 30 | 109268 * | 260.07 |
| Apr 23 | 109221 | 164.48 | Apr 30 | 109270 * | 395.60 |
| Apr 25 | 109222 | 99.39 | Apr 30 | 109271 | 202.12 |
| Apr 23 | 109223 | 326.86 | Apr 30 | 109272 | 198.59 |
| Apr 23 | 109224 | 311.43 | Apr 30 | 109274 * | 196.93 |
| Apr 25 | 109225 | 329.27 | Apr 30 | 109276 * | 308.36 |
| Apr 25 | 109226 | 261.75 | Apr 30 | 109278 * | 286.88 |
| Apr 23 | 109227 | 454.08 | Apr 30 | 109279 | 622.81 |
| Apr 20 | 109228 | 331.75 | Apr 27 | 109280 | 457.50 |
| Apr 25 | 109229 | 181.88 | Apr 30 | 109282 * | 211.69 |
| Apr 23 | 109230 | 217.70 | Apr 30 | 109283 | 435.27 |
| Apr 23 | 109231 | 502.46 | Apr 30 | 109284 | 146.48 |
| Apr 23 | 109232 | 110.74 | Apr 30 | 109285 | 326.57 |
| Apr 23 | 109233 | 112.51 | Apr 30 | 109286 | 399.52 |
| Apr 20 | 109234 | 369.29 | Apr 30 | 109287 | 184.36 |
| Apr 23 | 109235 | 115.21 | Apr 30 | 109288 | 303.51 |
| Apr 24 | 109236 | 262.31 | Apr 30 | 109289 | 188.87 |

SIGN 00101

Statement Period
From April   01, 2007
To   April   30, 2007
Page   5 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

```
LEWIS COUNTY DAIRY CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231
```

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          147

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Apr 30 | 109290 | 127.72 | Apr 30 | 109294 | 269.24 |
| Apr 30 | 109291 | 268.42 | Apr 30 | 109295 | 145.39 |
| Apr 30 | 109293 * | 725.57 | | | |

* Indicates break in check sequence

Daily Balances

| Date | Balance | Date | Balance |
|------|---------|------|---------|
| Mar 31 | 378.76- | Apr 20 | 701.04- |
| Apr 02 | 13,038.27- | Apr 23 | 8,194.97- |
| Apr 03 | 6,048.61- | Apr 24 | 2,313.96- |
| Apr 04 | 2,401.90- | Apr 25 | 1,092.07- |
| Apr 05 | 1,117.38- | Apr 26 | 8,154.28- |
| Apr 06 | 237.62- | Apr 27 | 1,050.78- |
| Apr 09 | .00 | Apr 30 | 8,917.70- |
| Apr 19 | 5,549.15- | | |

Rates for this statement period - Overdraft
Apr 01, 2007  12.250000 %

SIGN 00102

Statement Period
From May    01, 2007
To   May    31, 2007
Page   1 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408       22

                    *                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                              *

| Signature Relationship Summary | Opening Bal. | Closing Bal. ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583408    MONOGRAM CHECKING | 8,917.70- | .00 |
| | | |
| RELATIONSHIP        TOTAL | | .00 |

SIGN 00103

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        22

MONOGRAM CHECKING        1500583408                                    ?

Summary

Previous Balance as of May    01, 2007                              8,917.70-
       7 Credits                                                   33,792.44
      25 Debits                                                    24,874.74
Ending Balance as of    May    31, 2007                                  .00

Deposits and Other Credits
May 01  WEB TRANSFER    WEB CREDIT                                    8,917.70
        WEB XFR FROM: 1500583785
May 02  WEB TRANSFER    WEB CREDIT                                    4,080.35
        WEB XFR FROM: 1500583785
May 03  WEB TRANSFER    WEB CREDIT                                    3,875.30
        WEB XFR FROM: 1500583785
May 04  WEB TRANSFER    WEB CREDIT                                    7,563.92
        WEB XFR FROM: 1500812660
May 08  WEB TRANSFER    WEB CREDIT                                      552.88
        WEB XFR FROM: 1500812660
May 15  WEB TRANSFER    WEB CREDIT                                    7,802.29
        WEB XFR FROM: 1500883630
May 22  WEB TRANSFER    WEB CREDIT                                    1,000.00
        WEB XFR FROM: 1500883630

Withdrawals and Other Debits
May 03  AUTOMATED PAYMENT    ck/ref no.   6531711                     7,563.92
        TAX SERVICE 702    PMT IMPND    H1833-008212177
May 14  AUTOMATED PAYMENT    ck/ref no.   6629454                     7,802.29
        TAX SERVICE 702    PMT IMPND    H1833-008248424
May 23  MISC DEBIT    RESTRAINING                                     1,000.00

Checks by Serial Number
May 01    109202         380.41    May 01    109254 *       753.80
May 01    109244 *       145.66    May 02    109255         594.67
May 02    109251 *       404.26    May 01    109258 *       645.30
May 07    109252         552.88    May 01    109262 *       685.66

SIGN 00104

From May     01, 2007
To   May     31, 2007
Page   3 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

```
LEWIS COUNTY DAIRY CORP.                    9-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231
```

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          22

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| May 02 | 109264 * | 215.34 | May 02 | 109292 * | 235.56 |
| May 02 | 109267 * | 431.92 | May 01 | 109296 * | 251.97 |
| May 01 | 109269 * | 457.82 | May 02 | 109297 | 524.41 |
| May 02 | 109273 * | 219.06 | May 02 | 109298 | 234.94 |
| May 01 | 109275 * | 272.77 | May 02 | 109299 | 229.89 |
| May 02 | 109277 * | 218.73 | May 01 | 109300 | 486.96 |
| May 02 | 109281 * | 289.15 | May 02 | 109301 | 277.37 |

* Indicates break in check sequence

Daily Balances

| Date | Balance | Date | Balance |
|------|---------|------|---------|
| Apr 30 | 8,917.70- | May 08 | .00 |
| May 01 | 4,080.35- | May 14 | 7,802.29- |
| May 02 | 3,875.30- | May 15 | .00 |
| May 03 | 7,563.92- | May 22 | 1,000.00 |
| May 04 | .00 | May 23 | .00 |
| May 07 | 552.88- | | |

Rates for this statement period - Overdraft
May 01, 2007  12.250000 %

SIGN 00105

```
                                              Statement Period:
                                              From June   01, 2007
                                              To   June   30, 2007
                                              Page   1 of   2

                                              PRIVATE CLIENT GROUP 161
                                              565 FIFTH AVENUE
                                              NEW YORK, NY 10017


        LEWIS COUNTY DAIRY CORP.            8-161
        PAYROLL ACCT.
        P.O. BOX 310628
        BROOKLYN NY  11231

                                      For info call our toll-free Signature Line
                                      1-866-sigline or visit signatureny.com

                                      Primary Account: 1500583408         0

                *                               *
        FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
        BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                *                               *
```

| Signature Relationship Summary | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583408     MONOGRAM CHECKING | .00 | .00 | |
| | | | |
| RELATIONSHIP     TOTAL | | .00 | |

SIGN 00106

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          0

MONOGRAM CHECKING          1500583408                                      ?

Summary

  Previous Balance as of June     01, 2007                          .00

  There was no deposit activity during this statement period

  Ending Balance as of     June     30, 2007                        .00

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

SIGN 00107

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          0

*                                 *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                 *

Signature Relationship Summary                    Opening Bal.          Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583408      MONOGRAM CHECKING                        .00                  .00

                RELATIONSHIP        TOTAL                                      .00

SIGN 00108

Statement Period
From  July      01, 2007
To    July      31, 2007
Page    2 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          0

MONOGRAM CHECKING          1500583408                                    ?

Summary

  Previous Balance as of July     01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    July     31, 2007                             .00

Rates for this statement period - Overdraft
Jul 01, 2007  12.250000 %

SIGN 00109

Statement Period
From  August   01, 2007
To    August   31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                     8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        0

*
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                    *

Signature Relationship Summary                    Opening Bal.          Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583408      MONOGRAM CHECKING                        .00                  .00

                RELATIONSHIP        TOTAL                                     .00

SIGN 00110

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          0

MONOGRAM CHECKING          1500583408                                              ?

Summary

  Previous Balance as of August    01, 2007                                    .00

  There was no deposit activity during this statement period

  Ending Balance as of    August    31, 2007                                   .00

Rates for this statement period - Overdraft
Aug 01, 2007   12.250000 %

SIGN 00111

Statement Period
From   September 01, 2007
To     September 30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583408 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| RELATIONSHIP | TOTAL | | .00 | |

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        0

MONOGRAM CHECKING          1500583408                                   ?

Summary

 Previous Balance as of September 01, 2007                            .00

 There was no deposit activity during this statement period

 Ending Balance as of   September 30, 2007                            .00

Rates for this statement period - Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

SIGN 00113

Statement Period
From October  01, 2007
To   October   31, 2007
Page  1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408        0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583408 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP    TOTAL | | .00 | |

SIGN 00114

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408          0

MONOGRAM CHECKING          1500583408                              ?

Summary

  Previous Balance as of October   01, 2007                          .00

  There was no deposit activity during this statement period

  Ending Balance as of   October  31, 2007                           .00

Rates for this statement period - Overdraft
Oct 01, 2007   13.750000 %

SIGN 00115

SIGNATURE BANK

SIGNATURE BANK

Statement Period
From November 01, 2007
To   November 30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408              0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583408 | MONOGRAM CHECKING | .00 | .00 |
| | RELATIONSHIP      TOTAL | | .00 |

SIGN 01068



SIGNATURE BANK

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
PAYROLL ACCT.
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583408            0

MONOGRAM CHECKING          1500583408                                    ?

Summary

  Previous Balance as of November  01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of   November  30, 2007                              .00

Rates for this statement period - Overdraft
Nov 01, 2007   13.500000 %

Statement Period
From March   01, 2007
To   March   31, 2007
Page   1 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750       102

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

Signature Relationship Summary                     Opening Bal.          Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583750      MONOGRAM CHECKING                        .00              3,439.32-

                RELATIONSHIP      TOTAL                                   3,439.32-

SIGN 00116

Statement of
From March   01, 2007
To   March   31, 2007
Page   2 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        102

MONOGRAM CHECKING        1500583750                                    ?

Summary

    Previous Balance as of March      01, 2007                              .00
        20 Credits                                                  376,158.93
       104 Debits                                                   379,598.25
    Ending Balance as of    March     31, 2007                        3,439.32-

Deposits and Other Credits
Mar 01   ZBA/TBA TRANSFER IN
         ZBA/SWEEP TRANSFER FROM    1500812660                       23,435.25
Mar 02   ZBA/TBA TRANSFER IN
         ZBA/SWEEP TRANSFER FROM    1500812660                        5,782.57
Mar 05   ZBA/TBA TRANSFER IN
         ZBA/SWEEP TRANSFER FROM    1500812660                       26,447.55
Mar 07   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500812660                                    14,148.18
Mar 08   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    30,607.19
Mar 09   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    44,719.13
Mar 12   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                     1,463.03
Mar 13   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    21,073.96
Mar 14   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    20,298.15
Mar 15   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    28,534.50
Mar 16   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                     1,966.00
Mar 19   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    14,450.80
Mar 21   WEB TRANSFER     WEB CREDIT
         WEB XFR FROM: 1500583785                                    13,529.03
Mar 22   WEB TRANSFER     WEB CREDIT                                 33,887.36

SIGN 00117

Statement of March
From March    01, 2007
To   March    31, 2007
Page   3 of  5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750      102

| Date | Description | | | | |
|------|-------------|---|---|---|---|
| | WEB XFR FROM: 1500583785 | | | | |
| Mar 23 | WEB TRANSFER    WEB CREDIT | | | | 5,170.18 |
| | WEB XFR FROM: 1500583785 | | | | |
| Mar 26 | WEB TRANSFER    WEB CREDIT | | | | 17,598.02 |
| | WEB XFR FROM: 1500583785 | | | | |
| Mar 27 | WEB TRANSFER    WEB CREDIT | | | | 31,127.12 |
| | WEB XFR FROM: 1500583785 | | | | |
| Mar 28 | WEB TRANSFER    WEB CREDIT | | | | 1,086.78 |
| | WEB XFR FROM: 1500583785 | | | | |
| Mar 29 | WEB TRANSFER    WEB CREDIT | | | | 16,713.44 |
| | WEB XFR FROM: 1500583785 | | | | |
| Mar 30 | WEB TRANSFER    WEB CREDIT | | | | 24,120.69 |
| | WEB XFR FROM: 1500583785 | | | | |

**Withdrawals and Other Debits**

| Mar 21 | AUTOMATED PAYMENT    ck/ref no.    6063625 | | | | 16,602.01 |
|--------|---------------------------------------------|---|---|---|---|
| | PAYBYPHONE-PYMT     PHONE PYMT    9586 | | | | |
| Mar 26 | AUTOMATED PAYMENT    ck/ref no.    6102875 | | | | 1,019.81 |
| | PAYBYPHONE-PYMT     PHONE PYMT    9618 | | | | |

**Checks by Serial Number**

| Date | Serial | | Amount | Date | Serial | | Amount |
|------|--------|---|--------|------|--------|---|--------|
| Mar 01 | 9331 | | 1,200.00 | Mar 13 | 9508 | | 3,138.96 |
| Mar 14 | 9345 | * | 1,609.00 | Mar 16 | 9510 | * | 4,775.13 |
| Mar 28 | 9393 | * | 490.00 | Mar 01 | 9511 | | 359.45 |
| Mar 05 | 9398 | * | 11,349.56 | Mar 05 | 9516 | * | 102.60 |
| Mar 02 | 9436 | * | 59.40 | Mar 08 | 9517 | | 13,742.24 |
| Mar 02 | 9484 | * | 3,223.17 | Mar 05 | 9520 | * | 4,596.22 |
| Mar 26 | 9487 | * | 18,534.00 | Mar 05 | 9521 | | 1,287.08 |
| Mar 01 | 9488 | | 2,582.88 | Mar 01 | 9522 | | 380.00 |
| Mar 01 | 9493 | * | 789.96 | Mar 01 | 9523 | | 483.86 |
| Mar 05 | 9494 | | 162.23 | Mar 01 | 9524 | | 1,049.40 |
| Mar 16 | 9495 | | 2,000.00 | Mar 05 | 9525 | | 116.00 |
| Mar 16 | 9496 | | 2,000.00 | Mar 06 | 9527 | * | 1,000.00 |
| Mar 02 | 9497 | | 2,500.00 | Mar 05 | 9530 | * | 8,629.97 |
| Mar 16 | 9503 | * | 2,000.00 | Mar 01 | 9539 | * | 16,589.70 |
| Mar 09 | 9504 | | 750.00 | Mar 14 | 9540 | | 1,100.00 |
| Mar 05 | 9505 | | 203.89 | Mar 08 | 9541 | | 6,558.36 |
| Mar 13 | 9506 | | 1,500.00 | Mar 08 | 9542 | | 1,802.58 |
| Mar 13 | 9507 | | 3,666.31 | Mar 06 | 9543 | | 671.00 |

SIGN 00118

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        102

| Date | Serial Nbr | Amount | Date | Serial Nbr | Amount |
|------|-----------|--------|------|-----------|--------|
| Mar 08 | 9544 | 909.43 | Mar 13 | 9579 | 78.31 |
| Mar 08 | 9545 | 1,830.54 | Mar 14 | 9580 | 1,735.75 |
| Mar 14 | 9546 | 24,089.75 | Mar 13 | 9581 | 1,607.12 |
| Mar 07 | 9547 | 2,075.00 | Mar 13 | 9582 | 2,182.70 |
| Mar 20 | 9549 * | 4,398.38 | Mar 20 | 9583 | 4,508.00 |
| Mar 06 | 9550 | 6,865.00 | Mar 21 | 9584 | 1,327.00 |
| Mar 20 | 9551 | 3,740.00 | Mar 21 | 9585 | 15,958.35 |
| Mar 20 | 9552 | 50.00 | Mar 27 | 9587 * | 578.78 |
| Mar 20 | 9553 | 832.65 | Mar 27 | 9588 | 508.00 |
| Mar 16 | 9554 | 1,942.86 | Mar 30 | 9589 | 682.67 |
| Mar 12 | 9555 | 1,575.00 | Mar 29 | 9590 | 238.16 |
| Mar 15 | 9556 | 1,966.00 | Mar 29 | 9591 | 180.00 |
| Mar 06 | 9557 | 442.00 | Mar 23 | 9592 | 7,257.66 |
| Mar 16 | 9558 | 1,665.31 | Mar 30 | 9593 | 2,392.02 |
| Mar 09 | 9559 | 713.03 | Mar 28 | 9594 | 82.53 |
| Mar 13 | 9560 | 5,688.20 | Mar 22 | 9598 * | 5,170.18 |
| Mar 12 | 9561 | 50.00 | Mar 23 | 9599 | 5,170.18 |
| Mar 12 | 9562 | 1,941.99 | Mar 23 | 9600 | 5,170.18 |
| Mar 07 | 9563 | 3,000.00 | Mar 26 | 9601 | 5,170.18 |
| Mar 07 | 9564 | 7,804.88 | Mar 29 | 9602 | 203.89 |
| Mar 07 | 9565 | 7,386.95 | Mar 26 | 9608 * | 2,008.13 |
| Mar 06 | 9566 | 5,170.18 | Mar 30 | 9609 | 151.11 |
| Mar 07 | 9567 | 5,170.18 | Mar 29 | 9610 | 4,925.30 |
| Mar 07 | 9568 | 5,170.18 | Mar 29 | 9611 | 1,393.98 |
| Mar 12 | 9569 | 5,170.18 | Mar 28 | 9612 | 182.56 |
| Mar 12 | 9570 | 5,170.18 | Mar 29 | 9613 | 363.56 |
| Mar 12 | 9571 | 6,778.18 | Mar 29 | 9619 * | 284.20 |
| Mar 12 | 9572 | 388.43 | Mar 26 | 9620 | 4,395.00 |
| Mar 13 | 9573 | 884.59 | Mar 29 | 9621 | 8,081.60 |
| Mar 16 | 9574 | 67.50 | Mar 30 | 9623 * | 213.52 |
| Mar 13 | 9575 | 576.00 | Mar 29 | 9624 | 5,950.00 |
| Mar 08 | 9577 * | 19,875.98 | Mar 29 | 9625 | 2,500.00 |
| Mar 13 | 9578 | 975.96 | Mar 28 | 9627 * | 15,958.35 |

* Indicates break in check sequence

SIGN 00119

Statement Period
From March   01, 2007
To   March   31, 2007
Page   5 of   5

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        102

Daily Balances

| | | | | |
|---|---|---|---|---|
| Feb 28 | .00 | | Mar 19 | .00 |
| Mar 06 | 14,148.18- | | Mar 20 | 13,529.03- |
| Mar 07 | 30,607.19- | | Mar 21 | 33,887.36- |
| Mar 08 | 44,719.13- | | Mar 22 | 5,170.18- |
| Mar 09 | 1,463.03- | | Mar 23 | 17,598.02- |
| Mar 12 | 21,073.96- | | Mar 26 | 31,127.12- |
| Mar 13 | 20,298.15- | | Mar 27 | 1,086.78- |
| Mar 14 | 28,534.50- | | Mar 28 | 16,713.44- |
| Mar 15 | 1,966.00- | | Mar 29 | 24,120.69- |
| Mar 16 | 14,450.80- | | Mar 30 | 3,439.32- |

Rates for this statement period - Overdraft
Mar 01, 2007   12.250000 %

SIGN 00120

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.            9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        13

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583750     MONOGRAM CHECKING | 3,439.32- | .00 | |
| | | | |
| RELATIONSHIP          TOTAL | | .00 | |

SIGN 00121

Statement Period
From April    01, 2007
To   April    30, 2007
Page   2 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        13

MONOGRAM CHECKING        1500583750                                              ?

Summary

Previous Balance as of April    01, 2007                                   3,439.32-
     8 Credits                                                            60,806.90
    13 Debits                                                             57,367.58
Ending Balance as of    April    30, 2007                                      .00

Deposits and Other Credits
Apr 02  WEB TRANSFER     WEB CREDIT                                         3,439.32
        WEB XFR FROM: 1500583785
Apr 03  TELEPHONE TRANSFER                                                18,814.04
        TELEPHONE TRANSFER FROM: 1500583785
Apr 06  WEB TRANSFER     WEB CREDIT                                           300.84
        WEB XFR FROM: 1500583785
Apr 09  TELEPHONE TRANSFER                                                     44.41
        TELEPHONE TRANSFER FROM: 1500583785
Apr 10  TELEPHONE TRANSFER                                                    114.30
        TELEPHONE TRANSFER FROM: 1500583785
Apr 13  WEB TRANSFER     WEB CREDIT                                         2,500.00
        WEB XFR FROM: 1500583785
Apr 17  WEB TRANSFER     WEB CREDIT                                         2,500.00
        WEB XFR FROM: 1500583785
Apr 18  WEB TRANSFER     WEB CREDIT                                        33,093.99
        WEB XFR FROM: 1500583785

Checks by Serial Number

| Apr 12 | 9498 |   | 2,500.00 | Apr 17 | 9617 |   | 8,093.99 |
| Apr 16 | 9499 |   | 2,500.00 | Apr 02 | 9622 | * | 5,210.32 |
| Apr 02 | 9529 | * | 3,635.14 | Apr 02 | 9628 | * | 1,116.74 |
| Apr 02 | 9595 | * | 161.83 | Apr 05 | 9629 |   | 300.84 |
| Apr 09 | 9603 | * | 58.50 | Apr 06 | 9630 |   | 44.41 |
| Apr 17 | 9606 | * | 25,000.00 | Apr 09 | 9631 |   | 55.80 |
| Apr 02 | 9616 | * | 8,690.01 |   |   |   |   |

          * Indicates break in check sequence

SIGN 00122

Statement Period
From April    01, 2007
To   April    30, 2007
Page    3 of    3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        13

Daily Balances

| | | | | |
|---|---|---|---|---|
| Mar 31 | 3,439.32- | | Apr 10 | .00 |
| Apr 02 | 18,814.04- | | Apr 12 | 2,500.00- |
| Apr 03 | .00 | | Apr 13 | .00 |
| Apr 05 | 300.84- | | Apr 16 | 2,500.00- |
| Apr 06 | 44.41- | | Apr 17 | 33,093.99- |
| Apr 09 | 114.30- | | Apr 18 | .00 |

Rates for this statement period - Overdraft
Apr 01, 2007  12.250000 %

SIGN 00123

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750        4

*
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                          *

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583750    MONOGRAM CHECKING | | .00 | .00 | |
| | | | | |
| RELATIONSHIP    TOTAL | | | .00 | |

Statement Period
From May    01, 2007
To   May   31, 2007
Page   2 of  3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          4

MONOGRAM CHECKING        1500583750                                              ?

Summary

    Previous Balance as of May    01, 2007                                    .00
        4 Credits                                                       40,532.06
        5 Debits                                                        40,532.06
    Ending Balance as of   May    31, 2007                                    .00

Deposits and Other Credits
    May 04  WEB TRANSFER    WEB CREDIT                                   6,805.27
            WEB XFR FROM: 1500812660
    May 09  WEB TRANSFER    WEB CREDIT                                  25,078.79
            WEB XFR FROM: 1500883630
    May 16  WEB TRANSFER    WEB CREDIT                                   3,648.00
            WEB XFR FROM: 1500883630
    May 22  WEB TRANSFER    WEB CREDIT                                   5,000.00
            WEB XFR FROM: 1500883630

Withdrawals and Other Debits
    May 23  MISC DEBIT      RESTRAINING                                  5,000.00

Checks by Serial Number
    May 03    9596      3,666.31    May 08    9607 *    25,078.79
    May 03    9597      3,138.96    May 15    9626 *     3,648.00

            * Indicates break in check sequence

Daily Balances
    Apr 30           .00            May 15        3,648.00-
    May 03      6,805.27-           May 16             .00
    May 04           .00            May 22        5,000.00
    May 08     25,078.79-           May 23             .00
    May 09           .00

SIGN 00125

Statement Period
From May      01, 2007
To   May      31, 2007
Page   3 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          4

Rates for this statement period - Overdraft
May 01, 2007   12.250000 %

SIGN 00126

Statement Period
From June    01, 2007
To   June    30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          0

*
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                        *

Signature Relationship Summary                    Opening Bal.        Closing Bal.    ?

BANK DEPOSIT ACCOUNTS
1500583750     MONOGRAM CHECKING                      .00                 .00

          RELATIONSHIP          TOTAL                                     .00

SIGN 00127

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.            8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750            0

MONOGRAM CHECKING            1500583750                                      ?

Summary

Previous Balance as of June    01, 2007                                    .00

There was no deposit activity during this statement period

Ending Balance as of    June    30, 2007                                   .00

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

Statement Period
From July   01, 2007
To   July   31, 2007
Page   1 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

                          For info call our toll-free Signature Line
                          1-866-sigline or visit signatureny.com

                          Primary Account: 1500583750          0

            *
                                              *
      FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
      BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
            *                                    *

Signature Relationship Summary              Opening Bal.        Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583750      MONOGRAM CHECKING                   .00                .00

            RELATIONSHIP        TOTAL                                 .00

SIGN 00129

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          0

MONOGRAM CHECKING          1500583750                                    ?

Summary

Previous Balance as of July     01, 2007                             .00

There was no deposit activity during this statement period

Ending Balance as of  July     31, 2007                             .00

Rates for this statement period - Overdraft
Jul 01, 2007   12.250000 %

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          0

        *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
        *                                         *

Signature Relationship Summary                Opening Bal.        Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583750      MONOGRAM CHECKING                      .00                 .00

        RELATIONSHIP          TOTAL                                        .00

SIGN 00131

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          0

MONOGRAM CHECKING          1500583750                                      ?

Summary

  Previous Balance as of August    01, 2007                                    .00

  There was no deposit activity during this statement period

  Ending Balance as of    August    31, 2007                                   .00

Rates for this statement period - Overdraft
Aug 01, 2007   12.250000 %

SIGN 00132

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750            0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

Signature Relationship Summary

| | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583750 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| RELATIONSHIP | TOTAL | | .00 | |

SIGN 00133

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750            0

MONOGRAM CHECKING          1500583750                                    ?

Summary

Previous Balance as of September 01, 2007                            .00

There was no deposit activity during this statement period

Ending Balance as of   September 30, 2007                            .00

Rates for this statement period - Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

SIGN 00134

Statement Period:
From   October  01, 2007
To     October  31, 2007
Page    1 of    2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

Signature Relationship Summary                    Opening Bal.          Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583750      MONOGRAM CHECKING                      .00                    .00

                RELATIONSHIP        TOTAL                                     .00

SIGN 00135

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750          0

MONOGRAM CHECKING          1500583750                                        ?

Summary

Previous Balance as of October   01, 2007                                    .00

There was no deposit activity during this statement period

Ending Balance as of    October   31, 2007                                   .00

Rates for this statement period - Overdraft
Oct 01, 2007   13.750000 %

SIGN 00136

SIGNATURE BANK

Statement Period
From November 01, 2007
To   November 30, 2007
Page  1 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                 8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750              0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

Signature Relationship Summary

| | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583750 | MONOGRAM CHECKING | .00 | .00 |
| | RELATIONSHIP    TOTAL | | .00 |

SIGN 01070

Statement Period
From November 01, 2007
To   November 30, 2007
Page   2 of   2

*Signature*
SIGNATURE BANK

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
OPERATING ACCOUNT
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583750              0

MONOGRAM CHECKING          1500583750                                            ?

Summary

Previous Balance as of November  01, 2007                                      .00

There was no deposit activity during this statement period

Ending Balance as of   November 30, 2007                                       .00

Rates for this statement period - Overdraft
Nov 01, 2007   13.500000 %

SIGN 01071

**EXHIBIT P
(Part 4 of 5)**

```
                                            Statement Period
                                      From March    01, 2007
                                      To   March    31, 2007
                                      Page   1 of   4

                                      PRIVATE CLIENT GROUP 161
                                      565 FIFTH AVENUE
                                      NEW YORK, NY 10017


        LEWIS COUNTY DAIRY CORP.            9-161
        (SLF)
        P.O. BOX 310628
        BROOKLYN NY   11231

                                      For info call our toll-free Signature Line
                                      1-866-sigline or visit signatureny.com

                                      Primary Account: 1500583769        56


            IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
            NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
            THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
            THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
            INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
            IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
            CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
            SECTION.
```

Signature Relationship Summary                    Opening Bal.        Closing Bal.   ?

```
BANK DEPOSIT ACCOUNTS
1500583769     MONOGRAM CHECKING                     .00                  .00


            RELATIONSHIP         TOTAL                                     .00
```

SIGN 00137

Statement Period
From March   01, 2007
To   March   31, 2007
Page   2 of   4

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769           56

MONOGRAM CHECKING        1500583769                                      ?

Summary

Previous Balance as of March      01, 2007                                    .00
      20 Credits                                                      172,555.25
      57 Debits                                                       172,555.25
Ending Balance as of    March      31, 2007                                   .00


Deposits and Other Credits
Mar 01  ZBA/TBA TRANSFER IN
        ZBA/SWEEP TRANSFER FROM    1500812660                           8,418.67
Mar 02  ZBA/TBA TRANSFER IN
        ZBA/SWEEP TRANSFER FROM    1500812660                             750.00
Mar 05  ZBA/TBA TRANSFER IN
        ZBA/SWEEP TRANSFER FROM    1500812660                          19,535.84
Mar 07  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500812660                                       12,554.78
Mar 08  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                        4,715.70
Mar 09  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                       18,827.96
Mar 12  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                        9,264.00
Mar 13  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                       22,296.03
Mar 14  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                        3,441.49
Mar 15  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                        5,422.50
Mar 16  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                          900.00
Mar 19  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                        5,248.66
Mar 20  WEB TRANSFER    WEB CREDIT
        WEB XFR FROM: 1500583785                                       12,976.43
Mar 21  WEB TRANSFER    WEB CREDIT                                      16,041.20

SIGN 00138

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769        56

| Date | Description | | |
|------|-------------|--|--|
| | WEB XFR FROM: 1500583785 | | |
| Mar 22 | WEB TRANSFER    WEB CREDIT | | 525.00 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 26 | WEB TRANSFER    WEB CREDIT | | 304.18 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 27 | WEB TRANSFER    WEB CREDIT | | 3,245.51 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 28 | WEB TRANSFER    WEB CREDIT | | 5,821.30 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 29 | WEB TRANSFER    WEB CREDIT | | 22,200.00 |
| | WEB XFR FROM: 1500583785 | | |
| Mar 30 | WEB TRANSFER    WEB CREDIT | | 66.00 |
| | WEB XFR FROM: 1500583785 | | |

Withdrawals and Other Debits

| Mar 20 | AUTOMATED PAYMENT | ck/ref no.    6058039 | 1,008.68 |
|--------|-------------------|----------------------|----------|
| | POPULAR LEASING | DEBITS      055786.01 | |

Checks by Serial Number

| Date | Serial | Amount | Date | Serial | Amount |
|------|--------|--------|------|--------|--------|
| Mar 05 | 5680 | 10,000.00 | Mar 07 | 5825 | 68.25 |
| Mar 08 | 5756 * | 14,850.98 | Mar 05 | 5826 | 167.00 |
| Mar 28 | 5757 | 10,000.00 | Mar 07 | 5827 | 1,360.24 |
| Mar 06 | 5788 * | 10,713.69 | Mar 20 | 5828 | 4,946.87 |
| Mar 05 | 5789 | 7,713.59 | Mar 14 | 5829 | 5,312.50 |
| Mar 01 | 5793 * | 2,757.69 | Mar 21 | 5830 | 525.00 |
| Mar 01 | 5803 * | 4,000.00 | Mar 19 | 5831 | 460.02 |
| Mar 05 | 5805 * | 1,608.50 | Mar 07 | 5832 | 2,787.21 |
| Mar 09 | 5807 * | 2,500.00 | Mar 09 | 5833 | 1,764.00 |
| Mar 01 | 5808 | 380.00 | Mar 16 | 5834 | 5,236.16 |
| Mar 05 | 5814 * | 46.75 | Mar 19 | 5835 | 7,849.40 |
| Mar 01 | 5816 * | 1,280.98 | Mar 12 | 5836 | 1,290.17 |
| Mar 06 | 5817 | 1,841.09 | Mar 13 | 5837 | 838.97 |
| Mar 07 | 5818 | 500.00 | Mar 12 | 5838 | 535.14 |
| Mar 12 | 5819 | 2,711.10 | Mar 15 | 5839 | 900.00 |
| Mar 02 | 5820 | 750.00 | Mar 20 | 5840 | 5,386.69 |
| Mar 09 | 5821 | 2,500.00 | Mar 08 | 5841 | 134.40 |
| Mar 09 | 5822 | 2,500.00 | Mar 20 | 5842 | 4,753.00 |
| Mar 19 | 5823 | 4,612.97 | Mar 16 | 5843 | 12.50 |
| Mar 12 | 5824 | 14,709.84 | Mar 13 | 5844 | 28.34 |

SIGN 00139

Statement Period
From March   01, 2007
To   March   31, 2007
Page   4 of   4

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          56

| Date   | Serial Nbr | Amount   | Date   | Serial Nbr | Amount    |
|--------|------------|----------|--------|------------|-----------|
| Mar 13 | 5845       | 108.00   | Mar 28 | 5997       | 12,200.00 |
| Mar 13 | 5846       | 866.61   | Mar 27 | 5998       | 4,000.00  |
| Mar 14 | 5847       | 110.00   | Mar 27 | 6001 *     | 750.00    |
| Mar 08 | 5848       | 3,842.58 | Mar 27 | 6002       | 500.00    |
| Mar 13 | 5849       | 97.89    | Mar 27 | 6003       | 571.30    |
| Mar 12 | 5850       | 3,049.78 | Mar 26 | 6004       | 1,324.51  |
| Mar 13 | 5851       | 1,501.68 | Mar 23 | 6005       | 304.18    |
| Mar 26 | 5996 *     | 1,921.00 | Mar 29 | 6007 *     | 66.00     |

          * Indicates break in check sequence

Daily Balances

| Date   | Amount     | Date   | Amount     |
|--------|------------|--------|------------|
| Feb 28 | .00        | Mar 19 | 12,922.39- |
| Mar 06 | 12,554.78- | Mar 20 | 16,041.20- |
| Mar 07 | 4,715.70-  | Mar 21 | 525.00-    |
| Mar 08 | 18,827.96- | Mar 22 | .00        |
| Mar 09 | 9,264.00-  | Mar 23 | 304.18-    |
| Mar 12 | 22,296.03- | Mar 26 | 3,245.51-  |
| Mar 13 | 3,441.49-  | Mar 27 | 5,821.30-  |
| Mar 14 | 5,422.50-  | Mar 28 | 22,200.00- |
| Mar 15 | 900.00-    | Mar 29 | 66.00-     |
| Mar 16 | 5,248.66-  | Mar 30 | .00        |

Rates for this statement period - Overdraft
Mar 01, 2007   12.250000 %

SIGN 00140

Statement Period
From April   01, 2007
To   April   30, 2007
Page   1 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769        15

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | Opening Bal. | Closing Bal. ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583769      MONOGRAM CHECKING | .00 | .00 |
| | | |
| RELATIONSHIP       TOTAL | | .00 |

SIGN 00141

Statement Period
From April   01, 2007
To   April   30, 2007
Page   2 of  3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          15

MONOGRAM CHECKING          1500583769                                    ?

Summary

Previous Balance as of April   01, 2007                                        .00
        9 Credits                                                        32,758.21
       16 Debits                                                         32,758.21
Ending Balance as of    April   30, 2007                                       .00


Deposits and Other Credits
Apr 03  TELEPHONE TRANSFER                                                3,221.48
        TELEPHONE TRANSFER FROM: 1500583785
Apr 04  TELEPHONE TRANSFER                                                3,453.50
        TELEPHONE TRANSFER FROM: 1500583785
Apr 05  WEB TRANSFER     WEB CREDIT                                       2,460.00
        WEB XFR FROM: 1500583785
Apr 06  WEB TRANSFER     WEB CREDIT                                       1,174.30
        WEB XFR FROM: 1500583785
Apr 10  TELEPHONE TRANSFER                                                 105.00
        TELEPHONE TRANSFER FROM: 1500583785
Apr 11  WEB TRANSFER     WEB CREDIT                                       5,063.86
        WEB XFR FROM: 1500583785
Apr 16  WEB TRANSFER     WEB CREDIT                                       7,950.00
        WEB XFR FROM: 1500583785
Apr 23  WEB TRANSFER     WEB CREDIT                                       1,008.68
        WEB XFR FROM: 1500583785
Apr 25  WEB TRANSFER     WEB CREDIT                                       8,321.39
        WEB XFR FROM: 1500583785

Withdrawals and Other Debits
Apr 20  AUTOMATED PAYMENT       ck/ref no.   6394076                       1,008.68
        POPULAR LEASING      DEBITS       055786.01

Checks by Serial Number
Apr 05   5627              424.30    Apr 24   6006 *        8,321.39
Apr 03   5999 *          1,608.50    Apr 02   6008 *           26.86
Apr 10   6000            1,852.76    Apr 10   6009          2,711.10

SIGN 00142

Statement Period
From April   01, 2007
To   April   30, 2007
Page   3 of   3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769        15

| Date   | Serial Nbr | Amount   | Date   | Serial Nbr | Amount |
|--------|-----------|----------|--------|-----------|--------|
| Apr 03 | 6010      | 1,845.00 | Apr 09 | 6016      | 105.00 |
| Apr 13 | 6011      | 7,200.00 | Apr 10 | 6018 *    | 500.00 |
| Apr 02 | 6012      | 1,863.64 | Apr 05 | 6019      | 750.00 |
| Apr 04 | 6013      | 2,460.00 | Apr 13 | 6020      | 750.00 |
| Apr 02 | 6015 *    | 1,330.98 |        |           |        |

* Indicates break in check sequence

Daily Balances

| Date   | Amount      | Date   | Amount      |
|--------|-------------|--------|-------------|
| Mar 31 | .00         | Apr 11 | .00         |
| Apr 02 | 3,221.48-   | Apr 13 | 7,950.00-   |
| Apr 03 | 3,453.50-   | Apr 16 | .00         |
| Apr 04 | 2,460.00-   | Apr 20 | 1,008.68-   |
| Apr 05 | 1,174.30-   | Apr 23 | .00         |
| Apr 06 | .00         | Apr 24 | 8,321.39-   |
| Apr 09 | 105.00-     | Apr 25 | .00         |
| Apr 10 | 5,063.86-   |        |             |

Rates for this statement period - Overdraft
Apr 01, 2007  12.250000 %

SIGN 00143

```
                                                    Statement Period
                                          From May      01, 2007
                                          To   May      31, 2007
                                          Page   1 of    3

                                          PRIVATE CLIENT GROUP 161
                                          565 FIFTH AVENUE
                                          NEW YORK, NY 10017
```

```
        LEWIS COUNTY DAIRY CORP.            9-161
        (SLF)
        P.O. BOX 310628
        BROOKLYN NY  11231
                                    For info call our toll-free Signature Line
                                    1-866-sigline or visit signatureny.com

                                         Primary Account: 1500583769        1

                 *                                *
        FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
        BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                 *                                *
```

Signature Relationship Summary                     Opening Bal.          Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583769     MONOGRAM CHECKING                          .00                   .00

               RELATIONSHIP        TOTAL                                        .00

Statement Period
From May    01, 2007
To   May    31, 2007
Page    2 of    3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769            1

MONOGRAM CHECKING          1500583769                                                    ?

Summary

    Previous Balance as of May      01, 2007                                          .00
              2 Credits                                                         17,553.77
              2 Debits                                                          17,553.77
    Ending Balance as of    May     31, 2007                                          .00


Deposits and Other Credits
    May 02  WEB TRANSFER     WEB CREDIT                                         16,545.09
            WEB XFR FROM: 1500583785
    May 22  WEB TRANSFER     WEB CREDIT                                          1,008.68
            WEB XFR FROM: 1500883630

Withdrawals and Other Debits
    May 21  AUTOMATED PAYMENT       ck/ref no.    6704552                        1,008.68
            POPULAR LEASING     DEBITS       055786.01

Checks by Serial Number
    May 01       6017            16,545.09

Daily Balances
    Apr 30            .00              May 21        1,008.68-
    May 01      16,545.09-            May 22            .00
    May 02            .00

SIGN 00145

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    9-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          1

Rates for this statement period - Overdraft
May 01, 2007   12.250000 %

SIGN 00146

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

        *                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
        *                              *

Signature Relationship Summary                    Opening Bal.        Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583769      MONOGRAM CHECKING                      .00                 .00

        RELATIONSHIP         TOTAL                                         .00

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

MONOGRAM CHECKING          1500583769                                                    ?

Summary

  Previous Balance as of June     01, 2007                                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    June    30, 2007                                              .00

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

Statement Period
From July    01, 2007
To   July    31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

                    *
                                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                         *

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583769 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP      TOTAL | | .00 | |

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

MONOGRAM CHECKING          1500583769                                    ?

Summary

  Previous Balance as of July      01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    July    31, 2007                               .00

Rates for this statement period - Overdraft
Jul 01, 2007   12.250000 %

SIGN 00150

Statement Period
From  August   01, 2007
To    August   31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

                    *                              *
          FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
          BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                              *

Signature Relationship Summary                    Opening Bal.              Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500583769      MONOGRAM CHECKING                       .00                      .00

          RELATIONSHIP         TOTAL                                            .00

SIGN 00151

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769            0

MONOGRAM CHECKING            1500583769                                        ?

Summary

  Previous Balance as of August    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    August    31, 2007                            .00

Rates for this statement period - Overdraft
Aug 01, 2007   12.250000 %

Statement Period
From  September 01, 2007
To    September 30, 2007
Page   1 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583769 | MONOGRAM CHECKING | .00 | .00 |
| | RELATIONSHIP      TOTAL | | .00 |

SIGN 00153

Statement Period
From September 01, 2007
To   September 30, 2007
Page   2 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769            0

MONOGRAM CHECKING         1500583769                                    ?

Summary

 Previous Balance as of September 01, 2007                       .00

 There was no deposit activity during this statement period

 Ending Balance as of   September 30, 2007                       .00

Rates for this statement period - Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

SIGN 00154

From October   01, 2007
To    October   31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500583769 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP          TOTAL | | .00 | |

SIGN 00155

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.            8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769        0

MONOGRAM CHECKING         1500583769                                        ?

Summary

  Previous Balance as of October   01, 2007                            .00

  There was no deposit activity during this statement period

  Ending Balance as of    October   31, 2007                           .00

Rates for this statement period - Overdraft
Oct 01, 2007   13.750000 %

SIGN 00156

*Signature*
SIGNATURE BANK

Statement Period
From November 01, 2007
To   November 30, 2007
Page   1 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
(SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER 150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

Signature Relationship Summary

| | Opening Bal. | Closing Bal.  ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583769     MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP          TOTAL | | .00 |

SIGN 01072

*Signature*
SIGNATURE BANK

Statement Period
From November 01, 2007
To  November 30, 2007
Page  2 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
  (SLF)
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583769          0

MONOGRAM CHECKING          1500583769                                        ?

Summary

  Previous Balance as of November  01, 2007
                                                                      .00
  There was no deposit activity during this statement period

  Ending Balance as of   November  30, 2007
                                                                      .00

Rates for this statement period - Overdraft
Nov 01, 2007   13.500000 %

Statement Period
From March    01, 2007
To   March    31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
BABAD,CHK,CRC,MACHON,NEWSQ,STARK AND OU
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500626980          0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500626980    MONOGRAM CHECKING | | .00 | .00 |
| RELATIONSHIP         TOTAL | | | .00 |

SIGN 00157

From March    01, 2007
To    March    31, 2007
Page    2 of    2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
BABAD,CHK,CRC,MACHON,NEWSQ,STARK AND OU
P.O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

                          Primary Account: 1500626980           0

MONOGRAM CHECKING           1500626980                                              ?

Summary

   Previous Balance as of March      01, 2007                                    .00

   There was no deposit activity during this statement period

   Ending Balance as of    March    31, 2007                                     .00

Rates for this statement period - Overdraft
Mar 01, 2007   12.250000 %

SIGN 00158

Statement Period
From March    07, 2007
To    March    31, 2007
Page    1 of    2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY   11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649        0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

Signature Relationship Summary                    Opening Bal.        Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500883649      MONOGRAM CHECKING                      .00               .00

                RELATIONSHIP        TOTAL                                .00

Statement Period
From March    07, 2007
To    March    31, 2007
Page   2 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

MONOGRAM CHECKING          1500883649                                    ?

Summary

    Previous Balance as of March    07, 2007                              .00
              1 Credits                                                 38.44
              1 Debits                                                  38.44
    Ending Balance as of    March   31, 2007                             .00

Deposits and Other Credits
   Mar 13  DEPOSIT                                                      38.44

Withdrawals and Other Debits
   Mar 12  AUTOMATED PAYMENT      ck/ref no.   5966462                  38.44
           DELUXE BUS SYS.      BUS PRODS    24118971

Daily Balances
   Mar 07              .00              Mar 13          .00
   Mar 12            38.44-

Rates for this statement period - Overdraft
Mar 07, 2007   12.250000 %

SIGN 00160

```
                                                    PRIVATE CLIENT GROUP 161
                                                    565 FIFTH AVENUE
                                                    NEW YORK, NY 10017


          LEWIS COUNTY DAIRY CORP.              8-161
          OPERATING ACCOUNT
          P. O. BOX 310628
          BROOKLYN NY  11231

                                          For info call our toll-free Signature Line
                                          1-866-sigline or visit signatureny.com

                                              Primary Account: 1500883649          0
```

             IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
             NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
             THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
             THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
             INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
             IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
             CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
             SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883649 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| RELATIONSHIP | TOTAL | | .00 | |

SIGN 00161

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

MONOGRAM CHECKING          1500883649                                        ?

Summary

  Previous Balance as of April     01, 2007                            .00

  There was no deposit activity during this statement period

  Ending Balance as of    April     30, 2007                           .00

Rates for this statement period - Overdraft
Apr 01, 2007   12.250000 %

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


LEWIS COUNTY DAIRY CORP.                8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

                                For info call our toll-free Signature Line
                                1-866-sigline or visit signatureny.com

                                Primary Account: 1500883649         0

        *                                        *
        FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
        BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
        *                                        *

Signature Relationship Summary                     Opening Bal.        Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500883649      MONOGRAM CHECKING                       .00                 .00

                RELATIONSHIP        TOTAL                                   .00

From May      01, 2007
To   May      31, 2007
Page   2 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

MONOGRAM CHECKING          1500883649                                    ?

Summary

  Previous Balance as of May    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    May    31, 2007                            .00

Rates for this statement period - Overdraft
May 01, 2007  12.250000 %

SIGN 00164

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

*
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                        *

| Signature Relationship Summary | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500883649     MONOGRAM CHECKING | .00 | .00 | |
| | | | |
| RELATIONSHIP          TOTAL | | .00 | |

SIGN 00165

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

MONOGRAM CHECKING          1500883649                                    ?

Summary

   Previous Balance as of June     01, 2007                              .00

   There was no deposit activity during this statement period

   Ending Balance as of    June    30, 2007                              .00

Rates for this statement period - Overdraft
Jun 01, 2007   12.250000 %

SIGN 00166

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649           0

                    *                              *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                              *

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883649 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP        TOTAL | | .00 | |

SIGN 00167

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649            0

MONOGRAM CHECKING          1500883649                                    ?

Summary

  Previous Balance as of July    01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of    July    31, 2007                             .00

Rates for this statement period - Overdraft
Jul 01, 2007   12.250000 %

SIGN 00168

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY   11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649            0

                                *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                                *                        *

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883649 | MONOGRAM CHECKING | .00 | .00 | |
| | | | | |
| RELATIONSHIP | TOTAL | | .00 | |

SIGN 00169

Statement Period
From August    01, 2007
To    August    31, 2007
Page    2 of    2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

MONOGRAM CHECKING          1500883649                                                    ?

Summary

  Previous Balance as of August    01, 2007                                          .00

  There was no deposit activity during this statement period

  Ending Balance as of    August    31, 2007                                         .00

Rates for this statement period - Overdraft
Aug 01, 2007   12.250000 %

SIGN 00170

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.                    8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649              0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

Signature Relationship Summary                    Opening Bal.         Closing Bal.   ?

BANK DEPOSIT ACCOUNTS
1500883649        MONOGRAM CHECKING                      .00                  .00

                  RELATIONSHIP       TOTAL                                    .00

SIGN 00171

Statement Period
From  September 01, 2007
To    September 30, 2007
Page   2 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.               8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

MONOGRAM CHECKING          1500883649                                    ?

Summary

  Previous Balance as of September 01, 2007                            .00

  There was no deposit activity during this statement period

  Ending Balance as of    September 30, 2007                           .00

Rates for this statement period - Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

SIGN 00172

Statement Period
From October  01, 2007
To   October  31, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER  150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. | ? |
|---|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | | |
| 1500883649 | MONOGRAM CHECKING | .00 | .00 | |
| | RELATIONSHIP    TOTAL | | .00 | |

SIGN 00173

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.              8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY   11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649              0

MONOGRAM CHECKING        1500883649                                    ?

Summary

  Previous Balance as of October   01, 2007                          .00

  There was no deposit activity during this statement period

  Ending Balance as of   October   31, 2007                          .00

Rates for this statement period - Overdraft
Oct 01, 2007   13.750000 %

SIGN 00174

SIGNATURE BANK
SIGNATURE BANK

Statement Period
From November 01, 2007
To   November 30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.          8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649          0

SIGNATURE BANK HAS ENHANCED ITS ARRAY OF COMMERCIAL CREDIT
PRODUCTS BY OFFERING COMMERCIAL LEASE FINANCING WITH FAST
(TYPICALLY SAME DAY) APPROVAL FOR LINES UNDER 150,000 AND
TWO TO THREE DAY APPROVAL FOR LARGER LINES. CALL YOUR PRIVATE
CLIENT GROUP DIRECTOR TO INQUIRE ABOUT FINANCING YOUR NEXT
CAPITAL INVESTMENT.

| Signature Relationship Summary | | Opening Bal. | Closing Bal.  ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500883649     MONOGRAM CHECKING | | .00 | .00 |
| | | | |
| RELATIONSHIP          TOTAL | | | .00 |

SIGN 01074



Statement Period
From November 01, 2007
To    November 30, 2007
Page   2 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

LEWIS COUNTY DAIRY CORP.            8-161
OPERATING ACCOUNT
P. O. BOX 310628
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500883649            0

MONOGRAM CHECKING        1500883649                                        ?

Summary

Previous Balance as of November  01, 2007                                  .00

There was no deposit activity during this statement period

Ending Balance as of   November 30, 2007                                   .00

Rates for this statement period - Overdraft
Nov 01, 2007   13.500000 %

**SIGN 01075**

# EXHIBIT P
# (Part 5 of 5)

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231
                              For info call our toll-free Signature Line
                              1-866-sigline or visit signatureny.com

                              Primary Account: 1500583645          0

        IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
        NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
        THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
        THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
        INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
        IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
        CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
        SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583645 | MONOGRAM CHECKING | .00 | .00 |
| | | | |
| RELATIONSHIP | TOTAL | | .00 |

Statement Period
From March    01, 2007
To   March    31, 2007
Page  2 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645         0

MONOGRAM CHECKING          1500583645                                    ?

Summary

Previous Balance as of March    01, 2007                            .00

There was no deposit activity during this statement period

Ending Balance as of   March    31, 2007                            .00

Statement Period
From April   01, 2007
To   April   30, 2007
Page   1 of   2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231
                              For info call our toll-free Signature Line
                              1-866-sigline or visit signatureny.com

                              Primary Account: 1500583645        0

        IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
        NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
        THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
        THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
        INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
        IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
        CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
        SECTION.

Signature Relationship Summary                    Opening Bal.        Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583645     MONOGRAM CHECKING                          .00              .00


        RELATIONSHIP        TOTAL                                         .00

SIGN 00177

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

```
MOISE  BANAYAN OR                8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231              For info call our toll-free Signature Line
                               1-866-sigline or visit signatureny.com

                               Primary Account: 1500583645        0
```

MONOGRAM CHECKING          1500583645                                    ?

Summary

Previous Balance as of April    01, 2007                              .00

There was no deposit activity during this statement period

Ending Balance as of    April    30, 2007                            .00

SIGN 00178

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                        8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645          0

*                                    *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
*                                    *

| Signature Relationship Summary | Opening Bal. | Closing Bal. ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583645    MONOGRAM CHECKING | .00 | .00 |
| | | |
| RELATIONSHIP      TOTAL | | .00 |

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017


MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231                   For info call our toll-free Signature Line
                                     1-866-sigline or visit signatureny.com

                                     Primary Account: 1500583645          0


MONOGRAM CHECKING          1500583645                                      ?

Summary

  Previous Balance as of May      01, 2007                              .00

  There was no deposit activity during this statement period

  Ending Balance as of   May      31, 2007                              .00

SIGN 00180

Statement Period
From June    01, 2007
To   June    30, 2007
Page  1 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                     8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231
                              For info call our toll-free Signature Line
                              1-866-sigline or visit signatureny.com

                              Primary Account: 1500583645         0

                  *                           *
          FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
          BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                  *                           *

Signature Relationship Summary                  Opening Bal.        Closing Bal.  ?

BANK DEPOSIT ACCOUNTS
1500583645      MONOGRAM CHECKING                         .00                .00

          RELATIONSHIP          TOTAL                                        .00

SIGN 00181

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645          0

MONOGRAM CHECKING           1500583645                              ?

Summary

Previous Balance as of June      01, 2007                              .00

There was no deposit activity during this statement period

Ending Balance as of   June      30, 2007                              .00

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645            0

                              *
                       *
FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                       *                       *

| Signature Relationship Summary | Opening Bal. | Closing Bal. ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583645      MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP      TOTAL | | .00 |

SIGN 00183

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645         0

MONOGRAM CHECKING          1500583645                                        ?

## Summary

Previous Balance as of July    01, 2007                                    .00

There was no deposit activity during this statement period

Ending Balance as of   July    31, 2007                                    .00

SIGN 00184

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231
                              For info call our toll-free Signature Line
                              1-866-sigline or visit signatureny.com

                              Primary Account: 1500583645         0

                    *                                    *
             FOR MORE INFORMATION ON THE PRODUCTS AND SERVICES OFFERED
             BY SIGNATURE BANK, PLEASE VISIT WWW.SIGNATURENY.COM
                    *                                    *

| Signature Relationship Summary | Opening Bal. | Closing Bal.  ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583645     MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP          TOTAL | | .00 |

SIGN 00185

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645          0

MONOGRAM CHECKING          1500583645                                              ?

Summary

Previous Balance as of August    01, 2007                                    .00

There was no deposit activity during this statement period

Ending Balance as of    August    31, 2007                                   .00

SIGN 00186

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645        0

IMPORTANT MESSAGE ABOUT IDENTITY THEFT:  SIGNATURE BANK WILL
NEVER ASK YOU TO PROVIDE PERSONAL OR ACCOUNT INFORMATION
THROUGH E-MAIL. IF YOU RECEIVE AN E-MAIL REQUESTING INFORMATION
THAT APPEARS TO COME FROM SIGNATURE BANK, DO NOT RESPOND TO IT.
INSTEAD, CALL US TOLL-FREE AT 1-866-SIGLINE. FOR MORE ON
IDENTITY THEFT, VISIT OUR WEBSITE AT WWW.SIGNATURENY.COM.
CLICK ON "ABOUT SIGNATURE", AND SEE THE PRIVACY AND SECURITY
SECTION.

| Signature Relationship Summary | | Opening Bal. | Closing Bal. ? |
|---|---|---|---|
| BANK DEPOSIT ACCOUNTS | | | |
| 1500583645    MONOGRAM CHECKING | | .00 | .00 |
| | | | |
| RELATIONSHIP | TOTAL | | .00 |

SIGN 00187

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645          0

MONOGRAM CHECKING          1500583645                                    ?

Summary

  Previous Balance as of September 01, 2007                          .00

  There was no deposit activity during this statement period

  Ending Balance as of    September 30, 2007                         .00

SIGN 00188

Statement Period
From October 01, 2007
To   October  31, 2007
Page  1 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645            0

ON OR ABOUT NOVEMBER 17TH, SIGNATURE BANK WILL INTRODUCE
A NEW, MORE USER-FRIENDLY PUBLIC WEBSITE AND INTERNET
BANKING UTILITY AT WWW.SIGNATURENY.COM.  THE CHANGES INCLUDE
A NEW "LOOK AND FEEL" AS WELL AS SIGNIFICANT UPGRADES TO THE
ONLINE BANKING CAPABILITIES.  PLEASE VISIT SOON AND ENJOY.

| Signature Relationship Summary | Opening Bal. | Closing Bal. ? |
|---|---|---|
| BANK DEPOSIT ACCOUNTS | | |
| 1500583645     MONOGRAM CHECKING | .00 | .00 |
| RELATIONSHIP          TOTAL | | .00 |

SIGN 00189

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645          0

MONOGRAM CHECKING           1500583645                                        ?

Summary

Previous Balance as of October   01, 2007                              .00

There was no deposit activity during this statement period

Ending Balance as of   October   31, 2007                             .00

SIGN 00190

```
                                          Statement Period
                                          From November 01, 2007
                                          To   November 30, 2007
                                          Page  1 of  2

                                          PRIVATE CLIENT GROUP 161
                                          565 FIFTH AVENUE
                                          NEW YORK, NY 10017


        MOISE  BANAYAN OR              8-161
        SHOKROLLAH  BANAYAN
        C/O AHAVA FOOD CORP.
        110 BEARD STREET
        BROOKLYN NY  11231                For info call our toll-free Signature Line
                                          1-866-sigline or visit signatureny.com

                                          Primary Account: 1500583645         0


        ON OR ABOUT NOVEMBER 17TH, SIGNATURE BANK WILL INTRODUCE
        A NEW, MORE USER-FRIENDLY PUBLIC WEBSITE AND INTERNET
        BANKING UTILITY AT WWW.SIGNATURENY.COM.  THE CHANGES INCLUDE
        A NEW "LOOK AND FEEL" AS WELL AS SIGNIFICANT UPGRADES TO THE
        ONLINE BANKING CAPABILITIES.  PLEASE VISIT SOON AND ENJOY.
```

Signature Relationship Summary                    Opening Bal.           Closing Bal. ?

BANK DEPOSIT ACCOUNTS
1500583645      MONOGRAM CHECKING                        .00                   .00

            RELATIONSHIP        TOTAL                                           .00


**SIGN 01076**

Statement Period
From November  01, 2007
To   November  30, 2007
Page   2 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

MOISE  BANAYAN OR                    8-161
SHOKROLLAH  BANAYAN
C/O AHAVA FOOD CORP.
110 BEARD STREET
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500583645          0

MONOGRAM CHECKING         1500583645                                                    ?

Summary

 Previous Balance as of November  01, 2007                                        .00

 There was no deposit activity during this statement period

 Ending Balance as of   November  30, 2007                                        .00

SIGN 01077

# EXHIBIT Q

## Outside Deposits into Ahava Food/LCD
## from 3/1/07 to 11/12/07

**Ahava account ending 12660**

| Date | Deposit Amount | Description |
|------|---------------:|-------------|
| 3/1 | $92,217.88 | |
| 3/2 | $833.00 | |
| 3/5 | $187.80 | |
| 3/5 | $145,258.37 | |
| 3/6 | $2,713.30 | |
| 3/6 | $118,230.24 | |
| 3/7 | $46,368.78 | |
| 3/8 | $5,407.95 | |
| 3/8 | $71,237.01 | |
| 3/9 | $93,243.91 | |
| 3/12 | $1,500.00 | |
| 3/12 | $113,267.47 | |
| 3/13 | $54,963.72 | |
| 3/14 | $99,694.62 | |
| 3/15 | $.03 | (Deposit adjustment) |
| 3/15 | $19,766.00 | |
| 3/15 | $108,625.79 | |
| 3/16 | $21,300.00 | |
| 3/16 | $119,322.27 | |
| 3/19 | $2,398.57 | |
| 3/19 | $10,991.26 | |
| 3/19 | $118,811.90 | |
| 3/20 | $1,309.19 | |
| 3/20 | $5,250.00 | |
| 3/20 | $104,390.12 | |
| 3/21 | $91,311.06 | |
| 3/22 | $167,814.02 | |
| 3/23 | $5,572.99 | |
| 3/23 | $21,300.00 | |
| 3/23 | $142,338.34 | |
| 3/26 | $255,552.94 | |
| 3/27 | $113,086.56 | |
| 3/28 | $3,353.06 | |
| 3/28 | $169,677.70 | |
| 3/30 | $7,005.88 | |
| 4/2 | $.01 | (Deposit adjustment) |
| 4/2 | $324.13 | |

| | | |
|---|---|---|
| 4/2 | $19,595.08 | |
| 4/4 | $694.86 | |
| 4/5 | $1.10 | (Deposit adjustment) |
| 4/5 | $26,332.10 | |
| 4/6 | $4,349.80 | |
| 4/6 | $9,318.63 | |
| 4/6 | $14,058.11 | |
| 4/9 | $5,990.65 | |
| 4/10 | $5,019.25 | |
| 4/11 | $46,401.99 | |
| 4/12 | $.20 | (Deposit adjustment) |
| 4/12 | $34,863.24 | |
| 4/13 | $.22 | (Deposit adjustment) |
| 4/13 | $34,151.46 | |
| 4/16 | $1,219.75 | |
| 4/16 | $31,155.77 | |
| 4/16 | $42,356.90 | |
| 4/16 | $47,976.41 | |
| 4/17 | $54,487.02 | |
| 4/18 | $50,545.95 | |
| 4/18 | $62,418.85 | |
| 4/19 | $60,301.92 | |
| 4/20 | $209,075.54 | |
| 4/23 | $234,033.12 | |
| 4/24 | $97,362.05 | |
| 4/25 | $89,898.05 | |
| 4/26 | $130,174.85 | |
| 4/27 | $149,733.40 | |
| 4/30 | $220,033.48 | |
| 5/1 | $1.00 | (Deposit adjustment) |
| 5/1 | $68,537.85 | |
| 5/3 | $93,354.51 | |
| 5/4 | $8,100.00 | |
| 5/4 | $149,677.19 | |
| 5/7 | $740.40 | |
| 5/7 | $126,704.73 | |
| 5/8 | $80.00 | |
| 5/8 | $72,360.91 | |
| 5/9 | $66,506.70 | |
| 5/10 | $2,500.00 | |
| 5/10 | $127,067.64 | |
| 5/11 | $122,098.45 | |
| 5/14 | $.20 | (Deposit adjustment) |
| 5/14 | $81,287.94 | |
| 5/15 | $119,310.97 | |

| | | |
|---|---|---|
| 5/16 | $45,270.60 | |
| 5/17 | $926.31 | |
| 5/17 | $41,756.82 | |
| 5/18 | $74,437.69 | |
| 5/21 | $125,626.77 | |
| 5/22 | $74,670.93 | |
| 6/1 | $10,519.00 | (Misc. credit) |
| 6/4 | $364.61 | (Misc. credit) |
| 6/6 | $396.56 | |
| 6/15 | $711.13 | |
| 7/5 | $41,378.26 | |
| 7/10 | $2,252.25 | (Commercial lease payment) |
| 7/12 | $3,332.72 | |
| 7/13 | $360.00 | |
| 7/24 | $3,208.45 | |
| | No activity for August | |
| 9/14 | $40,181.73 | (Market administrator under) |
| 9/18 | $1,477.70 | |
| 10/12 | $10,140.20 | |
| 10/12 | $22,190.20 | |
| | | |
| **Total** | **$5,553,705.19** | |

No activity in Account 83386.  Account closed in March.

No outside deposits in Ahava accounts ending 833622, 83394.

No outside deposits in any of the LCD accounts: accounts ending 83408, 83750, 83769, 26980, 83649.

# EXHIBIT R

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------x
SIGNATURE BANK,                                 :
                                                :   Index No. 604356/07
                        Plaintiff,              :
                                                :
        -against-                               :
                                                :   **JUDGMENT**
AHAVA FOOD CORP., LEWIS COUNTY DAIRY:
CORP., ST. LAWRENCE FOOD CORP., YONI    :
REALTY, LLC, MOISE BANAYAN, ANA         :
BANAYAN AND SCHWARTZ AND SONS,          :
INC.                                            :
------------------------------------------------------------x

WHEREAS, on December 27, 2007, Plaintiff Signature Bank filed a motion pursuant to

CPLR § 3213 requesting that this Court: (1) enter summary judgment in lieu of complaint in

favor of Signature Bank and against Defendants Ahava Food Corp., Lewis County Dairy Corp.,

St. Lawrence Food Corp., Yoni Realty, LLC, Moise Banayan, Ana Banayan and Schwartz and

Sons, Inc. on the ground that this action is based upon an instrument for the payment of money

only, which is now due and payable, and entering judgment in such sum pursuant to CPLR 5012

and 5016; and (2) grant any such other and further relief as this Court deems just and proper;

WHEREAS, on March 11, 2008, the Court issued an Order granting Signature Bank's

motion for summary judgment in lieu of complaint against the Defendants;

WHEREAS, on March 11, 2008, the Court directed to enter judgment: (1) in favor of

plaintiff and against defendants Ahava Food Corp., Lewis County Dairy Corp., St. Lawrence

Food Corp., Yoni Realty, LLC, Moise Banayan and Schwartz and Sons, Inc. in the amount of

$9,338,103.90, and (2) in favor of plaintiff and against defendant Ana Banayan in the amount of $1,781,621.53, together with interest from the date of entry of judgment at the statutory rate, together with costs and disbursements to be taxed by the Clerk upon submission of an appropriate bill of costs;

IT IS HEREBY ADJUDGED that Plaintiff Signature Bank, with a principal place of business at 565 Fifth Avenue, 12th Floor, New York, New York 10017, recovers, jointly and severally, from Defendant Ahava Food Corp., with a principal place of business at 110 Beard Street, Brooklyn, New York 11231, Defendant Lewis County Dairy Corp., with a principal place of business at 7705 State Route 812, Lowville, New York, 13367, Defendant St. Lawrence Food Corp., with a principal place of business at 30 Main Street, Ogdenburg, New York 13669, Defendant Yoni Realty, LLC, with a principal place of business at 110 Beard Street, Brooklyn, New York 11231, Defendant Moise Banayan, who resides at 51 Parker Boulevard, Monsey, New York 10952, Defendant Schwartz and Sons, Inc., with a principal place of business at 110 Beard Street, Brooklyn, New York 11231 and Ana Banayan, who resides at 51 Parker Boulevard, Monsey, New York 10952, jointly and severally, in the amount of $1,781,621.53, plus costs and disbursements in the amount of $429.14 for a total sum of $1,782,050.67, and Plaintiff shall have  execution therefor;

IT IS HEREBY ADJUDGED that Plaintiff Signature Bank, recovers, jointly and

severally, from Defendants Ahava Food Corp., Lewis County Dairy Corp., St. Lawrence Food

Corp., Yoni Realty, LLC, Moise Banayan, and Schwartz and Sons, Inc., in the amount of

$7,556,482.37, plus costs and disbursements in the amount of $429.14 for a total sum of

$7,556,911.51, and that Plaintiff Signature Bank have execution therefore.

Judgment signed and entered this 14 date of March, 2008

Clerk, ~~Supreme Court~~



FILED

MAR 14 2008

COUNTY CLERK'S OFFICE
NEW YORK

# EXHIBIT S



# BOND, SCHOENECK & KING, PLLC

ATTORNEYS AT LAW ■ NEW YORK  FLORIDA  KANSAS

February 28, 2007

## SECOND REQUEST
## VIA FACSIMILE

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Signature Bank
565 Fifth Avenue
New York, NY 10017

Re:    *M&I Equipment Finance Company (f/k/a M&I First National Leasing Corp.)*
       *v. Lewis County Dairy Corp., Ahava Food Corp. and Moise Banayan*
       Lewis County Diary Corp. Customer No.: 00009400011211
       Ahava Food Group Corp. Customer No.: 00009400009047

Dear Sir/Madam:

This office represents M&I Equipment Finance Company. We enclose the following in connection with the above matter:

-An original Information Subpoena with Restraining Notice to Garnishee;

-An original and one copy of a Question and Answer form in response to said subpoena; and

-A self-addressed, stamped envelope.

Please note that you are required to answer the enclosed subpoena within seven (7) days of its receipt. Answers to the written questions accompanying the subpoena must be made in writing and executed before a notary public. Please return the completed and executed copy *only* of the Question and Answer Form in the envelope provided.

Furthermore, the Restraining Notice prohibits you from paying over to the judgment debtor all amounts due on any and all accounts payable or other debts or monies owing to the judgment debtor and from transferring or otherwise disposing of any property in which the judgment debtor may possess an interest. Failure to comply with this request is punishable as contempt of court. Thank you for your anticipated cooperation.

Very truly yours,

BOND, SCHOENECK & KING, PLLC

Maria Musolino
Legal Assistant
(315) 218-8239
Enclosures

SIGN 00191

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

                                 Plaintiff,

         v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan,

                            Defendants.

**INFORMATION SUBPOENA
WITH RESTRAINING NOTICE
TO GARNISHEE**

Index No.: 7:06-CV-54

### THE PEOPLE OF THE STATE OF NEW YORK

TO:           Signature Bank
ADDRESS:    565 Fifth Avenue
                New York, NY 10017

| Re: | Lewis County Dairy Corp. | Ahava Food Group Corp. | Moise Banayan |
|---|---|---|---|
| | 51 Parker Boulevard | 110 Beard Street | P.O. Box 31062 |
| | Monsey, NY 10962 | Brooklyn, NY 11231 | Brooklyn, NY 11231 |
| | Customer No: 00009400011211 | Customer No: 00009400009047 | |

WHEREAS, in an action in the United States District Court of the Northern District of New York, between M&I Equipment Finance Company f/k/a M&I First National Leasing Corp., Plaintiff and Lewis County Dairy Corp., Ahava Food Group Corp., and Moise Banayan Defendants, who are all the parties named in said action, a judgment was entered on January 12, 2007 in favor of M&I Equipment Finance Company, f/k/a M&I First National Leasing Corp., as Judgment Creditor, and against Lewis County Dairy Corp., Ahava Food Group Corp., and Moise Banayan , as Judgment Debtors, in the amount of $658,994.02, of which $658,994.02, together with interest thereon from January 12, 2007, remains unpaid;

    NOW, THEREFORE, WE COMMAND that you answer in writing under oath, separately and fully, each question in the questionnaire accompanying this subpoena, and that you return the completed answers, along with the original questions to the undersigned within seven (7) days after your receipt of this subpoena.

### RESTRAINING NOTICE

    WHEREAS, it appears that you owe a debt to the judgment debtor and/or are in possession or in custody of property in which the judgment debtor has an interest, including, but not limited to:

    Any and all checking account(s), savings account(s), safe deposit boxes, certificates of deposit and/or payroll accounts in which the judgment debtor may possess an interest.

    TAKE NOTICE THAT, pursuant to Section 5222(b) of the Civil Practice Law and Rules, you are hereby FORBIDDEN TO MAKE OR SUFFER ANY TRANSFER OR OTHER DISPOSITION OF ANY PROPERTY IN WHICH JUDGMENT DEBTOR HAS OR MAY HAVE ANY INTEREST, OR TO PAY OVER OR TO OTHERWISE DISPOSE OF ANY MONIES DUE OR TO BECOME DUE TO JUDGMENT DEBTOR, except as therein provided.

SIGN 00192

TAKE FURTHER NOTICE that this notice also covers all property in which the judgment debtor has an interest hereafter coming into your possession or custody, and all debts hereafter coming due from you to the judgment debtor.

FALSE SWEARING OR DISOBEDIENCE OF THIS INFORMATION SUBPOENA WITH RESTRAINING NOTICE IS PUNISHABLE AS CONTEMPT OF COURT.

I HEREBY CERTIFY THAT THIS INFORMATION SUBPOENA COMPLIES WITH RULE 5224 OF THE CIVIL PRACTICE LAW AND RULES AND THAT I HAVE A REASONABLE BELIEF THAT THE PARTY RECEIVING THIS SUBPOENA HAS IN THEIR POSSESSION INFORMATION ABOUT THE DEBTOR THAT WILL ASSIST THE CREDITOR IN COLLECTING THE JUDGMENT.

Dated:    February 28, 2007

Philip I. Frankel, Esq.
BOND, SCHOENECK & KING, PLLC
Attorneys for Judgment Creditor
Office and P.O. Address
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8127

## CIVIL PRACTICE LAW AND RULES

Section 5222(b). Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff, except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit who has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the

2

SIGN 00193

judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

3

SIGN 00194

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

|  |  |
|---|---|
| Plaintiff, | QUESTIONS AND ANSWERS IN CONNECTION WITH INFORMATION SUBPOENA |
| v. | |
| Lewis County Dairy Corp., Ahava Food Group Corp., and Moise Banayan | Index No.: 7:06-CV-54 |
| Defendants. | |

| Re: | Lewis County Dairy Corp. | Ahava Food Group Corp. | Moise Banayan |
|---|---|---|---|
|  | 51 Parker Boulevard | 110 Beard Street | P.O. Box 31062 |
|  | Monsey NY 10962 | Brooklyn, NY 11231 | Brooklyn, NY 11231 |
|  | Customer No: 00009400011211 | Customer No: 00009400009047 | |

STATE OF NEW YORK       )
COUNTY OF _____ ) ss.:

_____ being duly sworn deposes and says:  That deponent is the _____ of  **Signature Bank**, the recipient of an information subpoena herein and of the original and a copy of questions accompanying said subpoena.  The answers set forth below are made from information obtained from the records of the recipient.

1.    Does the above-referenced judgment debtor have any accounts with you, or do you have record of any account that the judgment debtor may have an interest in, either in the name of the debtor, a trade name or corporate name, or joint with another, as of the date of the information subpoena or up to one year prior to that date?

      Answer:

2.    As to each such account, state the title of the account, the date it was opened, and any amounts presently on deposit.  If the account has since been closed, state the amount on deposit when it was closed and the date it was closed?

| Title | Account Number | Date Opened | Amount on Deposit | Date Closed |
|---|---|---|---|---|
|  |  |  |  |  |

3.    Do you have record of the judgment debtor having any interest in a safe deposit box, whether in judgment debtor's name, under a trade name, a corporate name, or jointly with another, as of the date of the information subpoena or up to one year prior to that date?

SIGN 00195

Answer:

4.   As to each safe deposit box, what are the exact names of the lessees thereof, the date acquired, the date discontinued (if applicable), and the names of those having access to said box?

| Lessees | Date Hired | Date Discontinued | Those Having Access |
|---------|------------|-------------------|---------------------|
|         |            |                   |                     |

5.   Do you hold collateral in which the debtor has or may have an interest?

Answer:

6.   If so, what is the description and value of each item of collateral?

| Description | Value |
|-------------|-------|
|             |       |

7.   What interest does the debtor have in each item of collateral?

Answer:

8.   Is the judgment debtor indebted to you?

Answer:

9.   If so, what is the amount of each indebtedness which judgment debtor has with you, the date said debt was incurred, the amount and date of repayment?

| Amount | Date Incurred | Amount Repaid | Date Repaid |
|--------|---------------|---------------|-------------|
|        |               |               |             |

10.  Is judgment debtor current on his/her payments of said debt?

Answer:

2

11.    Do you hold any lien, mortgage or otherwise against the property of the judgment debtor?

Answer:

12.    If so, state the nature of each such lien, the full description of the property affected by the lien, where the lien was recorded or filed and the docketing information.

| Lien | Property | Where Recorded or Filed | Book and Page No. |
|------|----------|--------------------------|-------------------|
|      |          |                          |                   |

13.    Are there any of the assets of the debtor which you possess or hold, which are subject to liens, attachments or other encumbrances?

Answer:

14.    If so, state the full details of each asset in your possession or care.

Answer:

15.    Have you had any other transactions with the debtor, directly or indirectly, which may result in debtor being entitled to money or credit, now or hereafter? If so, explain in detail.

Answer:

16.    Do you have a statement of debtor's financial condition or an application on which the debtor discloses his/her credit and/or financial history?

Answer:

17.    If so, state the assets disclosed on said financial statement and/or application, or supply a copy of the statements.

Answer:

18.    State the name and address of judgment debtor's present place of employment. If the judgment debtor's present place of employment is unknown, state the name and address of judgment debtor's last known place of employment.

Answer:

3

SIGN 00197

Print Name: _____

Sworn to before me this
_____ day of _____, 2007.


_____
Notary Public

Attorneys for Judgment Creditor:
　　BOND, SCHOENECK & KING, PLLC
　　One Lincoln Center
　　Syracuse, New York 13202
　　(315) 218-8000

**Should additional space be needed to answer any of the above questions, please submit additional sheets.**

4



SENDER: COMPLETE THIS SECTION

COMPLETE THIS SECTION ON DELIVERY

7006 3450 0003 7090 5009

SIGN 00199

# EXHIBIT T

*Musolino*

# Fax

| To: | MARIA MUSOLINO | From: | BRUCE CHANG |
|---|---|---|---|
| Fax: | 315-218-8100 | Pages: | 10 w/cover sheet |
| Phone: | | Date: | APRIL 07, 2007 |
| Re: | RESTRAIN | cc: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● **Comments:** Please let me know if you do not receive all sheets faxed.

Regards,



Bruce Chang

Legal Servings Associate

SIGN 00200

**SIGNATURE BANK**

APR 03 2007

**BANK OPERATIONS**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

                                    Plaintiff,

                    v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan,

                                    Defendants.

**INFORMATION SUBPOENA
WITH RESTRAINING NOTICE
TO GARNISHEE**

Index No.: 7:06-CV-54

THE PEOPLE OF THE STATE OF NEW YORK

TO:         Signature Bank
ADDRESS:    565 Fifth Avenue
            New York, NY 10017

Re:   Lewis County Dairy Corp.        Ahava Food Group Corp.      Moise Banayan
      51 Parker Boulevard             110 Beard Street            P.O. Box 31062
      Monsey, NY 10962                Brooklyn, NY 11231          Brooklyn, NY 11231
      Customer No: 00009400011211     Customer No: 00009400009047

WHEREAS, in an action in the United States District Court of the Northern District of New York, between
M&I Equipment Finance Company f/k/a M&I First National Leasing Corp., Plaintiff and Lewis County
Dairy Corp., Ahava Food Group Corp., and Moise Banayan Defendants, who are all the parties named in
said action, a judgment was entered on January 12, 2007 in favor of M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp., as Judgment Creditor, and against Lewis County Dairy Corp.,
Ahava Food Group Corp., and Moise Banayan , as Judgment Debtors, in the amount of $658,994.02, of
which $658,994.02, together with interest thereon from January 12, 2007, remains unpaid;

        NOW, THEREFORE, WE COMMAND that you answer in writing under oath, separately and fully,
each question in the questionnaire accompanying this subpoena, and that you return the completed answers,
along with the original questions to the undersigned within seven (7) days after your receipt of this subpoena.

                            RESTRAINING NOTICE

        WHEREAS, it appears that you owe a debt to the judgment debtor and/or are in possession or in
custody of property in which the judgment debtor has an interest, including, but not limited to:

        Any and all checking account(s), savings account(s), safe deposit boxes, certificates of deposit
and/or payroll accounts in which the judgment debtor may possess an interest.

        TAKE NOTICE THAT, pursuant to Section 5222(b) of the Civil Practice Law and Rules, you are
hereby FORBIDDEN TO MAKE OR SUFFER ANY TRANSFER OR OTHER DISPOSITION OF ANY
PROPERTY IN WHICH JUDGMENT DEBTOR HAS OR MAY HAVE ANY INTEREST, OR TO PAY
OVER OR TO OTHERWISE DISPOSE OF ANY MONIES DUE OR TO BECOME DUE TO JUDGMENT
DEBTOR, except as therein provided.

SIGN 00201

TAKE FURTHER NOTICE that this notice also covers all property in which the judgment debtor has an interest hereafter coming into your possession or custody, and all debts hereafter coming due from you to the judgment debtor.

FALSE SWEARING OR DISOBEDIENCE OF THIS INFORMATION SUBPOENA WITH RESTRAINING NOTICE IS PUNISHABLE AS CONTEMPT OF COURT.

I HEREBY CERTIFY THAT THIS INFORMATION SUBPOENA COMPLIES WITH RULE 5224 OF THE CIVIL PRACTICE LAW AND RULES AND THAT I HAVE A REASONABLE BELIEF THAT THE PARTY RECEIVING THIS SUBPOENA HAS IN THEIR POSSESSION INFORMATION ABOUT THE DEBTOR THAT WILL ASSIST THE CREDITOR IN COLLECTING THE JUDGMENT.

Dated:    February 28, 2007

Philip I. Frankel, Esq.
BOND, SCHOENECK & KING, PLLC
Attorneys for Judgment Creditor
Office and P.O. Address
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8127

## CIVIL PRACTICE LAW AND RULES

Section 5222(b). Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff, except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit who has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the

2

SIGN 00202

judgment debtor or obligor, for any damages sustained by reason of the restraint.  If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

3

SIGN 00203

APR-03-2007 13:49    SIGNATURE BANK BKOPS    1 646 822 4160    P.05

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

                              Plaintiff,

        v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan

                    Defendants.

**QUESTIONS AND ANSWERS
IN CONNECTION WITH
INFORMATION SUBPOENA**

Index No.: 7:06-CV-54

Re:  Lewis County Dairy Corp.          Ahava Food Group Corp.          Moise Banayan
     51 Parker Boulevard               110 Board Street               P.O. Box 31062
     Monsey NY 10962                   Brooklyn, NY 11231             Brooklyn, NY 11231
     Customer No: 00009400011211       Customer No: 00009400009047

STATE OF NEW YORK        )
COUNTY OF _____  ) ss.:

_____ being duly sworn deposes and says:  That deponent is the
_____ of  **Signature Bank**, the recipient of an information subpoena herein and of the
original and a copy of questions accompanying said subpoena.  The answers set forth below are made from
information obtained from the records of the recipient.

1.    Does the above-referenced judgment debtor have any accounts with you, or do you have record of
      any account that the judgment debtor may have an interest in, either in the name of the debtor, a
      trade name or corporate name, or joint with another, as of the date of the information subpoena or up
      to one year prior to that date?

      Answer: YES

2.    As to each such account, state the title of the account, the date it was opened, and any amounts
      presently on deposit.  If the account has since been closed, state the amount on deposit when it was
      closed and the date it was closed?

| Title | Account Number | Date Opened | Amount on Deposit | Date Closed |
|-------|----------------|-------------|-------------------|-------------|
| LEWIS COUNTY DAIRY CORP | 1500583408 | 04/28/05 | $00.00 | N/A |
| | 1500583750 | 04/16/05 | $00.00 | N/A |
| | 1500583769 | 08/12/05 | $00.00 | N/A |
| | 1500626980 | 12/29/05 | $00.00 | 03/07 |
| | 1500883649 | 03/07/07 | $00.00 | N/A |

3.    Do you have record of the judgment debtor having any interest in a safe deposit box, whether in
      judgment debtor's name, under a trade name, a corporate name, or jointly with another, as of the date
      of the information subpoena or up to one year prior to that date?

SIGN 00204

APR-03-2007  13:50          SIGNATURE BANK BKOPS                    1 646 822 1366          P.06

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

                                    Plaintiff,

            v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan

                                    Defendants.

**QUESTIONS AND ANSWERS
IN CONNECTION WITH
INFORMATION SUBPOENA**

Index No.: 7:06-CV-54

Re:   Lewis County Dairy Corp.        Ahava Food Group Corp.       Moise Banayan
      51 Parker Boulevard             110 Beard Street             P.O. Box 31062
      Monsey NY 10962                 Brooklyn, NY 11231           Brooklyn, NY 11231
      Customer No: 00009400011211     Customer No: 00009400009047

STATE OF NEW YORK        )
COUNTY OF _____ ) ss.:

_____ being duly sworn deposes and says:  That deponent is the
_____ of  **Signature Bank**, the recipient of an information subpoena herein and of the
original and a copy of questions accompanying said subpoena.  The answers set forth below are made from
information obtained from the records of the recipient.

1.    Does the above referenced judgment debtor have any accounts with you, or do you have record of
      any account that the judgment debtor may have an interest in, either in the name of the debtor, a
      trade name or corporate name, or joint with another, as of the date of the information subpoena or up
      to one year prior to that date?

      Answer: YES

2.    As to each such account, state the title of the account, the date it was opened, and any amounts
      presently on deposit.  If the account has since been closed, state the amount on deposit when it was
      closed and the date it was closed?

| Title | Account Number | Date Opened | Amount on Deposit | Date Closed |
|-------|----------------|-------------|-------------------|-------------|
| AHAVA FOOD CORP | 1500583386 | 04/28/05 | $00.00 | 02/07 |
| | 1500583394 | 04/28/05 | $00.00 | N/A |
| | 1500812660 | 11/03/06 | $-40.37 (ACC OVERDRAWN) | N/A |
| | 1500883622 | 03/07/07 | $00.00 | N/A |

3.    Do you have record of the judgment debtor having any interest in a safe deposit box, whether in
      judgment debtor's name, under a trade name, a corporate name, or jointly with another, as of the date
      of the information subpoena or up to one year prior to that date?

APR-03-2007  13:51      SIGNATURE BANK BKOPS                1 646 822 4160    P.07

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

Plaintiff,

v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan

Defendants.

**QUESTIONS AND ANSWERS
IN CONNECTION WITH
INFORMATION SUBPOENA**

Index No.: 7:06-CV-54

Re:   Lewis County Dairy Corp.        Ahava Food Group Corp.        Moise Banayan
      51 Parker Boulevard             110 Beard Street               P.O. Box 31062
      Monsey NY 10962                 Brooklyn, NY 11231             Brooklyn, NY 11231
      Customer No: 00009400011211     Customer No: 00009400009047

STATE OF NEW YORK        )
COUNTY OF _____ ) ss.:

_____ being duly sworn deposes and says:   That deponent is the
_____ of   **Signature Bank**, the recipient of an information subpoena herein and of the
original and a copy of questions accompanying said subpoena.  The answers set forth below are made from
information obtained from the records of the recipient.

1.    Does the above-referenced judgment debtor have any accounts with you, or do you have record of
      any account that the judgment debtor may have an interest in, either in the name of the debtor, a
      trade name or corporate name, or joint with another, as of the date of the information subpoena or up
      to one year prior to that date?

      Answer:

2.    As to each such account, state the title of the account, the date it was opened, and any amounts
      presently on deposit.  If the account has since been closed, state the amount on deposit when it was
      closed and the date it was closed?

| Title | Account Number | Date Opened | Amount on Deposit | Date Closed |
|---|---|---|---|---|
| ▓▓▓▓▓▓▓▓▓▓ | 1500583645 | 07/13/05 | $00.00 | N/A |

3.    Do you have record of the judgment debtor having any interest in a safe deposit box, whether in
      judgment debtor's name, under a trade name, a corporate name, or jointly with another, as of the date
      of the information subpoena or up to one year prior to that date?

SIGN 00206

Answer:  NO

4.    As to each safe deposit box, what are the exact names of the lessees thereof, the date acquired, the date discontinued (if applicable), and the names of those having access to said box?

| Lessees | Date Hired | Date Discontinued | Those Having Access |
|---------|------------|-------------------|---------------------|
|         |            | N/A               |                     |

5.    Do you hold collateral in which the debtor has or may have an interest?

Answer:  NO

6.    If so, what is the description and value of each item of collateral?

| Description | Value |
|-------------|-------|
| N/A         |       |

7.    What interest does the debtor have in each item of collateral?

Answer:  N/A

8.    Is the judgment debtor indebted to you?

Answer:  NO

9.    If so, what is the amount of each indebtedness which judgment debtor has with you, the date said debt was incurred, the amount and date of repayment?

| Amount | Date Incurred | Amount Repaid | Date Repaid |
|--------|---------------|---------------|-------------|
|        | N/A           |               |             |

10.    Is judgment debtor current on his/her payments of said debt?

Answer:  N/A

2

SIGN 00207

APR-03-2007  13:53          SIGNATURE BANK BKOPS                    1 646 822 4886

11.    Do you hold any lien, mortgage or otherwise against the property of the judgment debtor?

       Answer:  NO

12.    If so, state the nature of each such lien, the full description of the property affected by the lien, where
       the lien was recorded or filed and the docketing information.

|        |          | Where Recorded | Book and |
| Lien   | Property | or Filed       | Page No. |

                              N/A

13.    Are there any of the assets of the debtor which you possess or hold, which are subject to liens,
       attachments or other encumbrances?

       Answer:  NO

14.    If so, state the full details of each asset in your possession or care.

       Answer:  N/A

15.    Have you had any other transactions with the debtor, directly or indirectly, which may result in
       debtor being entitled to money or credit, now or hereafter?  If so, explain in detail.

       Answer:  NO

16.    Do you have a statement of debtor's financial condition or an application on which the debtor
       discloses his/her credit and/or financial history?

       Answer:  NO

17.    If so, state the assets disclosed on said financial statement and/or application, or supply a copy of the
       statements.

       Answer:  N/A

18.    State the name and address of judgment debtor's present place of employment.  If the judgment
       debtor's present place of employment is unknown, state the name and address of judgment debtor's
       last known place of employment.

       Answer:  N/A

                                           3

SIGN 00208

APR-03-2007  13:54        SIGNATURE BANK BKOPS                    1 646 822 4160    P.10

SIGNATURE BANK BY: _____

Print Name: BRUCE CHANG

Sworn to before me this
_____ day of _____, 2007.

_____
Notary Public

Attorneys for Judgment Creditor:
    BOND, SCHOENECK & KING, PLLC
    One Lincoln Center
    Syracuse, New York 13202
    (315) 218-8000

Should additional space be needed to answer any of the above questions, please submit additional sheets.

4

TOTAL P.10

SIGN 00209

🖂 001

04/03/07  11:55 FAX

4/3
12·'0 4

```
*************************
***    TX REPORT    ***
*************************
```

*Maria M.*

TRANSMISSION OK

TX/RX NO                    0315
CONNECTION TEL             319715#916468221695#
SUBADDRESS
CONNECTION ID
ST. TIME                   04/03 11:50
USAGE T                    05'26
PGS. SENT                  10
RESULT                     OK



## BS&K   BOND, SCHOENECK & KING, PLLC
ATTORNEYS AT LAW ▪ NEW YORK  FLORIDA  KANSAS

646·822·1695

### FAX COVER SHEET

NAME:   Mr. Bruce Chang          FAX:   ~~646-758-8391~~

FIRM:   Signature Bank           PHONE:

                                 MATTER:  319715-7524

FROM:   Maria Musolino           DATE:   April 3, 2007

DIRECT PHONE:   (315) 218-8239

DIRECT FAX:                      **THIRD REQUEST**

TOTAL:   [Number of pages including cover sheet]: 10

---

COMMENTS:

Dear Mr. Chang:

This is the third request we've made regarding responses to the attached Information Subpoena with Restraining Notice to Garnishee.  Please contact me, at the above number, *immediately* upon receipt.

Thank you.

*Maria Musolino*
Maria Musolino

SIGN 00210



UNITED STATES POSTAGE
$ 00.63⁰
PITNEY BOWES
02 1M
000/4218369    APR 06 2007
MAILED FROM ZIP CODE 10018

RECEIVED

APR 09 2007

BOND, SCHOENECK & KING, PLLC

BOND, SCHOENECK & KING, PLLC
ONE LINCOLN CENTER
SYRACUSE, NY 13202-1355
ATTN: MARIA MUSOLINO

13202/31355 C009

*Signature*
SIGNATURE BANK
565 Fifth Avenue
New York New York 10017

SIGN 00211

# EXHIBIT U

 **BOND, SCHOENECK & KING, PLLC**

ATTORNEYS AT LAW ▪ NEW YORK  FLORIDA  KANSAS

May 8, 2007

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Signature Bank
565 Fifth Avenue
New York, NY  10017

*Re:*    *M&I Equipment Finance Company (f/k/a M&I First National Leasing Corp.)*
          *v. Lewis County Dairy Corp., Ahava Food Corp. and Moise Banayan*

Dear Sir/Madam:

This office represents M&I Equipment Finance Company.  We enclose the following in connection with the above matter:

-An original Information Subpoena with Restraining Notice to Garnishee;

-An original and one copy of a Question and Answer form in response to said subpoena; and

-A self-addressed, stamped envelope.

Please note that you are required to answer the enclosed subpoena within seven (7) days of its receipt. Answers to the written questions accompanying the subpoena must be made in writing and executed before a notary public.  Please return the completed and executed **copy only** of the Question and Answer Form in the envelope provided.

Furthermore, the Restraining Notice prohibits you from paying over to the judgment debtor all amounts due on any and all accounts payable or other debts or monies owing to the judgment debtor and from transferring or otherwise disposing of any property in which the judgment debtor may possess an interest. Failure to comply with this request is punishable as contempt of court.  Thank you for your anticipated cooperation.

Very truly yours,

BOND, SCHOENECK & KING, PLLC

Maria Muscino
Legal Assistant
(315) 218-8239
Enclosures

SIGN 00212



**BOND, SCHOENECK & KING, PLLC**

One Lincoln Center, Syracuse, NY 13202-1355

Phone: 315-218-8000    Fax: 315-218-8100

#1230

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

                                    Plaintiff,

        v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan,

                    Defendants.

**INFORMATION SUBPOENA
WITH RESTRAINING NOTICE
TO GARNISHEE**

Index No.: 7:06-CV-54

**THE PEOPLE OF THE STATE OF NEW YORK**

TO:         Signature Bank
ADDRESS:   565 Fifth Avenue
            New York, NY 10017

Re:    Lewis County Dairy Corp.          Ahava Food Group Corp.        Moise Banayan
       51 Parker Boulevard               110 Beard Street               51 Parker Boulevard
       Monsey, NY 10962                  Brooklyn, NY 11231             Monsey, NY 10962

WHEREAS, in an action in the United States District Court of the Northern District of New York, between M&I Equipment Finance Company f/k/a M&I First National Leasing Corp., Plaintiff and Lewis County Dairy Corp., Ahava Food Group Corp., and Moise Banayan Defendants, who are all the parties named in said action, a judgment was entered on April 23, 2007 in favor of M&I Equipment Finance Company, f/k/a M&I First National Leasing Corp., as Judgment Creditor, and against Lewis County Dairy Corp., Ahava Food Group Corp., and Moise Banayan , as Judgment Debtors, in the amount of $60,553.66, of which $60,553.66, together with interest thereon from April 23, 2007, remains unpaid;

        NOW, THEREFORE, WE COMMAND that you answer in writing under oath, separately and fully, each question in the questionnaire accompanying this subpoena, and that you return the completed answers, along with the original questions to the undersigned within seven (7) days after your receipt of this subpoena.

**RESTRAINING NOTICE**

        WHEREAS, it appears that you owe a debt to the judgment debtors and/or are in possession or in custody of property in which the judgment debtors have an interest, including, but not limited to:

        Any and all checking account(s), savings account(s), safe deposit boxes, certificates of deposit and/or payroll accounts in which the judgment debtors may possess an interest

        TAKE NOTICE THAT, pursuant to Section 5222(b) of the Civil Practice Law and Rules, you are hereby FORBIDDEN TO MAKE OR SUFFER ANY TRANSFER OR OTHER DISPOSITION OF ANY PROPERTY IN WHICH JUDGMENT DEBTORS HAVE OR MAY HAVE ANY INTEREST, OR TO PAY OVER OR TO OTHERWISE DISPOSE OF ANY MONIES DUE OR TO BECOME DUE TO JUDGMENT DEBTORS, except as therein provided.

SIGN 00213

TAKE FURTHER NOTICE that this notice also covers all property in which the judgment debtors have an interest hereafter coming into your possession or custody, and all debts hereafter coming due from you to the judgment debtor.

FALSE SWEARING OR DISOBEDIENCE OF THIS INFORMATION SUBPOENA WITH RESTRAINING NOTICE IS PUNISHABLE AS CONTEMPT OF COURT.

I HEREBY CERTIFY THAT THIS INFORMATION SUBPOENA COMPLIES WITH RULE 5224 OF THE CIVIL PRACTICE LAW AND RULES AND THAT I HAVE A REASONABLE BELIEF THAT THE PARTY RECEIVING THIS SUBPOENA HAS IN THEIR POSSESSION INFORMATION ABOUT THE DEBTOR THAT WILL ASSIST THE CREDITOR IN COLLECTING THE JUDGMENT.

Dated:    May 8, 2007

Philip I. Frankel, Esq.
BOND, SCHOENECK & KING, PLLC
Attorneys for Judgment Creditor
Office and P.O. Address
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8127

## CIVIL PRACTICE LAW AND RULES

Section 5222(b). Effect of restraint; prohibition of transfer; duration.  A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated.  A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served.  All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice.  Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff, except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment is satisfied or vacated, whichever event first occurs.  A judgment creditor or support collection unit who has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint.  If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

2

SIGN 00214

PLEASE TAKE NOTICE THAT THE WITHIN IS A
(CERTIFIED) TRUE COPY OF A
ENTERED IN THE OFFICE OF THE
COUNTY CLERK ON        20
AT                    , NEW YORK

_____
            ATTORNEY

I, THE UNDERSIGNED, AN ATTORNEY ADMITTED TO PRACTICE
IN THE COURTS OF NEW YORK STATE HEREBY CERTIFY THAT
THE ANNEXED
HAS BEEN COMPARED BY ME WITH THE ORIGINAL AND IS A
TRUE AND COMPLETE COPY THEREOF.

_____
            ATTORNEY

**BOND, SCHOENECK & KING, PLLC**
One Lincoln Center, Syracuse, NY 13202-1355
Phone: 315-218-8000    Fax: 315-218-8100

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
M&I Equipment Finance Company,
f/k/a M&I First National Leasing Corp.,

                                    Plaintiff,

                v.

Lewis County Dairy Corp., Ahava Food Group
Corp., and Moise Banayan

                                    Defendants.

**QUESTIONS AND ANSWERS
IN CONNECTION WITH
INFORMATION SUBPOENA**

Index No.: 7:06-CV-54

Re:    Lewis County Dairy Corp.          Ahava Food Group Corp.          Moise Banayan
       51 Parker Boulevard               110 Beard Street                51 Parker Boulevard
       Monsey NY 10962                    Brooklyn, NY  11231             Monsey, NY  10962

STATE OF NEW YORK          )
COUNTY OF _____) ss.:

_____ being duly sworn deposes and says:   That deponent is the
_____ of **Signature Bank**, the recipient of an information subpoena herein and of the
original and a copy of questions accompanying said subpoena.  The answers set forth below are made from
information obtained from the records of the recipient.

1.    Do the above-referenced judgment debtors have any accounts with you, or do you have record of any
      accounts that the judgment debtors may have an interest in, either in the name of the debtors, a trade
      name or corporate name, or joint with another, as of the date of the information subpoena or up to one
      year prior to that date?

           Answer:

2.    As to each such account, state the title of the account, the date it was opened, and any amounts presently
      on deposit.  If the account has since been closed, state the amount on deposit when it was closed and the
      date it was closed?

| Title | Type of Account | Account Number | Date Opened | Amount on Deposit | Date Closed |
|-------|----------------|----------------|-------------|-------------------|-------------|
|       |                |                |             |                   |             |

3.    As to each account, attach copies of each of the bank statements for the last two years.

4.    For each account (opened or closed) attach a copy of the banking resolution form and signature cards.

SIGN 00216

5.   Provide copies of all agreements, promissory notes, security agreements, mortgages, memoranda, Signature Bank has, or may have had, with judgment debtor, Moise Banayan.

6.   List all security liens, including the following: date of security, specific security listed, balance of debt and hot it is perfected.

7.   As to each security liens, advise which, if any, have been executed upon, and state how the execution was completed, the date of execution, and the amount recovered.

     Answer:

8.   Do you have record of the judgment debtors having any interest in a safe deposit box, whether in judgment debtors' names, under a trade name, a corporate name, or jointly with another, as of the date of the information subpoena or up to one year prior to that date? If so, provide the location of the safety deposit box.

     Answer:

9.   As to each safe deposit box, what are the exact names of the lessees thereof, the date acquired, the date discontinued (if applicable), and the names of those having access to said box?

| Lessees | Date Hired | Date Discontinued | Those Having Access |
|---------|------------|-------------------|---------------------|
|         |            |                   |                     |

10.  Do you hold collateral in which the debtors have or may have an interest?

     Answer:

11.  If so, what is the description and value of each item of collateral?

| Description | Value |
|-------------|-------|
|             |       |

2

SIGN 00217

12.    What interest do the debtors have in each item of collateral?

    Answer:

13.    Are the judgment debtors indebted to you?

14.    Answer:

15.    If so, what is the amount of each indebtedness which judgment debtors has with you, the date said debt was incurred, the amount and date of repayment?

| Amount | Date Incurred | Amount Repaid | Date Repaid |
|--------|---------------|---------------|-------------|
|        |               |               |             |

16.    Are judgment debtors current on their payments of the debt?  If not, specify the basis of the default.

    Answer:

17.    If you hold a mortgage or any of judgment debtors' property, provide the full description of the property affected by the lien, where the lien was recorded or filed, and the docketing information.

| Lien | Property | Where Recorded or Filed | Book and Page No. |
|------|----------|-------------------------|-------------------|
|      |          |                         |                   |

18.    Do you have a statement of debtors' financial condition or an application on which the debtors disclose their credit and/or financial history?  If so, attach a copy.

    Answer:

19.    State the name and address of judgment debtor's, Moise Banayan, present place of employment.  If the judgment debtors' present place of employment is unknown, state the name and address of judgment debtors' last known place of employment.

    Answer:

20.    Since January 2007, has the bank ever advised debtors to close any old accounts and open new accounts in the judgment creditors name?  If so, provide the date of such communication, the bank employee who

SIGN 00218

made the communication; was this communication in writing, to whom the bank communicated with; when this communication was, the result of the communication?

Answer:

21. Are there any accounts in the name of Chana Banayan, a/k/a Ana Banayan?

Answer:

_____

Print Name:

Sworn to before me this
_____ day of _____, 2007.


_____

Notary Public

Attorneys for Judgment Creditor:
    BOND, SCHOENECK & KING, PLLC
    One Lincoln Center
    Syracuse. New York  13202
    (315) 218-8000

**Should additional space be needed to answer any of the above questions, please submit additional sheets.**

SIGN 00219

PLEASE TAKE NOTICE THAT THE WITHIN IS A
(CERTIFIED) TRUE COPY OF A
ENTERED IN THE OFFICE OF THE
COUNTY CLERK ON            20
AT                          , NEW YORK

_____
ATTORNEY

I, THE UNDERSIGNED, AN ATTORNEY ADMITTED TO PRACTICE
IN THE COURTS OF NEW YORK STATE HEREBY CERTIFY THAT
THE ANNEXED
HAS BEEN COMPARED BY ME WITH THE ORIGINAL AND IS A
TRUE AND COMPLETE COPY THEREOF.

_____
ATTORNEY

SIGN 00220



SIGN 00222

# EXHIBIT V

**From:** Bloch, Robert
**Sent:** Tuesday, June 05, 2007 10:31 AM
**To:** Monigan, Margaret
**Subject:** FW: Lewis County Dairy Corp., Ahava Food Group., and Moise Banayan

FYI, thought I included you on this.

Sorry

---

**From:** Bloch, Robert
**Sent:** Friday, June 01, 2007 12:01 PM
**To:** Gonzalez, Marlon; Manzi, Patrick; Private Client Group - Kasulka (161); Merio, Michael; Gay, James; Duggan, Susan; Sherlock, Janet
**Cc:** Viant, Linnea; Chang, Bruce; Revollo, Pedro; Estevez, Amalia; Plasencia, Yolanda; McVay, Sharyn; 'agold@herrick.com'
**Subject:** RE: Lewis County Dairy Corp., Ahava Food Group., and Moise Banayan

FYI:

Today, as outlined below, there are several auto debit loan payments which are scheduled to hit the accounts of Ahava Food Corp. and Lewis Count Dairies.  Due to the current frozen status of the accounts these payments will be rejected and will need to be manually processed on Monday (6/4).  As $32,864.30 in aggregate funds have been frozen and removed from the subject's accounts and placed in suspense we will use these funds (as outlined below & directed by Andy Gold, Bank Counsel) to pay a portion of the principal and interest which is currently due to the Bank.

**Loan Payments due as of June 1, 2007 :**
- Ahava Food Corp.: Term Loan (Principal & Interest) i/a/o $41,744.44
- Ahava Food Corp.: Revolver (interest on prime note) i/a/o $364.61
- Lewis County Dairy: Matured $750,000 note (interest) i/a/o $12,532.71

**Funds held in Suspense due to Restraining Notice:**
- Ahava Food Corp: (various accounts) ($3,000 + $14,875 + $8,989.30) = **$26,864.30**
- Lewis County :(various accounts) ($5,000+1,000) = **6,000**

Thus, on Monday the funds held in suspense should be applied to the respective loan payments due, as noted below, with the balance of the payments being funded by two separate debits to the St. Lawrence Dairies (the Corporate Guarantor), account (#1500883630).  Specifics are as follows:

- Ahava: Total P&I of $42,109.05 to be paid via $26,864.30 in restrained funds and a $15,244.75 debit to St. Lawrence's account #1500883630.
- Lewis County: Interest of $12,532.71 to be paid via $6,000 in restrained funds and a $6,532.71 debit to St Lawrence's account #1500883630.

Please let me know who and how the loan department should contact to facilitate these payments.

Regards,

Rob

---

**From:** Gonzalez, Marlon
**Sent:** Friday, June 01, 2007 11:07 AM

SIGN 01056

5/28/2008

**To:** Manzi, Patrick; Private Client Group - Kasulka (161)
**Cc:** Viant, Linnea; Chang, Bruce; Revollo, Pedro; Estevez, Amalia; Plasencia, Yolanda; McVay, Sharyn
**Subject:** RE: Lewis County Dairy Corp., Ahava Food Group., and Moise Banayan

Yes, first thing Monday morning this account will be placed back on frozen status, being that the status has been changed several times the credit/debit might be rejected if changed once again.

---

**From:** Manzi, Patrick
**Sent:** Friday, June 01, 2007 10:45 AM
**To:** Gonzalez, Marlon; Private Client Group - Kasulka (161)
**Cc:** Viant, Linnea; Chang, Bruce; Revollo, Pedro; Estevez, Amalia; McVay, Sharyn; Plasencia, Yolanda
**Subject:** RE: Lewis County Dairy Corp., Ahava Food Group., and Moise Banayan

Once the credit and debit are made, please make sure that the status is restored to Frozen.

Thanks.

---

**From:** Gonzalez, Marlon
**Sent:** Friday, June 01, 2007 10:33 AM
**To:** Private Client Group - Kasulka (161)
**Cc:** Manzi, Patrick; Viant, Linnea; Chang, Bruce; Revollo, Pedro; Estevez, Amalia; McVay, Sharyn; Plasencia, Yolanda
**Subject:** RE: Lewis County Dairy Corp., Ahava Food Group., and Moise Banayan

Please be advised the Citi-Bank collection posted today by Yolanda has been debited due to a Restraining Notice.

The following has been done to the account below:

**Account No.1500812660-Debit of $8,989.30 Restrain Fund**

Regards,

Marlon Gonzalez
Signature Bank
Legal Servings Associate

---

**From:** Gonzalez, Marlon
**Sent:** Wednesday, May 23, 2007 12:49 PM
**To:** Private Client Group - Kasulka (161)
**Cc:** Manzi, Patrick; Viant, Linnea; Chang, Bruce; Revollo, Pedro; Estevez, Amalia; McVay, Sharyn
**Subject:** Lewis County Dairy Corp., Ahava Food Group., and Moise Banayan

We received a Restraining Notice in the matter of **M&I Equipment Finance Company f/k/a M&I First National Leasing Corp v Lewis County Dairy Corp., Ahava Food Group Corp, and  Moise Banayan** in the amount of **$60,553.66**.  We are therefore required to restrain twice the judgment amount for **$121,107.32** from these accounts. The following has been done to the accounts found:

**Account No.1500583408-Debit of $1000.00 Restrain Fund and placed account on Frozen Status**

**Account No.1500583750-Debit of $5000.00 Restrain Fund and placed account on Frozen Status**

**Account No.1500583394-Debit of $3000.00 Restrain Fund and placed account on Frozen Status**

**Account No.1500812660-Debit of $14,875.00 Restrain fund**
**Account No.1500812660-Debit of $125.00 Legal Fee and placed account on Frozen Status**

**Account No.1500583769-Placed on Frozen Status**
**Account No.1500883649-Placed on Frozen Status**

SIGN 01057

5/28/2008

Attached is a copy of the Restraining Notice. Please contact your client regarding this matter immediately

Regards,
**Marlon Gonzalez**
Signature Bank
Legal Servings Associate
Phone No. (646)822-4152
Fax No. (646) 758-8391
Email: mgonzalez@signatureny.com

SIGN 01058

5/28/2008

From June        01, 2007
To   June        30, 2007
Page   2 of  3

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660              0

MONOGRAM CHECKING          1500812660

Summary
      Previous Balance as of June     01, 2007                    1,529.91-
             6 Credits                                           13,351.51
             4 Debits                                            10,713.91
      Ending Balance as of    June    30, 2007                    1,107.69

Deposits and Other Credits
    Jun 01   MISC CREDIT      10609.21 USD                       10,519.21
    Jun 04   MISC CREDIT                                            364.61
    Jun 04   RETURNED CHECK                                       1,000.00
    Jun 06   RETURNED CHECK                                         360.00
    Jun 06   DEPOSIT                                                396.56
    Jun 15   INCOMING WIRE TRANSFER                                 711.13
             REF#  20070615B6B7261F00026206151309FT01
             FROM: FOODFEST INTERNATIONAL 2000 INC    ABA:
             BANK: RBC CENTRE ST BR THORNHILL

Withdrawals and Other Debits
    Jun 01   LOAN PAYMENT    CLPAYMENT                              364.61
             TRANSFER FROM LOANS       75000000000094090470001006
    Jun 01   MISC DEBIT     RESTRAIN 5/23                         8,989.30

Checks by Serial Number
    Jun 01      45073          1,000.00    Jun 04    45702 *       360.00

             * Indicates break in check sequence

Daily Balances
    May 31       1,529.91-            Jun 06       396.56
    Jun 01       1,364.61-            Jun 15     1,107.69
    Jun 04         360.00-

SIGN 01059

**Monigan, Margaret**

| | |
|---|---|
| **From:** | Sherlock, Janet |
| **Sent:** | Tuesday, May 27, 2008 4:10 PM |
| **To:** | Monigan, Margaret |
| **Subject:** | Agava |



SIGN 01060



Janet Sherlock
Signature Bank
Loan Administration
29 West 38th Street
12th Floor
New York, NY 10018
(P) 646-822-1733
(F) 646-758-8190

SIGN 01061

5/27/2008

**From:** Monigan, Margaret
**Sent:** Thursday, July 05, 2007 10:36 AM
**To:** Balram, Peter
**Cc:** Loan Administration; Bloch, Robert; Duggan, Susan
**Subject:** RE: Ahava Food Corp.

Client is making a deposit today into acct 1500812660 (I/N/O Ahava Food Corp) to cover loan fees stated below.  You will need to get the hold removed and then debit the account.

---

**From:** Balram, Peter
**Sent:** Thursday, July 05, 2007 10:11 AM
**To:** Monigan, Margaret; Fanelli, Mary Ann
**Cc:** Loan Administration
**Subject:** Ahava Food Corp.

Margaret,
Please let me know when the funds are available to make the monthly payment to the Term Loan.
The amount owed is Principal $33,333.33 Interest $9,042.94 for total $42,376.27 effective 07/02/2007.

```
AMAI          07/05/07        ACCOUNT INQUIRY        09:09:02
CUR
CTL2 000  CTL3 000  CTL4 0000   ACCT 94090470003004   EFF DATE      07/02/07
CTL2 000  CTL3 000  CTL4 0000   CUST 00009400009047   ACTIVE ACCOUNT
                        ********** RATES **********    SIMPLE INT - VAR RATE
PAYOFF          1309043.01                             AUTO DR              N
ORIG LOAN AMT   1633333.37   CURR RATE    8.3200000    PROD TYPE         VTRM
ORIG PROCEEDS   1633333.37   ORIG RATE    7.6518800    PRIM OFFICER       372
LT CHG DUE          0.00     PER DIEM   300.4444606    GL KEY 75     161 VTRM
FEES DUE            0.00     ********** DATES ********* CALL CODE         04A0
CURRENT PRIN    1300000.07   CONTRACT DATE   08/21/06  ***** REPAYMENTS *****
CURRENT INT        9042.94   CURR MATURITY   09/11/07  CURR TERM           13
SCH PYMT AMT      33333.33   CLOSED DATE               PYMTS MADE           0
CUR PYMT AMT      42376.27   SCHED DUE DATE  07/02/07  PYMTS REM            3
PAST DUE AMT         0.00    OLDEST DUE DATE 07/02/07  MONTHS EXTD  0 REN 001
PARTIAL PAID    131092.10    LAST MAINT DT   06/21/07  YTD INT COLL  54298.95
********************          LST BAL CHG DT  06/01/07  INT COL PREV  40764.88
AHAVA FOOD CORP.                                       ***** CREDIT HIST *****
110 BEARD ST.                                          015 030 060 090 120 150
                                          COLLATERAL   000 000 000 000 000 000
BROOKLYN              NY 11231            CODE: V01
PH (   ) ( 718 ) 243-0400                DESC:
PF3-ADDL INFO
```

Thanks
Peter

Girjanand (Peter) Balram
Commercial Loan Administration
29 West 38th Street, 12th Floor
New York, N.Y. 10018
Phone: 646-822-1956
Fax:    646-758-8190

SIGN 01054

**Signature**
SIGNATURE BANK

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

MONOGRAM CHECKING          1500812660

Summary

| | | |
|---|---|---:|
| Previous Balance as of July | 01, 2007 | 1,107.69 |
| 6 Credits | | 50,891.68 |
| 9 Debits | | 51,999.37 |
| Ending Balance as of    July | 31, 2007 | .00 |

Deposits and Other Credits

| | | | | |
|---|---|---|---|---:|
| Jul 05 | DEPOSIT | | | 41,378.26 |
| Jul 10 | ACH | ck/ref no. | 7235312 | 2,252.25 |
| | COMMERCIAL LEASE | LEASE PMT | 516-0060045-000 | |
| Jul 12 | RETURNED CHECK | | | 360.00 |
| Jul 12 | DEPOSIT | | | 3,332.72 |
| Jul 13 | DEPOSIT | | | 360.00 |
| Jul 24 | INCOMING WIRE TRANSFER | | | 3,208.45 |
| | REF#  20070724B6B7261F00028107241507FT01 | | | |
| | FROM: FOODFEST INTERNATIONAL 2000 INC     ABA: | | | |
| | BANK: RBC CENTRE ST BR THORNHILL | | | |

Withdrawals and Other Debits

| | | | | |
|---|---|---|---|---:|
| Jul 06 | WITHDRAWAL | UNUSED FEE | | 70.68 |
| Jul 06 | WITHDRAWAL | PRIN&INT PYMT | | 42,376.27 |
| Jul 09 | AUTOMATED PAYMENT | ck/ref no. | 7235312 | 2,252.25 |
| | COMMERCIAL LEASE | LEASE PMT | 516-0060045-000 | |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 930.00 |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 930.00 |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 930.00 |
| Jul 11 | RETURNED DEPOSIT ITEM | | | 941.72 |
| Jul 27 | MISC DEBIT | ADM RESTRAINT | | 3,208.45 |

Checks by Serial Number

| | | |
|---|---|---:|
| Jul 11 | 45703 | 360.00 |

SIGN 01055

**From:** Monigan, Margaret
**Sent:** Tuesday, September 18, 2007 11:25 AM
**To:** Manzi, Patrick; Gonzalez, Marlon
**Cc:** Sherlock, Janet; Bloch, Robert; Merlo, Michael; Duggan, Susan
**Subject:** Ahava Food Corp - 1500812660 - removal of blocked status
**Importance:** High

Pat,

We need to remove the restriction (hold) on acct. 1500812660 (i/n/o Ahava Food Corp.) so that the loan department can take out the loan fees/interest owed.  The account currently has a balance of **$40,181.73** and as such we would like to debit the account as follows:

```
Interest          Principal
$4,052.87         $1,213,333.41      Ahava
$22,566.11        $5,489,054.48      Ahava
$8,750.00         $1,750,000.00      Ahava & St Lawrence
$3,083.34         $750,000.00        Lewis County
```

**$38,452.32**   Total Interest

The remaining **$1,729.41** will be used to pay down principal under the Revolver ($5,489,054.48)

Tomorrow the block & credits only status will need to be put back on the account.

If you have any questions, please advise.

Regards
Margaret

SIGN 01052

5/28/2008

## Signature
### SIGNATURE BANK

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                    8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

MONOGRAM CHECKING          1500812660

Summary

| | |
|---|---:|
| Previous Balance as of September 01, 2007 | .00 |
| 2 Credits | 41,659.43 |
| 4 Debits | 40,181.73 |
| Ending Balance as of    September 30, 2007 | 1,477.70 |

Deposits and Other Credits
| | | |
|---|---|---:|
| Sep 14 | INCOMING WIRE TRANSFER | 40,181.73 |
| | REF#  20070914B6B7261F00021809141319FT01 | |
| | FROM: MARKET ADMINISTRATOR UNDER     ABA:   026009593 | |
| | BANK: | |
| Sep 18 | DEPOSIT | 1,477.70 |

Withdrawals and Other Debits
| | | | |
|---|---|---|---:|
| Sep 18 | WITHDRAWAL | INT PYMT | 3,083.34 |
| Sep 18 | WITHDRAWAL | INT PYMT | 4,052.87 |
| Sep 18 | WITHDRAWAL | INT PYMT | 8,750.00 |
| Sep 18 | WITHDRAWAL | PRIN&INTPYMT | 24,295.52 |

Daily Balances
| | | | |
|---|---:|---|---:|
| Aug 31 | .00 | Sep 18 | 1,477.70 |
| Sep 14 | 40,181.73 | | |

Rates for this statement period – Overdraft
Sep 19, 2007   13.750000 %
Sep 01, 2007   14.250000 %

SIGN 01053

# EXHIBIT W

**From:** Sherlock, Janet
**Sent:** Wednesday, November 14, 2007 11:56 AM
**To:** Bloch, Robert
**Cc:** Hegi, Maria
**Subject:** RE: Ahava etal interest

Interest thru 10/31,

- $5,500,000 RC:     $41,345.47     per diem     $1,295.62
- $1,200,000 TL     $9,142.13     per diem     $286.48
- $750,000 note:     $5,651.04     per diem     $177.08
- $1,750,000 note:     $16,199.65     per diem     $510.42

Thanks
Janet

Janet Sherlock
Signature Bank
Loan Administration
29 West 38th Street
12th Floor
New York, NY 10018
(P) 646-822-1733
(F) 646-758-8190

**From:** Bloch, Robert
**Sent:** Wednesday, November 14, 2007 11:03 AM
**To:** Sherlock, Janet
**Cc:** Hegi, Maria
**Subject:** Ahava etal interest

Janet:

Please provide me with the amounts and dates of interest payments which will be due on all of the Ahava loans.  Please breakdown as follows:

- $5,500,000 RC:
- $1,200,000 TL
- $750,000 note:
- $1,750,000 note:

Thanks

Rob

**Robert A. Bloch, SVP & Group Director**
Signature Bank
565 Fifth Avenue, 12th Fl.

SIGN 01047

5/28/2008

New York, NY 10017

(t)  646 822 1827
(f)  646 822 1833
(c) 914 329 3914

SIGN 01048

5/28/2008

Page: 1 Document Name: Tillotson

```
Command ===> IMI1                                    Page 01 of 02   11/15/07
                              ACCOUNT INFORMATION                     10:26:08
            Account 00001500812660  Ctl2 000 Ctl3 000 Ctl4 0000 Ctl1 75   Curr
Prod Type 010  MONOGRAM BUSINESS CHECKING              MSGS: STP.ACT.
Status 00-NORMAL                             System Type 010-COMMERCIAL
AHAVA FOOD CORP.                             EXT INV FUND       LINK    0
OPERATING ACCT.                              Available Bal          33808.10
110 BEARD ST.                                Current Bal            33808.10
BROOKLYN NY                     11231        DDA Balance            33808.10
                                             Loan Balance               0.00
                                             Sav Trlr Bal               0.00
Float        SHORT   Client      0161000037  Total Holds                0.00
                     Dt Opened       11/03/06 Bank Unavail              0.00
Charge Card?   NO   Dt Lst Cust Actv 10/12/07 Cust Unavail              0.00
Spec Inst?     YES  Dt Lst Dep      10/12/07 Min DDA Bal                0.00
NSF? NO  OD?   NO   Dt Lst Maint    10/12/07 Avg Coll Bal          33808.10
Bal Hist?      YES  Sign  0 CUS TYP ACPAHV   MTD Avg Bal           33808.10
Bal Hist Ret   60   TIN: Cd 1  Nbr 134084797 Last Dep Amt          22190.20
Con Kite Days   0   Number Amt Xfers       0 Chrg Off Amt              0.00
MTD Kite Days   0   Number Ck Items        0 EXTERNAL INV              0.00
Stop Pay        3   OD Limit 9999999999999.99 Cyc Accrd           0.000000
                                             Proj Accrd                 0.00

   PF1-Fwd  PF4-Hist  PF5-Redisp  PF14-S/H Inq  PF12-Help  PF18-IBT Inq
TSIMMSE1 IM0051 I: FILE MAINTENANCE HAS OCCURRED TODAY                LAST
```

Date: 11/15/2007 Time: 11:29:37 AM                          SIGN 01049

## Signature Bank

WE DEBIT YOUR ACCOUNT FOR THE REASON INDICATED BELOW     DATE _11/15/07_

| | DEPARTMENT NUMBER |
|---|---|
| | 161 |
| | AMOUNT |

Credit GL 276000006

Funds Hold

.11/15/07   14:3?     ?L 0160
3696  1500B12660        $33,808.10
111 - 565 Fifth     T9TI1150

| AMOUNT | |
|---|---|
| 33,808 | 10 |

| TOTAL | 33,808 | 10 |

**D E B I T**

MAIL TO:

_Ahava Food Corp._

ACCT. NO. _1500812660_

AUTHORIZED SIGNATURE

100028-0401

White - Customer copy     Yellow - Financial Center copy

SIGN 01050

*Signature*

SIGNATURE BANK

From November  01, 2007
To     November  30, 2007
Page   2 of  2

PRIVATE CLIENT GROUP 161
565 FIFTH AVENUE
NEW YORK, NY 10017

AHAVA FOOD CORP.                          8-161
OPERATING ACCT.
110 BEARD ST.
BROOKLYN NY  11231

For info call our toll-free Signature Line
1-866-sigline or visit signatureny.com

Primary Account: 1500812660          0

MONOGRAM CHECKING           1500812660

Summary

Previous Balance as of November  01, 2007                    33,808.10
        1 Debits                                             33,808.10
Ending Balance as of    November  30, 2007                        .00

Withdrawals and Other Debits
Nov 15  PRE-AUTHORIZED WD                            33,808.10

Daily Balances
Oct 31       33,808.10              Nov 15        .00

Rates for this statement period - Overdraft
Nov 01, 2007   13.500000 %

SIGN 01051